## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY

|  |  |
|---|---|
| SCOTT A. HARDIN,<br><br>               Plaintiff,<br><br>    v.<br><br>BUREAU OF ALCOHOL, TOBACCO,<br>FIREARMS AND EXPLOSIVES, *et al.*,<br><br>               Defendants. | Case No. 3:19-cv-56-DJH |

## <u>MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD</u>

**INTRODUCTION**

After a deadly mass murder in Las Vegas in which 58 concertgoers were killed and hundreds more wounded in a series of rapid bursts of gunfire, investigators recovered nearly two dozen rifles from the shooter's hotel room, over half of which were equipped with an item called a "bump stock." Ex. 1, Administrative Record ("AR"), AR000325-AR000328.[1]  A bump stock replaces the stock on an ordinary semi-automatic firearm, and is designed to allow a shooter to attain a rate of fire similar to that of an automatic weapon, like a machine gun.  Between 2003 and 2017, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), a component of the Department of Justice (collectively, "the Department" or "DOJ") issued a series of classification letters in which it erroneously concluded that some models of bump stocks constituted lawful firearms parts, unregulated at the federal level. This absence of regulation enabled the Las Vegas gunman to obtain his bump stocks, leading the Department to revisit its classification decisions in the wake of the mass murder.  This review concluded with the December 26, 2018, issuance of a final rule, *Bump-Stock-Type Devices*, correcting the erroneous prior classifications and amending DOJ's regulations to make clear on the face of those regulations that bump stocks are machine guns, prohibited by federal law.  *See* 83 Fed. Reg. ("FR") 66514 (Dec. 26, 2018) ("Rule").   Bump stock owners were required to destroy or otherwise dispose of their bump stocks by March 26, 2019.

**STATUTORY AND REGULATORY BACKGROUND**

**A.  Statutory Framework for Regulation of Firearms**

Machine guns are strictly regulated through an interconnected array of federal laws dating back to the 1930s: the National Firearms Act of 1934 ("NFA"), Pub. L. 73-474, 26 U.S.C. ch. 53; the Gun Control Act of 1968 ("GCA"), Pub. L. 90-351, 18 U.S.C. ch. 44; and the Firearm Owners Protection Act, ("FOPA"), Pub. L. 99-308.  Together, these statutes generally prohibit the possession by members of the public of newly-manufactured machine guns and closely regulate the possession of machine guns manufactured prior to the effective date of the FOPA.  *See* 18 U.S.C. § 922(o).

---

[1] The AR has been filed in DVD form with the Court.  *See* ECF No. 25.  For the Court's convenience, cited pages of the AR have been excerpted and attached as Ex. 1 to this motion. Copies of comments indexed in the AR and cited in this brief have been attached as Ex. 2.

These statutes share a common statutory and regulatory definition of machine guns, and the Rule revised the regulatory definition to clarify that bump stocks are properly classified as machine guns.[2]

The definition of machine gun used by all of these statutes is set forth in the NFA as follows:

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b). At the time of its enactment, the NFA was "popularly known as an 'anti-machine gun' law." Franklin Zimring, *Firearms and Federal Law: The Gun Control Act of 1968*, 4 J. Legal Studies 133, 138 n.29 (1975). The NFA regulated machine guns (and other "firearms")[3] as an exercise of Congress's taxing authority, and the NFA continues to be codified in the Internal Revenue Code and imposes taxes on the lawful manufacturers of firearms. *See* 26 U.S.C. § 5822.

In 1968, Congress passed the GCA, intended to "regulate more effectively interstate commerce in firearms" to reduce crime and misuse, "assist the States and their political subdivisions to enforce their firearms control laws," and "help combat . . . the incidence of serious crime." *See* 18 U.S.C. § 921 *et seq*.; S. Rep. No. 89-1866, at 1 (1966). The GCA supplanted some prior firearms regulations, but exists alongside the NFA. *See* Pub. L. No. 785, 52 Stat. 1250 (1938) (repealed 1968). The GCA generally established the current framework under which gun dealers and

---

[2] The Final Rule amends the regulations of ATF, which is charged with the administration and enforcement of the GCA and the NFA. The Final Rule was promulgated by the Attorney General and DOJ, who are responsible for overseeing ATF. *See* 28 C.F.R. § 0.130(a)(1). NFA provisions still refer to the "Secretary of the Treasury." *See* 26 U.S.C. Ch. 53. However, the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (2002), transferred the functions of ATF from the Department of the Treasury to the Department of Justice, under the general authority of the Attorney General. 26 U.S.C. § 7801(a)(2); 28 U.S.C. § 599A(c)(1).

[3] Although the NFA applies to "firearms," the term "firearms" is defined in the statute as a narrow set of dangerous weapons, not the full class of weapons labeled as "firearms" in ordinary parlance. *See* 26 U.S.C. § 5845. "Firearms" includes machine guns, short-barreled shotguns, short-barreled rifles, and several items that would not ordinarily be considered "firearms," such as silencers, rockets, and grenades. Thus, as a general matter, standard-length shotguns and rifles (including all semi-automatic rifles) and non-automatic handguns, are not "firearms" within the NFA's definition.

purchases are regulated, and limited the sale of machine guns to those who could obtain a supportive, sworn statement from local law enforcement.  *See* GCA, 82 Stat. 197, 230.

In 1986, Congress again turned its attention to firearms, directly addressing the hazards of machine guns.  *See* H.R. Rep. No. 99-495, at 2, 7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327, 1328, 1333 (describing proposed machine gun limits as "benefit[ing] law enforcement" and citing "the need for more effective protection of law enforcement officers from the proliferation of machine guns").  Congress therefore enacted the FOPA "to strengthen the [GCA] to enhance the ability of law enforcement to fight violent crime."  H. R. Rep. No. 99-495, at 1, 1986 U.S.C.C.A.N. at 1327. Among its provisions, FOPA added 18 U.S.C. § 922(o) to the GCA.  Section 922(o)(1) makes it "unlawful for any person to transfer or possess a machinegun," subject to the following exceptions:

> (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State . . .; or

> (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

18 U.S.C. § 922(o)(2).

## B. Past Regulation of Bump Stocks

After the FOPA barred the manufacture and sale to the public of new machine guns, the price of machine guns lawfully possessed pursuant to subsection (B) "steadily increased over time" due to continuing interest by firearms owners in the automatic-fire capability of such weapons.  83 FR 66515-16.  This rising price spurred innovation as manufacturers sought to devise ways to simulate automatic weapons fire while remaining compliant with 18 U.S.C. § 922(o).  *See, e.g.*, Ex. 2 at 0061. In 2002 and 2004, one weapons developer asked ATF whether the Akins Accelerator, an early model of a bump stock that "use[d] an internal spring and the force of recoil to reposition and refire the rifle," would be classified as a machine gun under the NFA.[4]  *Akins v. U.S.*, 312 F. App'x 197, 198

---

[4] ATF permits manufacturers and owners to seek ATF's view regarding the correct classification of a firearm, accessory, or other item, and in response, the agency may provide a classification letter indicating its current position on a particular device. *See* ATF, NFA Handbook § 7.2.4 (2009), *available at*: https://go.usa.gov/xpwp5; *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 599 (1st Cir. 2016).

(11th Cir. 2009).  ATF tested a prototype of the device and, after initially concluding it did not constitute a machine gun, reversed its view and classified the weapon as a machine gun.  *Id.* at 198-99.  ATF then ordered the manufacturer "to register the devices he possessed or to surrender them," *id.*, and issued a policy statement to explain that devices attached to semiautomatic firearms that use an internal spring to harness the force of the recoil so that the firearm shoots more than one shot with a single pull of the trigger are machineguns.   ATF Rul. 2006-2, at 2, available at: https://go.usa.gov/xEDCC (last visited Dec. 16, 2019); *see also* 83 FR 66516.  ATF also determined that the phrase "single function of the trigger" should be interpreted as a "single pull of the trigger" by the shooter, not a single trigger motion.  ATF Rul. 2006-2 at 1.  The inventor brought suit to challenge the reclassification of the device, as well as a takings claim seeking compensation, and courts rejected both claims.  *See Akins*, 312 F. App'x at 198; *Akins v. U.S.*, 82 Fed. Cl. 619 (2008).

The Department soon received classification requests for other bump stocks that, unlike the Akins Accelerator, did not include internal springs.  In a series of classification decisions between 2008 and 2017, the Department concluded that some such devices were not machine guns.  *See* AR at AR000103-AR000278; *see also* Compl. at ¶¶ 41-42, ECF No. 3 (describing these as "written determination letter[s]").  Under the analysis used, although the bump stocks acted with a "single pull of the trigger," the bump stocks did not fire "automatically" because they lacked internal springs or other mechanical parts that channeled recoil energy.  83 FR 66517.  The conclusion that some bump stocks were not machine guns placed those devices outside the scope of federal firearms regulations altogether, *see id.*, and these weapons became popular for recreation among those seeking inexpensive substitutes for machine guns grandfathered by the FOPA.  *See, e.g.*, Ex. 2 at 001-002, 003, 007, 023.

**C.  Development and Issuance of the Rule**

The Las Vegas attack, and the public attention given to bump stocks in the wake of that crime, led the Department to revisit its prior analysis of whether bump stocks properly should be classified as machine guns, as well the terms used to define machinegun in 26 U.S.C. § 5845(b). *See* 83 FR 66516-17.  As an initial step, ATF published an advance notice of proposed rulemaking

("ANPRM") in the Federal Register.  *See* AR000773 (*Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices*, 82 FR 60929 (Dec. 26, 2017)).  The ANPRM solicited comments concerning the market for bump stocks.  *See id.*  Specifically, the ANPRM asked a set of questions of manufacturers, consumers, and retailers regarding the cost of bump stocks, the number of sales, the cost of manufacturing, and input on the potential effect of a rulemaking prohibiting bump stocks.  *See* 83 FR 60930-31.  Public comment on the ANPRM concluded on January 25, 2018, yielding 115,916 comments.  *Id.* at 60929; *see* AR00198.

On February 20, 2018, the President issued a memorandum to then-Attorney General Jefferson B. Sessions III concerning bump stocks.  *See* AR000790 (*Definition of Machinegun*, 83 FR 7949).  The memorandum instructed DOJ, working within established legal protocols, "to dedicate all available resources to complete the review of the comments received [in response to the ANPRM], and, as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns."  *Id.*  Carrying out that directive, DOJ published an NPRM, setting forth changes to the regulations in 27 C.F.R. §§ 447.11, 478.11, and 479.11 that would interpret the meaning of the terms "single function of the trigger" and "automatically."  *See* AR001238 (*Bump-Stock-Type Devices*, 83 FR 13442 (Mar. 29, 2018)).  DOJ received "over 186,000 comments" on the NPRM, 83 FR 66519; *see* AR002121, reviewed those comments, and drafted the Rule, addressing the comments raised.  *See generally* 83 FR 66519-43.

DOJ published the Rule in the Federal Register on December 26, 2018.  *See* 83 FR 66514.  The Rule sets forth DOJ's interpretations of the terms "automatically" and "single function of the trigger."  First, consistent with ATF's position since 2006, the Rule explains that the Department is interpreting the phrase "single function of the trigger" to mean a "single pull of the trigger" as well as "analogous motions."  *Id.* at 66515.  As to "automatically," the Rule states that, in the context of the statutory definition of machine gun, the term means "as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger."  *Id.* at 66554.  The Rule explains that these definitions are being adopted because they "represent the best interpretation of the statute."  *Id.* at 66521.

Relying on these definitions, the Rule clarifies for members of the public that "[t]he term 'machine gun' includes a [bump stock]." *Id.* at 66554.  As the Rule describes, by pulling the trigger once, resting the trigger finger on the device's "extension ledge," and maintaining pressure on the barrel-shroud or fore-grip of the rifle with the other hand, a shooter is able to harness the firearm's recoil energy in a continuous back-and-forth cycle that continues until the shooter releases his pull, the weapon malfunctions, or the ammunition is exhausted.  *Id.* at 66532.  This "self-regulating" or "self-acting" mechanism that allows continuous firing after a single pull of the trigger thus functions "automatically" after a "single function of the trigger." *Id.*  Because bump stocks convert otherwise semiautomatic firearms into machine guns, the devices are prohibited under 18 U.S.C. § 922(o).[5]

### D. Litigation Over the Rule

The Rule has been challenged in several United States district courts apart from this action. Plaintiffs in three of those courts sought injunctions to prevent the Rule from taking effect, all of which were denied.  *See Aposhian v. Barr*, 374 F. Supp. 3d 1145 (D. Utah 2019), appeal docketed, No. 19-4036 (10th Cir. Mar. 18, 2019); *Gun Owners of Am.* ("*GOA*") *v. Barr*, 363 F. Supp. 3d 823 (W.D. Mich. 2019), appeal docketed, No. 19-1298 (6th Cir. Mar. 22, 2019); *Guedes v. ATF*, 356 F. Supp. 3d 109 (D.D.C. 2019) ("*Guedes I*"), aff'd 920 F.3d 1 (D.C. Cir. 2019) (*Guedes II*"), petition for cert. filed, — U.S.L.W. — (U.S. Sept. 4, 2019) (No. 19-296).  Neither these cases, nor any other challenge to the validity of the Rule, has been litigated to judgment in district court.  The only one of these to yield a decision of a United States Court of Appeals, *Guedes*, upheld the likely lawfulness of the Rule.  *See* 920 F.3d 1.  There, in a 2-1 opinion, the D.C. Circuit upheld the Department's "reading of the statute," *id.* at 31, rejected a potpourri of claims alleging "that, for various reasons, the Rule is arbitrary," *id.* at 32-33, and concluded overall that plaintiffs had "failed to establish a

---

[5] "The term 'semiautomatic rifle' means any repeating rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge."  18 U.S.C. § 921(a) (28).  The term "semi-automatic firearm" is not specifically defined in federal law, but generally refers to any weapon that after a round of ammunition is fired, chambers the next round of ammunition and can then be fired with a separate pull of the trigger.  *See, e.g.*, Ohio Rev. Code Ann. § 2923.11 (West 2017) ("'Semi-automatic firearm' means any firearm designed or specially adapted to fire a single cartridge and . . . chamber a succeeding cartridge ready to fire, with a single function of the trigger").

likelihood of success" on all their claims.  *Id.* at 35.[6]

## STANDARD OF REVIEW

On a motion for judgment on the administrative record, "the charge of the district court is 'to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'"  *Vaught v. FDIC*, 2018 WL 5098531 at *6 (E.D. Tenn. Apr. 4, 2018) (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)).  Thus, "the summary judgment standard set forth in [Fed. R. Civ. P.] 56 'does not apply because of the limited role of the court in reviewing the administrative record.'"  *Id.* (quoting *N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 79 (D.D.C. 2007)).  Summary judgment on the administrative record thereby "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Id.* (quoting *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007)).

"The court's function in reviewing final agency action following informal rulemaking" is further "prescribed by the APA."  *Simms v. NHTSA*, 45 F.3d 999, 1003 (6th Cir. 1995).  A court may set aside or hold unlawful only "agency action that is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  *Id.*, (citing 5 U.S.C. § 706(2)(A)).  "[T]his section . . . requir[es] the party challenging the agency's action to show that the action had no rational basis or that it involved a clear and prejudicial violation of applicable statutes or regulations."  *McDonald Welding v. Webb*, 829 F.2d 593, 595 (6th Cir. 1987); *see Bell Atl. Telephone v. FCC*, 79 F.3d 1195, 1202 (D.C. Cir. 1996) ("Judicial explications of this standard basically boil down to one simple proposition—agency action is arbitrary and capricious if the agency has, in the eyes of the court, committed a 'clear error of judgment.'").  "In addition to arbitrary and capricious review, the APA authorizes courts to review agency actions for conformity with law."  *Bangura v. Hansen*, 434 F.3d 487, 502 (6th Cir. 2006) (citing 5 U.S.C. § 706(2)(A)).

---

[6] A dissent concluded that the Final Rule erred as to its interpretation of one of the statutory terms and in its application of the Department's interpretation of the term "automatically" to bump stocks. *Guedes II*, 920 F.3d at 42 (Henderson, J., dissenting).

This "standard should not be a rubber stamp," *Reed v. Reno*, 146 F.3d 392, 397 (6th Cir. 1998), but an "agency's decision is presumptively valid" when subject to challenge under Section 706 of the APA. *Texas Tech Physicans Assoc. v. HHS*, 917 F.3d 837, 844 (5th Cir. 2019).

## ARGUMENT

### I.      The Rule Correctly Classifies Bump Stocks As Machine Guns And Is Not Arbitrary Or Capricious.

#### A.      The Rule Gives the Terms "Single Function of the Trigger" and "Automatically" Their Ordinary, Accepted Meaning.

The Rule interprets the phrase "single function of the trigger" to mean "a single pull of the trigger," along with "analogous motions," an interpretation that "reflect[s] ATF's position since 2006."  83 FR 66518.  As both the Rule and the district court in *Aposhian* recognized, the "shooter-focused interpretation" of the term "single function of the trigger" as "single pull of the trigger" is "the best interpretation" of the phrase. *Id.*; *Aposhian*, 374 F. Supp. 3d 1151.

When possible, courts "interpret [statutory] words consistent with their ordinary meaning at the time Congress enacted the statute." *Wisconsin Cent. Ltd. v. United States*, --- U.S. --- 138 S. Ct. 2067, 2070 (2018).  Interpreting the term "single function of the trigger" as a "single pull of the trigger" reflects the long-time, common-sense understanding of how most weapons are fired: by the shooter's pull on a curved trigger.  Courts have frequently applied this straightforward understanding of the term, "instinctively reach[ing] for the word 'pull' when discussing the statutory definition of 'machinegun.'" *Guedes I*, 356 F. Supp. 3d 130.  Recognizing the ubiquity of this usage, the Supreme Court has described a machine gun within the NFA's definition as "a weapon that fires repeatedly with a single pull of the trigger." *Staples v. U.S.*, 511 U.S. 600, 602 n.1 (1994).  Common usage also illustrates that "[p]ull the trigger" is, and has been, the ordinary, accepted terminology for how to discharge the typical firearm in common use. *See, e.g.*, Webster's New World Dictionary 1177 (3d ed. 1988) (defining "Russian roulette" as involving "aim[ing] a gun . . . and pull[ing] the trigger"); Dwight D. Eisenhower, *Address to the American Society of Newspaper Editors* (Apr. 17, 1958), in Public Papers of the Presidents of the United States (1958) ("It is far more important to be able to hit

the target than it is to haggle over who makes a weapon or who pulls a trigger"). And this phrase has made it into common parlance as an idiom meaning "to make a final decision." *See* Idioms, The Free Dictionary, "pull the trigger," *available at:* https://idioms.thefreedictionary.com/pull+the+trigger (last visited Dec. 16, 2019).

The Rule's interpretation of "single function of the trigger" reflects longstanding interpretations by ATF, dating to the 2006 ruling that corrected the original misclassification of the Akins Accelerator. *See* ATF Rul. 2006-2. There, ATF concluded that a device "activated by a single pull of the trigger, initiat[ing] an automatic firing cycle which continues until either the finger is released or the ammunition supply is exhausted," should be classified as a machine gun. The ruling noted, as the Rule does, that this "determination is consistent with the legislative history of the NFA." *Id.* In particular, Congress received testimony in 1934 that a gun "which is capable of firing more than one shot by a single pull of the trigger, a single function of the trigger, is properly regarded . . . as a machine gun," whereas "[o]ther guns [that] require a separate pull of the trigger for every shot fired . . . are not properly designated as machine guns." AR004230 (reproducing *Nat'l Firearms Act: Hrg's Before the Comm. on Ways and Means*, House of Rep's, Second Session H.R. 9066, 73rd Cong., at 40 (1934)). And in explaining the definition of "machinegun" in the bill that ultimately became the National Firearms Act, see H.R. 9741, 73d Cong. (1934), the House Committee on Ways and Means report stated that bill "contains the usual definition of machine gun as a weapon designed to shoot more than one shot without reloading and by a single pull of the trigger." H.R. Rep. No. 73-1780, at 2 (1934); *see* S. Rep. No. 73-1444 (1934) (reprinting House's "detailed explanation" of the provisions).

The Rule explains that the "single function of the trigger" is the action that initiates a firing sequence that continues automatically, and is therefore consistent with numerous cases recognizing that the definition of this term is not limited either to a specific method of making that trigger function or to a specific kind of "trigger" mechanism. As the Ninth Circuit explained in *United States v. Evans*, 978 F.2d 1112, 1113 n.2 (9th Cir. 1992), "'by a single function of the trigger' describes the action that enables the weapon to 'shoot ... automatically ... without manual

reloading,' not the 'trigger' mechanism" itself.  This is necessary to ensure that the statutory definition applies to weapons that have "no mechanical trigger" at all.  *United States v. Carter*, 465 F.3d 658 (6th Cir. 2006) (per curiam).  In *Carter*, the Sixth Circuit applied the statutory definition to a modified weapon that, although lacking a traditional "trigger," fired automatically when a shooter put a magazine in the weapon, "held it at the magazine port, pulled the bolt back and released it."  *Id.*  Other courts have similarly recognized that a trigger is whatever mechanism serves "to initiate the firing sequence" of a weapon, thereby ensuring that creative or innovative designs cannot be used to circumvent the definition of machinegun.  *United States v. Jokel*, 969 F.2d 132, 135 (5th Cir. 1992) (per curiam); *accord United States v. Fleischli*, 305 F.3d 643, 655-56 (7th Cir. 2002) (holding that a minigun fired by "an electronic switch" was a machinegun).  And the Rule reflects this longstanding interpretive approach by stating that a "single function of the trigger" encompasses "a single pull of the trigger and analogous motions" like pressing a button, flipping a switch, or otherwise initiating the firing sequence without pulling a traditional trigger. 83 FR 66553.  *See also* id. 66515 ("there are other methods of initiating an automatic firing sequence that do not require a pull,"); *id*. at 66518 n.5 (observing that many machineguns "operate through a trigger activated by a push").

The Rule's interpretation of "automatically" as meaning "the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger" is likewise "the best interpretation of the statute."  *Aposhian*, 374 F. Supp. 3d 1153.  "This interpretive language is borrowed, nearly word-for-word, from dictionary definitions contemporaneous to the NFA's enactment." *Id.* (citing 83 FR 66519).  For example, "'automatically' is the adverbial form of 'automatic,' meaning '[h]aving a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation[.]'" *Id.* (quoting Webster's New International Dictionary 187 (2d ed. 1934)); *see also id.* (quoting definition of "Automatic" as "[s]elf-acting under conditions fixed for it, going of itself" from 1 Oxford English Dictionary 574 (1933)).  As the Seventh Circuit explained in applying this definition in *U.S. v. Olofson*, 563 F.3d 652, 658 (7th Cir. 2009), the statutory definition works by "delineat[ing] how the discharge of

multiple rounds from a weapon occurs: as the result of a self-acting mechanism . . . set in motion by a single function of the trigger and . . . accomplished without manual reloading." *Id.*

### B.     The Rule Correctly Applies Its Interpretations of "Single Function of the Trigger" and "Automatically" To Classify Bump Stocks As Machine Guns.

As set forth in the Rule, applying the correct definitions of these statutory terms to bump stocks demonstrates that they are machineguns under federal law.  A bump stock produces automatic fire by "a single function of the trigger" because, as the Rule explains, "[w]hen a shooter who has affixed a bump-stock-type device to a semiautomatic firearm pulls the trigger," that single pull helps to initiate "a continuous back-and-forth cycle that allows the shooter to attain continuous firing after a single pull of the trigger."  83 FR 66519.  To be sure, this cycle requires several "conditions to be fixed" to ensure that "a firing sequence that produces more than one shot" occurs, but that is fully consistent with the definitions of "single function of the trigger" and "automatically."  *Id.*  One required condition is that "the trigger finger remains stationary on the device's ledge" as the trigger is pulled.  *Id.*  Another required condition is that "constant forward pressure" is maintained "with the non-trigger hand" on the appropriate part of the rifle.  83 FR 66518, 66532.  When those conditions are satisfied, a shooter's initial, conscious finger pull is the "movement [that] initiates a firing sequence that produces more than one shot."  83 FR 66519.

This ensuing firing cycle occurs "automatically."  The bump stock "performs a required act at a predetermined point" in the firing sequence by assisting the shooter in "directing the recoil energy of the discharged rounds into the space created by the sliding stock."  83 FR 66532.  The bump stock thereby ensures that the rifle moves in a "constrained linear rearward and forward path[]," enabling continuous fire by "eliminat[ing] the need for the shooter to manually capture, harness, or otherwise utilize th[e] recoil energy to fire additional rounds."  *Id*.  Because a bump stock assists a shooter in attaining automatic firing based on a single pull of the trigger, it is properly classified as a machine gun.

Plaintiff asserts that the Rule's analysis of bump stocks is incorrect, asserting that a bump-stock "shooter must still separately pull the trigger to fire each successive shot."  Mot. at ¶ 64; *see*

Compl. at Ex. A.  That is simply incorrect: the shooter maintains his single pull throughout the automatic firing sequence while resting his finger on the extension ledge of the device; if the shooter releases his finger from that pull, the weapon will no longer fire.  83 FR at 66516, 66532.  Plaintiff's effort to support his analysis with a declaration by former ATF official Rick Vasquez is also unavailing.[7]  In opining that a "bump-stock never fires . . . more than one round[] per function of the trigger" because the trigger must separate from the shooter's finger in order to allow the firing mechanism to reset, Compl. at Ex. A ¶ 9, Mr. Vasquez erroneously conflates the mechanical operation of the trigger with the legal definition of the term "single function of the trigger" adopted by the Rule.  Because a "single function of the trigger" is the action that initiates a firing sequence that continues automatically, *see supra* Part I.A, the fact that the trigger itself may "release and reset" between rounds, Compl. at ¶ 66 & Ex. A ¶ 9, is irrelevant to whether there is a "single pull" of the trigger.  *See Guedes I*, 356 F. Supp. 3d at 132.

Indeed, many weapons and devices that are indisputably machineguns require that the weapon's trigger be released and reset.  For example, in 2017, ATF evaluated and classified as a machine gun the "AutoGlove," designed to be a glove worn by a shooter, in which pushing a button inside the glove led to an electromechanical "finger" pulling repeatedly the trigger of an ordinary firearm.  *See* AR000660 *et seq.*  A device that uses a motor to pull and release the trigger on a firearm likewise qualifies as a machinegun, even though the firing mechanism must reset between shots.  *See United States v. Camp*, 343 F.3d 743, 744-45 (5th Cir. 2003) (holding that a rifle modified with a "switch" that activated a "motor connected to the bottom of a fishing reel" that rotated within the trigger guard causing "the original trigger to function in rapid succession" qualified as a

---

[7] Plaintiff suggests that Mr. Vasquez's opinion is entitled to added weight because he reached that conclusion as the former Acting Chief of ATF's Firearms Technology Branch, an "[e]xpert[] opining on behalf of ATF."  Compl. at ¶ 63.  Mr. Vasquez's expertise has no application to the Department's legal interpretation of the statutory terms, however.  Further, such "opinion testimony . . . [of] former agency officials . . . is of limited value . . . [because] the personal opinion of such officials as to what the regulations were intended to mean . . . does not bind the agency."  *Via Christi Regional Med. Ctr. v. Leavitt*, 2006 WL 2773006 at *13, n.3 (D. Kan. Sept. 25, 2006); *see Christmann & Welborn v. Dep't of Energy*, 589 F. Supp. 576, 581 (N.D. Tex. 1984) (disregarding "former government officials' personal opinions as to intent of an agency").

machinegun).

The interpretation urged by plaintiff and Mr. Vasquez is the definition that ATF rejected when it reclassified the Akins Accelerator in 2006. That device, too, required the release and reset of the trigger for each shot fired, as well as separation between the shooter's finger and the trigger, *see* 83 FR 66517. Contemporaneous with its reclassification, ATF interpreted the term "single function of the trigger" as a "single pull of the trigger." *See id.*; ATF Ruling 2006-2. Thus, as ATF noted throughout the period between its classification of the Akins Accelerator as a machine gun and the issuance of the Rule, the principal difference between the Akins Accelerator and other bump stocks is the presence of an internal spring that propelled the Akins device forward to "bump" the shooter's stationary finger. *See* 83 FR 66517. And ATF's recognition of the term "single function of the trigger" as addressing a shooter's initial act of pulling the trigger in the context of the Akins Accelerator was affirmed by the Eleventh Circuit. *See Akins*, 312 F. App'x at 200.

The administrative record provides additional evidence on which the Department relied in concluding bump stocks should be classified as machine guns. For example, the record highlights the statements of a major bump stock manufacturer, Bump Fire Systems, that its device "uses a gun's recoil to shoot multiple rounds." AR000837; AR000840. The record also identifies a mechanical explanation described by ATF as a "great animation for understanding bump stocks," which illustrates the manner in which the trigger finger remains fixed and the other hand provides constant pressure, permitting the "harnessing [of] energy" from the recoil into an automatic process. AR000716, *see* https://www.nytimes.com/interactive/2017/10/04/us/bump-stock-las-vegas-gun.html (last visited Dec. 14, 2019). In addition, the patent application for the Slide Fire bump stock, one of the Las Vegas shooter's weapons, explains that the core of the innovation in a bump stock is that "[t]he shoulder stock and pistol grip and finger rest are fixed together as a monolithic handle unit that, in use, is held tight to the user's body," AR 000382, and thus, this unit (including the user's trigger finger) "remain[s] relatively stationary as they are pulled" in the bump-firing mode. AR 000385. And the Department considered comments received from the public which further confirm the Department's conclusion that bump stock type devices are instruments that provide a

13

self-regulating mechanism that assists in bump-firing, and are therefore machine guns.  *See, e.g.*, Ex. 2 at 006-008; 015-018.

## C.   The Ability Of Shooters To Engage In Bump-Firing Without A Bump Stock Does Not Render The Rule Arbitrary And Capricious.

Plaintiff places heavy reliance in his arbitrary and capricious claim on the fact that the "technique" of "bump-firing" can be undertaken without a bump-stock (either unassisted or with the aid of common household items such as rubber band), *see* Compl. at ¶¶ 67-68, but this fact is irrelevant.  As to unassisted bump firing, the contention that its existence undercuts the Rule is easily dispensed with: the definition of "machinegun" in 26 U.S.C. § 5845 applies to specific weapons and equipment, not to a "technique."  On its face, Congress has defined a "machinegun" to be a physical object or collection of objects, *i.e.*, a "weapon," or the "frame," "receiver" or certain other "parts" associated with the weapon, not any method of producing a particular rate of fire.  *See* 26 U.S.C. § 5845.  Plaintiff's arguments thus cast no doubt on the correctness of the Rule's interpretation of the statutory terms.

The rulemaking record reflects that the Department considered Plaintiff's point about unassisted bump firing as part of the development of the Rule.  *See, e.g.*, AR000768 (ATF testimony to Congress discussing that "some shooters are able to accomplish the technique without using any device or accessory"); AR000703 (linking to a video of bump fire without a bump stock at https://www.youtube.com/watch?v=8Zo5ju4EVLc.).  ATF has long recognized that, absent a device such as a bump stock, the "term 'bump-fire' is a vernacular used in the firearms culture . . . meaning rapid manual trigger manipulation to simulate automatic fire."  ATF, Letter of Oct. 13, 2006 (AR 000073) (emphasis in original); ATF, Letter of Mar. 9, 2011 (AR000134) (same).  Bump stocks are designed for a particular function: to make bump-firing much easier.  *See* AR000383 (bump stocks are designed to "enable[] a firearms user to practice [bump-firing] in the *most effective manner possible*") (emphasis added); *accord* Ex. 2 at 006-008; 014-022; 131-133; AR001054 (inventor quoted as having invented bump stock "to make bump firing safer and more controlled").  This fact is hardly open to dispute: even commenters critical of the classification of bump stocks as machine

guns concede as much. *See, e.g.*, AR001007 (bump stocks do not "compromis[e] the shooter's aim and accuracy in the way that such is compromised when bump-firing . . . without a bump stock"). Having considered these materials, the Department explained that unassisted bump firing "relies on the shooter—not a device—to harness the recoil," thereby failing to satisfy the definition of machinegun. 83 FR 66533. Thus, the Department "clearly thought about [these] objections and provided reasoned replies," which is "all the APA requires." *Guedes I*, 356 F. Supp. 3d at 135.

The Rule also sufficiently explains the distinction between purpose-designed bump stocks and items such as belt loops or rubber bands that may be incidentally employed to assist with bump fire. *See* Compl. at ¶ 68 (alleging that because "ATF admits that [bump-]firing can be produced . . . [with] rubber bands or belt loops," the Rule leads to "absurd results"). The Rule explains the distinction drawn: unlike a belt loop or a rubber band, bump stocks are "designed to be affixed" to a semiautomatic firearm. 83 FR 66515; 83 FR 66533. Moreover, as the Rule also describes, a bump stock does do something more than a belt loop, wooden stick, or a rubber band would do in isolation—a bump stock provides an empty, yet constrained, space, and this space functions as a self-regulating mechanism that helps a shooter channel recoil energy that can then be used in resetting the trigger for the purpose of rapidly firing another round. *See* 83 FR 66531-32; *Guedes II*, 920 F.3d 33 ("Bump stocks, unlike household objects, are machine guns because they alone involve a 'self-acting or self-regulating mechanism.'").

## II.    Plaintiff's Other APA Challenges Are Meritless.

### A.    The Rule Provided An Adequate Comment Period.

Beyond his substantive challenge to the classification of bump stocks as machine guns, Plaintiff presents several other theories alleging that the Rule is invalid under the APA. In the first of these, Plaintiff highlights technical difficulties in submitting comments through the federalregister.gov portal during the first few days after publication of the NPRM and asserts that the Department did not comply with a provision of 18 U.S.C. § 926(b) requiring a 90-day public comment period. *See* Compl. at ¶ 33-39; 18 U.S.C. § 926(b) ("The Attorney General shall give not less than ninety days public notice, and shall afford interested parties opportunity for hearing, before

prescribing . . . rules and regulations" pursuant to the GCA).  This claim fails for two reasons.  First, the Department *did* provide a comment period of ninety days, notwithstanding the technical difficulties.  Although some would-be commenters were sent to the closed ANPRM activity rather than the NPRM, *see* 83 FR at 66542, this error did not shorten the comment period itself.  As the Rule noted in response to comments about the technical problems, *see, e.g.*, Ex. 2 at 040-042, those commenters had other options for submitting electronic comments during the entirety of the 90-day period, and could have also commented by mail or fax.  *See id.*  For example, "a simple search for 'bump stock' in the main search bar on Regulations.gov during this time would have displayed the link for the new NPRM Docket ID, which was active and accepting comments."  *Id.*  That the opportunity to comment existed is clear from the fact that "ATF received numerous comments from the very beginning of the comment period."  83 FR 66542; *see* AR002195-AR002211 (documenting hundreds of comments received on the first two days of the comment period, Mar. 29-30, 2018).  Plainly, even if there were some technical issue that created confusion around the comment process or affected the ability of some commenters to comment, *see* Compl. ¶ 37, the opportunity to comment nevertheless existed throughout the comment period.  *See Nevada v. Dep't of Energy*, 457 F. 3d 78, 90 (D.C. Cir. 2006) ("The many comments submitted . . . manifest that the public had sufficient information to comment").

Second, Plaintiff has not alleged any harm or prejudice from the technical difficulties, and under the "harmless-error rule [in] APA cases . . ., a mistake that . . . causes no prejudice shall not be the basis" for invalidating agency action.  *ECM BioFilms v. FTC*, 851 F.3d 599, 612 (6th Cir. 2017).  And, because Plaintiff alleges that any disruption associated with the website lasted no longer than "five days into the comment period," Compl. ¶ 35, any commenters who were turned away during that time had a full 85 additional days in which to submit comments.  There is thus no reason to believe any prejudice is associated with these technical problems, nor any reason to think that ATF "deprived [anyone] an opportunity to be heard" in a manner materially affecting the outcome of the rulemaking, as evidenced by the over 186,000 comments received.  *See U.S. v. Johnson*, 632 F.3d 912, 932 (5th Cir. 2011) (failing to obtain comments "not prejudicial" where "[t]here is no

16

suggestion that, if given the opportunity . . . [comments] would have presented an argument the [agency] did not consider"); *Guedes I*, 356 F. Supp. 3d at 137 ("[A]ny error . . . because of technical glitches was harmless.").

**B.     Plaintiff's Challenge To The Calculation of Costs Is Not Cognizable.**

Plaintiff also asserts that the NPRM relied on an "erroneous cost estimate" in its estimate of the value of the bump stocks to be destroyed as a result of the Rule.  Compl., preceding ¶ 54.  But neither the relevant statutes nor the APA require a cost-benefit analysis.  As the Rule explains, because Congress has banned machineguns, "bump-stock-type devices must be regulated because they satisfy the statutory definition of 'machinegun.'"  83 FR 66520.  Nothing in this prohibition permits ATF to weigh the costs of a ban on machineguns in evaluating whether a particular device qualifies under the statute.  Nor does the APA impose such a requirement.  *See Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 224 (2009) (upholding agency choice to seek "only to avoid extreme disparities between costs and benefits"); *Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 670-71 (D.C. Cir. 2011) (rejecting argument that "the APA's arbitrary and capricious standard alone requires an agency to engage in cost-benefit analysis").  As the Rule makes clear, the Department presented cost estimates only to comply with Executive Orders 12866, 13563, and 13771.  *See* 83 FR 66543.  Any claim alleging fault in such analysis is precluded because "Executive Orders cannot give rise to a cause of action" under the APA.  *Fla. Bankers Ass'n v. U.S. Dep't of Treas.*, 19 F. Supp. 3d 111, 118 n.1 (D.D.C. 2014), *vacated on other grounds*, 799 F.3d 1065 (D.C. Cir. 2015); *Meyer v. Bush*, 981 F.2d 1288, 1296 n.8 (D.C. Cir. 1993) ("An Executive Order devoted solely to the internal management of the executive branch—and one which does not create any private rights—is not . . . subject to judicial review.").

In any case, the Rule reasonably calculated the economic loss from banning bump stocks. The Department considered the advertised prices of the most popular models of bump stocks (including a model Plaintiff allegedly purchased) over a period of several years, looking both to archived versions of the vendors' web pages and to comments received during the rulemaking process.  *See* 83 Fed. Reg. 13451; 83 Fed. Reg. 66546; AR 000826-AR000843; Ex. 2 at 001-032.

And although Plaintiff disputes the accuracy of calculations provided in the NPRM, the Rule adjusted those calculations, arriving at an estimate within 1.5% of the number that Plaintiff alleges the Department should have used. *Compare* Compl. at ¶¶ 54-56 (alleging that ATF should have calculated that $104,000,000 was spent on bump stocks) *with* 83 FR 66546-47 (calculating amount spent on bump stocks as $102,470,977). Finally, contrary to Plaintiff's assertion, ATF reasonably explained its method of calculating the average selling price, highlighting the changes in bump stock pricing over time, including those that occurred when a new manufacturer entered the market. 83 FR 66547; *see* AR000841-000843; AR001136-001137. Plaintiff therefore cannot establish that the Rule's estimate is in error, let alone that it should be the basis to set aside the Rule.

### C.    The Rule Properly Reflects Input From Elected Officials.

Plaintiff likewise errs in asserting that the agency's consideration of the views of elected officials and the "President's regulatory philosophy" renders the Rule arbitrary and capricious. Compl. at ¶¶ 58-62 & n.4. Plaintiff does not explain how this input could alter the correct reading of the statutory terms addressed in the Rule. Nor does plaintiff offer any case law to support this surprising contention, which, if true, would be at odds with the principle that "[p]residential administrations are elected to make policy." *Guedes II*, 920 F.3d at 34. For this reason, "[a]s long as [an] agency remains within the bounds established by Congress, it is entitled to assess administrative records and evaluate priorities in light of the philosophy of the administration." *Id.* Indeed, the Supreme Court has recognized that it is entirely proper for an agency to consider both "Presidential oversight" and "political pressure from Congress" in adopting policy changes. *See FCC v. Fox Television Stations*, 556 U.S. 502, 523 (2009) (rejecting dissenting view that independent agencies should be "sheltered" from political influence). Even the law review article on which Plaintiff relies explains that "[t]here is *nothing nefarious* when a new administration disagrees" with the interpretations of a prior administration and changes those interpretations.[8] Josh

---

[8]  Plaintiff quotes language suggesting that courts "should hesitate before defer[ence]" is granted when the President directs a reversal of an agency interpretation. However, that issue is not presented here, because the Supreme Court has explained that it has "never held that the Government's reading of a criminal statute [such as 18 U.S.C. § 922(o)] is entitled to any

Blackman, *Presidential Maladministration*, 2018 Ill. L. Rev. 397, 405 (2018) (emphasis added); *see* Compl. ¶ 61.  Because the Rule is open in its acknowledgment that public attention, congressional interest, and Presidential input played a role in prompting the reconsideration of DOJ's past analyses and definitions, *see, e.g.*, 83 FR 66516-17 (discussing receipt of presidential direction regarding bump stocks), the standards of the APA are satisfied.  *Guedes II*, 920 F.3d at 34.

### D.  The Rule Properly Explains The Department's Change In Course.

Relatedly, Plaintiff suggests that the Rule violates the APA because it "abandons a previous administration's interpretation of a statute."  Compl. at ¶ 61 n.19.  However, "the standard for reviewing an agency's rule or interpretation of a statute does not change just because the agency reversed course and altered its prior interpretation."  *GOA v. Barr*, 363 F. Supp. 3d 833 (citing *Fox Television*, 556 U.S. at 515).  When changing position, an agency must demonstrate "that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which [a] conscious change of course adequately indicates."  *Fox Television*, 556 U.S. at 515 (emphasis in original).  Here, the Rule is "conscious [of the] change in course," *see, e.g.*, 83 FR 66517 & 66520, and it explains that the revised analysis is the correct reading of the statutory text, which, by definition, is a better reading than its prior, incorrect interpretation of that text.  That is, "[w]hile the Department accepted the previous classification of some [bump stocks] as non-machineguns, it relied on the mistaken premise that the need for 'shooter . . . input' for firing with [bump stocks] means that such devices do not enable 'automatic' firing."  83 FR 66531.  For these reasons, the Department's adoption of the correct reading of the statutory text by definition satisfies the standards of the APA.  *Cf. Abramski v. U.S.*, 573 U.S. 169, 191 (2014) (observing that "[w]hether the Government interprets a criminal statute too broadly . . . or too narrowly" does not change the meaning of the statute).

## IV.   The Department Promulgated The Rule Pursuant To Valid Authority.

Count II of the Complaint alleges that the Department lacked the authority to promulgate the

---

deference,"  *U.S. v. Apel*, 571 U.S. 359, 369 (2014), and the Defendants do not seek to have judgment on the administrative record entered on the basis of such deference.

Rule, *see* Compl. ¶¶ 71-80, asserting that the Department has acted contrary to law by "rewrit[ing] clear statutory terms to suit its own sense of how the statute should operate."  Compl. ¶ 72 (quoting *Util. Air Reg. Group v. EPA*, 573 U.S. 302, 328 (2014)).  This count largely overlaps with Plaintiff's first claim—that the interpretations in the Rule are arbitrary and capricious—and therefore fails for the same reasons: the Department has correctly interpreted "automatically" and "single function of the trigger" and correctly applied those interpretations to bump stocks.  *See supra* Part I.A & I.B.

To the extent Plaintiff separately challenges the Department's authority to define "machinegun" and its component terms, the Rule sets forth the specific authorities under which the Department acted.  *See* 83 FR 66515 (citing 18 U.S.C. § 926(a); 26 U.S.C. §§ 7801(a)(2)(A), 7805(a); and 28 CFR 0.130(a)(1)-(2)).  DOJ has exercised these authorities here in explaining that bump stocks are machineguns and notifying the public of that classification.  *See Guedes I*, 356 F. Supp. 3d 128 (recognizing that the Rule relies on DOJ's "general rulemaking authority under 18 U.S.C. § 926(a)").  And courts have recognized that ATF is empowered to issue rulings interpreting the statutory definition of "machinegun" and its component terms.  For example, in *United States v. Dodson*, the Sixth Circuit recognized the authority of ATF to issue a ruling "clarifying that . . . auto-sears"—a category of firearms parts —"were considered machineguns, subject to all the provisions" of the NFA, based on the fact that "[h]istorically, it was not clear whether [such] auto-sears were 'machineguns.'"  519 Fed. Appx. 344, 348 (6th Cir. 2013); *see also F.J. Vollmer Co. v. Higgins*, 23 F.3d 448, 449-51 (D.C. Cir. 1994) (upholding an ATF determination regarding machine gun receivers).  DOJ has exercised the same authority here to remove "historical[]" confusion by clarifying that bump stocks are machineguns.  *See Guedes I*, 356 F. Supp. 3d 128 (recognizing that the Rule relies on DOJ's "general rulemaking authority under 18 U.S.C. § 926(a)").

Plaintiff also objects that the Department lacks authority to adopt definitions that "accord[] with . . . plain meaning," 83 FR 66527, contending that the Department's definitional authority is limited to circumstances "when terms are ambiguous."  Compl. at ¶ 79.  Not so.  The statutory authorities discussed above empower ATF to issue interpretive rules like the one at issue here, which "advise the public of the agency's construction of the statutes and rules which it administers."  *Perez*

*v. Mortgage Bankers Ass'n*, 575 U.S. 92, 97 (2015).  ATF was thus well within its authority to issue an interpretive rule that explains the plain meaning of the statutory terms and "ensur[es] that the public is aware of the correct classification of bump-stock-type devices under the law."  83 FR 66523.

## III.   The Rule Is Not Unconstitutional.

Plaintiff presents several assorted constitutional claims as well, asserting that the Final Rule violates: (1) the Takings Clause of the Fifth Amendment, *see* Compl. at ¶¶ 84-90; (2) the Ex Post Facto Clause of Article I, *see* Compl. at ¶¶ 91-95; and (3) the Contracts Clause of Article I, *see* Compl. at ¶¶ 96-100.  As set forth below, the Rule is consistent with all of these constitutional provisions, and Defendants are therefore entitled to judgment on each of these claims.

### A.  Plaintiff's Takings Claim Lacks Merit.

Plaintiff's claim that the Rule is invalid as a "violat[ion] of the Takings Clause of the Fifth Amendment" neglects the fact that the Takings Clause does not limit government action outright.  As the Supreme Court has explained, the Fifth Amendment does not "prohibit the taking of private property, but instead places a condition on the exercise of that power. This basic understanding of the Amendment makes clear that it is designed not to limit the government[] . . . but rather to secure *compensation*."  *First English Evangelical Lutheran Church of Glendale v. County of L.A.*, 482 U.S. 304, 314 (1987) (emphasis in original) (citations omitted).  To the extent Plaintiff seeks to enjoin or invalidate the Rule, he cannot obtain such relief through a takings claim.

Plaintiff also seeks an award of compensation for the prohibition on his bump stocks, but federal courts lack jurisdiction under the statutes providing damages for compensatory takings unless a plaintiff acknowledges that he is challenging a *lawful* action by the government, which is not the case here.  The (unpleaded) jurisdictional basis in this court for Plaintiff's claim for compensation is the Little Tucker Act, 28 U.S.C. § 1346(a), which Congress established parallel to the "concurrent [jurisdiction] with the United States Court of Federal Claims," *id.*, provided in the Tucker Act, 28 U.S.C. § 1491.  The Little Tucker Act establishes jurisdiction on nearly-identical terms to the Tucker Act for monetary "claims against the United States founded either

upon the Constitution, or any Act of Congress, or any regulation of an executive department," except that Little Tucker Act claims are limited to $10,000. *Compare* 28 U.S.C. § 1346(a)(2) *with* § 1491; *see Brewer v. HUD*, 508 F. Supp. 72, 76 (S.D. Ohio 1980) (recognizing "identical" jurisdictional scope of two provisions). And it is well-established under the Tucker Act that "for the Court to possess jurisdiction over a takings claim, the 'claimant must concede the validity of the government action which is the basis of the taking claim.'" *Jackson v. U.S.*, 143 Fed. Cl. 242, 247 (Fed. Cl. 2019) (quoting *Tabb Lakes v. U.S.*, 10 F.3d 796, 802-03 (Fed. Cir. 1993)). This limitation flows logically from the principle that a "takings claim may only be based on the Government's rightful exercise of its property, contract, or regulatory powers," *Perry v. U.S.*, 28 Fed. Cl. 82, 85 (Fed. Cl. 1993).

Even if Plaintiff could maintain a Takings Clause claim, however, the prohibition on bump stock possession is an exercise of the police power that does not give rise to a "taking" that requires compensation. Although the plain language of the Clause "requires the payment of compensation whenever the government acquires private property for a public purpose," *Tahoe–Sierra Preservation Council v. Tahoe Regional Planning Agency*, 535 U.S. 302, 321 (2002), "the [g]overnment's seizure and retention of property under its police power does not constitute a 'public use,'" and therefore "the Fifth Amendment is not implicated." *United States v. Droganes*, 728 F.3d 580, 591 (6th Cir. 2013). *See also Price v. City of Junction, Tex.*, 711 F.2d 582, 591 (5th Cir. 1983) ("It is clear that not every destruction or injury to property by governmental action has been held to be a 'taking' in the constitutional sense"). These cases recognize long-established precedent holding that the scope of the Takings Clause excludes "[a] prohibition simply upon the use of property for purposes that are declared . . . to be injurious to the health, morals, or safety of the community[. Such] cannot, in any just sense, be deemed a taking." *Mugler v. Kansas*, 123 U.S. 623, 668 (1887); *see Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027 (1992) (A "property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers."). This is particularly true as to "personal property, by reason of the State's traditionally high degree of

control over commercial dealings," including where a "new regulation might even render . . . property economically worthless." *Lucas*, 505 U.S. at 1027-28.

Here, the promulgation of the Rule to clarify that bump stocks are contraband machine guns is precisely such an exercise of the police power, "the lawful exercise of [which]" includes prohibitions on "private property . . . as contraband goods, a power, the exercise of which is essential to the preservation of order and the enforcement of the laws." *German Alliance Ins. Co. v. Barnes*, 189 F. 769, 775 (C.C.D. Kan. 1911); *see Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1332 (Fed. Cir. 2006) ("[T]he . . . exercise of the police power to condemn contraband or noxious goods . . . has not been regarded as a taking for public use."). Applying this principle, multiple federal courts have recognized that prohibitions on bump stocks do not give rise to a compensable taking. *See Akins*, 82 Fed. Cl. at 622; *Maryland Shall Issue v. Hogan*, 353 F. Supp. 3d 400, 408-10 (D. Md. 2018); *McCutchen v. United States*, 2019 WL 4619754, at *8 (Fed. Cl. Sept. 23, 2019); *see also Modern Sportsman, LLC v. United States*, 2019 WL 5418055 (Fed. Cl. Oct. 23, 2019).

**B. The Rule Does Not Violate The Ex Post Facto Clause**.

The Rule does not fall within Article I, Section 9, Clause 3 of the Constitution, which provides that "No . . . ex post facto Law shall be passed." Possession of a bump stock violates 18 U.S.C. § 922(o), the criminal prohibition on machine gun ownership, a statute enacted in 1986. As the Rule explained, ATF had previously "misclassified" bump stocks in concluding they were not machineguns, and the Rule "reconsider[s] and rectif[ies]" those "classification errors." 83 FR 66523, 66531. Because the statute banned machineguns and "ATF must . . . classify devices that meet the statutory definition of 'machinegun' as machineguns," 83 FR 66529, the Rule subjects bump stocks "to the restrictions imposed by the NFA and GCA." 83 FR 66420. If the Court accepts Defendants' position that bump stocks are machine guns, as it should, this will not represent a change in the law, but will be "an authoritative statement of what the statute meant before as well as after the decision." *Rivers v. Roadway Express*, 511 U.S. 298, 312-13 (1994). It is therefore not the case that the Rule "makes an action, done before [the Rule], and which was

23

innocent when done, criminal."  Compl. ¶ 92 (quoting *Calder v. Bull*, 3 U.S. 386, 390 (1798)).  ,

In any event, in response to commenters raising concerns about the ex post facto implications of banning bump stocks, the Rule specified that, in light of the agency's previous misclassification, it would first inform the public of its determination before taking enforcement action, giving possessors of bump stocks ninety days to destroy or relinquish their devices and avoid prosecution.  This ensures that no consequences would arise for "past possession of bump stock type devices that ceases by the effective date of [the] rule."  83 FR 66525.  The "purpose of the ex post facto prohibition" is a practical one—to ensure that the public has "fair warning of [the] effect" of the laws and to "permit individuals to rely on their meaning."  *United States v. Reese*, 71 F.3d 582, 585 (6th Cir. 1995) (quoting *Weaver v. Graham*, 450 U.S. 24, 28-29 (1981)).  Because the Rule assures bump stock possessors that no punishment will ensue for "an action done before" the promulgation of the Rule, *Calder*, 3 U.S. 386, Plaintiff cannot establish a violation of the Ex Post Facto Clause.

**C.  The Rule Does Not Violate The Contracts Clause**.

The Contracts Clause of the U.S. Constitution provides only that "No State shall . . . pass any . . . law impairing the Obligation of Contracts."  U.S. Const. art. I, § 10.  Thus, "[t]he plain language of the Contracts Clause itself affirms that it applies only if a *state or local law* interferes with existing contracts."  *United States v. May*, 500 Fed. Appx. 458, 466 (6th Cir. 2012) (emphasis in original).  Because "the Contracts Clause does not apply to the federal government," *id.*, and no state or local action has been challenged, Plaintiff's Contracts Clause claim cannot succeed.

**IV.  Plaintiff Lacks Standing to Pursue Count III Of His Complaint.**

In Count III, Plaintiff asserts that the Rule, as applied to bump stocks predating "the date of the NPRM publication would violate" a statutory provision barring retroactive applications of tax regulations.  Compl. at ¶ 82.  26 U.S.C. § 7805(b), the provision referenced by Plaintiff, bars application of a "regulation relating to the internal revenue laws" to a "taxable period ending before" the date a regulation is published in the Federal Register, or that "notice substantially describing [its] contents" is published.  *Id.*  This limitation is subject to certain exceptions, such as for "[p]revention

of abuse," *id.* § (b)(3) and "[c]orrection of procedural defects," *id.* §(b)(4).

There is no need to address the merits of Plaintiff's argument because Plaintiff lacks standing to assert this claim.  The doctrine of standing aids courts in applying Article III's limitation of federal court jurisdiction to "actual cases and controversies."  *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017).  The "plaintiff bears the burden of establishing standing," *id.*, and must do so by demonstrating: (1) a concrete injury of fact; (2) a causal connection that can be traced between the defendant's alleged wrongdoing and that injury; and (3) that the relief sought will redress the injury. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  Plaintiff "must show [standing] for each claim he seeks to press." *Hagy v. Demers & Adams*, 882 F.3d 616, 620 (6th Cir. 2018) (internal quotations omitted).

Here, Plaintiff acknowledges that he did not even "bec[ome] interested in purchasing a bump stock device" until April 18, 2018—more than four months *after* the December 2017 publication of the ANPRM and weeks *after* the March 2018 publication of the NPRM.  *See* 82 FR 60929; 83 FR 13442.  Thus, Plaintiff is unaffected by the legal question of whether 26 U.S.C. § 7805(b) forbids DOJ from applying the Rule to pre-ANPRM or pre-NPRM bump stocks.  In other words, because Plaintiff acquired his bump stocks after publication of a "notice substantially describing [the Rule's] contents," 26 U.S.C. § 7805(b), Plaintiff's injury from the Rule—the requirement that he destroy or abandon them—would not be redressed if the Rule were to be invalidated as to pre-NPRM bump stocks.

## CONCLUSION

For the foregoing reasons, Defendants' motion for judgment on the administrative record should be granted.


DATED this 17th day of December, 2019.


Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

25

MATTHEW J. GLOVER
Counsel

LESLEY FARBY
Assistant Branch Director

/s/ *Eric J. Soskin*
ERIC J. SOSKIN (PA Bar #200663)
Senior Trial Counsel
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, NW Rm. 12002
Washington, DC 20530
Telephone: (202) 353-0533
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov
*Counsel for Defendants*

26