and I say it with deference to your experience, what I anticipate is that the bulk of the responsibility will rest upon the State in the enforcement of those rules.

Mr. COOPER. There is no disposition on my part to argue with you. I am trying to get at something tangible, something we can take hold of, to see if there is some way to control this matter which we all want, you and I, and I am sure the other members of the committee too. My experience has not at all been along the line of that indicated by you with reference to the Narcotic Act. It so happens that I have had some limited experience with cases coming under that act. It has occurred that an offender might be indicted under the Federal and under the State act at the same time, and in practice the State courts, in my part of the country, will wait for the Federal court to act and yield jurisdiction of the matter to the Federal court. It has also been my observation that in my part of the country there are perhaps 10 of these narcotic cases prosecuted in the Federal court where there would be one in the State court, although the offense would be a violation of both Federal and State law. When you make the statement that legislation of this type is going to require State legislation that will supersede the Federal legislation, and you base that upon the experience of the Narcotic Act, my experience prevents me from following in that conclusion.

Mr. IMLAY. I submit that to your judgment.

Mr. MCCORMACK. What State do you come from?

Mr. IMLAY. I am from the District of Columbia.

Mr. MCCORMACK. I appreciate what Mr. Cooper says, but I think that in our State our conditions are a little different. In my section there are a lot of prosecutions in the State courts. I suppose, if we were discussing the question as a question of experience, I would not want the gentleman to be placed in the position of making an argument which, at least, does not support some of the conditions which exist in some sections of the country. There is a tremendous number of prosecutions in the State courts in Massachusetts, the minor cases. The Federal courts take up the serious ones, but the police of Boston catch some with dope in their possession. They bring them in or catch them selling dope and the Federal court may later take jurisdiction, but there is a considerable number of prosecutions in the State courts. My only reason for that is not to contradict my friend from Tennessee but in order that if I were in this gentleman's position, and if I entertained the same thoughts, I would make the same argument he did, based on experience, assuming I agree with the gentleman.

Mr. IMLAY. Mr. Chairman, may I conclude in just about 2 minutes?

The CHAIRMAN. I hope you will be able to conclude soon. We desire to finish the hearing this morning.

Mr. IMLAY. I am willing to agree, in response to the suggestions just made, from a police standpoint, from the standpoint of prosecution, like Mr. Allen, that there are certain things that might be done that will make the law tight and will aid the police and aid the prosecutors, but you are legislating for citizens and when you take the history of firearms and their legitimate use in the history of this country, what do you find? You find that law and order has always been enforced by the citizen body and you can go now into some of our rural sections and you can find it is still true, as AR004337 the

early part of the Republic, that when the sheriff goes after a gangster, he can go from house to house and he can be sure there is a householder there with a weapon. It was once a shotgun or a rifle, but it is now a pistol, and the weapon is as much a part of the equipment of that household as the Bible on the mantle, but when you go into the city, and much of this legislation has come out of the city, you find a different situation. I ask you, before attempting a system of regulation like this, that you consider somebody other than the attorneys general, somebody other than the police, and consider the citizen, the one that is primarily affected. I thank you.

Mr. HILL. I want to ask 2 or 3 questions. Using the term "firearm" as it is defined in this proposed legislation, do you think that there is sufficient law now to properly and adequately regulate the use of them?

Mr. IMLAY. To regulate what?

Mr. HILL. The use of such firearms.

Mr. IMLAY. Yes.

Mr. HILL. That is, for the protection of society and having in view particularly the development of certain classes of criminals that have grown up in this country within recent times.

Mr. IMLAY. Yes.

Mr. HILL. In other words, you do not feel there is any need of any further regulation of firearms?

Mr. IMLAY. Not of Federal regulation.

Mr. HILL. You said it was impossible to regulate by Federal laws?

Mr. IMLAY. I think so, yes.

Mr. HILL. Did you mean it was impossible, or is it from your viewpoint undesirable?

Mr. IMLAY. I think both. Mr. Hill, I think when Mr. Keenan frankly confessed that he got by the Constitution by making the control measure a taxing measure that it is repugnant to me. It is repugnant for the Attorney General to tell you he gets by the Constitution by calling an act in the preamble a taxing measure and ending by saying that it may be cited as the National Firearms Act.

Mr. HILL. If it is lawful to do it, it is not a case of getting by the Constitution.

Mr. IMLAY. It is side-stepping the Constitution.

Mr. HILL. If you can do it lawfully under the taxing power, it is perfectly legitimate legislation, is it not?

Mr. IMLAY. It is legitimate when you take the letter of the law, but not the spirit.

Mr. HILL. You are opposed to any Federal regulation; that is your attitude?

Mr. IMLAY. Except in a limited sense.

Mr. HILL. And you say you have been working on the proposal of a uniform firearms regulation under State laws?

Mr. IMLAY. That is right.

Mr. HILL. You have not succeeded in obtaining uniformity in that respect?

Mr. IMLAY. We have made very good progress. Some 10 or 12 States have passed the uniform act.

Mr. HILL. But it has not in a material way contributed toward the suppression of kidnaping and bank robbery and general gangster

operations that cross State lines and are not within the jurisdiction of the State courts, in their full and comprehensive scope?

Mr. IMLAY. Not noticeably, and I do not know that any firearm law does, noticeably.

Mr. HILL. If you have Federal regulation such as is proposed here, whereby the Department of Justice and the Federal Secret Service force can take jurisdiction of the matter, do you not think that it would contribute largely toward the stamping out of this kind of crime, toward which the legislation is directed?

Mr. IMLAY. I think not. If it would, I would be for it.

Mr. TREADWAY. I would like to follow you a moment and plead ignorance. You referred to the possibility of side-stepping the Constitution. The one feature of this bill that appeals to me is getting rid of machine guns. If the Constitution is side-stepped to bring in a taxing measure in order to secure regulation of this nature, why could not we side-step it once more and prevent, by some kind of Federal statute, the manufacture of machine guns? Where, in the Constitution, are we so terribly tied down that we cannot prevent the manufacture of instruments of such a serious destructive nature as these are to human life?

Mr. IMLAY. If the courts are willing to say that a machine gun is so far contraband, or such a dangerous thing; that was the theory of some of the earlier prohibition acts. If the courts are willing to say that a machine gun is a nuisance, and insofar as Congress can legislate it legislates them out of existence, or for example, if they say they shall not ship any machine gun across the border at all, if the courts will go that far, I am perfectly willing to see some regulation of machine guns that will confine their manufacture and their use entirely to the police. We have, Mr. Treadway, a uniform machine-gun act. I have not mentioned that before, but this uniform machine-gun act has been approved by the American Bar Association, as well as the national conference, which approved it in its 1933 meeting, and this law is designed to accomplish in the States legislation against machine guns the same thing that the uniform act is with reference to pistols.

Mr. TREADWAY. That is a recommendation you are making to the States?

Mr. IMLAY. Yes.

Mr. TREADWAY. It has nothing to do with the Federal Government?

Mr. IMLAY. I think perhaps a better answer to your question is that there is now pending before the Committee on Interstate and Foreign Commerce of the House H.R. 9399, which is a bill to prevent the shipment of machine guns, submachine guns, sawed-off shotguns and bullet-proof vests in interstate commerce. I believe that if Congress were to pass that act, assuming that the courts would construe it as I think they would, as sufficiently dangerous to prevent their shipment altogether, I believe that is accomplished by that bill.

Mr. TREADWAY. That would not go as far as the Federal prohibition against manufacture, if we could get by with that.

Mr. IMLAY. It does not.

AR004339

Mr. TREADWAY. You spoke about whether the courts would support such a proposition. I am not a lawyer, as probably you will see from my line of questioning, but what defense is there of the possession or manufacture of machine guns outside of the country itself using them in case of war, or in connection with very dangerous police needs? What other good purpose can be served by the manufacture of any such article?

Mr. IMLAY. There is no good purpose except police, bank guards, Government guards in buildings, et cetera; they are the only ones that ought to have them.

Mr. TREADWAY. As a matter of interest, in your judgment how many machine guns could be used for legitimate purposes such as you are naming now?

Mr. IMLAY. I should say, in the District of Columbia, perhaps 100 ought to be enough. There are some wagons that go about the streets, from the Treasury Department to the Bureau of Engraving and Printing equipped with them.

Mr. TREADWAY. This has just come to my attention this morning, in a very unofficial way, but I understand that there is in this city today an automobile equipped with machine guns that was captured in Chicago by the Department of Justice agents that has the most complete mechanical devices conceivable against human life. I cannot see why some form of legislation cannot be enacted within the provisions of the Constitution that will absolutely overcome the possibility, not of transporting it in interstate commerce—that I feel confident we could regulate—but why permit their manufacture? As a result of permitting their manufacture, even though they may be transported contrary to interstate commerce regulations they can be used in this terribly destructive way on an automobile, and they are set off, as I understand, by an electrical connection.

Mr. IMLAY. I am in favor of State laws that forbid the manufacture of machine guns except for those few uses.

Mr. TREADWAY. You cannot go as far as to say that we can sidestep the Constitution sufficiently to prevent their manufacture?

Mr. IMLAY. I think not. I think you can pass a bill which says you cannot ship machine guns across State lines. That is as far as the Mann Act goes.

Mr. TREADWAY. Mr. Evans mentions an interesting analogy of opium. A Federal statute prevents that being manufactured, does it not?

Mr. IMLAY. I am not familiar with that. I do not know whether there is a separate opium act or not.

Mr. REED. I want to ask the witness a question. Do you know of any power other than the taxing power and the power to regulate interstate commerce by which we could prevent the manufacture of firearms?

Mr. IMLAY. I know of no other power. Mr. Chairman, I think I have taken enough time.

Mr. KEENAN. I wonder if I might be permitted to ask the witness one question?

The CHAIRMAN. It is rather an unusual request.

Mr. KEENAN. Or, if I may have the question asked of the witness.

AR004340

The CHAIRMAN. Without objection, you may ask a question.

Mr. KEENAN. Reference has been to the action of a member of a committee with which the witness served, and I got here a little late, and I do not know what the committee was, but a member of that committee made the open statement that he did not intend to comply with the State law which required registration of firearms. I only want to know what that committee was; was that a committee of the American Bar Association on Uniform State Laws, or how was the committee chosen?

The CHAIRMAN. Can you answer the question?

Mr. KEENAN. You told about a man who said he would not comply with a State law with respect to the registration of a pistol, a comember of a committee with you.

Mr. IMLAY. He was not on the committee; he was a citizen of Detroit.

Mr. KEENAN. Was he interested in the uniform State law, or was he connected with it?

Mr. IMLAY. He was talking with us about our act, and our proposed act.

Mr. TREADWAY. This hearing has run along here for several days and has kept going along the same lines. I do not know whether any representatives of the industry, manufacturers of pistols, desire to be heard. There have been gentlemen here continuously representing the industry, and if we are going to complete the hearings this morning, I wish they might be given time, if they want it.

The CHAIRMAN. The Chair will state that Mr. Nichols was in my office, and he said he would like 5 minutes.

## STATEMENT OF FRANK C. NICHOLS, VICE PRESIDENT, COLT PATENT FIREARMS MANUFACTURING CO.

The CHAIRMAN. The Chair will state that we must, if reasonably possible, close the hearings before noon. Mr. Nichols, I told you the other day that if it was agreeable to the committee, we would give you 5 minutes. Please give your name and in what capacity you appear.

Mr. NICHOLS. My name is Frank C. Nichols; I am vice president of Colt Patent Firearms Manufacturing Co. Mr. Chairman and gentlemen, there are two points I want to bring up, one in which I think you will be particularly interested, namely, the reference to machine guns. My company is the only manufacturer of machine guns in the United States, and our largest and principal client is the United States Government. The machine gun is not a weapon that can be used with any degree of convenience or satisfaction to the class of rascals that the Department of Justice is after. We do not make submachine guns.

Mr. TREADWAY. What is the distinction between a machine gun and submachine gun?

Mr. NICHOLS. A submachine gun is a small weapon, as described to you yesterday by Mr. Keenan, which can be carried under the coat. It is automatic, with a drum feed, holding as high as 500 cartridges, which simply spurts fire.

Mr. VINSON. Who manufactures those?

Mr. NICHOLS. We manufactured 15,000 of those in 1921 the Auto Ordnance Co., New York. The Auto Ordnance Co. are referred

to on page 66 of the hearing of April 18. They do not and never did manufacture a machine gun or a submachine gun. How many they have left, and what their method of merchandising was, I do not know. It was the invention of Col. John Thompson, formerly Chief of Ordnance, and was designed for purely a military weapon, shooting only a pistol cartridge. It was not successful as a military weapon, and, unfortunately, I think we can state correctly, they were a bit careless in their method of merchandising. It got into the hands of the dealers, and some of the dealers were not entirely responsible. I will ask the privilege of filing this catalog with the clerk, illustrating and describing exactly what a machine gun is. It is not sold commercially; it is sold for strictly military purposes to this Government and to foreign governments, if we are lucky enough to get foreign contracts.

Mr. VINSON. Do I understand today that there is no manufacturer in this country making a submachine gun?

Mr. NICHOLS. No, sir; unless he is making it under cover.

The CHAIRMAN. There would be no objection, if it is such a menace to society and there is no demand for it, to a law against its being transported in interstate commerce?

Mr. NICHOLS. None whatever, and frankly, gentlemen, it should not be manufactured.

Mr. HILL. Where did the machine guns come from that are in use in this country now?

Mr. NICHOLS. In my opinion, they have been stolen.

Mr. HILL. Stolen from what source?

Mr. NICHOLS. Stolen from police departments, prisons, and from dealers who got them shortly after the manufacture began, and before they were stopped or agreed to stop.

Mr. HILL. Is there any importation of that kind of gun?

Mr. NICHOLS. Not to my knowledge.

Mr. HILL. Where did the police departments get their supplies?

Mr. NICHOLS. From the Auto Ordnance Co.

Mr. HILL. Those 15,000 which you manufactured were for the Auto Ordnance Co.?

Mr. NICHOLS. Yes, sir.

Mr. HILL. That supply is gradually being exhausted, I take it, as far as the Auto Ordnance Co. is concerned?

Mr. NICHOLS. Yes.

Mr. TREADWAY. Those are submachine guns?

Mr. NICHOLS. Yes.

Mr. REED. Shortly after the war, the Ordnance Department put on sale quite a number of guns, among them some Colt .32 revolvers in a .45 frame, and they were sold to people out over the country for a small sum, I think, around $4. Did they at that time have machine guns for sale, in the same way?

Mr. NICHOLS. No, sir.

Mr. REED. Do you believe that these machine guns are manufactured by the criminals themselves, or through some organization of the criminals?

Mr. NICHOLS. They could be, very easily.

Mr. HILL. Where do they get the ammunition for the submachine gun?

AR004342

Mr. NICHOLS. They can buy the ammunition at any sporting-goods store.

Mr. VINSON. They shoot an ordinary pistol cartridge?

Mr. NICHOLS. Yes.

The CHAIRMAN. Of what caliber?

Mr. NICHOLS. .45.

The CHAIRMAN. Referring to the question of Mr. Reed as to the possibility of manufacturing machine guns by the unlawful element, it would require quite a set-up in the way of a factory to do that, would it not?

Mr. NICHOLS. No, sir. You are referring to the machine guns; I am referring to the submachine guns.

The CHAIRMAN. I am talking about submachine guns.

Mr. NICHOLS. A clever gunsmith or a clever locksmith could put one of those together but it would be a crude job, although it would shoot.

Mr. HILL. Mr. Treadway referred to a fully equipped automobile.

Mr. TREADWAY. Yes; it is in the city today.

Mr. HILL. That was not a crude affair, was it?

Mr. NICHOLS. That may have been a Thompson submachine gun. I cannot conceive, if you will study that catalogue, how they could use a machine gun.

Mr. TREADWAY. In an automobile?

Mr. NICHOLS. Yes; in an automobile, or anywhere else. Machine guns are only manufactured by my company in this country, and they are all chambered for shooting the high-power military cartridge.

The CHAIRMAN. What is the approximate weight of a machine gun?

Mr. NICHOLS. Sixty-five to ninety pounds.

The CHAIRMAN. They are too heavy to be carried.

Mr. NICHOLS. Yes.

Mr. VINSON. You certainly could equip an automobile with a machine gun.

Mr. TREADWAY. That was what I was told.

Mr. VINSON. You undoubtedly could plant a machine gun in an automobile and use it from an automobile.

Mr. NICHOLS. It would be a very inconvenient thing to do and I doubt very much if any criminal or crook or racketeer would resort to that type of weapon.

Mr. EVANS. You said your market was almost exclusively to the United States Government?

Mr. NICHOLS. Yes; and such foreign governments as we can sell.

Mr. EVANS. Do you have any other demands at all?

Mr. NICHOLS. No, sir.

Mr. EVANS. If you should have, would you sell one?

Mr. NICHOLS. No, sir.

Mr. EVANS. Are you restricted by law or regulation or otherwise?

Mr. NICHOLS. Not that I know of, exactly.

Mr. TREADWAY. You use your own good judgment as to the customers you ought to deal with?

Mr. NICHOLS. Yes.

AR004343

Mr. Evans. Your concern would not, under any conditions, sell anyone but some public functionary or governmental agency?

Mr. Nichols. Either the Government or a duly authorized subsidiary thereof.

Mr. Evans. That is an invariable rule that you have?

Mr. Nichols. Absolutely; there is no exception.

Mr. Evans. Has that always been your rule?

Mr. Nichols. Always.

Mr. Evans. So that any machine gun that may be in the hands of racketeers did not come through your sales department, or otherwise?

Mr. Nichols. No, sir; and furthermore, I do not believe there are any machine guns in the hands of racketeers; submachine guns; yes, but we never sold those.

Mr. Evans. You sold 15,000?

Mr. Nichols. Yes; to the Auto Ordnance Co.

Mr. Evans. Are they restricted in their sale or distribution of those machine guns?

Mr. Nichols. I do not believe in the early days they were.

Mr. Evans. That has not been so long ago.

Mr. Nichols. It was in 1921.

Mr. Evans. That is 13 years ago. Those machine guns could very well be in use yet, could they not?

Mr. Nichols. Yes; they are in use.

Mr. Evans. Do you think those are the ones in the hands of the racketeers?

Mr. Nichols. Yes, sir.

Mr. Evans. That explains where the racketeers are getting machine guns, in part, at least.

Mr. Reed. That exactly is the point I was trying to make when I questioned the witness before, that right after the war they sold a great number of implements such as revolvers and things of that kind as surplusage. They had been slightly used but they were apparently in good condition. Does anybody know how many of these machine guns or submachine guns the Ordnance Department sold indiscriminately?

Mr. Keenan. They did not sell any. He refers to the Auto Ordnance Co., which is a private corporation. Mr. Ryan, the president of that company, has already appeared. As I understand, the Colt Co. manufactured and sold 15,000 submachine guns to the Auto Ordnance Co.

Mr. Reed. What did they want them for?

Mr. Keenan. They owned the patent on the Thompson machine gun and they wanted them to sell at a profit and make some money; it was a pure commercial transaction.

Mr. Reed. They sold them to anybody, indiscriminately?

Mr. Keenan. They sold them to dealers or anybody that wanted them. I think there is no mystery about that; I think Mr. Ryan would admit it.

Mr. Evans. I want to know if this bill is enacted into law, would it be possible for another batch of submachine guns to get into the market in some way?

Mr. Nichols. I do not see how.  AR004344

Mr. Evans. What do you say, Mr. Keenan?

Mr. KEENAN. I think in the first place there is not any legitimate manufacturer of machine guns.

Mr. EVANS. But they could still manufacture them.

Mr. KEENAN. I imagine they could, but it would require elaborate equipment.

Mr. VINSON. They can still manufacture, even with the law.

Mr. EVANS. Why not make it strong enough to make that impossible?

Mr. VINSON. You run into the constitutional provisions.

The CHAIRMAN. It would be a question of whether you took the profit out of it.

Mr. EVANS. I am in favor of making it impossible to manufacture instruments of that kind.

Mr. TREADWAY. Isn't this the unfortunate situation? According to Mr. Nichols, a submachine gun, crude though it may be, can be put together by an ordinarily bright mechanic. That is the situation, and if that is going to reach the racketeer, you cannot overcome it.

Mr. EVANS. He would be a bootlegger in the business, and you cannot stop bootlegging.

Mr. TREADWAY. You say that so far as the present supply of these dangerous submachine guns is concerned, you think they are being largely stolen from police headquarters?

Mr. NICHOLS. Those used by the gangsters. The Auto Ordnance Co., as I understand, still have, but I do not know how many, a quantity of the 15,000 that were made in 1921.

Mr. TREADWAY. They are allowed to sell them without any restrictions?

Mr. NICHOLS. I think not.

Mr. KEENAN. There is no Federal law.

Mr. TREADWAY. They are situated in New York; is there a New York State law that prohibits them from being sold in the State of New York?

Mr. KEENAN. I cannot answer that. There are several States which have laws. Illinois has such a law and Texas has also.

Mr. TREADWAY. New York you do not know about?

Mr. KEENAN. I cannot answer that.

Mr. TREADWAY. I assume these are stored in New York?

Mr. KEENAN. We have an agreement, a code agreement, whereby they do not distribute or sell them to anyone without the specific permission of the Department of Justice, and I would like to have the record show that this company has lived up to that agreement and has acted in an honorable fashion.

Mr. TREADWAY. Isn't it a fact that these three men who are on trial for murder in Massachusetts today, in connection with the killing of a policeman and bank officials secured their big supply of these weapons from an exhibition in an armory somewhere in Massachusetts which they broke into?

Mr. NICHOLS. That is my understanding.

Mr. TREADWAY. And that is an illustration that led you to say that the present supply is being stolen, I assume?

Mr. NICHOLS. Yes.

Mr. EVANS. Mr. Chairman, it occurs to me that 13 years ago, when this concern bought these 15,000 submachine guns, it AR000486 had legal authority to buy and sell them at that time. Is it not very

likely that they have the same legal authority to sell them now that they had then?

Mr. NICHOLS. As far as I know.

Mr. EVANS. You would know about it if New York had passed a law in the meantime?

Mr. NICHOLS. I do not know of any law in New York that covers that point.

Mr. EVANS. I presume they are selling those guns yet.

Mr. VINSON. Mr. Keenan, as I understood him, said that they had signed a code agreement and that this concern did not sell the submachine gun except where such sale was approved by the Department of Justice.

Mr. KEENAN. That is correct. We have no practical problem with reference to machine guns made by legitimate manufacturers or dispensed by legitimate persons. There are, in several parts of our country, bootleg organizations that are manufacturing them, in accordance with reports from special agents.

Mr. VINSON. You are speaking of submachine guns?

Mr. KEENAN. Submachine guns; yes.

Mr. McCLINTIC. What is the name of the company that owns the machine guns in New York at the present time and how were they acquired?

Mr. NICHOLS. They are named the Auto Ordnance Co. I do not know the address. We manufactured under a contract in 1921, 15,000 of those submachine guns, not machine guns, but submachine guns, for them.

Mr. McCLINTIC. For whom?

Mr. NICHOLS. For the Auto Ordnance Co., New York City.

Mr. McCLINTIC. They bought them and paid the regular price?

Mr. NICHOLS. They bought them and paid us the contract price. We had nothing to do with the sale or distribution anywhere at any time.

Mr. TREADWAY. Until there was a code agreement reached with the firm, they were able to dispose of them legitimately to such customers as might apply, without restriction, either of a Federal nature or under the New York State law, as far as we can learn.

Mr. McCLINTIC. Do you have any information as to how many they now have on hand?

Mr. NICHOLS. They have never ordered any since the original contract, and I do not believe they will. If they can get out of that deal whole, I do not think they will go back.

Mr. HILL. What was the other proposition you wanted to submit?

Mr. NICHOLS. It was about the tax in the measure under discussion, and for this reason, for many, many years we have distributed our product through a selected number of jobbers, wholesalers, and retail dealers. We do not sell to the consumer or the user under any circumstances. There is no profit in this business, to speak of, to the dealer. He will not pay this tax; he will go out of business. You can quite appreciate, I believe, where that leaves us. We will not sell the user; we refer him now to his nearest dealer, give him the name, if you please, if that will help him any. I doubt very much, gentlemen, if, under this measure we would be justified in continuing our small arms business.

ARQ043446

Mr. TREADWAY. You mean pistols and revolvers?

Mr. NICHOLS. Yes; speaking solely as to pistols and revolvers.

Mr. TREADWAY. You feel that the inconvenience of this registration and the taxation would practically do away with the demand for a legitimate sale of your goods?

Mr. NICHOLS. Yes, sir.

Mr. HILL. You have reference to the size of the tax; not to the principle, but to the amount of the tax, do you not?

Mr. NICHOLS. Yes, to the amount of the tax; and also I am considering that in many States a law already exists where the dealers pays such a tax to handle small arms.

Mr. HILL. If you take away the tax feature entirely, this bill goes out of the picture.

Mr. NICHOLS. I understand that.

Mr. McCLINTIC. What other articles does your concern manufacture?

Mr. NICHOLS. We manufacture a molded compound material, such as bottle caps, tube caps, and certain lines of electrical equipment. We manufacture dish-washing machines of large types.

Mr. McCLINITC. You do not manufacture shotguns?

Mr. NICHOLS. No, sir.

Mr. McCLINTIC. Nothing of that character?

Mr. NICHOLS. No, sir.

Mr. McCLINTIC. You do have quite an extensive foreign business, do you not?

Mr. NICHOLS. On arms we have had, up to the present depression.

Mr. McCLINTIC. Then the placing of a tax on pistols does not necessarily mean that your concern would go out of business?

Mr. NICHOLS. No.

Mr. McCLINTIC. What you have in mind is that you might stop making pistols?

Mr. NICHOLS. We might stop making and selling pistols. I wonder if you gentlemen want that brought about. We were very valuable to the Government during the war. We cannot maintain a plant to assist the Government in case of war, unless we can stay in the business. We have been in business nearly 100 years, an honorable business and a legitimate business. We have used the utmost care in the distribution and sale of our product.

Mr. VINSON. What is the average State tax upon dealers for the sale of pistols and revolvers?

Mr. NICHOLS. I am very sorry, but I cannot give that.

Mr. VINSON. Can you give the maximum?

Mr. NICHOLS. $5 to $10.

Mr. VINSON. This substitute bill, as I see it, calls upon the dealer to pay $200 a year. That is quite some difference.

Mr. McCLINTIC. What would be the effect of this legislation if a new provision were added which would exempt duly organized rifle clubs or pistol clubs, organized under some Federal supervision? Would not that allow those that are interested in marksmanship and pistol shooting to carry on in a satisfactory manner?

Mr. NICHOLS. To a certain extent.

Mr. McCLINTIC. I think that such a provision along that line can be added to the legislation.

Mr. NICHOLS. The presentation along that line by General Reckord yesterday, I think, covers it very fully. I am not a lawyer. I am a

plain, ordinary business man, and sometimes I think not a very good one. The other point I wanted to touch upon is this: That the rascals that the Department of Justice wants to get hold of is a difficult matter. The first thing the racketeer and the bad man does when he gets hold of a gun, and they won't buy it, is to chisel out every identifying mark on the weapon. We keep a record religiously, and we ask our customers to keep a record of where they are sold.

Mr. HILL. This bill provides against that; it provides for that contingency, where they obliterate the number, as I understand.

Mr. NICHOLS. Would that stop him from doing it?

Mr. HILL. It would not stop him from getting the gun.

Mr. NICHOLS. Would it stop him from taking off the number?

Mr. HILL. No; but it would make it an offense if he did take it off.

Mr. NICHOLS. But you are talking about the registration.

Mr. HILL. It is not expected, as I understand, that he will register.

Mr. NICHOLS. No.

Mr. HILL. He will have the gun in his possession; he may have chiseled the number off, but if you find him with that kind of a gun, not registered, then he has committed an offense.

Mr. NICHOLS. What is not registered? He does not register in the first place. I may be thick on this; Mr. Keenan has been the soul of courtesy to me on two occasions, but I cannot get through my head where the matter of registration, the licensing, the fingerprinting, photographing, if you please, are going to get that bad man or help to get him.

Mr. REED. I do not know that I can make it clear to you, but here is my understanding: That if they find the man with the weapon, with the number chiseled off, the then has in his possession something unlawful, and it raises a presumption of guilt against him.

Mr. NICHOLS. Yes, sir.

Mr. REED. And that aids the Department of Justice in the prosecution of the man; that is the theory of it.

Mr. HILL. It enables them to hold him until the case is investigated.

Mr. VINSON. It subjects him to a fine of $2,000 or imprisonment of not more than 5 years.

Mr. NICHOLS. Even so; but where is the advantage of registration?

Mr. EVANS. It seems to me that is the answer.

Mr. VINSON. His point is you could have that offense for that thing without the necessity for registration. You can trace a revolver from the factory; it has been done hundreds of times; it is more cumbersome, perhaps, than if you simply had to look at a list. The point the gentleman is making is you could have an offense with regard to the erasure of an identifying mark without the necessity of registration.

Mr. NICHOLS. That is my understanding.

Mr. EVANS. The primary purpose of the registration, as I get it, is to furnish a means whereby one may have legitimate possession of a gun, is it not?

Mr. NICHOLS. I beg your pardon?

Mr. EVANS. The purpose of registration is to legitimatize the possession of firearms.

Mr. NICHOLS. For pistols and revolvers.

AR004348

Mr. Evans. I have a pistol which was given me 25 years ago. I have not seen it for 10 years, but if this law passes I will have to have that pistol registered. That means I am in lawful possession of that pistol and nobody can question it, but if my neighbor has a pistol, not registered, as Mr. Reed points out, there is some presumption that he has that illegitimately. Is it not a good thing to have the registration, then?

Mr. Nichols. I am afraid on certain of your questions my reply would be prejudiced because I am in the business.

Mr. McClintic. I have before me a statement of your company which shows that in 1932 you had a profit of $20,795 and in 1933 it had increased to $675,132. I was just wondering whether the increase of law violation, gangster operation, and so forth, had brought about any increase in the sale of articles which you manufacture?

Mr. Nichols. No, sir.

Mr. McClintic. How do you account for this enormous increase in profit?

Mr. Nichols. That increase in profit as you have read it was in connection with a contract I closed with the Argentine Government in 1926, and for one reason or another, we were unable to find out, we completed this contract but they did not pay it until 1933, and that is reflected in the increase. That was for machine guns.

Mr. McClintic. That is anticipated profit?

Mr. Nichols. They paid it in 1933.

Mr. McClintic. Then the impression is left by you with the committee that your company deals extensively with many foreign nations?

Mr. Nichols. Yes, sir; we did prior to the depression.

Mr. McClintic. The fact that we would put in a limitation on pistols would not in any way cause you to go out of business, would it? It might reduce your pistol sales to a small extent, but it is liable to be made up by some situation in foreign countries which bring about an increase in business.

Mr. Nichols. No, sir; not in small arms.

Mr. Reed. The thing I have in mind, I cannot see the point in taxing all these small dealers. I will take my own home town, which is typical of many towns in my district. There are several hardware stores. One man will be selling arms because he handles them in connection with sporting goods. I do not know how many such stores there are in my town; I suppose in this little town of 17,000 there might be a dozen or more handling firearms. If you put a tax of $200 on them, I can see where 9 out of 10 would go out of business rather than pay any such tax. The profit is too small.

Mr. Nichols. And you would put that tax on revolvers and pistols, where he may sell 8 or 10 a year.

Mr. Reed. I think the tax is too large; I do not think it accomplishes any great purpose. You may require them to keep records, but when it comes to a tax of that size, I think it is too large.

Mr. McClintic. Does the gentleman have in mind the thought that he pays no tax on the kind of firearms that are most in demand, shotguns and rifles, which are the two kinds of weapons bought by the sportsmen?

Mr. Reed. A lot of people have hobbies. I have quite a number of revolvers; I like to shoot at targets. I have a .22 Colt and I have the Colt .32 in .45 frames, which I take down to the farm and

shoot at targets with. It is a hobby. After you use one so long, you like to try something new. I can see where the small dealer will sell a number of such weapons.

Mr. McCLINTIC. We are bound to admit that it would reduce the number of dealers.

Mr. REED. It seems we might accomplish the purpose without destroying the dealer, without taxing him out of business.

Mr. McCLINTIC. I have thought that if the present situation exists throughout the Nation, with respect to kidnaping, we require something pretty strong.

Mr. REED. I will do anything that stops kidnaping. The question is, whether you are going to do it without putting on the heavy tax.

Mr. HILL. I think this is a matter for executive session.

Mr. EVANS. How many States in the Union have laws against carrying concealed weapons on the person?

Mr. KEENAN. I should say approximately three fourths.

Mr. EVANS. Some have no prohibition along that line?

Mr. KEENAN. No; some have none.

Mr. HILL. Who is the next witness?

General RECKORD. This gentleman was not our witness. He and Mr. Harrington were mentioned by the chairman.

Mr. HILL. Does Mr. Harrington wish to make a statement?

General RECKORD. All we would like to say in closing is what we have stated repeatedly, that we are willing to withdraw any objection that we have interposed if this bill is made to apply to machine guns, submachine guns, and sawed-off shotguns. We will go along with such a bill as that. We will take either bill that has been proposed if they will eliminate pistols and revolvers, and we suggest they do it for a year or two and try it out. If in a year or two, with all the other bills that have been passed, and the columns of newspapers stated last night that the Senate and House were in agreement on those bills, and with this as a machine-gun bill solely, we believe the Department of Justice will get the men they are after. If they find they cannot do it, then we will come along and try to work out the matter of pistols and revolvers.

Mr. McCLINTIC. What would you say along the line of a compromise by adding to the legislation a section which would allow pistol clubs and certain organizations to be exempt from the provisions of this legislation, in order to take care of those who are conscientious in the thought of promoting marksmanship and things of that kind?

General RECKORD. Mr. Cooper asked me practically that same question. I told him that we had agreed, in an effort to get together with the Department of Justice, to accept such an amendment, although we are not favorable to it, because it will look like it is an effort on our part to force people to join our organization.

Mr. VINSON. There will be more folks affected who are not members of pistol clubs.

General RECKORD. Millions will be affected. If this bill is basically right, you do not need to except our members, and we are not asking you to except them. We ask you to eliminate pistols and revolvers and make it a machine-gun bill and let us try it.

Mr. McCLINTIC. We can take care of the members nevertheless; we can write an amendment so as to fix it so that an organization that

had no membership fee could have the privilege of participating in matches of this kind.

General RECKORD. I would like, for the benefit of the record, if Mr. Seth Gordon might be permitted to read a resolution. He has handed me a resolution which his organization has passed.

## STATEMENT OF SETH GORDON, WASHINGTON, D.C.

Mr. GORDON. This is a resolution of the Izaak Walton League of America. The Izaak Walton League of America, at its convention in April, recommended that there be no legislation of this kind at this time and passed this resolution.

Mr. HILL. It may be included in the record.

(The resolution referred to is as follows:)

RESOLUTION ADOPTED BY THE TWELFTH ANNUAL CONVENTION OF THE IZAAK WALTON LEAGUE OF AMERICA, CHICAGO, ILL., JANUARY 20, 1934

Whereas some 13 million citizens in this Nation, both men and women, take part in the sport of hunting, both with rifle and shotgun, rifle and pistol target shooting, and the sport of shooting clay birds; and

Whereas it is most desirable that the youth of this land, both boys and girls, should be taught the proper use of firearms while young and thus, in a great measure, prevent the occasional accident generally born of ignorance of the proper handling of firearms; and

Whereas, during the past few years, this country has been experiencing a disgraceful wave of crime and domination of gangs and racketeers in many of our leading and most prosperous cities; and

Whereas a certain element of our citizens propose, as a control to this disgraceful crime wave, the control and restriction of the sale of all firearms of whatsoever nature, and to prevent by law the training of the youth of this land in the use of firearms; and

Whereas at the present time there are certain bills before the National Congress designed to restrict the use and sale of firearms in this country; and

Whereas such laws will merely disarm the law-abiding citizens and will in no way prevent the crook, the robber, and the gangster from getting firearms, and it is self-evident to any thinking person that the real remedy to our crime situation is not in disarming the law-abiding citizens but, on the other hand, the diligent enforcement of such laws as we now have; Therefore be it

*Resolved,* That the Twelfth Annual Convention of the Izaak Walton League of America, in its annual convention assembled, this 20th day of April 1934 go on record as being opposed to any and all antifirearms legislation that will in any way affect the right of our citizens to own and bear arms freely.

## STATEMENT OF JOSEPH B. KEENAN, ASSISTANT ATTORNEY GENERAL

Mr. HILL. Mr. Keenan, do you have anything further?

Mr. KEENAN. I do; but I would as soon put it in the record. It is very brief; I will not burden the committee; it is merely this: For the purpose of the record, and so there will be no misunderstanding, a common impression has been created that the legitimate firearms-manufacturing companies of this country have opposed salutary regulations of firearms from a selfish viewpoint. I want to say that I have been in communication with the largest manufacturers, and I have found that their attitude was an extremely decent and fair one. They have attempted to work with the Department of Justice and in some way to preserve the legitimate business interests, and to work out the best proposal available.

Mr. TREADWAY. Isn't your statement borne out by the testimony of Mr. Nichols? He was emphatic in his statement that his company

AR004351

wants to abide by the proper regulations of the Government in controlling the illegitimate sale of these weapons.

Mr. KEENAN. That is correct. I cannot overemphasize that. There has been a real effort made along that line, and we feel that the opposition to rules and regulations that would not be burdensome come from those whom we term hobbyists; but the legitimate enterprises, reflecting an investment of capital and the jobs of the employees, have shown a splendid spirit of cooperation with the Department of Justice. I do not want this occasion to go by with some contrary notion prevailing. It does appear—and I think it would be agreed to by Mr. Nichols—that today such companies as he represents are not making money in the manufacture and sale of small firearms to individuals. On the contrary, they are losing money; they are in red ink. Mr. Nichols says that is correct. If we do eventually curtail the distribution of firearms, we will not be destroying the profits of legitimate industry. The fact is, they are not operating at a profit in the manufacture and distribution of small firearms. We will let that speak for whatever it means. So many times reference has been made by members of the committee to this unconstitutional legislation. Before this hearing closes I would like respectfully to call attention to the case of *Nigro* v. *The United States*, found in volume 276, United States 332, which is a decision by Chief Justice Taft, decided April 9, 1928, in interpretation of the Harrison Narcotic Act.

Mr. TREADWAY. Has that a direct bearing on our problem?

Mr. KEENAN. It has on the constitutionality of the provisions set forth.

Mr. TREADWAY. I suggest that Mr. Keenan furnish a synopsis of it.

Mr. HILL. How long a decision is it?

Mr. KEENAN. It is quite long and involved. I think it might be epitomized.

Mr. TREADWAY. Will you make a synopsis of it?

Mr. KEENAN. Yes.

Mr. VINSON. What is the constitutional point involved?

Mr. KEENAN. The point involved is where a tax is required to be paid by certain persons under the Harrison Narcotic Act, and whether other persons than those required to pay the tax can be required to perform acts to comply with the law, which the Congressmen will see is getting dangerously close in analogy to the precise matter involved here, as far as the constitutionality is concerned.

Mr. HILL. You are referring to the registration feature?

Mr. KEENAN. Yes. I think we ought to answer one question, particularly, asked by the Congressman from California, as to what good registration will do. I think the point has escaped some members of the committee that have not attended all of the sessions. Without registration, there is no way to get at the control of firearms now possessed, before the effective date of the act. It would be helpful in the prosecution of cases where firearms were in possession of those gangsters roaming the lands, which were acquired previous to the enactment of the act.

Mr. VINSON. Why did you not provide for registration in the original bill?

AR004352

Mr. KEENAN. My answer to that is we had not given it sufficient thought to exhaust all the possibilities of Federal control.

Mr. VINSON. You had given it thought enough to cause the Attorney General to say that he was afraid it was not constitutional.

Mr. KEENAN. I think I ought to answer that the matter of registration, following the provisions of the narcotic act, not the terms of the act but the regulations promulgated, had not been taken up with the Attorney General at the time he made the statement.

Mr. VINSON. He expressed his view at that time.

Mr. KEENAN. I think the Attorney General expressed no definite opinion of its unconstitutionality, but he had some doubt.

Mr. VINSON. He said he was afraid it was unconstitutional.

Mr. KEENAN. He said he was afraid it was unconstitutional, and we got the suggestion while discussing it with the committee, and from further consultation with another branch of the Government, other than the Department of Justice.

Mr. REED. With regard to the registration, what we are seeking to do is when a criminal comes into court to prevent him from escaping prosecution by his saying that he purchased the weapon prior to the enactment of the statute.

Mr. KEENAN. Exactly.

Mr. VINSON. Criminal or law-abiding citizen, if he did have it prior to the effective date of the act, under the law there is no penalty.

Mr. KEENAN. There is a penalty if he transports it in interstate commerce.

Mr. VINSON. But I thought you indicated yesterday, or the day before, or some other time, that because there was no crime in the possession of it that there was some consideration to be given to the idea that you ought not to make it a crime to transport it across State lines.

Mr. KEENAN. I did not intend to convey that idea.

Mr. VINSON. You conveyed it to me.

Mr. KEENAN. I did not intend to say other than this: No penalty was provided for the failure to register, although the Treasury Department has suggested that such a penalty be provided in the act, but it was left out, because we wanted to get a bill, from a practical standpoint, that might receive the favorable consideration of the committee, realizing that there would be great opposition, as has developed, from those opposing the measure, even to the point of one man saying, "I am not going to the trouble of registering and giving my name and address."

(Mr. Keenan subsequently submitted the following estimate of the annual revenue to be derived from the proposed firearms tax measure and an amendment to section 4 of the proposed act upon the suggestion of Mr. McClintic:)

| | |
|---|---:|
| Sales of new firearms, 60,000 a year | $60,000 |
| Sales and transfers of used firearms, 40,000 a year | 40,000 |
| Revenue from tax on dealers and pawnbrokers: | |
| 200 wholesalers and 2,000 retailers at $100 each | 220,000 |
| 100 pawnbrokers at $300 each | 30,000 |
| Revenue from tax on machine-gun manufacturers: | |
| 20 sales at $200 each | 4,000 |
| 4 manufacturers at $500 each | 2,000 |
| Total | 356,000 |

AR004353

The estimated number of new and used weapons has been made from figures showing the present revenue derived from the taxation of pistols and revolvers, from the number of machine guns sold annually, from the number of pistols and revolvers manufactured in this country, which has fluctuated from approximately 165,000 in 1929 to 60,000 in 1933, and from the number of licenses obtained in New York City in 1933 to purchase pistols and revolvers.

SEC. 4. (a) It shall be unlawful for any person to transfer a firearm, except in pursuance of a written order from the person seeking to obtain such article, on an application form issued in blank in duplicate for that purpose by the Commissioner. If the applicant is a member of any association, designated by the Commissioner, which, in good faith, is organized for the purpose of, and is engaged in, target shooting or hunting, such order shall identify the applicant as a member of such association. In all other cases such order shall identify the applicant by such means of identification as may be prescribed by regulations under this act: *Provided*, That if the applicant is an individual such identification shall include fingerprints thereof.

Mr. HILL. This closes the hearings on the bill, as far as I am advised.

General RECKORD. I desire to extend my remarks if it is agreeable to the committee.

Mr. HILL. Without objection you may file any additional statement you desire.

(The statement referred to is as follows:)

The circular relative to H.R. 9066, referred to by Mr. Allen, was not broadcast, because by the time it had been delivered to us by the printer and the necessary copy of the bill to accompany the circular had been obtained and printed, conferences were already under way with the Attorney General's Office, and indications were at that time that several important changes would be made in the original draft of the bill. Having no desire to spread misinformation, the mailing of this letter was withheld, and it was finally destroyed about a week ago. A considerable number of individual copies of the letter and the accompanying bill were mailed, principally in response to inquiries from sportsmen, but in each case a personal letter accompanying the printed circular pointed out that many of the comments would probably not apply to the redrafting of the bill on which we were working with the Attorney General's Office.

The attempt which was made by Mr. Allen to leave the impression in the minds of the committee that this circular was broadcast throughout the United States was therefore entirely unwarranted. In view of the fact that the representatives of the Department of Justice at the committee hearing on Monday the 14th had been personally advised that this letter was never broadcast, the effort on the part of Mr. Allen to leave this impression with the committee can scarcely be credited as anything more than a deliberate attempt to discredit the National Rifle Association in the eyes of the committee members.

The statements made in the circular were the result of careful examination of the provisions of the bill as originally drafted. Much of the fault that Mr. Allen found with this letter appeared to be based on the fact that the letter did not apply to the bill in its present form. The letter as written had nothing to do with the bill in its present form but referred to the original draft. Many of the comments do, however, still apply to the redraft as submitted on the 14th by Mr. Keenan. Every statement concerning the probable effectiveness of the bill is substantiated by what would appear to be ample evidence to warrant the expression of such opinion.

The history of the so-called "Sullivan law" in New York State is an excellent example. This law was originally enacted to take the place of the conventional prohibition against the carrying of concealed weapons more than 20 years ago. Additional efforts to add teeth to the law have been an almost annual occurrence and have finally reached the point of complete prohibition of the use of rifles in some sections of the State.

In Massachusetts, the history of the firearms law has been the same. Originally a law prohibiting the carrying of concealed weapons, the Massachusetts law, was amended so as to require that a permit be obtained from the police before a pistol or revolver might be purchased. The law also requires permit be obtained to possess a pistol or revolver in the home or place of business, as well as a special form of permit to carry concealed. As in the case of the Sullivan law,

the Massachusetts law has had the practical effect of disarming honest citizens without disarming the criminal. Accordingly, this year in Massachusetts the conventional step was taken of introducing a bill which would require a permit from the police in order to purchase any firearm, rifle, or shotgun as well as pistol or revolver and the registration of such arms already possessed.

In Michigan the history of firearms legislation parallels that of New York and Massachusetts. Starting from the fundamental concealed-weapons law, the law has been expanded and made more severe until today the regulations cover rifles and shotguns as well as pistols and revolvers. This law has already been in effect in Michigan for 3 or 4 years, but fortunately it is being sanely administered by a superintendent of State police who is favorable to civilian small-arms practice. What will happen when a change in administrative officers becomes necessary cannot be foretold.

In Pennsylvania the same history of firearms regulation has applied. First, the concealed-weapons law, then a bill based on the uniform-firearms act, and now attempts on the part of the same reform groups to put more teeth into the uniform act by requiring a police permit for the purchase of rifles and shotguns and ammunition of all types.

The history of the situation in West Virginia has been the same. The reason that the uniform-firearms bill has not been adopted in Illinois up to this time has been because of the efforts of the reform element to add to the uniform act provisions requiring a permit to purchase, provision for the fingerprinting of bullets, so-called, and various other theoretical plans for disarming the criminal.

In California the story has been the same. From the basis of the concealed-weapons law, California went to a very excellent form of revolver, pistol, and machine-gun regulation based on the provisions of the uniform act. The women's organizations in California, particularly in one section of the State, have been particularly active in demanding that this law be made still more strict. And I suspect that some of the petitions mentioned by Mr. Keenan as having come from women's organizations favoring strict Federal firearms legislation have come from these particular groups in California, as we know that they have forwarded similar petitions to their Representatives and Senators in Congress from time to time.

There is no reason to believe, on the face of the evidence supplied from all parts of the country over a long period of time, that Federal firearms legislation would not follow the usual trend: First, the adoption of some kind of a Federal firearms bill; second, the effort to strengthen its provisions and to put more teeth into it; and finally, the effort to completely disarm the average citizen on the theory that by so doing we would be able to better arrest the armed criminal and save many people from suicide.

There is another reason for believing that this Federal legislation would take the turn indicated. The proponents of this bill, including the representatives of the Department of Justice, have repeatedly stated that they know this bill is not ideal but that they want to make a start. The logical question is "A start toward what?"

Furthermore, Mr. Keenan has said very frankly that the ideal solution of this problem would probably be to have the manufacture of all types of firearms entirely in the hands of the Government arsenals, because the Government could then refuse to sell arms to anyone it might choose to refuse.

When the importance of training our able-bodied citizens in the use of small arms as a measure of national defense was suggested to Mr. Keenan, he expressed the opinion that that was of relatively small importance, because the next war would not be won by small arms, and that in his opinion both the individual soldier, the small arms, and the ships of the fleet would be of no tangible value.

It was on the evidence presented by the Nation-wide history of firearms legislation in this country, plus the frankly expressed opinions of the Assistant Attorney General himself, that we pointed out in our letter the future possibilities of amendments to H.R. 9066.

The reference to possible dictatorial control by one or two men under the provisions of this bill which make it possible for the Secretary of the Treasury or the Commissioner of Internal Revenue to do many things by regulation which are not specifically mentioned in the bill was also based on numerous conversations with Mr. Keenan and Mr. Smith of the Department of Justice. They made it evident that many of the effective provisions under which the Narcotics Act is being administered were not included in the original law, but had merely been added on as regulations.

AR004355

It has seemed to us that while provisions written into a bill may easily be tested in the courts for constitutionality, it would probably be a much more difficult, long-drawn-out, and expensive proceeding to prove that a regulation was unconstitutional. As a matter of fact, we wonder if a regulation, not being a law, could be declared unconstitutional.

This is the evidence and these are the reasons lying behind the statements contained in our discussion of H.R. 9066.

(Thereupon, at 12:20 p.m., the hearings were concluded.)

AR004356

305 F.3d 643
United States Court of Appeals,
Seventh Circuit.

UNITED STATES of America, Plaintiff–Appellee,

v.

Joseph H. FLEISCHLI, Defendant–Appellant.

No. 01–2703.
|
Argued Jan. 7, 2002.
|
Decided Sept. 12, 2002.
|
Rehearing En Banc Denied Oct. 23, 2002.

## Synopsis

Defendant was convicted in the United States District Court for the Central District of Illinois, Richard Mills, Senior District Judge, of possession of machine guns, transportation of a firearm by a felon, possession of a firearm by a felon, unlawful manufacture of a machine gun, and possession of an unregistered destructive device, and he appealed. The Court of Appeals, Ilana Diamond Rovner, Circuit Judge, held that: (1) law enforcement agent's affidavit in support of search warrants for defendant's home and business for illegal firearms provided sufficiently reliable information on which to base finding of probable cause to issue the warrants; (2) defendant, as felon who could not possess any firearms, could not immunize himself from prosecution for possessing more tightly regulated machine guns by hiding behind corporate charter of licensed firearms manufacturer of which he was allegedly an authorized agent; (3) Congress did not exceed its powers under the Commerce Clause when it enacted statute setting forth offense of possession of machine guns; (4) Commerce clause requirement was met on charge of possession of a firearm by a felon with regard to firearms possessed in defendant's home or business so long as the guns had previously traveled in interstate commerce; (5) in a matter of first impression for the Seventh Circuit, gun had a "trigger" as required to constitute a "machine gun" for purpose of offenses of possessing and manufacturing a machine gun, where it had a mechanism used to initiate a firing sequence; (6) instruction on charge of possession of an unregistered destructive device was adequate; (7) evidence was sufficient to support conviction of possession of an unregistered destructive device; (8) fact that defendant was mere passenger in van in which gun was transported did

not bar finding that he "transported" the gun, for purpose of offense of transportation of a firearm by a felon; (9) admission of evidence of defendant's possession of firearms in Missouri did not violate defendant's Sixth Amendment right to be tried in the district where the crime was committed; and (10) application of two-point upward adjustment for exercise of management responsibility over property, assets, or activities of a criminal organization was within district court's discretion.

Affirmed.

## Attorneys and Law Firms

**\*647** Patricia A. Tomaw (argued), Office of U.S. Atty., Springfield, IL, for Plaintiff–Appellee.

Richard E. Gardiner (argued), Fairfax, VA, for Defendant–Appellant.

Before MANION, ROVNER and EVANS, Circuit Judges.

## Opinion

ILANA DIAMOND ROVNER, Circuit Judge.

Joseph Fleischli was convicted by a jury of two counts of possession of machine guns in violation of 18 U.S.C. § 922(*o*)(1), one count of transportation of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1), one count of possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1), one count of unlawful manufacture of a machine gun in violation of 26 U.S.C. § 5861(f), and one count of possession of an unregistered destructive device in violation of 26 U.S.C. § 5861(d). Fleischli was sentenced to 120 months' imprisonment, three years of supervised release and a $600 special assessment. He appeals from both his conviction and his sentence on numerous constitutional, statutory and factual grounds. We affirm.

## I.

Fleischli concedes that prior to the events that led to his indictment, he had been convicted of four felonies. Two convictions related to the illegal manufacture and possession of firearms and two related to illegal drugs. In March and May of 1998, an informant told the Springfield, Illinois ATF office that Fleischli had an aircraft machine gun (sometimes called a "minigun") and that Fleischli had taken it to

Missouri in the Spring of 1998. The informant said that in Missouri, Fleischli and others had fired the minigun. Around this same time, Donald Gibbs, an associate of Fleischli, approached Deputy James Malone in the Macoupin County Sheriff's Department with an unusual request. Gibbs wanted the Sheriff's Department to issue a letter to the Treasury Department requesting a demonstration of a Steyr machine gun in anticipation of a possible purchase. **\*648** Gibbs gave the deputy Fleischli's business card which listed Fleischli as president of Springfield Armaments Services, Inc. ("SAS"), a Class II licensed firearms manufacturer. Gibbs told the deputy that Fleischli was a licensed firearms manufacturer who owned a minigun and wanted to add to his collection. Gibbs provided the deputy with a sample letter to use in drafting the letter to the Treasury Department, requesting permission for Fleischli, as a licensed dealer, to purchase the gun. The deputy recognized Gibbs as a convicted felon and notified his captain who, in turn, notified the Springfield ATF about this strange encounter.

The ATF learned that SAS was incorporated in 1996 by Delmar and Diamonda Tobias, who were Fleischli's father-in-law and mother-in-law, and by Vernon Medlock. These three made up the board of directors as well. Delmar Tobias [1] was listed as president and Medlock was the secretary/treasurer. Apparently, Fleischli had attempted (and failed) to obtain a federal firearms license in 1991 and sought restoration of his federal explosives privileges in 1993. The ATF was therefore already familiar with Fleischli when Captain Jeff Rhodes called from the Sheriff's Department to tell them about Gibbs' conversation with Deputy Malone. The ATF agents decided to investigate, with the aid of Deputy Malone, possible firearms violations by Fleischli.

[1]   Hereafter we will use the name "Tobias" to refer to Delmar Tobias.

The ATF subsequently recorded a number of calls between Malone and Fleischli. The deputy initiated contact by calling the number listed on the business card provided by Gibbs. That number turned out to belong to Otto American Boiler, a business Fleischli owned in Springfield. During these recorded calls, Fleischli told the deputy about his firearms manufacturing business, the minigun he had constructed, and other machine guns he owned. To persuade the Sheriff's Department to issue the Treasury letter, Fleischli agreed to demonstrate the minigun on August 11, 1998 at the Brittany Range in Macoupin County. At the August 11 demonstration, ATF seized the minigun. ATF agents questioned Fleischli,

Delmar Tobias and Medlock about SAS. Fleischli said the minigun belonged to SAS, that SAS was Tobias's company and that he (Fleischli) was just an employee. Fleischli admitted he possessed other machine guns in a safe at Otto American Boiler and other firearms at his home. Fleischli volunteered that an ATF agent previously told him he could not obtain a federal firearms license in his wife's name so he decided to use his father-in-law instead. As the finger-pointing escalated, Tobias told the agents that SAS was Fleischli's idea and that Tobias was simply a partner. Tobias told the agents that Fleischli purchased all the guns that were registered to SAS. Medlock also washed his hands of blame, telling the agents that Fleischli asked him to be secretary/treasurer of SAS but that he received no pay and played no active role in the company.

On that same day, ATF agents armed with warrants obtained before this questioning searched Otto American Boiler, SAS and Fleischli's home. The agents recovered approximately seventy-five firearms from Fleischli's home. They seized machine guns, machine gun parts and explosive devices from his place of business. Machine guns registered to SAS were found at Otto American Boiler. Registration forms and other paperwork related to the guns were found at Otto American Boiler in Fleischli's office in his desk drawer. Following these seizures on August 11, the agents gathered evidence about the **\*649** prior shooting demonstration in Missouri. They obtained witness statements, a videotape of the event, and photographs. A six-count indictment against Fleischli followed.

Fleischli moved to suppress evidence seized from his home and business and moved to dismiss the indictment. He argued that the search warrants were not based on probable cause because one of the informants supplying information used to obtain the warrant was not reliable. That informant, Danny Dapron, told the agents he had last seen the minigun and other guns at Fleischli's home and business on February 1, 1998. Dapron had a checkered past himself and Fleischli argued he could not have seen the guns on February 1, 1998 because he (Dapron) was in jail at that time. The court denied the motion to suppress because Dapron was just one of several sources of information supporting the warrant. Indeed, Fleischli himself had independently corroborated Dapron's statements during his many recorded conversations with Deputy Malone. The district court therefore denied the motion to suppress and also rejected Fleischli's arguments in support of his motion to dismiss the indictment. A jury subsequently found Fleischli guilty on all six counts and the district court sentenced

him to 120 months' imprisonment. In determining Fleischli's sentence, the court included a two-level increase for his role in the offense as manager of an illegal business. Fleischli appeals.

## II.

Fleischli raises eleven challenges to his conviction and one to his sentence for an even dozen. He contends that: (1) there was no probable cause to issue the warrants used to search his home and business premises on August 11, 1998; (2) he was exempt from section 922(*o*)(1) by virtue of section 922(*o*)(2) because he was an authorized agent of a licensed firearms manufacturer; (3) section 922(*o*)(1) exceeds Congress's powers under the Commerce Clause; (4) the government failed to prove in the section 922(g)(1) possession count that Fleischli's possession of firearms substantially affected interstate commerce; (5) section 922(g)(1) exceeds Congress's powers under the Commerce Clause to the extent that it applies to Fleischli's mere possession of firearms in his home and business; (6) section 5822 does not encompass Fleischli's manufacture of machine guns because he was acting as an agent of a licensed manufacturer; (7) the minigun was not a machine gun within the meaning of section 5845 because it does not fire automatically and does not have a trigger; (8) the term "similar device" in the definition of the term "destructive device" in section 5845 is unconstitutionally vague; (9) the four alleged destructive devices seized from Fleischli did not come within the purview of section 5845(f) because they were used only as fireworks; (10) Fleischli could not be convicted of transporting firearms under section 922(g)(1) because he was merely a passenger in a vehicle used to transport firearms; (11) evidence of Fleischli's possession of firearms in Missouri was inadmissable under the Sixth Amendment which requires that a person be tried within the state and district in which the crime occurred; and (12) the court erred in applying a two-level enhancement for Fleischli's role in the offense because there were no other participants in the offense. A number of Fleischli's arguments are easily resolved by well-settled law and we will address them in summary fashion.

## A.

On August 11, 1998, ATF agents searched Fleischli's home and business **\*650** pursuant to two warrants. The warrants were issued on the basis of probable cause established by the affidavit of ATF Special Agent Robert Schmidt. Fleischli maintains that the warrants were improperly issued and not based on probable cause because Agent Schmidt credited information from Danny Lee Dapron, an unreliable informant, in drafting his affidavit. In the affidavit, Schmidt reported that he interviewed Dapron, a former employee of Otto American Boiler. Dapron told Schmidt that he saw the minigun at Otto American Boiler on February 1, 1998, and that Fleischli kept another gun in a safe on the premises as well. Dapron also reported seeing a number of firearms in a vault in the basement of Fleischli's home on that same day. Fleischli complains that the affidavit did not contain the basis of Dapron's knowledge and that the agent did not corroborate the information. Moreover, Fleischli contends, Dapron was an unreliable source with a criminal record who was actually in jail on February 1, 1998, the day he claims to have seen guns at Fleischli's home and business. Finally, Fleischli complains that the information provided by Dapron was stale by the time the warrant was executed, approximately six months later. Fleischli thus asks us to conclude that the warrant was not based on probable cause and that the evidence seized from his home and business should be suppressed.

We review *de novo* the district court's determination that probable cause existed to support a search warrant. *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *United States v. Singleton,* 125 F.3d 1097, 1102 (7th Cir.1997), *cert. denied,* 522 U.S. 1098, 118 S.Ct. 898, 139 L.Ed.2d 833 (1998). We review for clear error, however, findings of historical fact and give due weight to inferences drawn from those facts by resident judges and local law enforcement agencies. *Ornelas,* 517 U.S. at 699, 116 S.Ct. 1657; *Singleton,* 125 F.3d at 1102. We begin by reviewing the affidavit on which the court relied in issuing the warrants. Special Agent Schmidt's twelve-page affidavit contains an extensive amount of information from a variety of sources, including Fleischli himself. In recorded conversations with Deputy Malone, Fleischli corroborated much of the information provided by Dapron and others. A few examples will suffice to demonstrate the reliability of the information provided in the affidavit.

Dapron, a family friend of Fleischli's for thirty-seven years, worked at Otto American Boiler for a number of years. He correctly identified Delmar and Diamonda Tobias as Fleischli's in-laws, he knew that Fleischli's wife held an Illinois explosives license, he knew that Fleischli had taken the guns to Knob Creek, Kentucky for shooting demonstrations on a number of occasions, and he knew

where Fleischli stored his guns in safes both at his home and at Otto American Boiler. Dapron identified the types of guns Fleischli owned, naming the models and manufacturers. In short, Dapron demonstrated an intimate knowledge of Fleischli, his guns, and his home and business. Much of the detailed information provided by Dapron was corroborated by Fleischli himself, lending further credibility to Dapron's information. Fleischli told Malone, for example, that he had just returned from a machine gun shoot in Knob Creek, Kentucky, and that he had attended shooting events at Knob Creek twice a year for eighteen years. Fleischli told the deputy he had brought several guns with him down to Knob Creek. When asking for the Treasury letter, Fleischli originally asked that it be sent to 1905 East Washington, which turned out to be the address **\*651** of Otto American Boiler. The phone number on Fleischli's business card for SAS also turned out to be the number of Otto American Boiler. Fleischli also told the deputy about some of the guns he owned, including some that had been identified by Dapron. Special Agent Schmidt confirmed that Fleischli's wife held a valid explosives license from the State of Illinois. Further confirmation of Dapron's information was provided by Delmar Tobias who told a sheriff's deputy that his son-in-law stored the minigun in his (Fleischli's) safe. When an affidavit relies on an informant's tip, the issuing judge must look to the totality of the circumstances in determining whether probable cause exists. *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *United States v. Spry,* 190 F.3d 829, 835 (7th Cir.1999), *cert. denied,* 528 U.S. 1130, 120 S.Ct. 967, 145 L.Ed.2d 838 (2000). Probable cause is a fluid concept, based on a reasonable belief that evidence in the place to be searched will lead to an arrest or conviction for a particular offense. *United States v. McClinton,* 135 F.3d 1178, 1183 (7th Cir.1998), *cert. denied,* 524 U.S. 921, 118 S.Ct. 2308, 141 L.Ed.2d 167 and 525 U.S. 885, 119 S.Ct. 197, 142 L.Ed.2d 161 (1998). "Probable cause denotes more than a mere suspicion, but does not require certainty." *Id.* Special Agent Schmidt's affidavit provides sufficiently reliable information on which to base a finding of probable cause. In addition to information from Dapron and Fleischli himself, Special Agent Schmidt relied on information from another confidential informant, from Fleischli's associate Gibbs, and from sheriff's department and ATF investigators. Although Dapron was the only link to the location where the guns would be found, numerous sources including Fleischli himself verified that he currently possessed a large number of firearms. Although Dapron had a criminal record and may have misidentified the date on which he last saw the guns, he demonstrated an extensive and

intimate knowledge of Fleischli's family, business and home, as well as his gun collection. Much of this information was independently corroborated, lending further credibility to the facts that could not be confirmed until the search was actually conducted (i.e., the presence of guns in particular locations within Fleischli's home and business). The court thus did not err in issuing the warrant based on information provided by Dapron and others.

**B.**

Fleischli was convicted of two counts of possession of machine guns in violation of 18 U.S.C. § 922(*o*)(1). He argues on appeal that he was exempt from the operation of section 922(*o*)(1) by virtue of section 922(*o*)(2) and the accompanying federal regulations. Section 922(*o*)(1) states:

> Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.

18 U.S.C. § 922(*o*)(1). Section 922(*o*)(2) states in relevant part:

> This subsection does not apply with respect to ... a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof[.]

18 U.S.C. § 922(*o*)(2)(A). Federal regulations provide that qualified manufacturers may "import and manufacture machine guns ... for use by dealers qualified under this part as samples as provided in paragraph (d) of this section." 27 C.F.R. § 179.105(c). Paragraph (d), in turn, explains that applications to transfer and register certain machine guns will be approved "if it is established by specific information the expected governmental customers **\*652** who would require a demonstration of the weapon ... and letters from governmental entities expressing a need for a particular model or interest in seeing a demonstration of a particular weapon."

U.S. v. Fleischli, 305 F.3d 643 (2002)

Presumably this is the letter Fleischli and Gibbs sought to have the Sheriff's Department issue. Fleischli now argues that, in the Spring of 1998, when he transported machine guns to Missouri, he was authorized to do so by the president of SAS, a licensed manufacturer, and he was accompanied by the president of SAS on this trip as well. Because he was acting as an agent of the corporation, his possession of the guns was the corporations's possession. He thus maintains that he did not violate section 922(*o*)(1).

We review this question of statutory interpretation *de novo. United States v. Jain,* 174 F.3d 892, 897 (7th Cir.1999), *cert. denied,* 528 U.S. 889, 120 S.Ct. 210, 145 L.Ed.2d 177 (1999). Fleischli, in essence, argues that a felon who may not possess any firearms may immunize himself from prosecution for possessing more tightly regulated machine guns by hiding behind a corporate charter. He maintains that because his status as a felon is not an element of a section 922(*o*) violation, he may not be prosecuted under that provision if a licensed corporation authorized him to possess and transport a machine gun. Fleischli's argument is bold but unavailing. First, SAS would never have obtained a license if it had truthfully disclosed that it was a front for a convicted felon to gain access to firearms. Under 18 U.S.C. § 923(d)(1), an applicant for a license to manufacture or deal in firearms will be approved if "the applicant (including, in the case of a corporation, partnership, or association, any individual possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association) is not prohibited from transporting, shipping, or receiving firearms or ammunition in interstate commerce under section 922(g) and (n) of this chapter[.]" In other words, if Fleischli had held himself out to be the president of SAS during the licensing process (as he did when he approached the Sheriff's Department for the Treasury letter), SAS would not have received its license. *See also* 18 U.S.C. § 925(b) (allowing a licensed manufacturer, dealer or collector under indictment for a felony to continue operations until any conviction pursuant to the indictment becomes final). The statutory scheme when viewed as a whole was never intended to allow convicted felons to hide behind a corporate charter to gain access to the most heavily regulated firearms, such as machine guns.

Second, it is well-settled that "an agent cannot be insulated from criminal liability by the fact that his principal authorized his conduct." *McNamara v. Johnston,* 522 F.2d 1157, 1165 (7th Cir.1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976). *See also Gillespie v. City of Indianapolis,* 185 F.3d 693 (7th Cir.1999), *cert. denied,* 528 U.S. 1116, 120 S.Ct. 934, 145 L.Ed.2d 813 (2000) (upholding challenge to section 922(g)(9) by a police officer who lost his job because he could not possess a firearm after being convicted of domestic violence); *United States v. Floyd,* 882 F.2d 235, 240 (7th Cir.1989) (holding union official could not be absolved of wrongdoing by claiming the act was done with union authorization under the principal recognized in *McNamara* ). In short, a convicted felon who could not have legitimately obtained a manufacturer's or dealer's license may not obtain access to machine guns by setting up a sham corporation.

## C.

Fleischli next contends that Congress exceeded its powers under the Commerce **\*653** Clause when it enacted section 922(*o*)(1). Fleischli concedes that we have previously rejected a Commerce Clause challenge to section 922(*o*). *See United States v. Kenney,* 91 F.3d 884 (7th Cir.1996). He maintains, however, that *Kenney* is now in conflict with the Supreme Court's more recent ruling in *United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), and that we must therefore reverse his convictions on Counts 1 and 3. In *Morrison,* the Supreme Court struck down a section of the Violence Against Women Act that created a federal civil remedy for gender-motivated violence because gender-motivated violence is not an activity that substantially affects interstate commerce. Nothing in *Morrison* casts doubt on the validity of section 922(*o*)(1), and our analysis in *Kenney* remains sound. *See also United States v. Haney,* 264 F.3d 1161, 1166–71 (10th Cir.2001), *cert. denied,* 536 U.S. 907, 122 S.Ct. 2362, 153 L.Ed.2d 183 (2002) (upholding section 922(*o*) against a post-*Morrison* Commerce Clause challenge). Seeing no reason to doubt our earlier analysis and no reason to split from the well-reasoned decision of our sister circuit, we affirm Fleischli's convictions on Counts 1 and 3.

## D.

Fleischli challenges his conviction under 18 U.S.C. § 922(g)(1), the "felon in possession" statute, because the government was not required to prove that his possession of firearms substantially affected interstate commerce. Again Fleischli acknowledges that we have rejected an identical argument in the past. *See Gillespie,* 185 F.3d at 705. This time he maintains that *Gillespie* cannot stand in light of *Jones v. United States,*

529 U.S. 848, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000). But we have rejected that argument as well, and Fleischli offers us no reason to reconsider our earlier opinions. *See United States v. Mitchell,* 299 F.3d 632, 634–35 (7th Cir.2002); *United States v. Wesela,* 223 F.3d 656, 660 (7th Cir.2000), *cert. denied,* 531 U.S. 1174, 121 S.Ct. 1145, 148 L.Ed.2d 1008 (2001). *See also United States v. Singletary,* 268 F.3d 196, 205 (3rd Cir.2001), *cert. denied,* 535 U.S. 976, 122 S.Ct. 1450, 152 L.Ed.2d 391 (2002) (collecting cases).

### E.

We next review Fleischli's claim that section 922(g)(1) does not extend to firearms possessed in Fleischli's home or business. He bases this argument on *Jones,* stating that the possession of firearms in a home or non-firearms related business (presumably Otto American Boiler) is not in any sense commercial activity. Thus, he argues, as applied to him, section 922(g)(1) exceeds Congress's powers under the Commerce Clause. This is a curious argument given Fleischli's claim above that he did not personally possess any of the firearms but rather held them as an agent of SAS, a licensed firearms manufacturer. In that capacity, we have no doubt he would concede his possession of firearms affected commerce. Fleischli is entitled to argue in the alternative, however. This claim is really just a slightly different twist on Fleischli's claim above that the government should have been required to prove that his possession of firearms substantially affected interstate commerce. We have held numerous times that the Commerce Clause requirement is met in the case of firearms possession when the guns have previously traveled in interstate commerce. *See Mitchell,* 299 F.3d at 634–35; *Wesela,* 223 F.3d at 660. Nothing in *Jones* requires a different result.

### F.

Fleischli next challenges his conviction under 26 U.S.C. § 5822. Presumably **\*654** he means to challenge his conviction under 26 U.S.C. § 5861(f) which states that "[i]t shall be unlawful for any person to make a firearm in violation of the provisions of this chapter[.]" Section 5822, in turn, provides the scheme by which persons seeking to manufacture firearms may apply for permission to do so. Section 5822 provides that no person shall make a firearm unless he has filed a written application with the Secretary, paid any appropriate taxes, identified the firearm

on the application, identified himself on the application (a photograph and fingerprints must be included if the applicant is an individual), and obtained the approval of the Secretary to make and register the firearm. Section 5822 also provides "Applications shall be denied if the making or possession of the firearm would place the person making the firearm in violation of the law." Fleischli contends that section 5822 did not apply to him because he manufactured the gun in question under the auspices of SAS, a licensed manufacturer. Section 5822, he maintains, does not apply to licensed manufacturers but rather applies to non-licensed persons who wish to manufacture a machine gun. Because SAS was licensed under section 5802, it was not required to apply for approval under section 5822, and because Fleischli was employed by SAS, his manufacture of a machine gun could not be prosecuted under section 5822.

Fleischli does not cite a single case in support of this novel theory. It is essentially a replay of his argument that he is not subject to section 922(o)(1) because he was acting as the agent of a licensed manufacturer. We reject this claim here as we rejected it in section B above. First, SAS would not have obtained a license to manufacture guns if it had disclosed that Fleischli, a convicted felon, would be central to the operation. Second, Fleischli may not hide behind a corporate charter to engage in conduct he could not legally accomplish as an individual. Such a theory is contrary to the language and structure of the statutory scheme regulating firearms. If Fleischli's theory prevailed, a hypothetical "Felons, Inc." could provide convicted felon-employees with access to firearms they could not legally obtain, completely thwarting Congressional intent to keep firearms out of the hands of convicted felons. We do not believe Congress intended to create such a gaping loophole, and no statutory language supports such an expansive reading. *McNamara,* 522 F.2d at 1165; *Gillespie,* 185 F.3d at 693; *Floyd,* 882 F.2d at 240. Indeed, section 5822 specifies that applications will be denied if the making or possession of a firearm would place the person making the firearm in violation of the law. As a convicted felon, Fleischli's application would be denied because possession of a gun would place him in violation of 18 U.S.C. § 922(g)(1). Fleischli's conviction under section 5861 will stand.

### G.

Fleischli challenges his convictions for possessing and manufacturing a machine gun on the ground that the minigun

does not meet the statutory definition of a machine gun. In particular, he claims the minigun is not a machine gun as that term is defined in 26 U.S.C. § 5845(b) because the minigun does not fire automatically and does not have a trigger. Section 5845(b) defines a machine gun as follows:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, **\*655** for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b). The words "automatic" and "trigger" are not defined in the statute or regulations. Fleischli argues that a gun does not fire automatically unless it uses a portion of the energy of a firing cartridge to extract the fired cartridge and chamber the next round without a separate pull of the trigger. He derives this meaning from the United States Code's definition of "semiautomatic." He also claims the minigun is akin to a Gatling gun, which is not considered a machine gun under an IRS ruling. Relying on firearms reference manuals, he also contends that his minigun lacked a trigger as that term is defined in the firearms field because the minigun operates by virtue of an electrical on-off switch.

 In interpreting the National Firearms Act ("NFA"), the Supreme Court offered commonsense explanations of the terms "automatic" and "semiautomatic" that give us all the ammunition we need to dispose of Fleischli's disingenuous argument:

> As used here, the terms "automatic" and "fully automatic" refer to a weapon that fires repeatedly with a single pull of the trigger. That is,

once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted. Such weapons are "machineguns" within the meaning of the Act. We use the term "semiautomatic" to designate a weapon that fires only one shot with each pull of the trigger, and which requires no manual manipulation by the operator to place another round in the chamber after each round is fired.

*Staples v. United States,* 511 U.S. 600, 602 n. 1, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994). Fleischli dismisses this passage as not binding, arguing that the Court did not define "automatically" but rather defined "automatic." We think the Court's meaning is plain enough. If Fleischli's minigun, with one application of the trigger, continued to fire until the trigger was released or the ammunition exhausted, it was a machine gun within the meaning of the Act.

 That leads us to consider whether the minigun had a trigger. Fleischli's minigun was activated by means of an electronic on-off switch rather than a more traditional mechanical trigger. He maintains that an electronic switch does not meet the traditional definition of trigger and that the minigun, which fired between 2000 and 6000 rounds per minute once it was switched on, was therefore not a machine gun. This is a puerile argument, based on hyper-technical adherence to literalism. We are not surprised to learn that Fleischli is not the first defendant to make such a brazen argument, although he appears to be the first to do so in this circuit. We join our sister circuits in holding that a trigger is a mechanism used to initiate a firing sequence. *United States v. Jokel,* 969 F.2d 132, 135 (5th Cir.1992) (commonsense understanding of trigger is mechanism used to initiate firing sequence); *United States v. Evans,* 978 F.2d 1112, 1113–14 n. 2 (9th Cir.1992), *cert. denied,* 510 U.S. 821, 114 S.Ct. 78, 126 L.Ed.2d 46 (1993) (trigger is anything that releases the bolt to cause the weapon to fire). Fleischli's definition "would lead to the absurd result of enabling persons to avoid the NFA simply by using weapons that employ a button or switch mechanism for firing." *Evans,* 978 F.2d at 1113–14 n. 2. The dictionary definition of "trigger" includes both the traditional ("a small projecting tongue in a firearm that, when **\*656** pressed by the finger, actuates the mechanism that discharges the weapon") and the more general ("anything, as an act or event,

that serves as a stimulus and initiates or precipitates a reaction or series of reactions."). *See* WEBSTER'S UNABRIDGED DICTIONARY OF THE ENGLISH LANGUAGE (2001). Fleischli's electronic switch served to initiate the firing sequence and the minigun continued to fire until the switch was turned off or the ammunition was exhausted. The minigun was therefore a machine gun as defined in the National Firearms Act.

### H.

We next consider whether the term "similar device" in 26 U.S.C. § 5845(f) is unconstitutionally vague. Fleischli was convicted of violating section 5861(d), which prohibits possession of an unregistered firearm. Section 5845(a)(8) defines "firearm" to include a "destructive device." Section 5845(f), in turn, defines destructive device:

> The term "destructive device" means (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellant charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device[.]

26 U.S.C. § 5845(f). The statute further provides that the term "destructive device" does not include devices that are not designed or redesigned for use as weapons. 26 U.S.C. § 5845(f)(3). Fleischli was charged with possessing four "explosive or incendiary bombs or similar devices each consisting of a cardboard container sealed at both ends, containing a mixture of pentaerythritol tetranintrate (PETN) powder, a non-electric blasting cap with a short length of fuse." R. 26 at 7. Fleischli maintains that the use of the word "similar" causes a reasonable person to speculate as to how nearly a device must resemble a bomb, grenade, rocket, missile or mine in determining whether the device is encompassed by the statute. Fleischli thus contends the statute is unconstitutionally vague.

The three circuits to consider this issue have all found that the statute is not unconstitutionally vague. *See United States v. Markley,* 567 F.2d 523, 527–28 (1st Cir.1977), *cert.*

*denied,* 435 U.S. 951, 98 S.Ct. 1578, 55 L.Ed.2d 801 (1978); *United States v. Ross,* 458 F.2d 1144, 1145 (5th Cir.1972), *cert. denied,* 409 U.S. 868, 93 S.Ct. 167, 34 L.Ed.2d 118 (1972); *United States v. Morningstar,* 456 F.2d 278, 281 (4th Cir.1972), *cert. denied,* 409 U.S. 896, 93 S.Ct. 135, 34 L.Ed.2d 153 (1972). All three courts agreed that a person of ordinary intelligence would understand the statute to include any combination of parts intended to be used as a bomb or weapon or from which a bomb or weapon could be readily assembled. Fleischli's device comes well within the purview of the statute. He maintains, however, that the four devices he was charged with possessing were not intended for use as weapons but rather as fireworks. He complains that the jury was not instructed that the government was required to prove the devices were designed or redesigned for use as a weapon.

The jury was instructed as follows:

> You must determine whether any of the devices charged in Count 6 is a destructive device. If the objective design of the device indicates that the object has no legitimate social or commercial purpose, the defendant's intent in possessing that device is not relevant to your determination. However, if the assembled device may form an object with both a legitimate and a nonlegitimate **\*657** use, then you may consider the defendant's subjective intent in deciding whether that device qualifies as a destructive device.

R.81, Tr. at 461. This instruction was a correct statement of the law in this circuit, and allowed Fleischli to proceed with his defense that the objects were actually fireworks, not destructive devices. *See United States v. Saunders,* 166 F.3d 907, 914 (7th Cir.1999); *United States v. Johnson,* 152 F.3d 618, 625 (7th Cir.1998). The jury simply did not believe his version of events. The statute gave adequate notice of what conduct was proscribed, and the jury was properly instructed about the government's burden of proof. We find no error.

### I.

**U.S. v. Fleischli, 305 F.3d 643 (2002)**

Fleischli next raises a sufficiency of the evidence challenge, arguing that the government failed to prove that the four devices were designed or redesigned for use as weapons. He claims that the undisputed evidence shows that the devices were intended for use as fireworks at the Tobiases' farm. Fleischli's in-laws apparently held a valid fireworks permit. Fleischli has an uphill battle in making out a sufficiency of the evidence claim. In reviewing this claim we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Copus,* 93 F.3d 269, 271 (7th Cir.1996). We may reverse a conviction only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt. *Id.*

The government presented evidence that Fleischli possessed four fully assembled devices consisting of blasting caps (detonators), varying amounts of PETN (a highly explosive powder), and fuses. Government evidence demonstrated that lighting the fuse would cause the blasting cap to activate, which in turn would detonate the explosive powder. The resulting explosion was of sufficient force to damage property and cause personal injury. In response to Fleischli's claim that the devices were intended for use as fireworks, an ATF explosives expert testified that no commercial firecrackers of which he was aware used a detonator or PETN. The ATF expert testified that he knew of no social or commercial use for the devices as assembled. This evidence was more than adequate to support a conviction under section 5861(d).

### J.

Fleischli was convicted of transporting firearms in interstate commerce in violation of 18 U.S.C. § 922(g)(1). The district court here instructed the jury that a "defendant transports a firearm when he transports or causes to be transported the firearm in a vehicle." R. 81, Tr. at 458. The charge was based on the transport of the minigun from Illinois to Missouri in the Spring of 1998. The gun was transported in a trailer that was towed by a van owned and driven by Kevin Traeger. Fleischli and his family were passengers in Traeger's van. Fleischli cites *Muscarello v. United States,* 524 U.S. 125, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998), for the proposition that the driver of the vehicle was the only person legally liable for transporting the firearms. Because Fleischli was merely a passenger in the van in which the minigun was transported, he maintains he did not "transport" the gun. He does not dispute

that, as a factual matter, he agreed to bring his minigun to Missouri to attend a shooting event, that the minigun was loaded into Traeger's trailer at Otto American **\*658** Boiler, that Fleischli demonstrated the gun in Missouri, and that the gun was returned to the safe at Otto American Boiler at the end of the day.

In *Muscarello,* the Court considered the meaning of "carry" as that term is used in 18 U.S.C. § 924(c)(1). The Court concluded that "carry" is not limited to the carrying of weapons directly on the person but can include their carriage in a car. 524 U.S. at 132, 118 S.Ct. 1911. According to the Court, a person may "carry" firearms in a wagon, truck, car or other vehicle that one accompanies. 524 U.S. at 128, 118 S.Ct. 1911. The Court rejected the petitioner's claim that such a broad definition of "carry" would make it equivalent to "transport," which clearly had a separate meaning in the statute. The Court commented that "carry" implies personal agency and some degree of possession, "whereas 'transport' does not have such a limited connotation, and, in addition, implies the movement of goods in bulk over great distances." 524 U.S. at 134, 118 S.Ct. 1911. " 'Transport' is a broader category that includes 'carry' but also encompasses other activity." 524 U.S. at 135, 118 S.Ct. 1911.

There is no support in the language of the statute or the case law for Fleischli's distinction between a passenger and driver of the vehicle in which the firearm is transported. Under *Muscarello,* the key to the meaning of "carry" is personal agency and possession. "Transport" includes "carry" and is a broader category. The evidence demonstrated that the gun belonged to Fleischli, that it was transported to Missouri at his impetus, that he accompanied the gun in a van to Missouri and oversaw the loading and unloading of the gun at both ends of the trip. In short, he transported the gun to Missouri as that word is commonly understood. The government was required to prove no more than that. The district court's instruction accurately conveyed the law by clarifying that the standard could be met by showing that Fleischli caused the firearm to be transported.

### K.

Over Fleischli's objection, the government offered evidence of Fleischli's possession of firearms in Missouri. Fleischli contends that this evidence violated his Sixth Amendment right to be tried in the district where the crime was committed. Possession of a firearm is a continuing offense which ceases

only when the possession stops. *United States v. Ballentine,* 4 F.3d 504, 507 (7th Cir.1993), *cert. denied,* 510 U.S. 1179, 114 S.Ct. 1222, 127 L.Ed.2d 568 (1994). Continuing offenses may be prosecuted in any district in which they occurred. *United States v. Chin,* 981 F.2d 1275, 1278 (C.A.D.C.1992), *cert. denied,* 508 U.S. 923, 113 S.Ct. 2377, 124 L.Ed.2d 281 (1993). Thus, Fleischli was properly prosecuted for possession in either Illinois or Missouri, and the court did not err by admitting evidence of Fleischli's gun-related activities in Missouri. Moreover, Fleischli was also charged with transporting a gun from Illinois to Missouri and evidence of his possession of the gun in Missouri was highly relevant to that charge and appropriately admitted.

### L.

Finally, Fleischli contests his sentence, arguing that the district court incorrectly applied an enhancement for his role in the offense pursuant to U.S.S.G. § 3B1.1(c). That provision allows a court to increase the defendant's offense level by two levels if the defendant was an organizer, leader, manager, or supervisor in any criminal activity. Fleischli contends that this enhancement may be applied only when the offense is committed by more  **\*659** than one participant. Because "participant" is defined as a person who is criminally responsible for the commission of the offense (regardless of whether that person is convicted), and there were no other criminally responsible persons, Fleischli argues that the district court erred in applying the enhancement. Fleischli is correct that a section 3B1.1(c) enhancement may be applied only when there is another participant in the offense. *United States v. Mustread,* 42 F.3d 1097, 1103 (7th Cir.1994); U.S.S.G. 3B1.1, Application Note 2 ("To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants."). The district court was aware of this limitation, and declined to apply an adjustment under section 3B1.1(c). Instead the court departed upward, relying on additional language from Application Note 2:

> An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility

over the property, assets, or activities of a criminal organization.

U.S.S.G. § 3B1.1, Application Note 2.

In particular, the court referenced Application Note 2 and then noted:

> And here the government clearly established at trial that the defendant procured parts for illegal weapons and engaged in illegal weapons manufacture. He arranged for potential sale of the Minigun. He demonstrated its firepower at a gun show. And he had Mr. Tobias register arms and conduct transactions in his stead. Similarly, Mr. Fleischli employed Mr. Medlock as the firearm company's secretary-treasurer because Mr. Medlock had a valid firearm owner identification card, FOID card, and could use it to possess guns which the defendant could not legally possess himself. So these activities, it seems to the Court, clearly warrant a two-point upward departure pursuant to 3B1.1.

R.79, Sentencing Tr. at 8–9. The court had already found that it was Fleischli's idea to set up the corporation after repeated attempts to gain access to firearms legally had failed.

We review the court's decision to depart upward from the applicable Guideline range for abuse of discretion. *United States v. Leahy,* 169 F.3d 433, 439 (7th Cir.1999). We see no abuse of discretion here. Fleischli set up a sham corporation using friends and relatives to help him gain access to firearms he could not obtain legally. He recruited others to act as straw men in his gun purchase activities, and directed the operation himself. He maintained in his own home and business a veritable arsenal of weapons that were registered to this company, exercising management responsibility over the property, assets, or activities of a criminal organization. We therefore affirm the district court's application of an upward departure to Fleischli's sentence.