**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY**

| | |
|---|---|
| SCOTT A. HARDIN<br><br>              Plaintiff,<br><br>      v.<br><br>BUREAU OF ALCOHOL, TOBACCO,<br>FIREARMS AND EXPLOSIVES, *et al.*,<br><br>              Defendants. | Case No. 3:19-cv-56-DJH |

<u>**MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**</u>

# EXHIBIT 2

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2017-27898

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: <u>**Application of the Definition of Machinegun to Bump Fire Stocks and Other Similar Devices**</u>

For related information, <u>**Open Docket Folder**</u>

Comment Period Closed

Jan 25 2018, at 11:59 PM ET

---

**ID:** ATF-2018-0001-1050

**Tracking Number:** 1k1-90kr-x5jm

### Document Information

**Date Posted:**
Jan 5, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Mason Hicks

### Comment

Hello dear Sir/Ma'am, my name is Mason Hicks and I am commenting as a consumer.

To answer the questions on Docket No. 2017R-22 Pg. 8 for Consumers:

"21. In your experience, where have you seen these devices for sale and which of these
has been the most common outlet from which consumers have purchased these
devices (e.g., brick and mortar retail stores; online vendors; gun shows or similar
events; or private sales between individuals)?"
ANSWER: They were commonly sold in nearly all outdoor sporting goods (Brownell's, Cabelas, Academy Sports, Gander Mountain, Dick's, Field&Stream, et cetera), local gun stores, and countless online retailors (Amazon.com, Ebay.com cheaperthandirt.net, Impact guns, Bud's Gun Shop, et cetera) prior to the Las Vegas massacre.

"22. Based on your experience or observations, what is (or has been) the price range
for these devices?"
ANSWER: They're retailing for around $200-ish right now, during the panick they could be bought new at retailers for as little as $300 to as much as $1500 used at online auction (Gunbroker, prior to delisting). Before the Las Vegas attack, they could be had for a little less than $100, for example, off of Amazon.com and other online retailers. Brick and morter stores sold them for more then the online retailers did, usually for around $150-$250 depending on retailer and brand of manufacturer.

**EX2-001**

"23. For what purposes are the bump stock devices used or advertised?"

ANSWER: Amusement. They serve no real practical purpose, nor do I believe they can be made to. It's an attempt to simulate full auto fire, but it's too awkward a device to do so. It requires a skilled hand in order to work correctly, and even then there's no practical way to use it with the entire weapon shaking and and out of the operator's shoulder pocket while they have to concentrate on keeping forward momentum on the front handguard of the weapon. It's simply a mag dump device for backyard and range use. The device itself isn't even a necessary assist in that it's simply taking advantage of the inherent nature of self-loading rifles. Using the recoil of the rifle to reset the trigger, the only real thing needed to bump fire a rifle is the operator's index finger and practice. The bump stock itself is essentially like the training wheels on a bicycle.

Now, with the docket questions answered, I feel it's important to recognize that the main reason that bump fire devices became popular on the market was mostly due to the Hughes' amendment to the Firearm Owners Protection Act of 1986. Before the bill's passing, a law abiding citizen could pay a $200 tax in addition to the cost of the weapon and fill out the necessary ATF paperwork (4467) to register and own their own genuine machine gun under the National Firearms Act of 1934. Consequently, hobbyists and sportsmen had no affordable legal outlet to own weapons such as these given supply and demand driving up the cost of pre-'86 weapons.

As a direct result of the 1986 new machine gun sales ban (the Hughes' amendment), bump fire devices like Hell fire, Akins Accelerator (which was later decided illegal due to its spring mechanism), Slide Fire, and others became popular. Under the Hughes' amendment, if these devices are to be reclassified as machine guns, they will be unregistrable and henceforth banned. There are also unknown thousands out there, including those which were cobbled together using brackets, pistol grips, and buttstock parts and those manufactured using home 3D printers ; the bump fire stock is only a cheap piece of plastic. Rather than criminalizing thousands of people with unregistrable accessories, It would be more constructive to either grandfather them or have them registered under something like the 1968 Machine Gun Amnesty and to plead with/lobby Congress on behalf of a hired registered lobbyist or Congressional liaison to repeal the Hughes amendment which would allow for this. With a Hughes' Amendment repeal, machine guns and bump fire devices would be treated just as any other NFA item. Legally owned machine guns have only been used in 3 crimes prior to Las Vegas since 1934; over a period of 83 years, that isn't many.

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2017-27898

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: <u>**Application of the Definition of Machinegun to Bump Fire Stocks and Other Similar Devices**</u>

For related information, **Open Docket Folder**

Comment Period Closed
Jan 25 2018, at 11:59 PM ET

**ID:** ATF-2018-0001-1259

**Tracking Number:** 1k1-90ki-8eo2

### Document Information

**Date Posted:**
Jan 5, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Ronald Devito

## Comment

Alcohol, Tobacco, Firearms and Explosives Bureau
Docket Number: 2017R-22

Answers to Consumer Questions

Q 21:

New Bump Fire Stocks are sold via online vendors and at brick-and-mortar retail establishments. Private sales, gun shows, are a secondary market for used items.

Q 22:

Bump fire stocks range in price from $180 - $500.

Q 23:

Bump Fire Stocks are advertised and marketed as "novelties" or "range toys," allowing the recreational shooter to simulate machine gun fire.

***My perspective as a shooter***

Military and law enforcement agencies have machine guns. They don't need bump fire stocks, which are not suitable for combat or law enforcement. The bump fire stock consists of two pieces, wherein one piece slides in a track built into the other. This track could get clogged with grit and the stock would fail to function. The typical plastic bump stock would break when subjected to physical stress such as butt-stroking, or accidental drops. Finally, bump fire - with or without a bump fire stock - requires the shooter to change

**EX2-003**

the way he or she handles the weapon. With bump fire stocks, you're still shouldering, but you're pulling the weapon forward, while your trigger finger is on a finger rest and using the recoil to cycle the gun. It takes skill to do this without stalling the gun and inducing misfeeds.

26 U.S.C. 5845(b) defines a machine gun. The Obama-era approval of bump fire stocks very clearly states these devices are not machine guns and do not convert their host gun into a machine gun. The simple reason: the trigger must pulled one time for each round fired. To fire 30 rounds with a bump fire stock requires 30 trigger pulls. To fire 30 rounds with a machine gun requires only one trigger pull and holding the trigger down.

The Obama era approval of these stocks also stipulates that no mechanical assistance be provided to the shooter via springs, etc. Approved bump fire stocks meet this requirement.

Bump fire has been around as long as semi-auto firearms have been. Bump fire is using the gun's own recoil to assist the shooter in pulling the trigger much faster than the shooter can move the trigger finger. From your proposed rulemaking document:

"'Bump fire' stocks (bump stocks) are devices used with a semiautomatic firearm to increase the firearm's cyclic firing rate to mimic nearly continuous automatic fire. Since 2008, ATF has issued a total of 10 private letters in which it classified various bump stock devices to be unregulated parts or accessories, and not machineguns or machinegun conversion devices as defined in section 5845(b) of the NFA or section 921(a)(23) of the GCA."

Bump fire can be achieved without any device at all - purely by skill. It has a significant learning curve. The bump fire stock is much safer than the typical method of holding the weapon at the hip, and hooking the trigger finger through a belt loop and pulling forward - which is what beginner bump fire shooters do. It is possible to bump fire from the shoulder or a bipod without any devices, but again, there is a long learning curve.

The cone of fire generated by bump fire is much larger than that generated by a machine gun. With a machine gun, the shooter is holding the weapon steady and releasing a stream of rounds with a single trigger pull. In bump fire, the entire gun is moving as the shooter uses its recoil to generate the rapid fire.

***Bump Fire vs. Directed, Aimed Fire***

I performed this experiment: the goal was to hit 10 2-liter bottles at 10 yards. Using bump fire and a 30-round magazine, I was able to hit TWO out of 10 bottles. I replaced the two bottles hit with fresh ones and used directed, aimed,

fire, but went fast. I hit all 10 bottles with 12 rounds, since there were two misses. Directed, aimed fire is always more effective in getting hits - by a factor of at least five times!

****Las Vegas Attack****

The Las Vegas attack was the first nefarious use of a bump fire stock. One shooter was perched 32 stories up and bump fired into a crowd 300 - 400 yards away resulting in 58 deaths, and hundreds wounded. Ironically, if the shooter used directed, aimed, fire - if we were to extrapolate my own numbers with the bottles - the death toll would have been 250 to 300 or even more! The shooter actually *mimimized* casualties by bump firing, because he created a huge, inaccurate cone of fire from a great distance. He was relying on "shock and awe" and random hits.

The calls to re-classify bump fire stocks are rooted in emotion. Per the ATF's 10 approval letters, these stocks require a single trigger pull per round fired. It is my opinion that the 10 approval letters - ironically issued during the most anti-gun administration in our history - should stand as is. Bump fire stocks should not be re-classified as machine guns to appease emotions, and further infringe on our Second Amendment rights.

**EX2-005**

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2017-27898

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: <u>**Application of the Definition of Machinegun to Bump Fire Stocks and Other Similar Devices**</u>

For related information, <u>**Open Docket Folder**</u>

---

### Comment

Agencies:
Bureau of Alcohol, Tobacco, Firearms, and Explosives

Agency/Docket Number:
Docket No. 2017R-22

Commenter standing: Consumer

Credentials: Certified Pistol Instructor and Certified Range Safety Officer

Questions directed to consumer commenters are:

"21. In your experience, where have you seen these devices for sale and which of these has been the most common outlet from which consumers have purchased these devices (e.g., brick and mortar retail stores; online vendors; gun shows or similar events; or private sales between individuals)?

22. Based on your experience or observations, what is (or has been) the price range for these devices?

23. For what purposes are the bump stock devices used or advertised?"

Answers:

21. In my experience, I have seen these devices for sale in brick and mortar retail stores, from online vendors, and at gun shows. I have most commonly seen them stocked in the largest numbers in brick and mortar stores. I have seen the

Comment Period Closed
Jan 25 2018, at 11:59 PM ET

**ID:** ATF-2018-0001-1385

**Tracking Number:** 1k1-90mr-pzuz

### Document Information

**Date Posted:**
Jan 5, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Bernard Owens

**EX2-006**

most sales at gun shows. I have no experience with any private sale.

22. Based on my experience, the price range for these devices has generally been USD$139.00 to USD$149.00.

23. The purposes for which bump stock devices have, in my experience, been used or advertised is multi-faceted. Each of the following paragraphs is based directly on my personal experience.

First, given that bump-firing techniques that do not use bump fire stocks are ubiquitously understood amongst serious firearms enthusiasts, the stocks help reduce the learning curve for shooters who wish to discharge a firearm rapidly. While bump-firing is easily done by a number of other methods, those methods require excessive and potentially dangerous practice to become proficient. Bump-fire stocks also require practice to use effectively but the amount of effort expended in that practice is substantially reduced compared to the older bump-fire techniques such as two-handed free recoil against the shoulder, hooking the trigger finger into a belt loop, using a bump stick, etc. in order to obtain a similar level of skill.

Second, bump-fire stocks are used to better control aim while bump firing. In other words, using one of the stocks generally, for a given level of practice and/or instruction, results in more accurate fire. This is a major advantage to this technology; better accuracy during rapid fire means fewer chances for errant shots to strike unintended targets.

Third, bump-fire stocks are used to better control the number of shots fired when bump-firing. Older bump-firing techniques and devices tend to result in less control over the number of shots fired and it is often true that excessive rounds are fired. With a bump stock, it is easy to limit firing strings to two or three rounds.

Fourth, bump-fire stocks are advertised for the purpose in the previous paragraph. A review of point-of-sale video advertising used by Slide-Fire, for example, makes it very clear that one of the primary purposes of the stock is to enable firing 2 or 3 shots very quickly with good accuracy. In situations where a rifle is used for lawful defensive purposes, the ability to limit the number of rounds fired yet also fire them very quickly is extremely important, even life-saving.

Fifth, bump-fire stocks are advertised and used for lawful recreational purposes. Many informal shooting endeavors benefit from rapid fire, increasing the enjoyment of participants. While similar results can be obtained by other bump-firing methods, bump-fire stocks allow for easier, more accurate rapid fire by shooters without the time, facilities, money, and large quantities of ammunition normally needed to obtain a given level of skill.

In sum and in my experience, bump-fire stocks enable an increased rapidity of fire in the many sporting and defensive situations where such an increased rate of fire is appropriate while also ensuring better control, greater accuracy, and, for those reasons, substantially enhanced safety for all lawful participants.

As an addendum, I would like to add a personal observation. Bump-firing is now a known commodity well beyond the firearms enthusiasts who have previously practiced it. A rule defining bump stocks as machine guns will reduce the numbers of them in circulation. It will not, however, discourage a now much-larger audience of gun owners from seeking ways to bump-fire. They will find ways; such techniques have existed for at least a century. However, the loss of the stocks as an easily-legal and simple way to bump-fire will inevitably result in people trying to bump-fire without instruction with unsafe results. The "bump-fire genie" is out of the bottle. The availability of the stocks ensures that even shooters of a low skill level can bump-fire safely, with reasonable accuracy and control, even without formal training. Their removal from society will substantially increase the dangers that accompany people trying to learn to bump-fire without such a useful shooting aid.

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2017-27898

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: <u>**Application of the Definition of Machinegun to Bump Fire Stocks and Other Similar Devices**</u>

For related information, <u>**Open Docket Folder**</u>

Comment Period Closed
Jan 25 2018, at 11:59 PM ET

**ID:** ATF-2018-0001-19191

**Tracking Number:** 1k2-9103-3jwk

### Document Information

**Date Posted:**
Jan 25, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Brandon Bartoskewitz

**Organization Name:**
The Gun Room, LLC

### Comment

To whom this may concern,

I am a firearms collector as well as the owner of an industry retailer with a current 01 FFL and SOT. Below I have completed the requested questionnaires for the consumer and retailer portions. In addition I wish to voice a few additional concerns with this proposed regulation change. The current definition of Machinegun is coded in the National Firearms Act of 1934, and was defined in a congressional act. Specifically, my concern centers around this statement, taken from the text of the background of this proposed regulation change:

"Over time, however, as firearms technologies have advanced, manufacturers and the public have attempted to develop firearms, triggers, and other devices that permit shooters to use semiautomatic rifles to replicate automatic fire without converting these rifles into 'machineguns' within the meaning of the statute."

This statement concedes that these are not machinegun conversion devices, as they do not allow for more than one round of ammunition to be fired with one single action of the trigger. A bump stock does not modify the trigger mechanism in any way. Furthermore, the "simulated fully automatic fire" that these can generate can also be replicated by simply using the trigger finger in a particular way, using a rubber band, or any number of other devices. This proposed rule change would, in fact, change the definition of the term "Machinegun" to mean something other than how it was written in the 1934 National Firearms Act. As such, this proposed rule change would be in

violation of the existing law, and for that reason I do not believe that it will withstand scrutiny by the courts if it were to be implemented. The proper course to take in this instance would require a new law to be passed by congress and signed by the president that would modify or supersede the 1934 NFA.

My biggest concern is that without any type of solid, tangible definitions in place that cover bump stocks in existing legislation, any regulation change would be overly broad, and subject to interpretation by whomever is in power and wishes to have the regulation change, as opposed to a definition that is codified and backed by the strength of law. Thank you kindly for your time and consideration with this comment.

Retailer Questionnaire Section

Are you, or have you been, involved in the retail sale of bump stock devices? Yes

11. 4
12. 1-10
13. $100-$125
14. $100-$1,250
15. Recreational shooting, shooting aids.
16. Much the same, 1-10 devices at $100-$125 per.
17. The complete balance of $100-1,250 per year.
18. Ammunition sales decrease, time spent handling calls of concern from prior customers of bump stocks.
19. Unsure, would depend on classification of weapons and mandates for disposal.
20. Absolutely not, regarding its use as a shooting aid, very few, if any, officers/soldiers with the nature of injury that would benefit from the use of a bump fire stock would be able to serve in an active unit. To the extent that bump fire stocks "simulate fully automatic fire," LE/Mil units can order fully automatic weapons, and have no need for devices that simulate full auto fire.

Consumer Questionnaire Section

21. I have seen these devices sold across all sales media, including those mentioned in the question.
22. $100-$125, however prices recently spiked to upwards of $500 no doubt because of this pending regulation decision.
23. Recreational shooting, shooting aid.

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



# Comment on FR Doc # 2017-27898

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Application of the Definition of Machinegun to Bump Fire Stocks and Other Similar Devices**

For related information, **Open Docket Folder**

## Comment

See attached file(s) for Docket No. 2017R-22

## Attachments (1)

### Docket No. 2017R-22

**View Attachment:**  

Comment Period Closed
Jan 25 2018, at 11:59 PM ET

**ID:** ATF-2018-0001-19428

**Tracking Number:** 1k2-9117-t1ds

## Document Information

**Date Posted:**
Jan 25, 2018

**RIN:**
1140-AA52

**Show More Details**

## Submitter Information

**Submitter Name:**
John Richardson

Docket No. 2017R-22
RIN 1140–AA52
Bureau of Alcohol, Tobacco, Firearms, and Explosives
Comment on Advanced Notice of Proposed Rulemaking

First, to answer the questions posed by the ANPRM:

Q. 21: a) I have never seen bump fire stock devices for sale in gun stores. This may be a factor of the size or type of the gun store that I patronize. b) I have seen one bump fire stock device for sale at the two most recent gun shows that I attended. It was for sale by a private individual. c) The most common place for these devices to be sold is online directly from the manufacturer.

Q. 22: The price range of the bump fire stock devices online is between $150 and $300. I was told anecdotally by a vendor at the last gun show I attended that the one bump fire stock that I had seen for sale was being sold for $1,200.

Q. 23: The one person I know who does own a bump fire stock is a wheel-chair bound paraplegic who installed it on a semi-automatic shotgun for self-defense in the home. As to the claims of the manufacturers, that I cannot answer as I'm not aware of what they state is the intended purpose for a bump fire stock device.

Second, I would like to respond as to whether a bump fire stock device would fall into the statutory definition of a machine gun as defined by the National Firearms Act of 1934 and the Gun Control Act of 1968.

Per the NFA Handbook, a machine gun is "Any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machine gun, and any combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person."

This was the definition used by the Firearms Technology Division when it examined the Slide Fire bump stock. As Richard Vasquez, then the ATF's Senior Technical Expert, who conducted the examination noted the Slide Fire stock was "not designed to shoot with a single function of the trigger." **Designed** is the key word. He went on to say:

*The Slide Fire does not fire automatically with a single pull/function of the trigger.*

*It is designed to reciprocate back and forth from the inertia of the fired cartridge. When firing a weapon with a Slide Fire, the trigger finger sits on a shelf and the trigger is pulled into the trigger finger. Once the rifle fires the weapon, due to the push and pull action of the stock and rifle, the rifle will reciprocate sufficiently to recock and reset the trigger. It then reciprocates forward and the freshly cocked weapon fires again when the trigger strikes the finger on its forward travel.*

ATF Ruling 2006-2 sought to expand the definition of what constitutes a "machine gun". It equated one pull of the trigger with a single function of the trigger. This was based upon BATFE's reading of the legislative history of the National Firearms Act. However, even that definition would not apply to bump fire stocks such as the one from Slide Fire Solutions. That is because it doesn't rely on springs, blocks, rods, etc. which  "result in a weapon that shoots more than one shot, without manual reloading, by a single pull of the trigger" and thus is a machine gun.

Third, to base any new rule or law upon a single outlying event such as that which happened in the Mandelay Bay shootings in Las Vegas results in bad law and bad policy. This will also bring into existence the law of unintended consequences. If one reads the proposed laws before Congress that seek to outlaw bump fire stocks in a knee-jerk reaction to the shootings, it is clear that a broad reading would include any trigger job, lighter buffer spring, and all after-market triggers. A rough or heavy stock trigger is more likely to cause a shot to go astray and to cause serious bodily injury or death than a replacement.

Finally, it is not the job of the Bureau of Alcohol, Tobacco, Firearms, and Explosives to use regulation to change the meaning of the law. If Congress wants to change the definition of a machine gun, they should pass such a law. They should not pass the buck to the BATFE due to their own inability to agree on new legislation. Any proposed or anticipated rulemaking should be ended until such time as Congress changes the law.

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2017-27898

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: <u>**Application of the Definition of Machinegun to Bump Fire Stocks and Other Similar Devices**</u>

For related information, **Open Docket Folder** 🗗

Comment Period Closed
Jan 25 2018, at 11:59 PM ET

**ID:** ATF-2018-0001-20294
**Tracking Number:** 1k2-9119-zmoz

### Document Information

**Date Posted:**
Jan 25, 2018

**RIN:**
1140-AA52

**Show More Details** 🗗

### Submitter Information

**Submitter Name:**
Nathan Johnson

### Comment

Comments Attached.

### Attachments (5)

#### Attachment_1_Bumpfire_Stock_Comments

**View Attachment:**  

#### Attachment_2_Bumpfire-Beltloop

**View Attachment:**  

#### Attachment_3_Bumpfire_Board-Stick

**View Attachment:**  

#### Attachment_4_Bumpfire_Shoestring

**View Attachment:**  

#### Attachment_5_Bumpfire_Scratch-Built_Stock

**View Attachment:**  

**EX2-014**

I am commenting as an individual citizen, one who has not purchased a bump-stock, nor have I any intention to do so, for reasons which will be included below.

Regarding your specific questions,

21) In my experience, where I have seen these devices for sale has been exclusively on the internet, as no local gun store has had such devices in stock when I have visited.  I have not, to my recollection, seen them at a gun show, but I usually go on the second day, so I may have missed them.

22. The prices I have seen have ranged from $129.95 for a Bump Fire Systems brand stock, or $179.95-$329.95 for Slide Fire brand stocks.

23. I'll let their marketing statements speak for themselves:

Slide Fire: "Bump-fire is a well-established technique utilizing the recoil of a semi-automatic firearm to fire multiple shots in rapid succession. The patented Slide Fire® stock allows shooters to bump-fire their rifles without compromising safety and accuracy."

Bump Fire Systems: "Did you know that you can do simulated full-auto firing and it is absolutely legal? Bump Fire Systems is here to introduce you to Bump Fire Stock, that allows you to recreate the feeling of automatic firing. You can use it with your semiautomatic weapon by gripping the fore-end of the barrel and pulling it forward. Bump Fire uses a gun's recoil to shoot multiple rounds."

Now here is my case as to why these answers are irrelevant.  The "bump-fire stock" devices are an aesthetically and ergonomically pleasing replacement for numerous methods of accelerating the ability to pull the trigger on a semi-automatic firearm.  The methods they replace are nearly-to-absolutely impossible to regulate:

The first, and least safe for anyone to use, is to extend a thumb through the trigger guard of the firearm and hook it through a belt loop on one's pants (or shorts), then use the other hand to pull the firearm

forward, drawing the trigger into the thumb, depressing it.  The recoil forces the firearm back, allowing the trigger to reset.  As the recoil dissipates, the gripping hand draws the firearm forward again, repeating the process.

The second, which closely resembles the functionality of a "bump-fire stock" is to use a dowel rod, braced against the shoulder, with the firing hand's index finger held across the forward end, and extended through the trigger guard to rest upon the trigger, and the rest of the hand palming the front and sides of the pistol grip of the firearm.  The other hand is used to pull the firearm forward, drawing the trigger into the firing hand's index finger, depressing it.  The recoil forces the firearm back, allowing the trigger to reset.  As the recoil dissipates, the other hand draws the firearm forward again, repeating the process.

The third is a variant of the second.  A board braced against the shoulder, with a stick or bar affixed across the front end.  A pistol can then be held with the fingers outside of the trigger guard, and placed so that the stick fits through the trigger guard and across the trigger.  The other hand supports the board/stick combination.  Pressing the firing hand forward will cause the stick to depress the trigger, discharging the firearm.  The pistol pivots back and down with the recoil, releasing pressure on the trigger, and allowing it to reset.  When the slide returns to the battery position, tension in the wrist pivots the firearm back into position, putting pressure upon the trigger and restarting the process.

The fourth, which is surprisingly functional, but only works with firearms with a reciprocating charging handle, is to use a piece of string (such as paracord, nylon cord, kite string, a shoe string, or high-strength fishing line) affixed to the charging handle, wrapped back behind the pistol grip or the back of the trigger guard (on the same side as the charging handle), then through the trigger guard so that it creates tension across the trigger, and then to a ring (an empty key-ring will do), which fits on the trigger finger.  The firearm is then held in its normal firing position.  The trigger finger is tensed, drawing the ring back, and creating sufficient tension to depress the trigger, discharging the firearm.  When the firearm discharges, the charging handle moves back with the bolt carrier, creating slack in the string, which allows the trigger to reset.  When the bolt carrier returns forward, the charging handle pulls the string taught, creating tension upon the trigger sufficient to depress it, beginning the process anew.  This will continue until the operator of the firearm reduces the tension they are applying with the ring and string.

The fifth option is the "zero equipment" option.  A semi-automatic firearm can be held half an inch to an inch from the shoulder, held firmly by the support hand and cradled with the firing hand.  The trigger finger is held at a firm approximation of a ninety(90)-degree angle, and placed in the trigger guard

against the trigger, while the arm is locked in place.  The support hand pulls the firearm forward, drawing the trigger against the locked trigger finger until it is depressed, discharging the firearm.  The recoil forces the firearm back into the shoulder, and away from the trigger finger, allowing the trigger to reset.  Once the recoil has dissipated, the supporting hand continues to draw the firearm forward, pressing the trigger against the trigger finger, and beginning the process anew.  For a pistol too small to grip with a second hand, the wielding hand can grasp the grip below the trigger guard, while one finger of the off-hand is extended through the trigger guard and placed against the trigger.  The wielding hand presses the pistol forward, pressing the trigger against the off-hand trigger finger until the trigger depresses and the pistol discharges.  The pistol rocks back with the recoil, relieving pressure on the trigger and allowing it to reset.  When the slide returns to battery, tension in the wrist of the wielding hand then returns the pistol to its firing position, pressing the trigger against the off-hand trigger finger until it depresses and begins the process anew.

That list comprises one evening of research, and does not include the numerous scratch-built bump-stocks also discovered, which have been constructed by individuals for around twenty (20) dollars.  The simple fact is that the only thing commercially available bump-fire stocks achieve is to part firearms enthusiasts from their money.  They replicate, in some cases, something that can be done with less than a dollar's worth of investment, and do not reduce the mechanical trigger-pull-to-discharge ratio.  Atop that, bump-fire stock equipped firearms do not have the reliability to serve in the capacity of a machinegun, with many online available videos depicting the finicky nature of firearms equipped with these devices, the result being intermittent bursts of fire good for little more than short recreational thrills.

There is also information that the ATF has that citizens do not.  It is a pertinent question you could ask of your own records, regarding the incident which spurred this discussion in the first place: "How many of the bump-stock equipped firearms out of the substantial arsenal reportedly used in the Las Vegas Incident were jammed or otherwise rendered useless due to malfunctions caused by the use of bump-stocks on weapons not designed to fire at those rates?"  Also available to you should be the statistics of how many times a bump-fire stock has been used in a crime, nationally.  The answer should provide some answer as to the feasibility of these devices as machine guns.

Finally, there is the economic argument.  In order to classify these devices as machineguns, the ATF would have to create a comprehensive database of all devices sold, then try to either confirm registration of all devices, in contradiction to the Hughes Amendment, or require their confiscation and destruction, in contradiction to the post-facto clause in the Constitution of the United States as well as the Second Amendment.  As far as I can tell, there would need to be some kind of legislation in place to allow for the processing of these devices.  Atop of this, there will most likely be a series of lawsuits challenging the ruling, resulting in substantial expenditures of taxpayer funds, and requests for stays of

enforcement for the duration of the lawsuits, which could put enforcement efforts on hold.  Honestly, as a taxpayer, I do not want my money wasted on such fruitless endeavors - not to ban a thing which serves the same function as a belt-loop, a dowel rod, or a key-ring and string.


Thank you for your time and consideration.  I hope this document has been of assistance.

EX2-018



EX2-019





EX2-021



**EX2-022**

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



# Comment on FR Doc # 2017-27898

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: <u>**Application of the Definition of Machinegun to Bump Fire Stocks and Other Similar Devices**</u>

For related information, <u>**Open Docket Folder**</u> ⊞

## Comment

See attached file(s)

## Attachments (1)

### Silencer Shop - Comment Bump fire

**View Attachment:** 

Comment Period Closed

Jan 25 2018, at 11:59 PM ET

---

**ID:** ATF-2018-0001-24397

**Tracking Number:** 1k2-9134-hs15

## Document Information

**Date Posted:**
Jan 26, 2018

**RIN:**
1140-AA52

**Show More Details** ⍐

## Submitter Information

**Submitter Name:**
Dave Matheny

**Organization Name:**
Hill Country Class III, LLC d/b/a Silencer Shop



---

**COMMENT OF HILL COUNTRY CLASS III, LLC D/B/A SILENCER SHOP TO NOTICE OF APPLICATION OF THE DEFINITION OF MACHINEGUN TO BUMP FIRE STOCKS AND OTHER SIMILAR DEVICES**

---

Respectfully submitted on behalf of Hill Country Class III, LLC d/b/a Silencer Shop.

_____

Hill Country Class III, LLC
d/b/a Silencer Shop
13729 Research Blvd #630
Austin, TX 78750
(512) 931-4556

Hill Country Class 3, LLC d/b/a/ Silencer Shop ("Silencer Shop") files this comment related to ATF-2018-0001-0001, docket number 2017R-22, RIN 1140-AA52, entitled Application of the Definition of Machinegun to Bump Fire Stocks and Other Similar Devices.  Silencer Shop is the largest dealer of firearm silencers in the country.   Silencer Shop has a public showroom in Austin, Texas and a large online store available at www.silencershop.com.   Silencer Shop sells silencers and other firearms to law enforcement agencies, individual law enforcement officers, as well as individuals.  Silencer Shop customers use their silencers for a broad array of applications, including use in their official duties as law enforcement officers, home and self-defense, hunting, teaching, recreational shooting, varmint eradication, and collecting.  Although Silencer Shop is a licensed firearms dealer, Silencer Shop is not, nor has it ever been, in the business of selling bump-fire stocks.

## I.    "BUMP FIRE" STOCKS ARE SIMPLY NOT MACHINE GUNS.

The National Firearms Act defines "machinegun" as any weapon which: "shoots, is designed to shoot, or can be readily restored to shoot automatically more than one shot, without manual reloading, by a single function of the trigger." The term also includes "the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." 26 U.S.C. 5845(b).  Since 2008, ATF has issued a total of ten letters in which it classified various bump stock devices to be unregulated parts or accessories, and not machineguns or machinegun conversion devices as defined in section 5845(b) of the NFA or section 921(a)(23) of the GCA. In its January 7, 2010, John Spencer the Chief of the Firearms Technology Branch of the ATF correctly concluded that "[t]he stock has no automatically

functioning mechanical parts or springs and performs no automatic function when installed.  In order to use the installed device, the shooter must apply constant forward pressure with the non-shooting hand and constant rearward pressure with the shooting hand.  Accordingly, we find that the "bump-stock" is a firearm part and is not regulated as a firearm under the Gun Control Act or the National Firearms Act.

The bump-fire stock simply assists in rapid semi-automatic fire, not automatic.  Each individual shot comes from independent function of the trigger.  With each shot, the trigger is fully reset and must be pulled again.  Simply because a firearm part allows this independent trigger function to be accomplished in a more economic manner, does not make it "more than one shot" coming with a "single function of the trigger."  As such, this device is simply not a machine gun.

The ATF lacks to authority to classify a device as a machine gun simply because the device received "a significant amount of public attention" and the "general public and from members of both houses of Congress request[ed] that ATF re-examine its past classification."  In order to be classified as a machine gun it must meet the statutory definition of a machine gun.  Should those members of Congress who requested the "reexamination" want the statutory definition of machine gun changed it would be up to them to do so by legislation.

## II.   DEFINING "BUMP FIRE" STOCKS AS MACHINE GUNS WOULD CREATE FEAR OF PROSOCUTION FOR THOUNSANDS OF AMERICANS WHO RELIED ON THE ATF'S PRIOR RULING

As the ATF notes in its request for comment it has at least 10 letters concluding that bump-fire stocks are not machine guns.  Since that time, thousands (perhaps even tens or hundreds of thousands) of Americans have relied on these letters to purchase bump-fire stocks.  The retroactive classification of these devices as machine guns would have the enormous impact of making most of these Americans illegally in possession of an unregistered machine gun.   Additionally, because of 922(o), there is no legal way for these Americans to register these firearms as machine guns. Americans would be uncertain on how to handle the new contraband and could lead to countless criminal felony prosecutions of unknowing citizens, who believed they were buying an "ATF Approved" product.

*A retroactive ban without a grandfather clause would be an unconstitutional taking unless compensation was paid.*

The "Takings Clause" of the Fifth Amendment to the federal constitution prohibits taking private property "for public use, without just compensation." While the Takings Clause is often discussed in the context of land and real estate, it also applies to personal property.  The clause applies to actual confiscations of property as well as to regulatory takings.

In the context of firearms, several courts have ruled that bans are only not an unconstitutional taking if they contain a grandfather clause.   See, e.g. *Silveira v. Lockyer*, 312 F.3d at 1092 (city's assault weapon ban upheld only because it contained a grandfather clause).

_If the ATF moves forward with this rule it should allow amnesty registration._

When the National Firearms Act was amended in 1968, a 30-day amnesty period immediately following the law's effective date was established during which persons possessing unregistered firearms could register them.  The 1968 amendments also provided for the establishment of additional amnesty periods at the discretion of the director.  Such a period would be appropriate here given the volume of contraband in the hands of the general public and the serious penalties that could be imposed on buyers who relied on the ATF's prior rulings.

Such amnesty registrations are not unheard of when the ATF reclassifies a previously unregulated item.  For instance, on March 1, 1994, the Secretary of the Treasury announced that the USAS 12, Streetsweeper, and Striker-12 shotguns had been classified as Destructive Devices subject to registration and tax controls under the NFA. The ATF rulings was retroactive for registration purposes as many had previously been imported as traditional shotguns.  However, the ATF allowed for retroactive registration, and waived the $200 tax.  The ATF held the registration period open from 1994 to 2001 and some 8,200 firearms were registered.  See ATF Ruling 2001-1.

### III.   ANSWERS TO CERTAIN QUESTIONS POSED BY THE ATF.

**Question 20: If ATF classified bump stock devices as "machineguns" under the Gun Control Act of 1968, as amended, and the National Firearms Act of 1934, as amended, do you believe that there would be a viable (profitable) law-enforcement and/or military market for these devices?**

*Answer:* No.

**Question 21: In your experience, where have you seen these devices for sale and which of these has been the most common outlet from which consumers have purchased these devices (e.g., brick and mortar retail stores; online vendors; gun shows or similar events; or private sales between individuals)?**

*Answer:* These devices are commonly sold online, at gun shows, in traditional brick and mortar stores (both firearm and non-firearm dealers), and in fact-to-face sales.  Common retainers include Walmart, Cabela's, Slide Fire and Bump Fire Systems.

**Question 22: Based on your experience or observations, what is (or has been) the price range for these devices?**

*Answer:* Prices typically range from $99 for the most basic model to $329.95 for high-end models with added features.  Firearms equipped with bump-fire stocks in price from $300 to $5000 and up, depending on the firearm used as the platform.

**Question 23: For what purposes are the bump stock devices used or advertised?**

Answer: These have been marketed as a product that would allow users to "bump-fire" firearms.  Bump-fire is commonly understood to be a method of rapid semi-automatic fire by allowing the recoil of the firearm to cause a quick, but independent, pull of the trigger.  Some companies advertise these devices specifically to users with limited mobility or handicaps.  They are also marketed as "ATF Approved" items.  Many retailers either include a copy of an ATF letter with the stock or actively tout that it was been ATF approved.

We have seen these devices used for several lawful and legitimate purposes.  Most importantly, licensed firearm manufacturers and retailers have used these devices to conduct reach and development and to test and evaluate firearms and parts.  For instance, many silencer makers, retailers, and evaluators use these devices to "torture" test silencers for evaluation under extreme rapid semi-automatic shooting conditions.  Bump-fire is an extremely valuable tool for this type of testing.

Some customers use these devices for hunting and other sporting purposes.  This device is an important tool in varmint control and eradication.  According to Smithsonian Magazine, "[w]ild hogs are among the most destructive invasive species in the United States today." Wild hogs often herd together, so having the ability to use rapid semi-automatic fire can often result in the eradication of more hogs. For similar reason, these devices are also used in the control of other varmints including coyotes, foxes, gophers and prairie dogs. Some consumers use these devices for shooting competitions.

Some consumers use these devices to conduct training and to practice for "real world" shooting scenarios.  Many customers are military or law enforcement and often train off-duty with personal guns.  Having a device that allows for rapid semi-automatic fire is essential for their training.

Lastly, many customers simply use these devices in recreational shooting and "plinking". Although often overlooked, recreational shooting is an important part of American's connection with nature and is an important bonding time for many American families.

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2017-27898

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Application of the Definition of Machinegun to Bump Fire Stocks and Other Similar Devices**

For related information, **Open Docket Folder**

Comment Period Closed
Jan 25 2018, at 11:59 PM ET

**ID:** ATF-2018-0001-24408

**Tracking Number:** 1k2-9135-91gz

### Document Information

**Date Posted:**
Jan 26, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Luke Ganucheau

### Comment

2017R-22 seeks comments on a proposed rule change, to apply the definition of machinegun to bump fire stocks and other similar devices.

From the general public, ATF has asked for answers to several specific questions:

21. I have seen these devices for sale online, but also occasionally in gun shows. They were originally a rare sight in gun stores, but in the months leading up to October 2017, they were fairly common at big gun shops like Cabelas. Now, I only see them for sale online, and one manufacturer (Fostech) appears to have stopped selling them (they removed the product from their website.)

22. Before October, the prices I saw ranged from $150 (Slide Fire Solutions' cheapest) to $450 (all-metal stock from Fostech).

Given the cost of these devices, which owners purchased after explicit and repeated ATF approval, I would like to call attention to Section 3.2.1 of the ATF's NFA handbook, which I have attached to this comment.

The handbook states that the 1968 Gun Control Act allows for "amnesty registration" periods to be established for machineguns (and other NFA firearms), and that period shall not exceed 90 days. Such an amnesty period has only been implemented once.

If the ATF were to define bump fire stocks as machineguns, rather than force their destruction or surrender nationwide,

EX2-031

they should implement a 90-day amnesty registration period. This would allow owners, who paid several hundred dollars for these devices, to pay the required $200 NFA registration tax and undergo a background check. If they passed the background check, the device would be registered and they would be able to keep it - if they failed the check, they would then lose the device. This would give owners a chance to avoid losing the money they spent on the device while still complying with the ATF's decision. It should be noted that the background check associated with NFA registration is a strict one - the same as is required to possess silencers, hand grenades, grenade launchers, etc.

If the ATF does not allow such an amnesty period, then owners will have no choice but to destroy or surrender their (rather expensive) firearms accessories, as the NFA registry is currently closed to machineguns.

23. I have seen these products marketed exclusively as recreational devices. "Full auto fun without the full auto price tag."

If the ATF decides that this proposed rule is in the public interest, then let them implement it; however, this should not be done without implementing an amnesty registration period, as the ATF is authorized to do by the 1968 Gun Control Act.

## Attachments (1)

atf-p-5320-8-chapter-3

**View Attachment:** 

# CHAPTER 3.  REGISTRATION OF NFA FIREARMS

### Section 3.1  The National Firearm Registration and Transfer Record (NFRTR)

The NFRTR is the central registry of all NFA firearms in the U.S. which are not in the possession or under the control of the U.S. Government. The registry includes (1) the identification of the firearm, (2) date of registration, and (3) identification and address of the person entitled to possession of the firearm (the person to whom the firearm is registered).[30]

### Section 3.2  Who may register NFA firearms

**3.2.1  Amnesty registration.**  When the NFA was amended in 1968, a 30-day amnesty period immediately following the law's effective date was established during which persons possessing unregistered firearms could register them in the NFRTR.[31]

The 1968 amendments also provided for the establishment of additional amnesty periods not exceeding 90 days per period.[32]  To date, no additional amnesty periods have been declared. Requests for further amnesty periods have been denied, principally because additional periods could jeopardize pending ATF investigations and prosecutions of NFA violations.

**3.2.2  Registration by State and local agencies**.  To be lawfully possessed by States and political subdivisions of the States (for example, local police departments), NFA firearms must be registered in the NFRTR. The regulations permit State and local police organizations acquiring unregistered NFA firearms for official use, by seizure, forfeiture, or abandonment, to register them in the NFRTR by filing ATF Forms 10. Appendix C contains a copy of the form. Firearms registered on Forms 10 are for official use only and subsequent transfers will be approved only to other government agencies for official use.[33]   For example, they may not be traded to an FFL/SOT in exchange for other firearms or police equipment.

**3.2.3  Registration by makers.**  Persons other than FFLs and SOTs desiring to make an NFA firearm are required to first register the firearm by filing Form 1 with ATF and obtaining approval of the form and registration of the firearm. Appendix C contains a copy of the form. ATF will approve a making application on Form 1 if the maker pays the $200 making tax required by the NFA, identifies the firearm as the form requires, includes his/her fingerprints and photographs if the maker is an individual, and if the making and the maker's possession of the firearm would not place the maker in violation of any Federal, State or local law.[34]  A law enforcement certification is also required if the maker is an individual. Note also that ATF will not approve the making of a machinegun it determines would violate 18 U.S.C. 922(o). Section 922(o) generally prohibits the possession of machineguns manufactured on or after May 19, 1986.

---

[30] 26 U.S.C. 5841(a)
[31] Section 207(b) of the Gun Control Act of 1968, Public Law 90-618, approved October 22, 1968
[32] Section 207(d), ibid
[33] 27 CFR 479.104
[34] 26 U.S.C 5822; 27 CFR 479.62, 479.63, 479.64

**3.2.4  Registration by importers.** FFLs/SOTs qualified as importers must register imported firearms by filing ATF Forms 2, Notice of Firearms Manufactured or Imported, no later than 15 days from the date the imported firearms were released by Customs.  Upon timely receipt by ATF of a Form 2 and a copy of Form 6A showing Customs' release of an imported firearm, ATF will register the firearm to the importer.[35]  Appendix C contains copies of Forms 2 and 6A. Note that the NFA prohibits importation of NFA firearms unless they are being imported for the use of the United States or a State agency, for scientific or research purposes, or for testing or use as a model by a registered importer or solely for use as a sales sample by a registered importer or registered dealer.[36]  In the case of an imported machinegun, Section 922(o) of the GCA would also apply.

**3.2.5 Registration by manufacturers**. FFLs/SOTs qualified as manufacturers must register manufactured firearms by filing ATF Form 2, Notice of Firearms Manufactured or Imported. All firearms manufactured during a single day must be listed on one Form 2. The form must be filed no later than the close of the next business day. Receipt of the form by ATF will serve to register the listed firearms to the manufacturer.[37]  Appendix C contains a copy of Form 2.

**3.2.6  Registration to transferees**. Registered firearms may be transferred by their registered owners/possessors to transferees. Other than Form 10 registration, there is no mechanism in the NFA to lawfully transfer unregistered NFA firearms.

**3.2.6.1  Transfers by persons other than FFLs/SOTs to other such persons**. Transferors of registered firearms must file ATF Forms 4, Application for Tax Paid Transfer and Registration of a Firearm, to register the firearm to the transferee and pay the applicable transfer tax.[38]  Appendix C contains a copy of the form.  The form must be approved by ATF before the transfer may be made.[39]  ATF will not approve the form if the transfer, receipt, or possession of the firearm would place the transferee in violation of any Federal, State, or local law.[40]  A law enforcement certification is also required on ATF Form 4.

**3.2.6.2  Transfers by FFLs/SOTs to persons other than FFLs/SOTs**.  Transferors of registered firearms must file ATF Forms 4, Application for Tax Paid Transfer and Registration of a Firearm, to register the firearm to the transferee and pay the applicable transfer tax. Appendix C contains a copy of the form. The form must be approved by ATF before the transfer may be made.[41]  ATF will not approve the form if the transfer, receipt, or possession of the firearm would place the transferee in violation of any Federal, State, or local law.[42]

**3.2.6.3  Transfers by non-FFLs/SOTs to FFLs/SOTs**.  Transferors of registered firearms must file ATF Forms 4, Application for Tax Paid Transfer and Registration of a Firearm, to register the firearm to

---

[35] 27 CFR 479.112
[36] 26 U.S.C. 5844
[37] 27 CFR 479.103
[38] 26 U.S.C. 5812(a); 27 CFR 479.84
[39] 26 U.S.C. 5812(b); 27 CFR 479.86
[40] 26 U.S.C. 5812(a); 27 CFR 479.85
[41] 26 U.S.C. 5812(b); 27 CFR 479.86
[42] 26 U.S.C. 5812(a); 27 CFR 479.85

EX2-034

the transferee and pay the applicable transfer tax.[43]   Appendix C contains a copy of the form.  The form must be approved by ATF before the transfer may be made.[44]   ATF will not approve the form if the transfer, receipt, or possession of the firearm would place the transferee in violation of any Federal, State, or local law.

**3.2.6.4  Transfers by FFLs/SOTs to other FFLs/SOTs**.  Transferors must file ATF Forms 3, Application for Tax-Exempt Transfer of Firearm and Registration to Special Occupational Taxpayer, to register the firearm to the transferee.[45]   Appendix C contains a copy of the form.  In these transactions, the transferor has no liability for the transfer tax.  The form must be approved by ATF before the transfer may be made.[46]   ATF will not approve the form if the transfer, receipt, or possession of the firearm would place the transferee in violation of any Federal, State, or local law.

**3.2.6.5  Transfers to State and local government agencies**.  Transferors must file ATF Forms 5, Application for Tax Exempt Transfer and Registration of a Firearm, to register the firearm to such agency.[47]   Appendix C contains a copy of the form.  In these transactions, the transferor has no liability for the transfer tax.  The Form must be approved by ATF before the transfer may be made.[48]

## Section 3.3  Status of unregistered firearms

Firearms not lawfully registered as required by the NFA may not be registered and legitimized by their possessors.  They are contraband and unlawful to possess.[49]  However, see Section 2.4 for information on removing NFA firearms from the scope of the NFA because of their status as collectors' items, modification, or elimination of certain component parts.

## Section 3.4  ATF disclosure of NFA registration information

**3.4.1  Restrictive use of information.**  The NFA provides that no information or evidence obtained from an application, registration, or records required to be submitted or retained by a natural person (individual) in order to comply with the NFA or the NFA regulations shall be used directly or indirectly as evidence against the person in a criminal proceeding with respect to a violation of law occurring prior to or concurrently with the filing of the application or registration.[50]  Filing false information is an exception to this prohibition.[51]

**3.4.2  Prohibition on ATF's disclosure of tax returns or tax return information.**  NFA forms are treated as tax returns and registration information in the NFRTR is considered to be tax return

---

[43] 26 U.S.C. 5812(a); 27 CFR 479.84
[44] 26 U.S.C. 5812(b); 27 CFR 479.86
[45] 26 U.S.C. 5812(a); 27 CFR 479.88
[46] 26 U.S.C. 5812(b); 27 CFR 479.88(b)
[47] 26 U.S.C. 5812(a); 27 CFR 479.90
[48] 26 U.S.C. 5812(b); 27 CFR 479.90(b)
[49] U.S. v. Freed, 401 U.S. 601 (1971)
[50] 26 U.S.C. 5848(a)
[51] 26 U.S.C. 5848(b)

EX2-035

information. ATF is generally prohibited from disclosing tax returns and tax return information.[52]
However, firearms registration information may be disclosed to registered owners/possessors of the
firearms.

**3.4.3  Determining the registration status of an NFA firearm.**  The situation may arise when a person
finds in his or her possession an NFA firearm and is uncertain whether the firearm is lawfully registered.
Naturally, the person will want to query the NFA Branch to determine the registration status of the
firearm. Because of the restriction on disclosure of NFA registration information discussed in section
3.4.2, ATF will not respond to the person's telephone request for the registration status of the firearm.
To communicate with the person, the NFA Branch will respond to the request if the person verifies his
or her identity to the Branch in writing. If the firearm is registered to the person in the NFRTR, the
Branch will so advise the person and, if the circumstances warrant, provide the person with a copy of the
registration. See also Section 3.5 on lost or stolen registration documents.

**Section 3.5  Lost or stolen registration documents.**  A person possessing a firearm registered as
required by the NFA must retain proof of registration, that is, the registration form showing registration
of the firearm to the person, which must be made available to ATF upon request.[53]  If a registrant
discovers that a Form 1, 2, 3, 4, 5, 6A, or 10 is stolen, lost or destroyed, the registrant must immediately
report the theft, loss, or destruction in writing to the NFABranch.[54]  The report must contain the details
of the situation. ATF will issue a duplicate copy of the registration document as the circumstances
warrant.

**Section 3.6  Correcting incorrect registration documents**.  Occasionally**,** the registered possessor of
an NFA firearm may notice that the registered firearm does not match the registration document.
Perhaps the serial number is slightly different. In this situation, the registrant should take a photograph
of the markings on the firearm (or a rubbing) and send it to the NFA Branch with a written request to
correct the serial number as documented on the NFRTR. ATF will respond to the request by letter
stating that the NFRTR has been corrected and advising the registrant to keep the letter with the
registration document as evidence of proper registration.

**Section 3.7 Maintaining registration documents.** A person possessing an NFA firearm registered as
required by law must retain proof of registration, that is, the document showing the person's registration,
which must be made available to ATF upon request.[55]

---

[52] 26 U.S.C. 6103
[53] 26 U.S.C. 5841(e)
[54] 27 CFR 479.142
[55] 26 U.S.C. 5841(e)

EX2-036

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2017-27898

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: <u>**Application of the Definition of Machinegun to Bump Fire Stocks and Other Similar Devices**</u>

For related information, <u>**Open Docket Folder**</u>

Comment Period Closed

Jan 25 2018, at 11:59 PM ET

---

**ID:** ATF-2018-0001-27040

**Tracking Number:** 1k2-912p-wgx0

### Document Information

**Date Posted:**
Jan 29, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Michael Taylor

### Comment

I acknowledge that at this time no rule has been proposed, and at this point only a specific request has been made concerning manufacturing, sales and consumer use of bump-fire devices. I shall therefore confine my comments to the questions asked in Section III. Requests for Public Input, Consumers, Questions 21., 22., and 23., and relevant background information concerning my exposure and use of shooting aids.

Q. 21: In your experience, where have you seen these devices for sale and which of these has been the most common outlet from which consumers have purchased these devices (e.g., brick and mortar retail stores; online vendors; gun shows or similar events; or private sales between individuals)?
A. 21: I saw these stocks at a variety of retail stores in the Phoenix area at one point. Shortly after they became a commonly seen item, they also ended up on the secondary (private sale) market as people discovered how expensive they were, in terms of ammunition costs, to operate.

Q. 22: Based on your experience or observations, what is (or has been) the price range for these devices?
A. 22: Depending on the date, I have seen these stocks go from around $100 to $350 or more depending on the specific model. Obviously now, with the prospect of a ban or similar adverse action, prices of nearly $1000 have been paid online for these devices.

Q. 23: For what purposes are the bump stock devices used or advertised?
A. 23: When I have personally used these devices, I found

EX2-037

their most advantageous feature to be the reassigning of the muscles used to control the firing of the rifle from the fine finger muscles of my right hand (which in my case no longer work due to severe nerve damage resulting from cancer in my cervical spinal cord) to the gross motor control provided by my functional left/support arm. In this manner I was able to use my support arm, from its proper grip location on the forend, to accurately and safely fire the rifle in a more effective fashion, despite to my disability.

I realize that there are many other safe and lawful uses for these devices. I am simply sharing my experiences. To further elaborate, when bird hunting with a Remington 870, pump-action shotgun, I must also use a similar technique, wherein I: shoulder the shotgun, cradle the trigger-guard with my right hand, insert a finger from my right hand into the trigger guard, and pull forward on the forend with my left hand to cause my right hand to make contact with the trigger and fire the shot, while also tracking the birds flight with my support/left hand to provide aim. I got three pheasants last time I was hunting, using this adaptive technique. Unfortunately, without adaptive equipment, it is more difficult, and less accurate to use this technique with certain firearm configurations, and therefore these stocks are indeed helpful. In my instance slide fire is more descriptive of my use of these stocks, as they are used to slide the rifle forward into the stationary trigger finger.

Thanks for taking the time to review my comments in the areas requested.

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov

 Regulations.gov - Your
Voice in Federal Decision

# Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder**

Comment Period Closed

Jun 27 2018, at 11:59 PM ET

**ID:** ATF-2018-0002-1873

**Tracking Number:** 1k2-92b6-s6tb

## Comment

Hello, you can bump fire a rifle with a belt loop. You do not need a bump stock, will beltloops still be legal? If so how? Video included https://youtu.be/D5ROC1ElVhQ
Thanks for your time

## Document Information

**Date Posted:**
Apr 4, 2018

**RIN:**
1140-AA52

**Show More Details**

## Submitter Information

**Submitter Name:**
Morgan Proctor

EX2-039

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder**

Comment Period Closed

Jun 27 2018, at 11:59 PM ET

**ID:** ATF-2018-0002-1996

**Tracking Number:** 1k2-92b7-waqr

### Document Information

**Date Posted:**
Apr 4, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Alex Stelly

### Comment

I made a comment on this last night, now its turned off. Seems like the ATF doesnt like the over 1000 comments already submitted. When they did this last time 85% told them not to change the rules. Here is what i commented

To allow an unelected body to make decisions infringing on any constitutional right goes against the core of our nation's founding principles. There is no legislative basis for changing the definition of the legal term "machinegun" and the decision made by ATF in the 2010 review that they do not have authority to regulate so called "bumpstocks" was correct. To take action now based on political pressure would set a very dangerous precedent that will inevitably risk politicizing this bureau to achieve what cannot be done through legislative activity by elected representatives.

https://www.regulations.gov/document?D=ATF-2018-0001-35714

## Attachments (2)

### Screenshot_20180330-084345

**View Attachment:**  

### Screenshot_20180330-133751

**View Attachment:**  

**EX2-040**



AT&T 4G LTE 67% 8:43 AM

## Regulations.gov

SHARE

**regulations.gov**
Your Voice in Federal Decision-Making

Home   Help ▾   Resources ▾   Contact Us

Advanced Search

**PR**  Bump-Stock Type Devices

This Proposed Rule document was issued by the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF)
For related information, **Open Docket Folder** ⊕

Comments Not Accepted

ID:  ATF-2018-0001-35714

View original printed format: PDF

Tweet    Share    Email

### Document Information

**Date Posted:**
Mar 29, 2018
**RIN:**
1140-AA52
**CFR:**
27 CFR Parts 447, 478, and 479
**Federal Register Number:**
2018-06292
**Show More Details** ⊕

### Docket Information

This document is contained in
ATF-2018-0001
**Related Dockets:**
None
**Related RINs:**
None
**Related Documents:**
• Application of the Definition of
  Machinegun to Bump Fire…

Document text and images
courtesy of the
Federal Register

## Action

Notice of proposed rulemaking.

## Summary

The Department of Justice (Department) proposes to amend the Bureau of Alcohol, Tobacco, Firearms, and Explosives regulations to clarify that "bump fire" stocks, slide-fire devices, and devices with certain similar characteristics (bump-stock-type devices) are "machineguns" as defined by the National Firearms Act of 1934 (NFA) and the Gun Control Act of 1968 (GCA), because such devices allow a shooter of a semiautomatic firearm to initiate a continuous firing cycle with a single pull of the trigger. Specifically, these devices convert an otherwise semiautomatic firearm into a machinegun by functioning as a self-acting or self-regulating mechanism that harnesses the recoil energy of the semiautomatic firearm in a manner that allows the trigger to reset and continue firing without additional physical manipulation of the trigger by the shooter. Hence, a semiautomatic firearm to which a bump-stock-type device is attached is able to produce automatic fire with a single pull of the trigger. With limited exceptions, primarily as to government agencies, the GCA makes it unlawful for any person to transfer or possess a machinegun unless it was lawfully possessed prior to the effective date of the statute. The bump-stock-type devices covered by this proposed rule were not in existence prior to the GCA's effective date, and therefore would fall within the prohibition on machineguns if this Notice of Proposed Rulemaking (NPRM) is implemented. Consequently, current possessors of these devices would be required to surrender them, destroy them, or otherwise render them permanently inoperable upon the effective date of the final rule.

## Dates

Written comments must be postmarked and electronic comments must be submitted on or before June 27, 2018. Commenters should be aware that the electronic Federal Docket Management System will not accept comments after midnight Eastern Daylight Time on the last day of the

AT&T    76% 1:37 PM

⭐ 🔒 www.regulations.gov ↻ ⋮

**regulations.gov**
Your Voice in Federal Decision-Making

Home    Help ▾    Resources ▾    Contact Us

🔍
Advanced Search

📁 **ANPRM on "Bumpfire" Stocks and Other Similar Devices. To comment on the NPRM, search ATF-2018-0002**

Docket Folder Summary    ⊞ View all documents and comments in this Docket

**Docket ID:** ATF-2018-0001    **Agency:** Alcohol Tobacco Firearms and Explosives Bureau (ATF)
**Parent Agency:** Department of Justice (DOJ)

**RIN:** 1140-AA52

+ View More Docket Details

Take a Tour!

🔔 Sign up for Email Alerts

**116,857**
**Comments Received***

🐦 Tweet   f Share   ✉ Email

**Primary Documents**    View All (2)

PR | **Application of the Definition of Machinegun to Bump Fire Stocks and Other Similar Devices**
Proposed Rule    Posted: 12/26/2017    ID: ATF-2018-0001-0001

Comment Period Closed
Jan 25, 2018 11:59 PM ET

PR | **Bump-Stock Type Devices**
Proposed Rule    Posted: 03/29/2018    ID: ATF-2018-0001-35714

Comments Not Accepted

*This count refers to the total comment/submissions received on this docket, as of 11:59 PM yesterday. Note: Agencies review all submissions, however some agencies may choose to redact, or withhold, certain submissions (or portions thereof) such as those containing private or proprietary information, inappropriate language, or duplicate/near duplicate examples of a mass-mail campaign. This can result in discrepancies between this count and those displayed when conducting searches on the Public Submission document type. For specific information about an agency's public submission policy, refer to its website or the Federal Register document.

**Supporting Documents**

No documents available.

**Comments**    View All (35,709)

❝ *My name is Roy I am a Marine Veteran and although I have no use or desire to have a Bump Stock others do. I am getting very tired of people and politicians..."*
View Comment    **Submitter Name:** Roy Robeson    **Posted:** 03/14/2018    **ID:** ATF-2018-0001-35708

❝ *The Legislative Process | House.gov www.house.gov/content/learn/legislative_process/ How Are Laws Made? Laws begin as ideas. First, a representative sponsors a..."*
View Comment    **Submitter Name:** david mccarthy    **Posted:** 03/14/2018    **ID:** ATF-2018-0001-35665

❝ *Im sure the bandits, burglars and general criminals are all impressed with your worthless proposed legislation that will only effect the law abiding citizens..."*
View Comment    **Submitter Name:** Shane Moscatelli    **Posted:** 03/14/2018    **ID:** ATF-2018-0001-35707

❝ *NO "GUN CONTROL" LAWS HAVE EVER SAVED ONE SOLITARY LIFE. NOT ONE. CRIMINALS DO NOT ABIDE OR COMPLY WITH ANY LAWS, THIS IS WHAT MAKES THEM CRIMINALS. "GUN FREE..."*
View Comment    **Submitter Name:** JOHN AND LINDA ROBEL FAMILY VOTING UNIT
**Posted:** 03/14/2018    **ID:** ATF-2018-0001-35703

❝ *To whom it may concern, I feel the definition of "Machine Gun" should be left alone. Trying to ban or regulate "Bump Fire" Stocks and other similar Devices is..."*
View Comment    **Submitter Name:** Lawrence Dang    **Posted:** 03/14/2018    **ID:** ATF-2018-0001-35657

**Home**
Search
Advanced Search
Browse By Category
Learn

**About Us**
eRulemaking Program
Media Toolkit
Agencies
Awards & Recognition
Enhancements & Fixes

**Resources**
Site Data
Regulatory Agenda
Agency Reports Required by Statute
API Overview
Developers

**Help**
How to use Regulations.gov
FAQs
Glossary

**Connect With**
📶 🐦
✉ **Contact Us**
Privacy and Security Notice
User Notice
Accessibility Statement

Partner Sites ⧉    We the People | Federal Register | Reginfo | Congress.gov | USA.gov | E-Gov | Opengov    **Participate Today!**

‹    →    🏠    📖    [2]
Back    Forward    Home    Bookmarks    Tabs

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: <u>**Bump-Stock Type Device**</u>

For related information, **Open Docket Folder**

Comment Period Closed

Jun 27 2018, at 11:59 PM ET

**ID:** ATF-2018-0002-2052

**Tracking Number:** 1k2-92bu-yeyt

### Comment

After reading through the proposed changes, I have many questions and concerns. I will keep to the largest concerns I have.

The first is the claim that the bump stock alters the function of the semi automatic rifle. There are really good examples of video footage on the internet that shows you can bump fire a semi automatic rifle from the shoulder with no other objects such as a rubber band or belt loop as stated in Alternative #3 in the proposed ruling. Because this function exists before the bump stock is introduced into the picture, the logical conclusion is that the bump stock does not alter the function of the rifle because the function already existed.

The second question I have is regards to the proposal of altering "a single function of the trigger" to "a single pull of the trigger". How would that affect other situations than a standard trigger system such as the butterfly trigger on a Browning M2. Would that now not be a machine gun because it fires when the trigger is pushed because it was pushed and not pulled? Or a firearm with a crank as the trigger is the turning of the crank? I view the original definition of "a single function of the trigger" is actually a much better definition that covers more situations. The new definition may open the way to declassify certain designs currently labeled as a machine gun. This is even stated in footnote number 6 which is the really surprising piece as its an argument the proposal touches on without addressing in full.

The third and final question I will discuss today is the comparison of the Akins Accelerator to the current designs of bump stocks. You missed a key difference between the

### Document Information

**Date Posted:**
Apr 4, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Michael Pfoser

two. The original design allowed multiple rounds to be fired once the trigger was pulled. You could bump fire the rifle holding the rifle by the pistol grip only. This means, no shouldering, belt loop, etc. This is not a function a semi automatic rifle is capable of without this device. The new design does not allow this. It requires the operator to pull the rifle forward tripping the trigger mechanism each time a round is to be fired. This is the same function as described in my original question/concern where this function is possible without the device or any other device other than a user and a semiautomatic rifle with a solid stock.

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder**

Comment Period Closed

Jun 27 2018, at 11:59 PM ET

**ID:** ATF-2018-0002-2270

**Tracking Number:** 1k2-92cf-5vgu

### Document Information

**Date Posted:**
Apr 4, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
David Sharpe

### Comment

The following argument from the proposed rule is incorrect:

"When a bump-stock-type device is affixed to a semiautomatic firearm, however, the device harnesses the recoil energy to slide the firearm back and forth so that the trigger automatically re-engages by "bumping" the shooter's stationary trigger finger without additional physical manipulation of the trigger by the shooter. "

This is incorrect because the device does not enable recoil energy to push the firearm forward. All of the forward motion of a bump-stock-equipped firearm is caused by forward pressure from the shooter's support hand and arm. Once recoil pushes the firearm rearward, the firearm will not move forward again until the shooter applies this pressure. If the shooter decides not to apply forward pressure, the firearm will reach its rearmost point of travel and then stop. The trigger is definitely *NOT* "automatically re-engaged", it is engaged by the deliberate application of forward pressure by the support hand and deliberate maintenance of the trigger finger in position.

There is no legal justification for differentiating between forward pressure exerted by the support arm and rearward pressure exerted by the finger as the proximal cause of the trigger function. In either case, the shooter chooses to actuate the trigger and, in doing so, causes one shot to be fired per function, meaning that the definition of a machine gun is not being fulfilled.

Circumventing the plain legal definition of machine gun in this case would lead to absurdities, since bump stocks' mechanism of operation ("bump fire") can be accomplished

without any device whatsoever. An unassisted shooter can simply hold his finger stationary in front of the trigger and use support-hand forward pressure to bring the trigger to his finger, then apply that pressure again after the gun fires, causing quick shots in exactly the same way. The only advantage provided by a bump stock is that the shooter can better maintain shoulder contact while bump-firing. Of course, neither the rate at which a shooter can actuate the trigger, nor the amount of shoulder contact he is able to maintain while doing so, is part of the legal definition of a machine gun.

"Bump fire" is, by its very principle, not a method by which a firearm begins firing more than one round per trigger function. It is simply a physical technique which makes it easier to leverage the human body's mechanics and cause the trigger to function more often. It cannot be said to turn a firearm into a machine gun. A bump stock makes "bump fire" more ergonomically easy, but does not change the principles involved or provide additional physical force to assist the shooter. It cannot fall under the definition of a machine gun in so doing.

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder** 🔗

Comment Period Closed
Jun 27 2018, at 11:59 PM ET

---

**ID:** ATF-2018-0002-2867
**Tracking Number:** 1k2-92b9-zz5j

### Comment

The proposal to amend the Bureau of Alcohol, Tobacco, Firearms, and Explosives regulations to clarify that "bump fire" stocks, slide-fire devices, and devices with certain similar characteristics (bump-stock-type devices) are "machineguns" as defined by the National Firearms Act of 1934 (NFA) and the Gun Control Act of 1968 is ridiculous.

The proposal's determination that "bump stocks" allow the trigger to reset and continue firing" without additional physical manipulation of the trigger is false. They harness the recoil energy of the semiautomatic firearm but, they do NOT do so in a manner that allows the trigger to reset and continue firing without additional physical manipulation of the trigger. These devices do not alter the trigger or firing mechanism in any way shape or form, which means the firearm is still functionally and legally a semiautomatic weapon. The trigger is manipulated twice for each shot fired, pull-fire, release-reset. The shooter's finger still physically manipulates trigger for each shot fired, the recoil energy that is harnessed by the stock, stick, or belt loop is simply displaced.

These devices are nothing more than a gimmick. The ability of shooter of a semiautomatic firearm to initiate a continuous firing cycle with a "single" pull of the trigger is easily achieved without any "bump fire" stock or devices. Harnessing the recoil energy of the semiautomatic firearm in a manner that allegedly allows the trigger to reset and continue firing "without additional physical manipulation of the trigger" by the shooter has been done without the use of a "bump stock" for decades. Prior to the creation of the Slide Fire bump stock and its competition on the market, many recreational shooters have been and are aware of "bump"

### Document Information

**Date Posted:**
Apr 5, 2018

**RIN:**
1140-AA52

**Show More Details** 🔗

### Submitter Information

**Submitter Name:**
Dakota Duffy

firing a semiautomatic weapon by various means. This includes utilizing the belt loop on their pants, using a small stick/rod, or holding the firearm in an "80's action hero" fashion.

I stand by the ATF's original ruling on these devices.

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: <u>Bump-Stock Type Device</u>

For related information, **Open Docket Folder**

Comment Period Closed

Jun 27 2018, at 11:59 PM ET

**ID:** ATF-2018-0002-3955

**Tracking Number:** 1k2-92d5-n8i6

### Document Information

**Date Posted:**
Apr 5, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Robert Golding

### Comment

When viewed with high speed photography, a bump stock in action requires both continual finger pressure on the trigger, as well as a pressure from the supporting arm for every shot to be fired. The motions involved are quite This is no different than bumpfiring without an assisting device device, or by using an ad hoc device such as a belt loop.

The proposed rule ignores this role of the support hand in activating each firing cycle by providing pressure pressure on the firearm to force it forward against the trigger after each shot is fired. When viewed at high speed, this motion is a series of pulling the weapon forward at high speed. The shooter is moving the weapon forward in discrete cycles. See : https://www.youtube.com/watch?v=67oxh-KpWeQ

The proposed rule also ignores the vast body of regulatory interpretation of crank-type devices, which pre-dated modern gas/recoil automatic weapons, and as such predated the 1934 NFA, and have never been considered machine guns by the ATF, or its predecessor agencies. Crank devices, such as the stereotypical 1865 Gatling gun, only require continuous rotary movement of the crank to produce continuous firing.

1. How are crank mechanisms different than the reward pressure necessary to use a bump stock? It is a continual single direction movement causing repeated shots in either case, but the bumpstock actually requires motions from two hands.

2. Or is the intent to now include crank devices in this rule, ignoring their existence predating federal definition of a machine gun by some 60 years, and at least three

EX2-049

opportunities for legislative remedies (1934, 1968, 1986).

3. In the economic analysis of the impact of the rule, there appears to be no discussion of home built devices, which have been quite popular. These devices range from converted thumbhole AK-stocks for underfolder AKs, to 3-D printed grips for AR-15s, and have been made in significant numbers. As a specific example, one design hosted to a popular 3-D printing vendor, shapeways, sold some hundreds of copies in a matter of a week in Q3 2017.

4. The proposed rule specifies devices that use the recoil energy of a shot to allow trigger reset without additional trigger manipulation. How does this apply to the phenomena of very heavy loads in double action revolvers causing multiple discharges? See https://www.youtube.com/watch?v=VRWpImpP4Ag Would heavy loads be regulated? Or double action revolvers with light triggers?

5. In general, the lighter a semiautomatic rifle's trigger pull is, and the lighter the rifle's weight is, the easier it is to bumpfire it from the shoulder without any bumpfire accessory. Will using lightweight components (i.e. Titanium parts) and lightweight match triggers be covered under this rule if they make a rifle easier to bumpfire? What will be the standard used to analyze this? If a user replaces a 7lb AR-15 trigger with a 1lb digitrigger, will that be considered manufacturing a machine gun? What about installing a super lightweight upper receiver assembly? Both situations make the resulting rifle much easier to bumpfire from the shoulder or belt-loop methods. There appears to be no regulatory analysis of the uncertainty this will cause for the manufacturers of replacement triggers and lightweight plastic and metal parts, which is a market much, much larger than the bump-stock market.

6. The proposed rule, reversing at least 10 years of technical branch opinions on which both manufacturers and hundreds of thousands of purchasers relied on, appears to give rise to 5th amendment challenge as a regulatory "taking", since it provides no compensation or grandfathering. What are the expected costs in defending this rule against court challenges?

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder** 

Comment Period Closed

Jun 27 2018, at 11:59 PM ET

**ID:** ATF-2018-0002-15158

**Tracking Number:** 1k2-92rw-h6mh

## Comment

See attached file(s)

## Document Information

**Date Posted:**
Apr 25, 2018

**RIN:**
1140-AA52

**Show More Details**

## Attachments (1)

### Comments of MSI on AFT Proposed Rule

**View Attachment:** PDF

## Submitter Information

**Submitter Name:**
Mark Pennak



**President**
Mark W. Pennak

April 24, 2018

## WRITTEN COMMENTS OF MARK W. PENNAK, PRESIDENT, MARYLAND SHALL ISSUE, INC., REGARDING DOCKET NUMBER ATF 2017R-22

The undersigned is the President of Maryland Shall Issue, Inc. ("MSI").  Maryland Shall Issue is an all-volunteer, non-partisan organization dedicated to the preservation and advancement of gun owners' rights in Maryland. It seeks to educate the community about the right of self-protection, the safe handling of firearms, and the responsibility that goes with carrying a firearm in public. The undersigned is also an attorney and an active member of the Bar of the District of Columbia, having recently retired from the Department of Justice after more than 33 years of service in the Civil Division, Appellate Staff. These comments are submitted on behalf of MSI, its Board and Officers and members in response to the Notice of Proposed Rulemaking issued by the Alcohol, Tobacco, Firearms, and Explosives Bureau ("ATF") on March 29, 2018, at https://www.federalregister.gov/documents/2018/03/29/2018-06292/bump-stock-type-devices in docket number ATF 2017R-22.  For the reasons set forth below, the ATF should abandon its attempt to reverse its prior rulings in which it expressly declined to regulate bump-stocks as a machinegun part.  Alternatively, at a minimum, the ATF should expressly provide that its regulation does not apply to ban the continued possession of bump stocks already possessed and lawfully acquired by existing owners.

### A. THE REGULATION IS IMPERMISSIBLY RETROACTIVE WITHOUT CONGRESSIONAL AUTHORIZATION.

The proposed rule makes clear that it would require a current lawful owner of a bump stock to either destroy the bump stock or turn it into law enforcement.  See Preamble at 30.  There is no grandfather clause in the proposed regulation that allows an existing owner to retain possession. As statutory authorization, the proposed rule cites 18 U.S.C. § 926(a); 26 U.S.C. § 7801(a)(2)(ii), § 7805(a) as the authority to issue rules and regulations.  None of these statutory provisions authorize retroactive rules or regulations with respect to the subject matter addressed in this docket number, *viz.*, the definition of machinegun and machine parts as otherwise regulated by 18 U.S.C. § 922(o), and as defined by 26 U.S.C. § 5845(b). Indeed, Section 7805(b) generally bans retroactive rulemaking with respect to the internal revenue laws at issue here.  As detailed below, the proposed rule is retroactive in requiring the destruction or dispossession of any existing bump stocks currently lawfully possessed by existing owners.  Such retroactive rules exceed the authority of the ATF under the law for multiple reasons.

**EX2-052**

### 1. The ATF statutory justification for retroactive application fails.

The proposed rule explicitly purports to require the destruction of all existing bump stocks on the theory that registration of existing bump stocks is impossible because the NFA "provides that only the manufacturer, importer or maker of a firearm my register it." Proposed Rule at 25, citing 26 U.S.C. § 5841(b). That is incorrect as a matter of law. While Section 5841(b) provides that manufacturers, importers or makers shall register covered firearms, nothing in Section 5841(b) states that "only" such entities may register.

Indeed, the ATF has permitted existing owners to register firearms lawfully owned where the ATF has issued interpretations that have brought existing firearms under the ambit of the National Firearms Act ("NFA") that were previously not registered by a manufacturer, importer or maker. See Expiration of the Registration Period for Possession of the USAS–12, Striker–12, and Streetsweeper Shotguns (ATF Ruling 2001–1), 66 Fed. Reg. 9748 (Feb. 9, 2001). In that ruling, the ATF reclassified certain firearms as "destructive devices" under the National Firearms Act retroactively, but applied the rule prospectively under 26 U.S.C. § 7805(b) to allow "the prospective application of the tax provisions" and to allow "registration without payment of tax." See 66 Fed. Reg. at 9749. Section 7805(b) provides that

> no temporary, proposed, or final regulation relating to the internal revenue laws shall apply to any taxable period ending before the earliest of the following dates:
> (A) The date on which such regulation is filed with the Federal Register.
> (B) In the case of any final regulation, the date on which any proposed or temporary regulation to which such final regulation relates was filed with the Federal Register.
> (C) The date on which any notice substantially describing the expected contents of any temporary, proposed, or final regulation is issued to the public.

Section 7805(b) plainly allows only a "prospective" application of the tax and registration provisions of the National Firearms Act. That requirement provision fully applies to machineguns. Both machine guns and destructive devices are encompassed by 26 U.S.C. § 5845 and 26 U.S.C. § 7805(b), so there is no principled basis for applying one approach to "destructive devices" and a different approach to machineguns. Yet, the agency's approach in ATF Ruling 2001–1 is ignored in this proposed rule. The proposed rule never addresses the prospective-only requirements of Section 7805(b) that it expressly applied in ATF Ruling 2001–1.

The ATF should follow the same approach here that it followed in ATF Ruling 2001-1, by making the rule prospective only. A failure to do so would be "contrary to law" and arbitrary and capricious, an abuse of discretion and not in accordance with law and in excess of statutory jurisdiction, authority and limitations and short of statutory right under the APA, 5 U.S.C. § 706(2). At a minimum, the ATF is

**EX2-053**

required to acknowledge its prior approach and explain why it is not following that approach here. It is well established that a failure to explain a regulatory departure from prior statutory interpretation is a violation of Section 706. See, e.g., *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009) ("the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books.").

## 2. The ATF's reliance on 18 U.S.C. § 922(o) creates an impermissible Ex Post Facto law and is otherwise misplaced.

The proposed rule also relies on 18 U.S.C. § 922(o)(1), noting that under that provision it is unlawful for any person to possess a machinegun, except for those machineguns that were "lawfully possessed before the date" that the provision took effect (in 1986).  (Id. at 25).  First, this reliance on Section 922(o)(1) is circular, as it begs the question of whether existing bump stocks should be made illegal as "machineguns." As prior ATF rulings attest, this result can be easily avoided by interpreting the NFA as not to include bump stocks.

Second, in any event, the agency's reliance on Section 922(o)(1) would mean that, by virtue of an agency *ipse dixit*, all current bump stocks owners become instant felons on the effective date of the regulation **and** became felons in the past as of the date and time they took possession of a bump stock, even though such possession was then expressly permitted by prior ATF interpretations. That reality is inescapable if, as the agency states, Section 922(o)(1) flatly illegalizes all such possessions or transfers taking place after 1986.  Such a retroactive application of an ATF rule would violate the *ex post facto* clause of the Constitution.  See Article 1, Section 9, Clause 3 ("No Bill of Attainder or ex post facto Law shall be passed."). As the Supreme Court stated long ago, an *ex post facto* law is "[e]very law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action." *Calder v. Bull*, 3 U.S. 386, 390 (1798). See also *Peugh v. United States*, 569 U.S. 530 (2013) ("the Clause also safeguards 'a fundamental fairness interest ... in having the government abide by the rules of law it establishes to govern the circumstances under which it can deprive a person of his or her liberty or life.'"), quoting *Carmell v. Texas*, 529 U.S. 513, 533 (2000). The doctrine of constitutional avoidance counsels giving Section 922(o) and 26 U.S.C. 5845, a limited interpretation in these unique circumstances. See, e.g, *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568, 575-77 (1988) (where agency interpretation raises serious constitutional questions, an agency and reviewing court are required to inquire as to whether there existed another permissible interpretation that did not raise substantial constitutional doubts). The rule would be unconstitutional if issued as proposed.

This *ex post facto* result can be avoided by a proper application of Section 922(o). Specifically, Section 922(o)(2)(A) expressly provides that the ban imposed on possession under Section 922(o)(1) does not apply with respect to any possession "under the authority of the United States or any department or agency thereof."

**EX2-054**

While this provision has been interpreted to permit possession of machineguns by federal or state agents acting in an official capacity, *United States v. Warner*, 5 F.3d 1378, 1381 (10th Cir.1993) (§ 922(o)(2)(A), *cert. denied*, 510 U.S. 1126 (1994), that limited meaning is not compelled by the statutory language and should not be applied here where bump stocks are possessed under "the authority" of prior ATF rulings. Simple fairness requires a broad interpretation of Section 922(o)(2)(A) in such circumstances. Cf. *Staples v. United States*, 511 U.S. 600 (1994) (holding that government must prove beyond a reasonable doubt that the defendant knew that his rifle had the characteristics that brought it within the statutory definition of a machinegun). In any event, the ATF may not retroactively change its interpretation and then invoke the provisions of Section 922(o)(1) to illegalize (as a felony) a possession that it previously allowed without running afoul of the ban on *ex post facto* laws. In short, ATF's decision to change its interpretation cannot be sustained.

### 3. Retroactive application greatly impairs legitimate reliance interests without justification.

The rule against retroactive rulemaking was stated by the Supreme Court in in *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208 (1988), where the Court held that "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." As the Court explained, "an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress" and "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." Id. Thus, "[e]ven where some substantial justification for retroactive rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant." Id. at 208-09.

As explained in *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 36 (2006), in assessing whether a rule has retroactive effect "we ask whether applying the statute to the person objecting would have a retroactive effect in the disfavored sense of 'affecting substantive rights, liabilities, or duties [on the basis of] conduct arising before [its] enactment.'" Id. quoting *Landgraf v. USI Film Products*, 511 U.S. 244, 278 (1994). Such retroactivity is highly disfavored in the law in accordance with "fundamental notions of justice" that have been recognized throughout history, *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 855 (1990) (Scalia, J., concurring); *Horne v. Department of Agriculture*, 135 S.Ct. 2419, 2427 (2015) ("people still do not expect their property, real or personal, to be actually occupied or taken away").

Here, as the ATF's reliance on Section 922(o)(1) demonstrates, there is no question that the proposed rule would retroactively illegalize existing possession of bump stocks that were lawfully possessed before the proposed rule was announced. As the proposed rule fully recognizes, prior ATF classification letters had expressly ruled that bump stocks did not convert a semi-auto firearm into a machinegun. https://www.federalregister.gov/d/2018-06292/p-38 In reliance on these prior rulings, existing owners purchased, possessed and owned bump stocks that were, at that time, fully compliant with these ATF rulings. That reality is undisputed. These prior purchases were completed prior to this proposed new rule and thus the

**EX2-055**

proposed rule would attach new legal consequences to those completed purchases. See *Landgraf*, 511 U.S. at 269-70.

The proposed rule reverses these prior rulings to illegalize these devices and requires destruction or dispossession of any bump stocks that were purchased and possessed prior to the effective date of the new, proposed rule. It converts an existing, lawful owner into a felon under Section 922(o). It is thus incontestable that the proposed rule would "affect" existing rights and impose new liabilities on the past and continued possession of these items of personal property.  Indeed, under the ATF's reasoning and interpretation of Section 922(o), bump stocks were *always* a machinegun part and thus *always* illegal under Section 922(o). It is thus only a matter of prosecutorial discretion whether to arrest and prosecute existing owners. Yet, any interpretation that allows that result is impermissible. See, e.g., *Marinello v. United States,* 138 S.Ct. 1101, 1108 (2018) ("we have said that we 'cannot construe a criminal statute on the assumption that the Government will use it responsibly'"), quoting *McDonnell v. United States*, 136 S.Ct. 2355, 2372-73 (2016) (internal quotation omitted). The proposed rule violates these principles. ATF's reliance on and construction of Section 922(o) thus fails for this reason alone.

These principles have an especially powerful application to bump stocks because of the reliance that existing owners placed on the ATF's prior rulings applying an interpretation of the term "machinegun" it now reverses in the proposed rule.  The Supreme Court has stated that "an administrative agency may not apply a new rule retroactively when to do so would unduly intrude upon reasonable reliance interests." *Heckler v. Community Health Services*, 467 U.S. 51, 60 n.12 (1984).  The D.C. Circuit held in *Georgetown Hospital* that there is no exception to this rule against retroactive rulemaking for "curative rules." *Bowen v. Georgetown University Hospital*, 821 F.2d 750, 758 (D.C. Cir. 1987) ("both the express terms of the APA and the integrity of the rulemaking process demand that the corrected rule, like all other legislative rules, be prospective in effect only"). The D.C. Circuit has continued to adhere to that position.  See, e.g*., ICORE, Inc. v. FCC*, 985 F.2d 1075, 1080-81 (D.C. Cir. 1993) ("It seems apparent that the Court does not view "curative" rules as permissible under a statutory scheme that generally withholds authority for retroactive rulemaking."). We know of no contrary precedent. Retroactive application of the proposed rule to ban existing, lawfully owned property fails under these principles. The ATF simply may not engage in this retroactive rulemaking.

At a minimum, the reliance interests at issue here place a heavy burden on the ATF to explain fully and justify its change of its prior interpretation of the National Firearms Act.  See *Fox Television*, 556 U.S. at 515 ("This means that the agency need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate. *Sometimes it must—when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account.*") (emphasis added). The agency has failed to do so here, stating merely the new rule adopts "a better legal and practical interpretation of 'function'" of the trigger. (Proposed Rule at 19).  That failure to address fully its prior interpretations makes clear that the ATF's proposed rule is not entitled to

**EX2-056**

*Chevron* deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

The Supreme Court's recent decision in *Encino Motorcars, LLC v. Navarro*, 136 S.Ct. 2117, 2125 (2016), is on point. There, the Court held that an agency's change in interpretation of statutory authority was not entitled to *Chevron* deference because the agency had failed to adequately explain its departure from its prior interpretation. As the Court stated, "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars,* 136 S.Ct. at 2125. Yet, the Court stressed that "[i]n explaining its changed position, an agency must also be cognizant that longstanding policies may have "engendered serious reliance interests that must be taken into account." Id. at 2126, quoting *Fox Television Stations,* 556 U.S. at 515. "In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." (Id.).

The proposed rule completely fails address the heavy reliance interests that came about as a direct result of the ATF's prior interpretations. The ATF estimates that there are as many as 520,000 bump stocks devices currently in possession (Proposed Rule at 33), with a value of up to $96,242,750. (Id. at 34). Yet, the ATF accords absolutely no recognition of or weight to the enormity of this reliance interest in deciding whether to change its interpretation. Rather, it merely cites these burdens in conducting a *cost-benefit* analysis under Executive Orders 12866, 13563, and 13771. Yet, that cost-benefit analysis is obviously not the same as assessing **reliance** interests. A cost-benefit mandate is intended to require the agency "to select regulatory approaches that maximize net benefits." (Preamble at 25). "Net benefits" are not the same thing as "reliance interests," particularly where, as here, a criminal statute (section 922(o)) is involved. As *Encino Motorcars* holds, that failure to address reliance interests indicates that the agency's action is "arbitrary and capricious" under 5 U.S.C. § 706, "[a]nd arbitrary and capricious regulation of this sort is itself unlawful and receives no *Chevron* deference." *Encino Motorcars*, 136 S.Ct. at 2126. The reliance interests alone suggest that the ATF should not require the destruction of $96.2 million of lawfully acquired and legally owned private property. For all the foregoing reasons, the proposed rule will not survive judicial review. At a minimum, the ATF should modify the proposed rule to make clear that the rule will not apply to the possession of existing bump stocks already lawfully owned.

## B. THE PROPOSED RULE VIOLATES THE TAKINGS CLAUSE OF THE CONSTITUTION.

The Takings Clause provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const., Amendment 5. As explained in *Horne v. Dept. of Agriculture*, 135 S.Ct. 2419, 2426 (2015), the Clause "protects 'private property' without any distinction between different types," and thus includes personal property as well as real property. Under the Takings Clause, the government simply does not have the right to take property by declaring, in an *ipse dixit*, the property to be noxious or in the interest of public safety. In *Horne* the

**EX2-057**

Supreme Court held that there is a fundamental difference between a regulation that restricts only the use of private property and one that requires "physical surrender … and transfer of title." *Horne*, 135 S. Ct. at 2429. *Horne* squarely holds that the latter situation is a Takings that must be compensated. See also *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 322 (2002) ("When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof."). As detailed below, the ban on possession of existing property in the proposed rule is a total regulatory taking that must be compensated.

This duty to compensate may not be evaded by invoking the general police power to provide for the common good. In *Mugler v. Kansas*, 123 U.S. 623 (1887), the Supreme Court held that the State may ban the sale and manufacture of beer from a brewery. However, the case did not involve a seizure of the brewery itself. The Court made that clear in stating "[a] prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit. Such legislation *does not disturb the owner in the control or use of his property for lawful purposes, nor restrict his right to dispose of it*, but is only a declaration by the state that its use by any one, for certain forbidden purposes, is prejudicial to the public interests." 123 U.S. at 668-69 (emphasis added).

These limits of *Mugler* were stressed in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), where the Supreme Court reversed a lower court's reading of *Mugler* as allowing a State to ban harmful or noxious private property without paying compensation. The Court stated:

> [T]he legislature's recitation of a noxious-use justification cannot be the basis for departing from our categorical rule that total regulatory takings must be compensated. If it were, departure would virtually always be allowed." 505 U.S. at 1026 (emphasis added).

The proper test, the Court held, is:

> Where the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with. (Id. at 1027) (emphasis added).

See also *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 425 (1982) (accepting the lower court's holding that the regulation at issue was "within the State's police power," but holding that "[i]t is a separate question, however, whether an otherwise valid regulation so frustrates property rights that compensation must be paid"); *Andrus v. Allard*, 444 U.S. 51, 65-66 (1979) (holding there was no Taking because the Government did not "compel the surrender of the artifacts, and there [was] no physical invasion or restraint upon them").

**EX2-058**

The Proposed Rule does not even mention the Takings issue, much less this body of controlling Supreme Court precedent.  Here, an owner's possession of bump stocks and magazines were indisputably "interests" that were "part of his title to begin with." *Lucas*, 505 U.S. at 1027. Illegalizing such interests constitutes a "total regulatory taking" which must be compensated under the Court's "categorical rule."

Specifically, banning possession by lawful owner of his own property is "tantamount to a direction appropriation or ouster" under *Loretto v. Teleprompter Manhattan CATV Corp.* 458 U.S. 419, 426 (1982), because possession is an essential property interest.  The word "property" in the Takings Clause means "the group of rights inhering in [a] citizen's relation to [a] ... thing, as the right to possess, use and dispose of it." *United States v. General Motors Corp.*, 323 U.S. 373, 378 (1945).  As one court of appeals has held, "it is sufficient" that the law "involves a direct interference with or disturbance of property rights," even if the government itself does not "directly appropriate the title, possession or use of the propert[y]." *Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*, 561 F.2d 1327, 1330 (9th Cir. 1977).

The Taking at issue here is not supported by *Akins v. United States*, 892 Fed. Cl. 619 (2008).  In that case, the AFT ruled that a particular new invention, (the Akins accelerator) violated previously existing law on the manufacture of machineguns. In holding that this AFT ruling did not effect a Taking, the Court of Federal Claims ruled that the government may invoke its police power to enforce existing criminal law by banning the sale or possession of property that is in violation of that previously existing law. *Akins* did not involve a retroactive ban on a person's existing lawful possession of a machinegun.  Rather, *Akins* is in accord with the rule that "the Takings Clause does not prohibit the uncompensated seizure of evidence in a criminal investigation, or the uncompensated seizure and forfeiture of criminal contraband." *Spann v. Carter*, 648 Fed. Appx. 586 (6th Cir. 2016), citing *Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1331 (Fed. Cir. 2006).  Existing bump stocks are lawful property under prior ATF rulings, not contraband. As stated in *Lucas* "the legislature's recitation of a noxious-use justification cannot be the basis for departing from our categorical rule that total regulatory takings must be compensated. If it were, departure would virtually always be allowed." 505 U.S. at 1026.

In summary, the ATF may not retroactively ban such existing bump stocks without express Congressional authorization (which it lacks) and it certainly may not impose such a ban without paying just compensation.

EX2-059

Sincerely,

Mark W. Pennak
President, Maryland Shall Issue, Inc.
1332 Cape St. Claire Rd #342
Annapolis, MD 21409
mpennak@marylandshallissue.org

**EX2-060**

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder** ⬚

**ID:** ATF-2018-0002-31210

**Tracking Number:** 1k2-93f3-s09b

### Document Information

**Date Posted:**
May 29, 2018

**RIN:**
1140-AA52

**Show More Details** ⬚

### Submitter Information

**Submitter Name:**
Len Savage III

**Organization Name:**
Historic Arms LLC

## Comment

See Attached

## Attachments (4)

### Email 013 (Historic Arms) rec 5-29-18

View Attachment:   + View more information

**Abstract:**

### Email 013 (Historic Arms) rec 5-29-18 - Part2

4 Parts to Document~ total 66 pages

View Attachment: 

### Email 013 (Historic Arms) rec 5-29-18 - Part3

View Attachment: 

### Email 013 (Historic Arms) rec 5-29-18 - Part4

View Attachment: 

**EX2-061**



LEN SAVAGE, PRESIDENT

# Historic Arms L.L.C.



706-675-0287 Home
706-675-0818 Shop

Analysis and commentary regarding:  **DOCKET NUMBER: ATF 2017R-22**
&

# <u>BUMP-STOCK-TYPE-DEVICES</u>

ORIGIN

***Why was the bump stock invented in the first place?***   The answer is that they would not exist if the government had not effectively "banned" machineguns on May 19, 1986 with implementation of the Hughes amendment of the Firearms Owners Protection Act.

A "bump-stock-type-device" is a direct result of the government banning something. With the supply of citizen legal machineguns fixed, demand grew with the population and that has caused prices of these "transferable" machineguns to skyrocket in price.

Prices drove the market into looking for an alternative.  Simulating "full auto fire" with a multitude of products that claim to increase the rate of fire had a ready made market created by the government.

In most cases the product is more of a parlor trick than anything else.  You do not hear of any law enforcement agency or foreign military fielding them.

OPERATION

***How does a bump stock work?***  A bump stock can do NOTHING without the skill and coordination of the shooter.   A specific skill based shooting technique called "bump firing" must be utilized.

The United States Department of Justice on July 27, 2017 explained the operation of bump-stock-type-devices to US district courts as:

> **"Bump firing" is the process of using the recoil of a semiautomatic firearm to fire in rapid succession, simulating the effect of an automatic firearm when preformed with a high level of skill and precision by the shooter.  Bump**

Page | 1

**firing requires the shooter to manually and simultaneously pull and push the firearm in order for it to continue firing.**

*(Case 3:16-cv-00243-RLY-MPB Document 28, Page 21) complete document attached.*

All firearms have a recoil impulse because in order to propel a projectile out the barrel, an equal force in the opposite direction is also generated.   A semiautomatic firearm, due to its mechanical nature, has the ability to generate this recoil impulse every time the trigger is activated.

This cycle of mechanical events that start with the trigger activation and end with a new round in the chamber ready to begin again is the cycle rate or how fast the firearm can physically complete cycles (or rounds fired).

The fact is any semiautomatic AR-15 (or AK-47 for that matter) can fire as fast as a machinegun version.  Their cyclic rates are identical to the machinegun version.  Their essential operating mechanisms are identical, same ammo, same mags, same reciprocating mass.  The only small physical difference is the machineguns described have a mechanical lever that "automatically" starts the new cycle as soon as the previous cycle ends.

Some semiautomatic firearms can even fire faster than the full auto version because the machinegun version having some form of a rate reducing mechanism.

ALL semiautomatic firearms can be "bump fired" regardless of any "bump-type-stock-device" installed or not.  It is a matter of skill and coordination to find the "rhythm", or cyclic rate of the firearm at hand and the correct amount of counterforce to be applied and when to apply them.

The only "self acting and self regulating" force of a bump-type-stock-device is provided by the shooter and the firearm, none is provided by the stock.   Basketballs don't dribble automatically even if the skills of most the NBA players make it appear so.

A bump-type-stock-device allows a small amount of linear motion of the firearm frame, allowing for safe control of the firearm while utilizing the bump fire shooting technique. There is less risk of loss of control of the firearm when using bump-type-stock-device vs. using the shooting technique without one.

**Put bluntly, bump-stock-type-devices make using the bump fire shooting technique safer for the shooter and those around the shooter.**

ADMINISTRATIVE RECORD

Bill Akin seeking to fill a market need invented, patented, and then produced the Akin's Accelerator.  In his quest to simplify or make the bump fire shooting technique easier, though similar to a bump-stock-type-device it was different in two ways.

1.) No required bump fire skills or technique to function.
2.) Reduced shooter input required to function (no coordination required).

The ATF initially agreed with Mr. Akin that indeed the trigger of the firearm was being activated with each shot.   Mr Akin after securing his patent went into business making the "Akins Accelerator" stock for the Ruger 10/22 rifle.

The .22 rim fire cartridge made the real skill in the Akins Accelerator the tuning process involved in adjusting the operating spring that regulated his device.   They were tricky to set up to work, (lots of trial and error), but once set up ran like a sewing machine.

When the ATF reclassified his product Mr. Akins sought judicial relief and took the ATF and DOJ to court over the issue.   The case went to the 11th circuit court of appeals.   The Department of Justice documented through court proceedings just how much "extensive legal analysis" was conducted by them on the subject of machineguns and bump-stock-type-devices.

Mr. Akin researched ways to salvage his patent and hopefully come up with a lawful replacement product that would pass ATF examination and classification.

I was a member of Mr. Akins legal team and my company later helped him research and develop his compliant replacement product.  20% of the DOJ cited ATF classification letters on "Bump-Stock-Type-Devices" are addressed to me.  I have no commercial interest in bump-stock-type devices other than the research and development completed.

The administrative record, such that it is, is VERY clear.

The basic premise of all current  ATF classification letters as well as court pleadings by ATF and DOJ to date are that a device not omit the required skill or the shooters required input in order to achieve "bump fire".

The Department of Justice on September 13, 2017 on why a bump-stock-type-device is NOT a machinegun:

> **"Because of the manual, skill based methods required to operate a bump fire device"** *(case3:16-cv-00243-RLY-MPB, Document 33, page 8) complete document attached.*

The above policy is based on logic and science and is therefore demonstrable with a simple scientific test.

ATF RULING 82-8 proves that DOJ knows that "grandfathering" a device when they had; 1.) Previously declared the device to be lawful, 2.) Then later declared the device to be a machinegun, as being perfectly lawful to possess if made before the ruling date. *Complete document attached.*

*Complete document attached.*

Furthermore on September 10, 2009, ATF experts were asked about the firearms "grandfathered" in ATF Ruling 82-8 under oath.  The ATF's official position is that the firearms are machineguns, do not require registration, nor do they require a tax be paid on them, and the ATF is aware they are in circulation *(approximately 50,000)*, but are no longer manufactured.  (US vs. One Historic Arms Model 54RCCS Case 1:09-CV-00192-GET).  *Relevant document page attached.*

The Department of Justice currently claims that an ordinary shoe string can be a machinegun if installed on a semiautomatic firearm.  There are documents dating from 1996, 2004, and 2007 from ATF on this issue.  ATF letter to Brian Blakely June 25, 2007:

> **"When the string is added to a semiautomatic firearm as you proposed in order to increase the cycling rate of that rifle, the result is a firearm that fires automatically and consequently would be classified as a machinegun"**
> *Complete document attached.*

It is significant that the DOJ claims that both shoe strings and bump-stock-type-devices convert semiautomatic firearms into machineguns, yet has chosen NOT to regulate them in any way, let alone ban all shoe strings and demand their forfeiture, destruction, or ban further manufacture.

The documents prove that DOJ can indeed grandfather items that purportedly convert a semiautomatic firearm into a machinegun as they have with the shoe string issue.

BUMP-STOCK-TYPE-DEVICE CRIME

***Just how many crimes are committed using "Bump-Stock-Type-Devices" anyway?***
The only alleged use of a "bump-type-stock-device" during a crime was the Las Vegas shooting incident on October 1, 2017.

Both ATF and FBI were specifically asked if they had ANY records of a "bump-type-stock-device" being used in a crime on April 9, 2018 via a Freedom Of Information Act (FOIA) request.  *Complete document attached.*

To date neither ATF nor FBI will confirm ANY crime being committed (including the Oct 1, 2017 Las Vegas incident).  In fact ATF Firearms Technology did not even receive the firearms from the Oct. 1, 2017 shooting incident until April of this year.

No ATF "Report of Technical Examination" (ATF form 3311.2) has been released for any of the firearms used in the incident.  For all we know the firearms could have been a machinegun with a "bump-stock-type-device" installed to throw off unwanted attention from law enforcement as a ruse or decoy for reports of automatic gun fire.

EX2-065

There simply are no other known crimes committed with "bump-stock-type-devices". No known military uses "bump-stock-type-devices, nor does any known law enforcement agency.


## THE NPRM ENFORCEMENT SCHEME FATALLY FLAWED

The NPRM does not address several serious issues.

1. The change in policy asks for a willing suspension of disbelief of basic science and physics.

2. The change in policy will put ATF experts at risk of being impeached as expert witnesses.

3. The summary of the NPRM is filled with demonstrably false or misleading statements that are disputed by DOJ's own experts at ATF.

ATF expert testimony in trials and in classification letters conflict factually with the NPRM when it states on page 19:

**"Because these bump stock type devices allow multiple rounds to be fired when the shooter maintains pressure on the extension ledge of the device, they are a machinegun".**

The problem with that statement is that it is patently false.

Furthermore, it easily demonstrated as a false statement.

If that where all it took to make a bump-stock-type-device to function as the DOJ claims a simple scientific test could be given to determine if the device is really self activating and self regulating or whether there is coordinated skilled input from the shooter:

**....please demonstrate firing a bump type stock device equipped firearm using only your trigger hand as described, using no skilled coordinated input from your other hand.** *(It can't be done as it takes two hands, skill, and coordination in order to function.)*

 No doubt such a requested demonstration would be part of any court proceedings should this proposed rule be implemented and ultimately prosecuted.

One could point out the United States Department of Justice knows of this test, as they certainly are familiar with the results of such a test:

**EX2-066**

**"Bump firing" is the process of using the recoil of a semiautomatic firearm to fire in rapid succession, simulating the effect of an automatic firearm when preformed with a high level of skill and precision by the shooter. Bump firing requires the shooter to manually and simultaneously pull and push the firearm in order for it to continue firing.**

*(Case 3:16-cv-00243-RLY-MPB Document 28, Page 21)Complete document attached.*

If such a device were truly self acting and self regulating as the Department of Justice now claims, then a bump-stock-type-device equipped firearm should fire as a machinegun with no coordinated skilled effort from any other body part (which is impossible).

**This same "coordinated input test" applied to an Akins Accelerator equipped firearm would fire and operate** with just one hand providing input and no coordinated skilled effort from any other body part.

**This same "coordinated input test" applied to the "shoe string" equipped firearm would fire and operate** with just one hand providing input and no coordinated skilled effort from any other body part.

The document control number of every ATF classification letter contains the identity of person drafting the communication. Furthermore, a simple search for the "Correspondence Approval and Clearance" (ATF form 9310.3A) associated with any bump stock letter assuring the item in question is not a firearm under the NFA and GCA will indentify every person involved in the classification process. Under US v. Brady the Department of Justice is mandated to providing this information to any future defendant when they attempt to prosecute anyone on this policy.

The cost of this proposed rule will be the credibility of the ATF firearms expert trying to explain or defend its preposterous claims under cross examination during some current or future court case.

**The definition of the word arbitrary:** *"Based on some random choice or personal whim, rather than any reason or system".*

THE SCOPE OF THE NPRM IS OVERLY BROAD DUE TO VAGUE LANGUAGE

The NPRM has descriptive language that is so vague it could be describing hundreds of thousands of pump shotgun in the US, making each a potential machinegun. As there are several models of shotguns that operate precisely as stated on page (1) of the NPRM **"firing without additional physical manipulation of the trigger by the shooter"** (There were approximately 500,000 Model 37 pump shotguns made by Ithaca alone).

The vague language of the NPRM also describes every semiautomatic firearm made to date. Because;

Page | 6

**EX2-067**

1.)  All semiautomatic firearms have the intrinsic ability to "bump fire" and are a type of device.

2.)  All semiautomatic firearms are by their very definition both a "self regulating", and a "self acting" mechanism.

Rate of fire is not regulated by the NFA or the GCA in any way.  DOJ knows that ALL semiautomatic firearms CAN fire as fast as a machinegun.  This is because a semiautomatic and a machinegun version of the same firearm have the same essential operating mechanism (other than a few small parts in the trigger assembly).

Bump-stock-type-devices were created as a direct result of government regulation.  They simply would not exist if the purchase price of so called "transferable" machineguns were not so expensive due to supply being fixed on May 19, 1986.

If the government really wanted bump-stock-type-devices to go away, and they claim they have the right to reconsider its previous interpretations, then the government would open the NFRTR to new transferable machineguns.

Nobody would bother with a bump-stock-type-devices and the government would know precisely where each new machinegun was.   922(o) " ….Or under the authority of". The government could choose to simply "authorize" the new registrations.

OR: The Attorney General could simply declare a general amnesty under the NFA any time he wishes to as long as they are not concurrent (must be separated by one calendar day).

DOJ has had the power to do both and neither would have required any proposed rule making.

Claims made by DOJ in the NPRM can only be described as deceptive; they are not supported by scientific facts or DOJ's own documents.

Len Savage
Historic Arms LLC
May 25, 2018

The documents are attached in the order they are referred to in the text.

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder**

### Comment

Please see attached.

### Attachments (1)

Giffords_Bump_Stocks_Comment_FINAL_6.26.18

**View Attachment:** 

---

**ID:** ATF-2018-0002-85346

**Tracking Number:** 1k2-93yd-gnrt

### Document Information

**Date Posted:**
Jul 5, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Lindsay Nichols

**Organization Name:**
Giffords Law Center



**TO**   VIVIAN CHIU, OFFICE OF REGULATORY AFFAIRS
ENFORCEMENT PROGRAMS AND SERVICES
BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES
99 NEW YORK AVE. NE
WASHINGTON DC, 20226

**FROM** LINDSAY NICHOLS, GIFFORDS
**DATE** JUNE 26, 2018
**RE**   DOCKET NO. ATF 2017R–22

## BUMP-STOCK-TYPE DEVICES

This comment is submitted on behalf of Giffords and Giffords Law Center to Prevent Gun Violence ("Giffords") in response to the Notice of Proposed Rulemaking regarding Bump-Stock-Type Devices, Docket No. ATF 2017R–22 (the "NPRM"). Giffords continues to call on Congress to directly address all rapid-fire trigger activators, but in the absence of Congressional action, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") should move forward with the NPRM and promulgate a rule to address the danger some of these devices pose to the public.

Giffords is committed to advancing commonsense change that makes communities safer from gun violence. Operating out of offices in San Francisco, New York, and Washington DC, our staff partners with lawmakers and advocates at the federal, state, and local levels to craft and enact lifesaving gun safety laws, provide expertise in critical gun violence prevention litigation, and educate the public on the proven solutions that reduce gun violence.

## BUMP STOCKS AND THE LAS VEGAS MASSACRE

Bump-fire stocks, also known as bump stocks, are one of several devices that can be used to convert a semi-automatic rifle into what is effectively a fully automatic machine gun. When a rifle fitted with a bump stock is fired, the bump stock causes the weapon to move back and forth rapidly, allowing the rifle to fire without separate pulls of the trigger and thus increasing the rate at which the rifle can be fired. These dangerous devices, which are sometimes marketed as a novelty item, have absolutely no legitimate hunting and sporting purpose.



On October 21, 2017, a gunman in Las Vegas, Nevada, used a number of semiautomatic weapons equipped with bump stocks to fire more than 1,100 rounds of ammunition into a crowd gathered at a country music festival. In eleven minutes he shot more than 400 people. In the end, fifty-eight died.

As the Las Vegas shooting—the worst mass shooting in modern U.S. history—shows, bump stocks are extremely dangerous, and pose a high risk to public health and safety. Yet despite some efforts in the wake of the shooting, Congress has failed to take any action to regulate or ban bump stocks. In the face of this unconscionable Congressional failure, ATF should acknowledge these devices for what they are—a work-around that can be used to convert otherwise legal weapons into deadly machine guns that are illegal under federal law.

As noted in the NPRM, over a decade ago, ATF issued rulings finding that one form of bump stock, known as the Akins accelerator, did not fall within the definition of "machinegun" under the National Firearms Act ("NFA") and the Gun Control Act ("GCA"). However, ATF later reversed itself, finding that an Akins accelerator is in fact a machinegun subject to the NFA. When Akins challenged ATF's re-designation of these devices, the Eleventh Circuit Court of Appeals sided with ATF and upheld its ruling.[1]

Unlike many bump stocks, the accelerator used a coiled spring to help translate the rifle's kickback into repeated fire. When asked whether bump stocks that lacked a coiled spring were machineguns subject to the NFA, ATF repeatedly advised that they were not.[2]

Following the Las Vegas massacre, proposals were introduced in Congress to regulate bump stocks, but none of these proposals has moved forward.[3] This inaction by Congress is appalling.

ATF has now proposed a change in the regulatory definition of "machinegun" that would specify that bump stocks fall within this definition. ATF should quickly finalize this regulation.

---

[1] *Akins v. United States*, 312 Fed. App'x 197 (11th Cir. 2009)).
[2] See Notice of Proposed Rulemaking, Docket No. ATF 2017R–22, 83 Fed. Reg. 13442 (March 29, 2018).
3 H.R. 3497 (Cicilline); S.B. 1916 (Feinstein); H.R. 3999 (Curbelo); H.R. 4168 (Fitzpatrick).



## THE PROPOSED RULE CORRECTLY INTERPRETS FEDERAL LAW

Federal laws distinguish between semiautomatic weapons and automatic weapons primarily based on whether multiple shots can be fired by a single pull of the trigger.[4] According to these existing definitions, then, it is clear that a bump stock should be classified as a machinegun.

Machineguns are defined to include weapons that can discharge more than one shot with "a single function of the trigger." Through this regulation, ATF would correctly define the phrase "single function of the trigger" to mean a single pull of the trigger. When a rifle is equipped with a bump stock, a shooter who pulls the trigger once can fire multiple shots. After the first shot, these subsequent discharges result from the recoil, not a trigger pull.

In prior rulings, ATF has stated that firearms are semiautomatic only if a shooter "must consciously pull the trigger for each shot."[5]  Indeed, ATF has ruled in other contexts that a device that allows a rifle to fire multiple times when a shooter effects a single trigger pull is a machinegun under federal law. These prior rulings make it clear that devices, such as bump stocks, that allow for multiple discharges based on a single conscious pull of a trigger allow for automatic fire, and that such devices must therefore be classified as machineguns.

Second, although ATF has in the past declined to define weapons as "automatic" in the absence of coiled spring or other "automatically functioning mechanical part," this conclusion is not compelled by the statutory text.

Through this regulation, ATF would correctly define the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," to mean functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger. In *United States v. Olofson*, the Seventh Circuit adopted this interpretation of this term.[6] By adopting this interpretation through this regulation, ATF would correct an inconsistency in its prior rulings and caselaw regarding the term "automatically."

When a rifle equipped with a bump stock is fired, the trigger assembly automatically resets to fire more than one shot, in the same manner as an off-the-shelf fully automatic rifle. This reset does not depend on a coiled spring; bump stocks lacking coiled springs still allow rifles to effect successive shots with a single trigger pull. A bump stock is the "self-acting" mechanism that

---

[4] 26 U.S.C. § 5845(b); 18 U.S.C. §§ 921(a)(23); 922(o).
[5] *See* ATF private letter ruling Oct. 13, 2006, at http://lawcenter.giffords.org/wp-content/uploads/2018/01/ATF-letter-Oct.-13-2006.pdf.
[6] 563 F.3d 652 (7th Cir. 2009).

**EX2-072**



initiates automatic firing. It is a mechanical device that causes an otherwise semiautomatic firearm to function automatically, whether or not the bump stock includes a coiled spring.

ATF would correctly state that the definition of "machinegun" includes any device that enables a firearm to continue firing without additional physical manipulation of the trigger by the shooter. This interpretation should include any device that enables a firearm to fire any number of shots greater than one without the shooter taking an additional action. When the firing sequence ultimately ends is irrelevant, so long as it does not end after only one shot.  A firearm is not a machinegun if and only if the firing sequence ceases after one shot.

The proposed regulation provides a reasoned analysis for ATF's changed assessment, which would be consistent with the manner in which courts have interpreted the statutory definition of "machinegun."

## THE PROPOSED RULE DOES NOT ADDRESS THE LARGER ISSUE

While Congress has failed to address this issue, ATF is doing what it can to ban bump stocks. Giffords supports the efforts of the agency to refine its rule to address the dangerous nature of these rapid-fire trigger activators.

ATF has also requested comment on the scope of this proposed rule. Unfortunately, the proposed rule addresses a very narrow issue and does not address the larger problem posed by rapid-fire trigger activators. Bump stocks are merely one kind of rapid-fire trigger activator that falls within the already existing statutory definition of "machinegun" as interpreted through this proposed rule. Many other kinds of rapid-fire trigger activators, however, are masquerading as novelty items and are similarly devoid of any legitimate hunting or sporting purpose.  All such devices do not belong in civilian hands and contradict the NFA's purpose of limiting civilian access to firearms that discharge bullets at a rate higher than appropriate for civilian use.

ATF's proposed rule will make clear that bump stocks are "machineguns" within the meaning of that term in the NFA. Giffords also appreciates that footnotes 6, 7, and 8 in the NPRM provide some clarification about the meaning of the term "pull" in the proposed rule. Nevertheless, the rule leaves open the question whether other rapid-fire trigger activators, such as binary triggers, are machineguns. ATF has issued private letter rulings finding that some of these devices do not fall within the NFA's definition. The proposed rule calls some of those rulings into question and should supersede them — and ATF should clarify the proposed rule to definitively identify those devices, too, as machineguns.



## THERE ARE COMPELLING REASONS FOR A BUMP STOCK BAN

The NPRM displays awareness and provides a reasoned explanation for ATF's decision to change the classification of bump stocks. "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change."[7] The agency must merely "display awareness that it is changing position" and "show that there are good reasons for the new policy," as ATF has done.[8]

As ATF has stated, the proposed regulation is necessary to protect public safety from the danger of bump stocks and similar devices. The NRPM mentioned, among other things, "the destructive capacity of firearms equipped with bump-stock-type devices and the carnage they can inflict." The NPRM also provided extensive legal analysis that justifies ATF's interpretation of the term "automatically" and the phrase "single function of the trigger."

## ATF MUST NOT DELAY FINALIZING THIS RULE

Giffords remains concerned about the potential for delay before this rule is finalized, as bump stocks continue to threaten public safety. As ATF has noted, bump stocks continue to be on the market. Until this regulation is finalized, the number of civilians who own bump stocks may increase. The bipartisan consensus regarding the need to ban bump stocks should spur ATF to act quickly. Urgency is necessary given the frequency of mass shootings in recent months and the likelihood that a potential perpetrator will seek out these weapons.

Courts have emphasized the responsibility agencies have to respond promptly. "Quite simply, excessive delay saps the public confidence in an agency's ability to discharge its responsibilities and creates uncertainty for the parties, who must incorporate the potential effect of possible agency decisionmaking into future plans."[9]

The Administrative Procedures Act provides individuals with a cause of action when agency action has been unreasonably delayed. Consequently, that law requires agencies to conclude matters "within a reasonable time," and states that courts shall "compel agency action unlawfully withheld or unreasonably delayed."[10]

---

7 *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (citing *Nat'l Cable & Telecomms. Assn. v. Brand X Internet Servs.*, 545 U.S. 967, 981–982 (2005), *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 863-864 (1984)).
8 *Encino,* 136 S. Ct. at 2126.
9 *Potomac Electric Power Co. v. ICC,* 702 F.2d 1026, 1034 (D.C. Cir. 1983)
10 5 U.S.C. §§ 555, 706.



The danger to public safety posed by bump stocks should spur ATF quickly enough, but we reiterate this urgency.  "[A] reasonable time for agency action is typically counted in weeks or months, not years."[11] As the DC Circuit has stated, "delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake."[12]

Our understanding is that SlideFire, the principal maker of bump stocks, has ceased operations already. We hope that all manufacturers of bump stocks have heeded the proposed regulation when it was issued and have already ceased production of these dangerous devices. No responsible business would continue to produce and sell devices that may put their consumers in violation of the law or may contribute to the scope of a mass shooting like the one in Las Vegas. An unknown number of these devices remain in circulation in civilian hands, however, and they could be used any day in a mass shooting like Las Vegas; to address this problem, ATF must act decisively and swiftly.

## ATF MUST ADDRESS EXISTING BUMP STOCKS

As ATF noted, when this regulation is finalized, current civilian possessors of bump-stock-type devices will be obligated to dispose of these devices. ATF should not authorize any civilians to continue possessing bump stocks.  Existing bump stocks lack markings or serial numbers to identify them, so any grandfathering of existing bump stocks in civilian hands would make the regulation difficult, if not impossible, to enforce.  Such grandfathering is not contemplated by the proposed rule. In fact, ATF promised that a final rule will specify acceptable methods of disposal, as well as the timeframe under which disposal must be accomplished.

In the NPRM, ATF has already stated several methods for disposal of these devices, including turning the devices in to the nearest ATF office for destruction, or destroying the devices themselves by melting, crushing, hammering, sawing, or shredding in a manner that renders the device incapable of ready restoration. Notably absent from this list or proposed disposal methods is turning bump stocks over the state or local law enforcement.  ATF may wish to avoid putting the burden of disposal on these agencies or suggesting that individuals incriminate themselves in states where bump stocks have been banned. Nevertheless, turning these devices over to these state or local agencies is a responsible method of disposal, and some

---

11 See *Public Citizen Health Research Group v. Auchter,* 702 F.2d 1150, 1154 n.12 (D.C. Cir. 1983) (per curiam) (OSHA's failure to issue a notice of proposed rulemaking—some 18 months after announcing its intention to do so was agency action unreasonably delayed), *Families for Freedom v. Napolitano,* 628 F. Supp. 2d 535 (S.D.N.Y. 2009) (quoting *In re Am. Rivers & Idaho Rivers United,* 372 F.3d 413, 419, (D.C. Cir. 2004))(holding a two and one-half year delay was unreasonable).
12 *Telecommunications Research & Action Center v. FCC* ("TRAC"), 750 F.2d 70 (D.C. Cir. 1984).



owners of bump stocks will inevitably attempt to turn them over to state and local agencies, although there are other methods of disposal available.

Rather than relying purely on ATF agents to collect and dispose of bump stocks, ATF may choose to partner with willing state and local agencies in an effort to ensure that bump stocks are properly disposed of, and that state and local partners do not treat the surrender of bump stocks as any evidence of wrongdoing. At the least, ATF should ensure that its state and local partners are prepared with information about this regulation and the timeline and methods for disposal.

### ATF SHOULD REQUIRE THE QUICK DISPOSAL AND DESTRUCTION OF BUMP STOCKS

The NPRM provided notice to the public that bump stocks might soon no longer be available for sale or legally possessed.  People with little regard for the law may nevertheless currently be seeking out bump stocks or offering to sell them to others.  This situation puts the public at even further risk that a bump stock will fall into the wrong hands. This situation will continue until the new regulation has been fully implemented. In order to prevent even more dangerous and ill-intentioned individuals from obtaining bump stocks, ATF should set a tight timeline for the disposal and destruction of these devices. We suggest 30 days, in keeping with the Administrative Procedures Act's requirements.

### ATF MUST CONSIDER THE ECONOMIC IMPACT ON ALL RELEVANT STAKEHOLDERS

The NPRM reflects ATF's awareness of its obligation under various executive actions to conduct a cost-benefit analysis before issuing this regulation. We are disappointed that the NPRM does not disclose the full responses to the ANPRM's inquiries, which focused on potential manufacturer and retailer commercial losses from the bump stock's machinegun classification. We are also disappointed that the NPRM does not go into any detail regarding the public health and safety costs caused by the use of bump stocks, or specifically, the bump stock used in the Las Vegas shooting.

As noted by the Executive Order, agencies engaged in rulemaking must "select those approaches that maximize net benefits... including public health and safety..."[13] As described above, public health and safety are threatened as long as bump stocks continue to be available to the public. In order to assist ATF in conducting its analysis, we provide the following information:

---

13 E.O. 12866 (Sept. 30, 1993); see Congressional Research Service, *Cost-Benefit and Other Analysis Requirements in the Rulemaking Process,* Dec. 9, 2014, at https://fas.org/sgp/crs/misc/R41974.pdf.



Mass shootings produce overwhelming economic costs that accumulate starting the moment the trigger is pulled. The medical expenses and lost wages associated with mass shootings are particularly enormous.

The Pacific Institute for Research and Evaluation (PIRE) has created cost estimates for gun violence using methods that have been relied on by the Centers for Disease Control and Prevention (CDC). According to the PIRE analysis, each fatal shooting results in an average $49,164 healthcare expenses. Nonfatal shootings are even more expensive – the ongoing medical care and treatment for nonfatal gunshot wounds average at least $63,289. The victims of these injuries must continue to be treated after they are released from inpatient care, often requiring physical therapy, mental health care, and prescription medications that cost tens of thousands of dollars.

Gunshot victims often cannot continue to earn income if they have been killed, disabled, or incapacitated by their injuries. On average, a person whose life is lost represents an average value of lost work of about $2 million, while a nonfatal shooting that requires hospitalization costs nearly $100,000 per incident. Pain and suffering also reduce the quality of life for victims and loved ones. Economists have also attempted to quantify this reduction in quality of life and found that it can equal almost $3.5 million for each gunshot fatality and as much as $327,000 for each non-fatal gunshot wound.[14]

Because a shooting that results in more victims is more expensive, the Las Vegas tragedy was the most devastating shooting in modern times both in terms of personal loss and in terms of economic impact. An economist at PIRE named Ted Miller estimated the total cost of the Las Vegas shooting as over $600 million. The 2016 shooting at the Pulse nightclub in Orlando, FL, in which bump stocks do not appear to have been used, was the second deadliest shooting in modern American history, costing over $200 million less.

It is not only the increased number of deaths and injuries that make the cost estimates of the Las Vegas shooting so high. As Miller noted, the extreme nature of the shooting, due in part to the use of a bump stock, also increases the cost for the mental healthcare of the surviving victims.[15]

---

14 Cost estimates are derived from the model of the cost of gun violence published in 2012 by economists at the Pacific Institute for Research and Evaluation (PIRE). PIRE is a nonprofit research organization that focuses on using scientific research to inform public policy. This model can be found at www.pire.org/documents/gswcost2010.pdf. All cost estimates were adjusted to 2016 dollars.
15 John Haltiwanger, "Las Vegas Shooting Recovery Will Cost at Least $600 Million," Newsweek, Oct. 2, 2017, http://www.newsweek.com/las-vegas-mass-shooting-will-cost-least-600-million-675982.



Another factor that must be considered in evaluating the overall cost of this rule is that, since the NPRM was released, five additional states, Connecticut, Delaware, Maryland, Rhode Island, and Vermont, have banned bump stocks. Consequently, these markets for additional bump stock sales should now be effectively closed. By the time this regulation is finalized, even more states may have banned bump stocks. These state-level bans, in addition to the six state-level bans in existence at the time of the NPRM, will significantly reduce the economic impact of this regulation.

Finally, as long as bump stocks remain legal, state and local law enforcement must police our neighborhoods with the assumption that bump stocks and similar devices exist in the hands of dangerous people. This additional layer of anxiety and vigilance exacts a toll.

## CONCLUSION

ATF must finalize the proposed rule without delay. While Congress should take action to address all rapid-fire trigger activators, Giffords supports ATF's efforts to make America safer through this regulation banning bump stocks.

Sincerely,

*Lindsay Nichols*

Lindsay Nichols

### ABOUT GIFFORDS LAW CENTER

For nearly 25 years, the legal experts at Giffords Law Center to Prevent Gun Violence have been fighting for a safer America by researching, drafting, and defending the laws, policies, and programs proven to save lives from gun violence.

EX2-078

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: <u>Bump-Stock Type Device</u>

For related information, **Open Docket Folder**

| | |
|---|---|
| **ID:** ATF-2018-0002-69169 | |
| **Tracking Number:** 1k2-93vs-yfji | |

### Document Information

**Date Posted:**
Jul 2, 2018

**RIN:**
1140-AA52

**Show More Details**

### Submitter Information

**Submitter Name:**
Jill Dahlman

### Comment

I am the daughter of a career military officer. Every night I watched my father come home and lock up his gun. Every night. When I asked him why, he told me that only experienced people should have a gun or should have access to that gun. I believed him. I had no reason not to. But now that I am older, I understand why my father felt the way he did. And I agree with him.

On the night of October 1, 2017, my family was shaken to its core. Even though I don't live in Las Vegas, my family does. My older brother. My niece, My nephew. One of my nephews was killed in a hit and run in Las Vegas when he was 20. My family has had its share of tragedy. Oddly, my nephew was supposed to be at the festival, but his ride didn't pan out. I am insanely grateful for that because otherwise, I would have had to have helped my brother and sister-in-law bury another child.

But like the 9/11 tragedy of so many years ago, the loss of life from when a gunman opened fire from a hotel room on the 32nd floor of the Mandalay Bay hotel into the 22,000 person crowd at the Route 91 Harvest country music festival in Las Vegas, Nevada, killing 58 people and injuring more than 500, everyone knew someone who was affected. At the school I teach in Alabama, the drummer was a member of the faculty. We all knew someone who was affected, and no wonder. The gunman fired more than 1,100 rounds of ammunition in 11 minutes, using semi-automatic rifles modified with dangerous firearm accessories designed to dramatically accelerate the rate of gunfire, commonly known as bump fire stocks. It was hard not to miss someone.

These "bump fire stock" devices are intended to circumvent

the restrictions on possession of fully automatic firearms in
the Gun Control Act of 1968 and the National Firearms Act
of 1934 by allowing an individual to modify a semiautomatic
rifle in such a manner that it operates with a similar rate of
fire as a fully automatic rifle, posing a substantial risk to
public safety.

In the absence of immediate action by Congress, which is
no surprise considering how many people are paid off by the
NRA, I urge ATF to finalize its proposed rule clarifying that
bump fire stocks, along with other conversion devices that
enable semiautomatic weapons to mimic automatic fire,
qualify as machine guns under the National Firearms Act.
And then Congress must act as wellto ensure that
manufacturers cannot continue to endanger public safety by
designing devices that imitate machine guns and subvert
the law. Who knows when a next killer will strike? Perhaps it
will take the death of a child of a member of Congress to
finally get someone to do something about the tragedy that
this nation faces every time a mass shooting occurs. Which
unfortunately is often.

The continued presence of these dangerous devices puts all
of our communities at risk, and both Congress and ATF
must take action quickly to address this threat. I understand
that there is a Second Amendment here, but this
amendment was written at a time when the musket was the
gun du jour. We no longer have muskets, and our
Constitution must adapt. We must adapt.

Thank you for your consideration of my opinion.

EX2-080

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov


Your Voice in Federal Decision-Making

## Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder**

## Comment

See the attached comments of Gun Owners Foundation.

## Attachments (1)

### GOF Comments on Bump Fire Stocks

**View Attachment:**    PDF

---

**ID:** ATF-2018-0002-16707

**Tracking Number:** 1k2-931s-nz4u

## Document Information

**Date Posted:**
May 10, 2018

**RIN:**
1140-AA52

**Show More Details** 

## Submitter Information

**Submitter Name:**
William Olson

**Organization Name:**
Gun Owners Foundation

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



# Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder**

## Comment

See attached file(s)

## Attachments (1)

### CGay Comment Final Draft

**View Attachment:**  DOC   PDF

---

**ID:** ATF-2018-0002-16095

**Tracking Number:** 1k2-92vp-92p0

## Document Information

**Date Posted:**
May 2, 2018

**RIN:**
1140-AA52

**Show More Details** 

## Submitter Information

**Submitter Name:**
Coleman Gay

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



# Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder** 

## Comment

See attached file(s)

Docket number ATF 2017R-22

## Attachments (1)

### Docket number ATF 2017R

**View Attachment:** 🗎 PDF

---

**ID:** ATF-2018-0002-91367

**Tracking Number:** 1k2-93yr-h7vm

## Document Information

**Date Posted:**
Jul 5, 2018

**RIN:**
1140-AA52

**Show More Details** ⧉

## Submitter Information

**Submitter Name:**
Joshua Fitch

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov

 Regulations.gov - Your
Voice in Federal Decision

# Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: <u>**Bump-Stock Type Device**</u>

For related information, **Open Docket Folder** 🔗

| |
|---|
| **ID:** ATF-2018-0002-61777 |
| **Tracking Number:** 1k2-93xx-l8o0 |
| ## Document Information |
| **Date Posted:** Jun 26, 2018 |
| **RIN:** 1140-AA52 |
| **Show More Details** |
| ## Submitter Information |
| **Submitter Name:** Joshua Prince |
| **Organization Name:** Firearms Industry Consulting Group (FICG) |

## Comment

See Attached

## Attachments (20)

### FPC Comment ATF 2017R-22

View Attachment: 🖼    + View more information

### Exhibit 1

**Abstract:**
FPC/FICG Comment with Exhibit List and Exhibits 1, 2, 5, 6, 7, 8, 9, 10, 15, 16, 19, 20, 21, 22 (4 parts), and 23. Exhibits 24, 25 (3 parts) and 27, 29 ( 2 parts), 30, 31, 32, 33, 34, and 35 are in a separate comment submission (comment ID 61778) due to limitations on attachment size. Exhibits 3, 4, 11, 12, 13, 14, 17, 18, 26, and 28 are video files that cannot be uploaded as attachments to regulations.gov

### Exhibit 2

View Attachment: 🖼

### Exhibit 5 [UPDATE] Bumbling Machinations on Bump Stocks The Zelman Partisans

View Attachment: 🖼

### Exhibit 6 - Friesen

View Attachment: 🖼

### Exhibit 7 Holder contempt

**EX2-084**

View Attachment:

## Exhibit 8

View Attachment:

## Exhibit 9 Feinstein Screenshot

View Attachment: JPG

## Exhibit 10 ATF Determinations

View Attachment:

## Exhibit 15 Guedes Declaration

View Attachment:

## Exhibit 16 Thompson Declaration

View Attachment:

## Exhibit 19 - 82 Stat. 1235

View Attachment:

## Exhibit 20 1969-CFR-ATF-amnesty-regs 26 CFR 179-120

View Attachment:

## Exhibit 21 Violating Due Process

View Attachment:

## Exhibit 22 1998testimony_Part1

View Attachment:

## Exhibit 22 1998testimony_Part2

View Attachment:

## Exhibit 22 1998testimony_Part3

View Attachment:

## Exhibit 22 1998testimony_Part4

View Attachment:

## Exhibit 23 ATF Quarterly Roll Call

**View Attachment:**

---

## Exhibit List

**View Attachment:**

---

## Bureau of Alcohol, Tobacco, Firearms, and Explosives

| | | |
|---|---|---|
| _____ ) | | |
| ) | | Docket No. ATF 2017R-22 |
| **Bump-Stock-Type Devices** ) | | |
| ) | | RIN 1140-AA52 |
| _____ ) | | |

## Firearms Policy Coalition and Firearms Policy Foundation's Comments in Opposition to Proposed Rule ATF 2017R-22

Joshua Prince, Esq.
*Chief Counsel*

Adam Kraut, Esq.
*Attorney*

Firearms Industry Consulting Group
a Division of Civil Rights Defense Firm, P.C.
646 Lenape Road
Bechtelsville, PA 19505
888-202-9297
www.FirearmsIndustryConsultingGroup.com

June 19, 2018

# TABLE OF CONTENTS

I. **PROCEDURAL IRREGULARITIES HAVE DENIED INTERESTED PERSONS A MEANINGFUL OPPORTUNITY TO COMMENT ON THE PROPOSED RULEMAKING**.................................................................3

    A. *ATF Failed to Make Available the Underlying Determinations, Evidence and Other Information Upon Which It Purportedly Relied in Formulating its Proposed Rule* ...........................................................................................3

    B. *ATF Failed to Describe a Single Situation Illustrating the Problem it Purports to Address; The Entire Rulemaking Seems to Rest on Multiple False Premises*...................7

    C. *ATF Failed to Permit a Ninety-Day Comment Period and Procedural Irregularities Have Denied Interested Persons a Meaningful Opportunity to Comment on the Proposed Rulemaking* .........................................................12

    D. *ATF's Prior Lack of Candor Demonstrates a Heightened Need for Procedural Regularity* ...................................................................................17

        1. ATF's "Institutional Perjury" Before the Courts ......................................18

        2. ATF's Deception in Congressional Oversight ........................................20

        3. ATF's Misleading of the Public .....................................................20

II. **ATF'S PROPOSED RULE RAISES IMPORTANT CONSTITUTIONAL ISSUES** ...............................................................................................21

    A. *The Second Amendment*...............................................................22

    B. *The Fifth Amendment* .................................................................25

        1. *The Proposed Rulemaking Violates Due Process* ....................................25

            i. ATF has Failed to Provide Notice and Opportunity to Response to All Interested Parties ..................................................................25

            ii. The Rulemaking Proposal Constitutes Entrapment Given ATF's Prior Approvals and Public's Reliance Thereon ...........................................26

        2. *The Proposal Constitutes a Taking Without Just Compensation* .............................27

            i. The Fifth Amendment Precludes a Regulatory Taking...............................27

            ii. Cost-Impact Statement Fails to Address Just Compensation for the Taking....................................................................................30

    C. *The Ex Post Facto Clause* .............................................................33

        1. *ATF's Proposal Acknowledges that Bump-stocks are not Covered by the Definition of a Machinegun and Retroactively Criminalizes Lawful Conduct* .........33

III. **ATF'S PROPOSAL EXCEEDS ITS STATUTORY AUTHORITY** ...............................34

    A. *Congress Prohibited "Undue or Unnecessary" Restrictions* ...........................35

ii

B. *Independent of FOPA, ATF Lacks Statutory Authority As the Congress Defined What Constitutes a Machinegun* ..................................................................36

C. *ATF is Statutorily Prohibited From Retroactively Applying the NPR* ...........40

**IV. ATF'S PROPOSAL IS ARBITRARY AND CAPRICIOUS** .............................41

A. *ATF's Interpretative Jiggery-Pokery is Pure Applesauce* ...............42

B. *Belt Loops, Rubber Bands and Fingers, OH MY!* .....................................42

C. *The Jerry Miculek Example – He's One Bad Mother… Shut Your Mouth (And: Oh No! They Banned Jerry!)* ...................................................................44

D. *Whoops, We Did it Again! ATF Misleads the Public Regarding the Use of Bumpstock Devices in the Las Vegas Shooting* .............................................45

E. *We Lied To You Once (Shame On Us). We Lied To You More Times Than We Can Count (Shame On You For Having Your Eyes Wide Shut). The Continuing Lies Espoused By ATF Regarding The Functionality Of Bump-Stock-Devices* ..............47

F. *The Akins Accelerator Difference* ...........................................................54

**V. ATF'S PROPOSAL IS OVERLY VAGUE AND CONTRADICTORY** ...............55

**VI. ATF FAILED TO CONSIDER VIABLE AND PRECEDENTIAL ALTERNATIVES** ...........................................................................................57

A. *FPC Supports "Alternative 1"* ...............................................................57

B. *The Amnesty Alternative* .........................................................................57

C. *ATF's Reclassification of the Streetsweeper and USAS 12 and Seven Year Registration/Amnesty that Followed* ...........................................................59

D. *ATF's Reclassification of Open Bolt Macs* ............................................60

E. *Revision of Proposed Changes to 27 C.F.R. §§ 447.11, 478.11, and 479.11* .................61

**VII. POLICY CONSIDERATIONS DO NOT SUPPORT ATF'S PROPOSED RULE** ........63

A. *ATF's Assumptions Lack Statistical Validity* ...............................63

B. *ATF Relies On Multiple False Premises* ........................................65

**CONCLUSION** .....................................................................................66

iii

**EX2-089**

**Bureau of Alcohol, Tobacco, Firearms, and Explosives**

<table>
<tr><td>_____ )</td><td></td></tr>
<tr><td>)</td><td>Docket No.  ATF 2017R-22</td></tr>
<tr><td>**Bump-Stock-Type Devices**           )</td><td></td></tr>
<tr><td>)</td><td>RIN 1140-AA52</td></tr>
<tr><td>_____)</td><td></td></tr>
</table>

### Firearms Policy Coalition and Firearms Policy Foundation's Comments in Opposition to Proposed Rule ATF 2017R-22

On March 29, 2018, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF" or the "Agency") published a Notice of Proposed Rulemaking ("NPR") in the Federal Register at Volume 83, pages 13442 through 13457, to institute this rulemaking proceeding with respect to firearms regulated under the National Firearms Act ("NFA"), 26 U.S.C. §§ 5801-5872. ATF's current regulations under the NFA are codified at 27 C.F.R. Part 479.

Firearms Policy Coalition (FPC) is a grassroots, non-partisan, 501(c)(4) public benefit organization. It is interested in this rulemaking because FPC's mission is to protect and defend the Constitution of the United States and the People's rights, privileges and immunities deeply rooted in this Nation's history and tradition, especially the inalienable, fundamental, and individual right to keep and bear arms; to protect, defend, and advance the means and methods by which the People of the United States may exercise those rights, including, but not limited to, the acquisition, collection, transportation, exhibition, carry, care, use, and disposition of arms for all lawful purposes, including, but not limited to, self-defense, hunting, and service in the appropriate militia for the common defense of the Republic and the individual liberty of its citizens; to foster and promote the shooting sports and all lawful uses of arms; and to foster and promote awareness of, and public engagement in, all of the above and defend the Constitution of

1

the United States, especially the fundamental, individual Second Amendment right to keep and bear arms. In response to the NPR, FPC offers this public comment for consideration with respect to the proposed rule.

Firearms Policy Foundation (FPF) is a grassroots, non-partisan, 501(c)(3) public benefit organization. It is interested in this rulemaking because FPF's mission is to protect and defend the Constitution of the United States and the People's rights, privileges and immunities deeply rooted in this Nation's history and tradition, especially the inalienable, fundamental, and individual right to keep and bear arms; to protect, defend, and advance the means and methods by which the People of the United States may exercise those rights, including, but not limited to, the acquisition, collection, transportation, exhibition, carry, care, use, and disposition of arms for all lawful purposes, including, but not limited to, self-defense, hunting, and service in the appropriate militia for the common defense of the Republic and the individual liberty of its citizens; to foster and promote the shooting sports and all lawful uses of arms; and to foster and promote awareness of, and public engagement in, all of the above and defend the Constitution of the United States, especially the fundamental, individual Second Amendment right to keep and bear arms. In response to the NPR, FPF offers this public comment for consideration with respect to the proposed rule.

FPC and FPF oppose the proposed rulemaking for the reasons set forth below and in the Exhibits to this Comment incorporated herein by reference.  For ease of reference and given that FPC's and FPF's interests are aligned, the use of "FPC" throughout this Comment incorporates or otherwise constitutes both FPC and FPF.

EX2-091

I.    **PROCEDURAL IRREGULARITIES HAVE DENIED INTERESTED PERSONS A MEANINGFUL OPPORTUNITY TO COMMENT ON THE PROPOSED RULEMAKING**

ATF has repeatedly violated the basic obligations designed to permit *meaningful* public participation in this rulemaking proceeding.  Despite efforts by FPC and other interested persons to encourage compliance with the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 501-559, other statutory provisions governing rulemaking, and fundamental due process, ATF has persisted on a course that ensures a waste of time and resources by all involved. It should be clear that ATF cannot proceed to promulgate a final rule without publishing a proper NPR and providing the necessary opportunity for *meaningful* public comment.

A.    ***ATF Failed to Make Available the Underlying Determinations, Evidence and Other Information Upon Which It Purportedly Relied in Formulating its Proposed Rule***

On March 30, 2018, the day after ATF published NPR in this matter, Firearms Industry Consulting Group ("FICG"), on behalf of FPC, submitted an expedited FOIA Request "for all ATF determinations relative to devices referred to as 'bump stocks' and 'bump-fire stocks' by ATF in its proposed rulemaking (ATF 2017R-22, RIN 1140-AA52, Fed. Register No. 2018-06292 - https://www.regulations.gov/document?D=ATF-2018-0002-0001), as well as, all ATF Form 9310.3A 'Correspondence Approval and Clearance' forms relative to each determination, and any versions or drafts of the determinations, which were different than the final

3

determination" since ATF failed to include these, or any other "supporting documents," in the
docket folder. [1] *See* Exhibit 1.



As of the filing of this Comment, not only has ATF declined to make public any of the requested
and necessary supporting documents – *especially its own determinations that bump stocks and
bump-fire stocks <u>do not</u> constitute firearms, let alone machineguns* [2] – but has additionally failed
to respond to FICG's expedited FOIA or even assign a number to it. [3] Moreover, while
acknowledging that it has received "correspondence[s] from members of the United States

---

[1] As reflected in the FOIA Request, "[t]he use of the word 'determinations' shall be understood
to mean any correspondence, whether in electronic or paper form, by ATF to any person, which
shall include any individual, Member of Congress, corporation, limited liability company, and
partnership, regarding the lawfulness or unlawfulness of any bump stock or bump-fire stock
device, whether a sample device was submitted or not to ATF."

[2] ATF admits that there are at least "ten letter rulings between 2008 and 2017" (83 Fed. Reg. at
13445); none of which have been made available by ATF. 83 Fed. Reg. at 13445.

[3] FICG submitted its request on March 30, 2018. As is common practice for ATF, it has failed to
comply with 5 U.S.C. § 552(a)(6)(A)(i).

Senate and the United States House of Representatives, as well as nongovernmental organizations, requesting that ATF examine its past classifications and determine whether bump-stock-type devices currently on the market constitute machineguns under the statutory definition" (83 Fed. Reg. at 13446), ATF has failed to also provide these in the docket.

As a result, ATF still has not provided any of the documents underlying the NPR either in the docket or in response to the FOIA request.

It has long been understood that "[t]he process of notice and comment rule-making is not to be an empty charade. It is to be a process of reasoned decision-making. One particularly important component of the reasoning process is the opportunity for interested parties to participate in a meaningful way in the discussion and final formulation of rules." *Connecticut Light & Power Co. v. NRC,* 673 F.2d 525, 528 (D.C. Cir. 1982). "If the [NPR] fails to provide an accurate picture of the reasoning that has led the agency to the proposed rule, interested parties will not be able to comment meaningfully upon the agency's proposals." *Id*. at 530. Providing access to materials like FPC requested – in addition to those that ATF has acknowledged in the NPR as the basis for the rulemaking – has long been recognized as essential to a meaningful opportunity to participate in the rulemaking process.

The APA "'requires the agency to make available to the public, in a form that allows for meaningful comment, the data the agency used to develop the proposed rule.'" *American Medical Ass'n, v. Reno,* 57 F.3d 1129, 1132-33 (D.C. Cir. 1995) (quoting *Engine Mfrs. Ass'n v. EPA,* 20 F.3d 1177, 1181 (D.C. Cir. 1994)). In order to ensure that rules are not promulgated on the basis of data that to a "critical degree, is known only to the agency," the agency must make available the "methodology" of tests and surveys relied upon in the NPR. *Portland Cement Ass'n v. Ruckelshaus,* 486 F.3d 375, 392-93 (D.C. Cir. 1973).

An agency commits serious procedural error when it fails to reveal the basis for a proposed rule in time to allow for meaningful commentary. *Connecticut Power & Light,* 673 F.2d at 530-31. The notice and comment requirements

> are designed (1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review.

*International Union, United Mine Workers of America v. Mine Safety & Health Admin.,* 407 F.3d 1250, 1259 (D.C. Cir. 2005).

In this rulemaking proceeding, ATF not only refused to make available its own prior determinations that "bump stocks", "bump-fire stocks", and "bump-stock-devices" were not firearms, *let alone*, machineguns, and communications received from Congress and other organizations, but more importantly, as discussed in Sections I., B., and IV., D., *infra*, ATF has failed to provide any evidence that a "bump stock", "bump-fire stock", or a "bump-stock-device" was ever utilized in a single crime. As the putative use of a bump stock in the Las Vegas shooting is the purported underlying basis for this rulemaking (83 Fed. Reg. at 13443, 13444, 13446, 13447, 13452, 13454) the lack of evidentiary support is mind-boggling – especially in light of legitimate national concerns involving the media and governmental agencies misleading the public on a variety of issues – and constitutes a serious procedural error, as the absence of such evidence supports that there are no verified instances of a bump stock being utilized criminally and neither ATF nor FBI have confirmed the use of a bump-stock-device in any crime. [4]

---

[4] An expedited Freedom of Information Act request was submitted to both ATF and FBI requesting "Any and all records documenting the use of a bump-fire type stock being used by anyone on or about October 1, 2017 at the Mandalay Bay shooting incident in Las Vegas,

(footnote continued)

The lack of access to these materials has seriously hindered the ability of interested persons to address everything that underlies the apparent unsupported assertions in the NPR. Bringing forth any such material in support of a final rule will do nothing to remedy the fact that those materials were not available to inform the interested persons preparing public comments. If ATF intends to take any further action relative to this rulemaking, it needs first to lay the foundation for a proposal and then expose that foundation to meaningful critique.

> **B.**      ***ATF Failed to Describe a Single Situation Illustrating the Problem it Purports to Address; The Entire Rulemaking Seems to Rest on Multiple False Premises***

In the docket, ATF failed to provide evidence of a single instance where a "bump stock" or "bump-fire stock" was confirmed to be utilized in the commission of a crime. [5] Even more disconcerting, in order to argue a putative benefit of this rulemaking, ATF relies on public comments from an ANPR, stating:

> "As reported by public comments, this proposed rule would affect the criminal use of bump-stock-type devices in mass shootings, such as the Las Vegas shooting incident… Banning bump-stock-type devices *could* reduce casualties in an incident involving a weapon fitted with a bump-stock-type device, as well as assist first responders when responding to incidents, because it prevents shooters from using a device that allows them to shoot a semiautomatic firearm automatically."

---

(footnote continued)

Nevada; and Any and all records documenting the use of a bump-fire type stock used during the commission of any crime to date." To date, neither ATF nor FBI has confirmed the use of a bumpfire stock in the commission of any crime. *See* "Analysis and Commentary Regarding: Docket Number: ATF 2017R-22 & Bump-Stock-Type-Devices", ID: ATF-2018-0002-31210, Tracking Number: 1k2-93f3-s09b at 4 and 62 – 63, *available electronically at* – https://www.regulations.gov/document?D=ATF-2018-0002-31210, in "Email 013 (Historic Arms) rec 5-29-18 – Part4" as pdf pages 1 – 2.

[5] *Id*.

EX2-096

83 Fed. Reg. 13454 (emphasis added). These purported benefits are equally illusory and misleading. First, ATF presents no evidence that bump-stock-type devices have actually ever been used in any mass shooting incidents.[6] As further discussed *infra* in Section IV., D., even in relation to the Las Vegas incident upon which the NPR relies (83 Fed. Reg. at 13443, 13444, 13446, 13447, 13452, 13454), the Las Vegas Metropolitan Police Department Preliminary Investigative Report *only* indicates that some weapons were outfitted with bump-stock-type devices but provides no indication that any bump-stock-device was utilized. *See*, Exhibit 2.[7] Second, ATF contends that casualties *could* be reduced in such an incident without demonstrating that there have been *any* casualties attributable to the devices.[8] ATF has also failed to address the fact, as discussed in Sections IV., B. and C., that not only is a bump-stock unnecessary to bump-fire a firearm but that practiced shooters can match, *if not exceed*, the speed of a bump fire device, *with far superior accuracy*, unassisted by such a device. *See*, Exhibits 3 and 4.[9] Moreover, as stated by former ATF Acting Chief of FTB Rick Vasquez, "[a] factory semi-automatic

---

[6] Interestingly, ATF relies solely on prior "public comments" to suggest that a bump stock device was utilized in Las Vegas (83 Fed. Reg. 13454), while thereafter declaring that bump stock devices "*could* be used for criminal purposes." (83 Fed. Reg. 13455)(emphasis added). The use of the word "could" reflects that such use is a *possible* future, not past, occurrence. Thus, ATF is acknowledging that but for public conjecture, it has *no* evidence that a bump stock device has been utilized in a crime and only hypothesizes that a bump stock device "could be used for criminal purposes." *See also* Fn. 4, *supr*a.

[7] A copy of the report is also available online at – https://www.lvmpd.com/en-us/Documents/1_October_FIT_Report_01-18-2018_Footnoted.pdf.

[8] Relying on nothing more than a "conclusory statement would violate principles of reasoned decisionmaking." *Foundation on Economic Trends v. Heckler,* 756 F.2d 143, 154 (D.C. Cir. 1985); *see also Pearson v. Shalala,* 164 F.3d 650, 659 (D.C. Cir. 1999).

[9] Copies of the videos are also available online – Iraqveteran8888, Worlds Fastest Shooter vs Bump Fire! – Guns Reviews, YouTube (Oct. 13, 2014), https://www.youtube.com/watch?v=JTb6hsSkV1w and Miculek.com, AR-15 5 shots in 1 second with fastest shooter ever, Jerry Miculek (Shoot Fast!), YouTube (June 20, 2013) https://www.youtube.com/watch?v=v3gf_5MR4tE&t.

EX2-097

and fully-automatic (*i.e.* machinegun) firearm, manufactured by the same manufacturer, will have identical cyclic rates, [10] unless the machinegun version has some form of rate reducing mechanism; whereby, the machinegun version may have a slower cyclic rate than the semi-automatic version." *See* Exhibit 32. [11] Thus, not only can an individual exceed the rate of fire of a bump-stock-device with greater accuracy, but an individual can equal, and sometime exceed, the rate of fire of an actual machinegun.

Third, as also addressed by the Savage Comment [12] and the Expert Declaration of Vasquez (*see* Exhibit 32), the technique of bump firing merely utilizes the recoil impulse that *all* semi-automatic firearms generate, every time the firearm discharges. More importantly, as discussed by the Expert Declaration of Vasquez and the Savage Comment, and reflected *infra* in Sections IV., A. and E., including as depicted in video exhibits related thereto, contrary to ATF's interpretive jiggery-pokery in the NPR that

---

[10] As expert Vasquez explains, "[t]he cyclic rate of a firearm is neither increased nor decreased by the use of a bump-stock-device, as the cyclic rate of a particular firearm is the mechanical rate of fire, which can be explained in laymen's terms as how fast the firearm cycles (*i.e.* loads, locks, fires, unlocks, ejects), which is an objective, not subjective, mechanical standard." *See* Exhibit 32.

[11] This was also addressed by Firearm Engineer Len Savage on page 2 of his Comment, where he declares that all semi-automatic firearms:

> "can fire as fast as a machinegun version. Their cyclic rates are identical to the machinegun version. Their essential operating mechanisms are identical, same ammo, same mag[azines], same reciprocating mass. The only small physical difference is the machineguns described have a mechanical level that 'automatically' starts the new cycle as soon as the previously cycle ends. Some semiautomatic firearms can even fire faster than the full auto version because the machinegun versions having some form of rate reducing mechanism."

*See* Analysis and Commentary Regarding: Docket Number: ATF 2017R-22 & Bump-Stock-Type-Devices, ID: ATF-2018-0002-31210, Tracking Number: 1k2-93f3-s09b, available *electronically at* – https://www.regulations.gov/document?D=ATF-2018-0002-31210, in "Email 013 (Historic Arms) rec 5-29-18".

[12] *Id.*

9

bump-stock devices "convert an otherwise semiautomatic firearm into a machinegun by functioning as a *self-acting* or *self-regulating* mechanism" (83 Fed. Reg. 13443), in reality, a bump-stock-device is neither self-acting nor self-regulating and requires the trigger to be fully released, reset and fully pulled, before a subsequent round can be fired. [13] To the extent ATF contends otherwise, then all semi-automatic firearms are "self-acting" or "self-regulating," since, as discussed *infra* in Section IV., B., the technique of bump firing can be easily achieved solely with one's finger while operating a *factory* semi-automatic firearm.

Thus**,** to the extent ATF contends that bump-stock-devices are self-acting, self-regulating or otherwise harness the recoil energy of the firearm, then *all* semi-automatic firearms are self-acting, self-regulating or otherwise harness the recoil energy of the firearm. Under the logic and contentions employed in the NPR, ATF would seemingly be entitled and empowered to regulate *all* semi-automatic firearms in the same manner as they seek to do for bump-stock devices, whereby all semi-automatic firearms could be re-classified by fiat, transmuted into unlawfully-possessed and proscribed contraband items, and, accordingly, force forfeiture (and provide for seizure) and destruction of these items,

---

[13] As also addressed in the Expert Declaration of Vasquez:

> The bump-stock-device does not permit automatic fire by harnessing the recoil energy of the firearm. Harnessing the energy would require the addition of a device such as a spring or hydraulics that could automatically absorb the recoil and use this energy to activate itself. If it did harness the recoil energy, the bump-stock equipped firearm in the video would have continued to fire, while the shooter's finger remained on the trigger, after pulling it rearwards without requiring the shooter to release and reset the trigger and then pull the trigger completely reward for a subsequent round to be fired.
> …
> A firearm in a bumpstock/slidefire stock cannot be a machinegun because it requires an individual to activate the forward motion of the stock when the firearm is fired. Additionally, it requires a thought process of the individual to continually pull the trigger when the stock is pulled forward bringing the trigger into contact with the finger.

EX2-099

without any just compensation being paid—never-mind the statutes, let alone the Constitution. [14]

In fact, Eric Larson clairvoyantly published an article in March of 1998 in the Gun Journal, entitled *How Firearm Registration Abuse & the "Essential Operational Mechanism" of Guns May Adversely Affect Gun Collector*s, in which he raised concern over ATF banning all semi-automatic firearms through these types of "interpretations" of law. *See* Exhibit 24.

Fourth, ATF suggests that this rule will assist first responders by preventing shooters from using the devices; however, ATF does not elaborate on how exactly a firearm outfitted with a bump-stock-type device impedes first responders in any way that a differently configured firearm does not.

Finally, ATF laughably suggests that it is addressing a negative externality of the commercial sale of bump-stock-type devices. This negative externality is "that they could be used for criminal purposes." 83 Fed. Reg. at 13449. This suggestion is not supported by any evidence aside from the unproven allegation of their use in the Las Vegas

---

[14] If "the eight-year assault on . . . Second Amendment freedoms [came] to a crashing end" with President Trump's election and inauguration, then a new assault on individual liberties and lawfully acquired and possessed private property apparently came to a crushing beginning in this NPR. *See*, *Trump at NRA convention: 'Eight-year assault' on gun rights is over*, Fox News, April 28, 2018, online at http://www.foxnews.com/politics/2017/04/28/trump-at-nra-convention-eight-year-assault-on-gun-rights-is-over.html. But the "President then directed the Department of Justice . . . to dedicate all available resources to complete the review of the comments received [in response to the ANPRM], and, as expeditiously as possible, to propose for notice and comment a rule banning all" bump-stock devices. Federal Register / Vol. 83, No. 61 at 13446 (NPR Section III). Indeed, it is difficult to reconcile President Trump's statement that "[he] will never, ever infringe on the rights of the people to keep and bear arms," *Trump at NRA convention, supra*, with the NPR. As the NPR admits, it a direct result of his *personal* directive to lawlessly seek an unlawful total, confiscatory ban on bump-stock devices (and criminalize the law-abiding people who possess them) in spite of the Executive Branch's lack of legal and constitutional authority to do so.

EX2-100

incident. Further, any suggestion that a device responsible for substantial, and lawful, market activity should be banned because it has a *potential* to be used for criminal purposes is a mind-blowing and preposterous proposition that supports the banning of virtually all consumer products, such as vehicles (given the number of individuals who utilize them while unlawfully under the influence of drugs or alcohol and cause significant numbers of injuries and deaths [15], and those who use them to carry out terrorist attacks). [16]

If the sole example ATF has to offer is the conjectured use of a bump-stock-equipped firearm during the Law Vegas shooting, there is simply *no evidence of any problem* that existing criminal law does not address, let alone a statistically-significant one. Murder is already unlawful, right? And if serious criminal laws have no meaningful *deterrent* effect, what then is the objective of this NPR, if not to subject law-abiding people who did not commit any crime to pain of criminal penalty and loss of their property?

    **C.**    ***ATF Failed to Permit a Ninety-Day Comment Period and Procedural Irregularities Have Denied Interested Persons a Meaningful Opportunity to Comment on the Proposed Rulemaking***

18 U.S.C. § 926(b) requires that ATF provide "not less than ninety days public notice,

---

[15] "Every day, 29 people in the United States die in motor vehicle crashes that involve an alcohol-impaired driver. This is one death every 50 minutes. The annual cost of alcohol-related crashes totals more than $44 billion." *See, e.g.*, "Impaired Driving: Get the Facts" (citing sources, internal footnotes omitted), Centers for Disease Control and Prevention, online at https://www.cdc.gov/motorvehiclesafety/impaired_driving/impaired-drv_factsheet.html.

[16] *See*, https://www.usatoday.com/story/news/2016/07/14/dozens-dead-nice-france-after-truck-plows-into-crowd-mayor-says/87101850. *See also*, http://abcnews.go.com/International/truck-hits-pedestrians-busy-barcelona-street/story?id=49272618.

and shall afford interested parties opportunity for hearing, before prescribing such rules and regulations."

***First and foremost, FPC demands, pursuant to Section 926(b) and ATF's offer in the NPR (83 Fed. Reg. 13456), [17] that they be provided an opportunity to be heard at a hearing before ATF prescribes any rule or regulation in relation to this NPR. [18]***

In this rulemaking proceeding, numerous procedural irregularities and issues have arisen that have precluded the public a meaningful opportunity to respond and have caused some to believe that the comment period was closed, since the very start of the comment period; thus, depriving the public of the ninety day comment period that is required by law.

Immediately, upon the publication of the NPR on March 29, 2018, numerous individuals were advised on FederalRegister.gov [19] "COMMENT PERIOD CLOSED – The comment period on this document is closed and comments are no longer being accepted on Regulations.gov. We apologize for any inconvenience."

---

[17] Contrary to ATF's assertion in the NPR that the Director of ATF has discretion in whether to grant a public hearing, Section 926(b) requires ATF to hold a public hearing when such is requested, as the statutory language provides that the Attorney General "*shall* afford interested parties opportunity for hearing, before prescribing such rules and regulations." (Emphasis added). If it were discretionary, the Congress would have utilized a permissive word like "may" instead of the command "shall".
[18] Although requesting a hearing in a comment is sufficient, based on the request in the NPR, a separate letter was sent to Acting Director Brandon on behalf of FPC requesting an opportunity to be heard at a hearing. *See* Exhibit 34.
[19] The specific link is https://www.federalregister.gov/documents/2018/03/29/2018-06292/bump-stock-type-devices

13



As is reflected in the above image, taken from the subject Web site, the notice that the comment period was closed was in relation to this proposed rulemaking regarding Bump-Stock-Type devices of "03/29/2018" and also reflects that the comment period was not supposed to end until "06/27/2018"; however, individuals were denied the opportunity to comment.

Even when individuals reached out online to the Federal Register regarding their inability to submit comments, the Federal Register responded by saying that it isn't its problem [20]:

---

[20] It would seem that, at a minimum, the Federal Register's Web site and social media accounts are managed by the same parties responsible for the www.healthcare.gov debacle that precluded individuals from being able to register for Obamacare, which led the Inspector General of the Department of Health and Human Services to issue a scathing report over the incompetence of those responsible. *See* http://www.mcall.com/news/local/watchdog/mc-obamacare-website-failure-watchdog-20160224-column.html.

14



But the procedural irregularities and issues didn't end there. On April 2, 2018, Carl Bussjaeger published an article, which was later updated, *[Update] Bumbling Machinations on Bump Stocks? See*, Exhibit 5. [21] In his article, he details the trials and tribulations of trying to find the appropriate docket, based on the NPR in this matter, and the differing number of comments putatively submitted and available for review between three separate dockets. When he submitted an inquiry to ATF regarding these issues, without explaining why there are three separate related dockets, ATF Senior Industry Operations Investigator Katrina Moore responded that he should use https://www.regulations.gov/document?D=ATF-2018-0002-0001; yet, ATF

---

[21] A copy of the article is also available online at – http://zelmanpartisans.com/?p=5071. *See also*, http://zelmanpartisans.com/?p=5055.

failed to relay that information to the public at large or place notices on the other two related dockets informing interested individuals of the location where they can submit their comments.

When other federal administrative agencies have failed to provide a statutorily mandated comment period or issues arose during the comment period, whereby the comment period was thwarted by technological or other delays, those agencies have extended the applicable comment periods. *See, e.g.,* Department of the Interior -- Fish & Wildlife Service, *Endangered and Threatened Wildlife and Plants; Extending the Public Comment Periods and Rescheduling Public Hearings Pertaining to the Gray Wolf (Canis lupus) and the Mexican Wolf (Canis lupus baileyi),* 78 Fed. Reg. 64192 (Oct. 28, 2013); Environmental Protection Agency, *Extension of Review Periods Under the Toxic Substances Control Act; Certain Chemicals and Microorganisms; Premanufacture, Significant New Use, and Exemption Notices, Delay in Processing Due to Lack of Authorized Funding,* 78 Fed. Reg. 64210 (Oct. 28, 2013); Department of the Interior -- Fish & Wildlife Service, *New Deadlines for Public Comment on Draft Environmental Documents,* 78 Fed. Reg. 64970 (Oct. 30, 2013); Department of Labor -- Occupational Safety and Health Administration, *Occupational Exposure to Crystalline Silica; Extension of Comment Period; Extension of Period to Submit Notices of Intention to Appear at Public Hearings; Scheduling of Public Hearings,* 78 Fed. Reg. 35242 (Oct. 31, 2013); Department of Agriculture -- Food and Nutrition Service, *Supplemental Nutrition Assistance Program: Trafficking Controls and Fraud Investigations; Extension of Comment Period,* 78 Fed. Reg. 65515 (Nov. 1, 2013); Federal Communications Commission, *Revised Filing Deadlines Following Resumption of Normal Commission Operations,* 78 Fed. Reg. 65601 (Nov. 1, 2013); Federal Trade Commission, *Ganley Ford West, Inc.; Timonium Chrysler, Inc.; TRENDnet, Inc.; Pinnacle Entertainment, Inc.; Honeywell International, Inc.; Nielsen Holdings, Inc., et al.;*

16

*Polypore International, Inc.; Mylan, Inc., et al.; Actavis, Inc., et al.; Agency Information Collection Activities (Consumer Product Warranty Rule, Regulation O, Affiliate Marketing Rule),* 78 Fed. Reg. 65649 (Nov. 1, 2013); Federal Communications Commission, *Revised Filing Deadlines Following Resumption of Normal Commission Operations,* 78 Fed. Reg. 66002 (Nov. 4, 2013). In this rulemaking proceeding, by refusing to extend the comment period and failing to notify interested parties of the correct docket for filing comments, ATF failed to mitigate the harm caused by these procedural irregularities and issues that were resultant from ATF's own conduct and actions. Thus, ATF has failed to provide the statutorily-mandated public comment period and caused public confusion as to whether or not the comment period was open or closed and the appropriate docket for the filing of comments. More disconcerting is that this is not the first time that ATF has acted in this manner during the rulemaking process. [22]

### D.     ATF's Prior Lack of Candor Demonstrates a Heightened Need for Procedural Regularity

The litany of procedural irregularities in this proceeding would undermine the efforts of an agency with a sterling reputation for fairness and candor. ATF has a well-documented record of "spinning" facts and engaging in outright deception of the courts, Congress, and the public. Many of the examples of such conduct arise precisely in the area of regulation of NFA firearms

---

[22] *See*, Firearms Industry Consulting Group's comment in response to ATF-41P, RIN: 1140-AA43, *available at* https://www.regulations.gov/document?D=ATF-2013-0001-8364, wherein it documents in Section I the numerous procedural irregularities and issues that denied interested persons a meaningful opportunity to comment on the proposed rulemaking. For brevity, FPC incorporates into this Comment all exhibits attached to the Comment of Firearms Industry Consulting Group in the response to ATF-41P. All of Firearms Industry Consulting Group's exhibits in response to ATF-41P are available at https://www.regulations.gov/document?D=ATF-2013-0001-8364.

as detailed in the Motion in Limine filed in *United States v. Friesen,* CR-08-041-L (W.D. Okla. Mar. 19, 2009). *See* Exhibit 6. In light of that record, there is an even greater need for ATF to provide the underlying documents that would permit scrutiny of whether it has fairly characterized issues in the NPR, engaged in a fair consideration of alternatives, only inadvertently provided misleading information about its proposed rule in relation to the Las Vegas incident and operation of bump-stock-devices, omitted pertinent documents – especially its own determinations that bumpstocks were *not even firearms*, let alone, machineguns – from the docket only through an oversight, and only accidentally failed to provide a 90-day comment period.

### 1.    *ATF's "Institutional Perjury" Before the Courts*

ATF's NFA Branch Chief, Thomas Busey, advised ATF employees in the course of a training program that the National Firearms Registration and Transfer Record ("NFRTR") database had an error rate "between 49 and 50 percent" in 1994. Exhibit 6, p. 14. Yet, despite acknowledging such a high error rate, he observed that "when we testify in court, we testify that the database is 100 percent accurate. That's what we testify to, and we will always testify to that." *Id.* Judges have overturned their own imposition of criminal convictions upon learning of this information, *see, e.g., id.,* pp. 16-17, information that should have routinely been provided to defense counsel in advance of trial as *Brady* material.[23] *See also id.,* p. 6. It is difficult to imagine a more powerful admission that an agency had knowingly, repeatedly misled courts.

This blatant "institutional perjury" took place not only in the context of criminal prosecutions but also in support of numerous probable cause showings for search warrants.

---

[23]  In *Brady v. Maryland,* 373 U.S. 83 (1963), the Supreme Court required that government investigators and prosecutors provide criminal defendants with potentially exculpatory information.

EX2-107

Indeed, NFA Branch Chief Busey expressly addressed that situation. Despite acknowledging an NFRTR error rate of 49 to 50 percent, he told his ATF audience "we know you're basing your warrants on it, you're basing your entries on it, and you certainly don't want a Form 4 waved in your face when you go in there to show that the guy does have a legally-registered [NFA firearm]. I've heard that happen." *Id.,* p. 15.

Using data obtained from ATF in response to FOIA requests, Eric M. Larson demonstrated that ATF apparently had added registrations to the NFRTR years after the fact, reflecting the correction of errors apparently never counted as errors. *Id.,* pp. 21-28. While reassuring courts as to the accuracy of the NFRTR, at the same time ATF seemed to be adding missing information to the database when confronted with approved forms that had not been recorded in the database. *Id.,* pp. 26-28. As a result of the questions raised by Mr. Larson, both ATF and the Treasury Department Inspector General conducted investigations. *Id.,* pp. 29-31.

In the course of the resulting investigations, ATF's Gary Schaible recanted sworn testimony he had given years earlier in a criminal prosecution. *Id.,* pp. 30-33. The Inspector General's October 1998 report rejected Mr. Schaible's effort to explain away his prior sworn testimony, concluding: "National Firearms Act (NFA) documents had been destroyed about 10 years ago by contract employees. We could not obtain an accurate estimate as to the types and number of records destroyed." *Id.,* pp. 32-33. It is difficult to understand how ATF could routinely provide Certificates of Nonexistence of a Record ("CNRs") to courts without disclosing that an unknown number of records were destroyed rather than processed for the NFRTR. [24]

---

[24] In *Friesen* itself, the prosecution introduced duplicate ATF records of the approved transfer of a NFA firearm (bearing the identical serial number), but differing in the date of approval.

(footnote continued)

19

2.      *ATF's Deception in Congressional Oversight*

In response to a Congressional inquiry, a DOJ Inspector General advised that a request for documents that reflected errors in the NFRTR had been "fully processed" when, in fact, the documents had merely been sent to another component – ATF itself – so as to delay disclosure. *See* Exhibit 6, pp. 12-14. Moreover, ATF changed the meaning of terms like "significant" errors thereby frustrating any attempt to ascertain the true error rate. *See id.,* p. 19. So too, when a congressionally-mandated audit found a "critical error" rate in the NFRTR of 18.4%, the Treasury Department Inspector General seemingly manipulated audit procedures at the instigation of the NFA Branch so as to produce a more acceptable figure. *Id.,* pp. 35-39.

Congress remained sufficiently concerned about inaccuracies in the NFRTR to appropriate $1 million (in Fiscal Years 2002 and 2003) for ATF to address remaining issues. *Id.,* p. 39. In 2007, however, Dr. Fritz Scheuren advised Congress that "serious material errors" continued to plague the NFRTR that ATF "has yet to acknowledge". *Id.,* p. 41.

As recently as June 2012, failure to answer questions about ATF's botched "Fast and Furious" gun-walking operation prompted the House of Representatives to find Attorney General Holder in both civil and criminal contempt. *See* Exhibit 7.

3.      *ATF's Misleading of the Public*

When, after a prolonged period of evasion, ATF finally produced a transcript of NFA Branch Chief Busey's remarks in the training session in response to FOIA requests, the transcript had been "corrected" by ATF's Gary Schaible to minimize damage to ATF. *See* Exhibit 6, p. 17.

---

(footnote continued)

Exhibit 6, pp. 48-49.  ATF could not explain the situation.  *Id.,* p. 49.  Nor could ATF find the original documents underlying the computerized entries.  *Id.,* p. 52.

20

Among those corrections, Mr. Schaible asserted that he was unaware that any ATF employee had ever testified that the NFRTR was 100% accurate.

In order to frustrate public inquiries into the Waco Raid, ATF participated in a game of "shifting the paperwork and related responsibilities" among DOJ components and other law enforcement agencies. *Id.,* pp. 13-14.

Former Acting Chief of the NFA Branch, Mr. Schaible, testified that ATF repeatedly – in 2000, 2001, 2002, 2003, 2005, 2008 – approved NFA transfer forms without following procedures to update the information in the NFRTR. *See* Exhibit 8, pp. 398-414. The consequence of those failures was that members of the public received contraband machineguns accompanied by genuine ATF-approved forms indicating that the purchaser had acquired a legally-registered firearm, only to have ATF subsequently seize the machineguns from innocent purchasers.

*       *       *

ATF's long record of shading the truth to mislead courts, Congress, and the public, underscores the serious nature of the procedural irregularities in this rulemaking. In order to permit meaningful public participation, ATF must provide access to the materials it has placed in issue.

## II.     ATF'S PROPOSED RULE RAISES IMPORTANT CONSTITUTIONAL ISSUES

Because judicial review of any final rule promulgated by ATF may consider not only compliance with the APA but also all alleged violations of the U.S. Constitution, *see, e.g., Porter v. Califano,* 592 F.2d 770, 780 (5th Cir. 1979), it is incumbent upon ATF to take such

21

considerations into account in this rulemaking proceeding. [25] Where, as here, agency rulemaking would inherently impact constitutional rights, that impact is among the matters the APA requires the agency to consider in evaluating regulatory alternatives and to address in a reasoned explanation for its decision. *See R.J. Reynolds Tobacco Co. v. FDA,* 696 F.2d 1205 (D.C. Cir. 2012); *Pearson v. Shalala,* 164 F.3d 650 (D.C. Cir. 1999).


### A.   *The Second Amendment*

Nowhere in the NPR did ATF demonstrate the slightest awareness that it is proposing to regulate in an area involving fundamental constitutional rights. Congress has not amended the NFA since the U.S. Supreme Court confirmed that "the Second Amendment conferred an individual right to keep and bear arms." *District of Columbia v. Heller,* 554 U.S. 570, 595 (2008). Consequently, it would seem exceptionally important for ATF to consider the background constitutional issues in formulating policy, particularly as ATF's proposed rule would *outright ban* bump-stock devices, thereby burdening the exercise of this constitutional right held by law-abiding citizens. Where fundamental, individual constitutional rights are at issue, an agency engaged in rulemaking cannot rely on a conclusory assertion in order to "supplant its burden to demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Ibanez v. Florida Dep't of Business & Professional Regulation,* 512 U.S. 136, 146 (1994). Yet, in direct defiance of this Supreme Court dictate, as discussed *supra* and *infra* in Sections I., B. and IV., D., ATF has failed to provide any evidence

---

[25]   Agency determinations with respect to constitutional issues, however, are not entitled to any deference on judicial review. *See J.J. Cassone Bakery, Inc. v. NLRB,* 554 F.3d 1041, 1044 (D.C. Cir. 2009) (*quoting Lead Indus. Ass'n Inc. v. EPA,* 647 F.2d 1130, 1173-74 (D.C. Cir. 1980)).

EX2-111

that (1) bump-stock devices have actually ever been used in the facilitation of a crime, [26] (2) that casualties *could* be reduced in an incident involving a bump stock, since there is no evidence demonstrating that there have been any causalities attributable to bump-stock devices, (3) that this rule will assist first responders, and (4) that "they could be used for criminal purposes" any differently than any other item that is currently available throughout the United States. Rather, ATF relies solely on the conclusory assertions of public comments to an Advanced Notice of Proposed Rulemaking to determine the benefits of the very rulemaking it is considering. In soliciting potential benefits from the public and suggesting them without evidence, ATF has run afoul of the words of wisdom contained in another decision issued by the Supreme Court stating that "[w]e are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 416 (1922).

While ATF claims that this rule is necessary to carry out the will of Congress, as discussed *infra* in Section III., ATF lacks the authority to alter the definition of a machinegun as it was enacted by the Congress. Even Senator (and ranking member of the Senate Judiciary Committee) Diane Feinstein, the lead sponsor of the now-expired federal ban on so-called "assault weapons" and author or sponsor of voluminous other proposed gun control legislation, declared that "ATF lacks authority under the law to ban bump-fire stocks. Period." *See*, Exhibit 9.

---

[26] *See* Fns. 4, 6, *supra*.

23