## Feinstein: Congress Shouldn't Pass the Buck on Bump-Fire Stocks

Oct 11 2017

*Washington*—In response to comments by Speaker Paul Ryan (R-Wis.) saying that the Bureau of Alcohol, Tobacco and Firearms should address bump-fire stocks, Ranking Member of the Senate Judiciary Committee Dianne Feinstein (D-Calif.) today released the following statement:

**"The ATF lacks authority under the law to ban bump-fire stocks. Period. The agency made this crystal clear in a 2013 letter to Congress, writing that 'stocks of this type are not subject to the provisions of federal firearms statutes.' Legislation is the only answer and Congress shouldn't attempt to pass the buck."**

###

Even a broken clock is right twice a day, and, similarly, Senator Feinstein is correct in her assessment of the ATF's lack of authority for its bump-stock NPR.

Furthermore, as discussed *supra* in Section I., A., ATF only states that it received correspondence from an undisclosed number of members and failed to place that/those correspondence(s) into the docket. The will of Congress cannot simply be derived from the writings of a small number of Senators or Representatives – especially writings outside of the legislative record – nor has it been in the past. [27]

While it is impossible to know for certain, given the NPR's dearth of analysis and discussion of the Second Amendment, it may well be that the ATF, without stating so, believes that the NPR does not violate the fundamental, individual right to keep and bear arms by considering bump-stock devices to be both "dangerous and unusual weapons" *and* "not commonly possessed by law-abiding citizens for lawful purposes today." *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1031-1032 (2016). But as the Court recently reminded in

---

[27] *See* Exhibit 10, pp. 4 – 5, *also available at* https://perlmutter.house.gov/uploadedfiles/atf_response_04.16.13.pdf

*Caetano*, the controlling rule set forth in *Heller* "is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Id.*, at 1031 (emphasis in original). However, ATF does not discuss these factors, and instead walks right past the necessary analysis (and the Court's clear direction). The NPR fails to show that a bump-stock device is both "dangerous and unusual," or even that it would materially affect the dangerousness of any firearm so equipped, which are already dangerous *per se*. The ATF's proposed total ban self-evidently lacks necessary tailoring – indeed, its lack of tailoring underscores its overwhelming breadth – and amounts to the total destruction of the right of law-abiding people to keep and bear the affected items for self-defense and other lawful purposes.

### B.    *The Fifth Amendment*

ATF's proposed rule violates the Due Process and Takings clauses of the Fifth Amendment to the U.S. Constitution by failing to provide notice to affected parties of a compelled forfeiture or destruction, entrapping otherwise law-abiding citizens, and failing to provide just compensation for the property in question.

1.    *The Proposed Rulemaking Violates Due Process*

i.    <u>ATF has Failed to Provide Notice and Opportunity to Response to All Interested Parties</u>

Although, as discussed *supra* in Section I., A., ATF has failed to place into the docket any of its prior ten determinations between 2008 and 2017 that bump-stock-devices *do not even*

EX2-114

*constitute firearms*, let alone, machineguns (83 Fed. Reg. at 13445),[28] it is admitted by ATF that it publicly approved of the bump-stock-type devices, which, per ATF (83 Fed. Reg. at 13451), is believed to have resulted in *over half a million* bump-stock-devices being produced and sold. Furthermore, to the extent the NPR applies to slamfire shotguns and firearms, Gatling guns, and triggers, there are tens of millions of such firearms and devices in private ownership. Yet, ATF has failed to provide individual notice to all those known to own or possess a bump-stock-device, let alone those owning or possessing slamfire shotguns and firearms, as well as, Gatling guns, and triggers; thereby, potentially depriving those individuals of an opportunity to respond, in direct violation of due process. As there can be no dispute, as discussed *infra* Section II., B., 1., i., that those owning and possessing bump-stock-devices and other firearms and devices covered by the NPR, have a vested property interest in their firearms and devices, ATF was required, at a minimum, to take all possible steps to identify those known to own or possess these firearms and devices and provide them, each, with notice of this rulemaking proceeding, since it directly affects their property interests.

   ii. The Rulemaking Proposal Constitutes Entrapment Given ATF's Prior Approvals and Public's Reliance Thereon

  Although ATF publicly approved bump-stock-devices on at least ten occasions between 2008 and 2017 (83 Fed. Reg. at 13445; *see also* Exhibit 10) and issued ATF Ruling 2004-5 [29] and Revenue Ruling 55-528, 1955-2 C.B. 482, in relation to Gatling guns, it now seeks to severely criminalize the possession of those very same bump-stock-devices – and potentially

---

[28] FPC believes that they have found three of the ten determinations that were issued between 2008 and 2017, which are attached as Exhibit 10. *See also,* https://www.cbsnews.com/news/can-the-atf-regulate-bump-stocks-the-device-used-by-the-las-vegas-shooter/; https://perlmutter.house.gov/uploadedfiles/atf_response_04.16.13.pdf.
[29] *Available at* https://www.atf.gov/file/83561/download

EX2-115

"slamfire" shotguns and firearms, Gatling guns, and triggers – at the expense of law-abiding

individuals who have relied on those determinations, followed appropriate procedures and

complied with the law. This sudden change in position after eight years of reliance by the public

on determinations to the contrary, clearly constitutes entrapment since the agency invited

reliance on its consistent decisions and now seeks to unfairly impose criminal penalties for the

public's reliance, with potential punishment of 10 years imprisonment, pursuant to 18 U.S.C. §

924(a)(2). As declared by the U.S. Supreme Court, "[e]ntrapment occurs only when criminal

conduct was the 'product of the creative activity of law-enforcement officials.'…. a line must be

drawn between the trap for the unwary innocent and the trap for the unwary criminal." *Sherman*

*v. United States*, 356 U.S. 369, 372 (1958) (internal citation omitted). The Court continued that it

is unconstitutional for the Government to beguile an individual "into committing crimes which

he otherwise would not have attempted." *Id*. at 376. In this matter, by changing the definition of

a machinegun, ATF seeks to entrap citizens who have simply purchased a federally-approved

firearm accessory. Thus, ATF has set a trap with, by their own estimate, the potential to ensnare

520,000 law-abiding citizens;[30] whereby, those law-abiding citizens can be imprisoned for up to

10 years, without even receiving individual notice of ATF's reversal of position. 83 Fed. Reg.

13451.

    2.    *The Proposal Constitutes a Taking Without Just Compensation*

        i.    The Fifth Amendment Precludes a Regulatory Taking

ATF's proposed rule will force law-abiding citizens to forfeit or destroy their lawfully

_____

[30] The actual number may be significantly larger – possibly triple or quadruple the stated number – depending on all the firearms and devices to which the NPR applies, as discussed *supra* and *infra*.

purchased, owned, and possessed property, in violation of the Fifth Amendment. The Takings Clause of the Fifth Amendment to the U.S. Constitution provides that when private property, real or personal, is taken or destroyed by the government, the government must pay just compensation to the person(s) whom the property was taken from. *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2425-28 (2015) (applying Takings Clause to personal property); *Pumpelly v. Green Bay & Mississippi Canal Co.*, 80 U.S. 166, 177 (1871) (applying Takings Clause to destroyed property not used for public purpose). The general rule states that a regulatory action constitutes a taking under the Fifth Amendment when the action goes *too far* in regulating private property. *Mahon*, 260 U.S. at 415. Moreover, the Supreme Court has declared that "[a] 'taking' may be more readily found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). As this regulation is clearly not meant to adjust the benefits or burdens of economic life, the compelled forfeiture or destruction of bump-stock-devices and other firearms and devices covered by the NPR constitutes a physical invasion and taking by government; and therefore, ATF must address and provide for the payment of just compensation to each individual who would be deprived of their property under the NPR.

As reflected in the Verified Declaration of Damien Guedes, he purchased a Bump Fire Systems' bump-stock-device, only after ensuring the legality of the device and relying on ATF's determination to Bump Fire System that the device was lawful and did not constitute a machinegun. *See* Exhibit 15. Matthew Thompson, likewise, issued a Verified Declaration stating that he purchased a Slide Fire bump-stock-device, only after ensuring the legality of the device and relying on ATF's determination to Slide Fire that the device was lawful and neither

constituted a firearm nor a machinegun. *See* Exhibit 16. Thus, both Mr. Guedes and Mr. Thompson, in reliance on ATF's prior determinations, purchased bump-stock-devices, which ATF now seeks to reclassify [31] as a machinegun – in violation of the *ex post facto* clause of the U.S. Constitution, discussed *infra* – and seeks to force their surrender or destruction of the bump-stock-devices, in the absence of just compensation, [32] all in violation of the takings clause of the U.S. Constitution.

Since ATF failed to address the takings aspects of this proposed rule, including, as discussed *supra* and *infra*, its potential application to shotguns and firearms that are capable of "slamfiring", as well as, Gatling guns, and triggers, interested parties have been denied meaningful review of ATF's position in this regard; however, to the extent ATF contends that an individual would lack a possessory interest in a bump-stock-device and other firearms and devices covered by the NPR as a result of the proposed rule being enacted, the U.S. Supreme Court has already held that while an individual may lose his/her possessory interest in a firearm or other tangible or intangible object, the individual does not lose his/her property or ownership interest in the object. *Henderson v. United States*, 135 S.Ct. 1780, 1785 (2015) (holding that even where an individual is prohibited from purchasing and possessing firearms, he/she still retains a property interest in firearms previously acquired.). Furthermore, as the proposed rule constitutes a *per se* taking, the Government must provide just compensation. *Nixon v. United States*, 978 F.2d 1269, 1284 (D.C. Cir. 1992). Thus, even if ATF enacted the proposed rule, it would still be responsible for paying just compensation to each person deprived of his/her property.

---

[31] *See* 83 Fed. Reg. 13348, where ATF acknowledges that the proposal is a reclassification.
[32] As reflected in the declarations, Mr. Guedes paid a total of $105.99 for his bump-stock-device and Mr. Thompson paid a total of $134.00 for his bump-stock-device.

ii.   Cost-Impact Statement Fails to Address Just Compensation for the
Taking

Once again, ATF has denied interested individuals meaningful review and opportunity to

comment by failing to address the economic impact when factoring in the just compensation that

it is constitutionally-obligated to pay law-abiding citizens, who own bump-stock-devices and

other firearms and devices covered by the NPR, if it proceeds with the proposed rule. While ATF

provides detailed tables concerning the anticipated economic loss to producers, retailers, and

consumers, the proposed rule fails to provide information on how the Government will fulfill its

obligation to compensate affected individuals for the taking. As reflected in the proposal, ATF

assumes "an average sale price for bump-stock-devices from 2012-2017 [of] $200.00," while

acknowledging that the prices ranged from $179.95 to $425.95. 83 Fed. Reg. 13451. The

proposal then declares the primary estimated cost to be $96,242,750.00 based on ATF's primary

estimate of 520,000 bump-stock-devices having been produced. *Id*. However, multiplying ATF's

stated average price of $200.00 by the primary estimate yields a value of $104,000,000.00, not

$96,242,750.00 as stated in Table 3. Moreover, by averaging the acknowledged prices for bump-

stock-devices, a proper average sale price should be $302.95, which would result in a primary

estimated cost of $157,534,000.00 in just compensation being due. Additionally, both estimated

costs may be grossly under-estimated given ATF's proposed changes to 27 C.F.R. § 447.11 and

27 C.F.R. 478.11, since they would seemingly include any device – inclusive of rubber bands

and belt loops. More disconcerting, as mentioned on page 6 of the Savage Comment, [33] the

proposed rule would seemingly apply to hundreds of thousands, if not millions, of shotguns and

---

[33] *See* "Analysis and Commentary Regarding: Docket Number: ATF 2017R-22 & Bump-Stock-
Type-Devices", ID: ATF-2018-0002-31210, Tracking Number: 1k2-93f3-s09b at 4 and 62 – 63,
*available electronically at* – https://www.regulations.gov/document?D=ATF-2018-0002-31210,
in "Email 013 (Historic Arms) rec 5-29-18 " as pdf pages 1 – 2.

other firearms, which are capable of "slamfiring" [34] which would constitute "firing without additional physical manipulations of the trigger by the shooter." It would also seemingly overrule – without any notice and opportunity to comment – ATF Ruling 2004-5 [35] and Revenue Ruling 55-528, 1955-2 C.B. 482, in relation to Gatling guns and result in reclassification of their status – *i.e.* turning the millions of owners into felons overnight and without just compensation being provided. Given that the price, per Gatling gun, can be as high as $124,000.00, if not more, the reclassification of Gatling guns would result in a substantial upward calculation of the cost estimate in this matter.

## How much is a Gatling gun?

### Narrow Your Search

| Item | Title Click Headers to Sort | Price |
|------|------------------------------|-------|
| 771029939 | Colt 1874 Camel Gatling gun (C9743) | **$124,000.00** |
| 770122834 | REAL- WORKING GATLING GUN FULLY- FUNCTIONAL 45 LC | **$6,995.00** |
| 770033106 | Colt 1877 Bulldog 10 Barrel Gatling Gun Carriage NEW Wood Never Touched the Ground! CGG1877HS | $55,000.00 |

35 more rows

Gatling Gun For Sale – Buy a Gatling Gun Online at GunBroker.com
https://www.gunbroker.com/Gatling-Gun/Browse.aspx?Keywords=Gatling+Gun

---

[34] *See* Colton Bailey, *Slam Fire Shotgun? This One Shoots Multiple Rounds Without Releasing The Trigger*, Wide Open Spaces, (Feb. 13, 2017*), available at* http://www.wideopenspaces.com/slam-fire-shotgun-shoots-multiple-rounds-without-releasing-the-trigger.
[35] *Available at* https://www.atf.gov/file/83561/download.

Even more disconcerting, as discussed *infra* in Section V., given ATF's argle-bargle and interpretive jiggery-pokery, the NPR can be construed as applying also to triggers and fingers, [36] which again, would result in a skyrocketing upward calculation of the cost estimate in this matter.

Regardless of the estimate considered, ATF has failed to address any appropriations available to it or, more generally, the Department of Justice to fund these takings and any such fund, if limited solely to bump-stock-devices, must have a high estimate of $221,494,000.00 ($425.95 x 520,000) available to ensure that all individuals are justly compensated. If, on the other hand, the proposal will apply to shotguns and other firearms capable of "slamfiring", as well as Gatling guns, triggers and fingers, [37] there must be an allocation of no less than $50,000,000,000,000.00.

Thus, before ATF can proceed in this matter, it must provide logistical information as a part of its cost-impact statement detailing how it plans to pay compensation including, but not limited to, the compensation rate, timeline for completing payment, source of the funding, and sequestration of an appropriate amount in an account restricted to paying just compensation in this matter. Thereafter, it must provide interested parties with a meaningful opportunity to respond, which, per 18 U.S.C. § 926(b), cannot be shorter than ninety days.

---

[36] The average value under state and federal workers compensation acts across the U.S. for the loss of an index finger is $24,474.00, with the federal value being $86,788.00. Accordingly, as a federal rate is set, at a minimum, ATF would be required to utilize this value. *See* Exhibit 31, also *available at* - https://projects.propublica.org/graphics/workers-compensation-benefits-by-limb.

[37] With there being between 270,000,000 and 310,000,000 gun owners in the U.S. (*see* http://www.pewresearch.org/fact-tank/2013/06/04/a-minority-of-americans-own-guns-but-just-how-many-is-unclear*), the takings alone in relation to fingers, utilizing the low 270 million gun owner estimate, would be $23,432,760,000,000.00 or 270,000,000 x $86,788.00.

C.      *The Ex Post Facto Clause*

Pursuant to Article 1, Section 9, Clause 3 of the U.S Constitution, "No Bill of Attainder or ex post facto Law shall be passed." The U.S. Supreme Court in *Calder v. Bull*, 3 U.S. 386 (1798) held that an *ex post facto* law includes, *inter alia*, "[e]very law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action." The Court later recognized that the provision reached far enough to prohibit any law which, "in relation to the offence or its consequences, alters the situation of a party to his disadvantage." *Collins v. Youngblood*, 497 U.S. 37, 47 (1990).

1.      *ATF's Proposal Acknowledges that Bump-stocks are not Covered by the Definition of a Machinegun and Retroactively Criminalizes Lawful Conduct*

On at least two occasions in the proposed rulemaking, ATF acknowledges that the current definition of a machinegun does not cover bump-stock-type devices [38] that it now seeks to regulate. 83 Fed. Reg. 13444, 13448. ATF then explicitly declares that if the final rule is consistent with the proposal, there will be no mechanism for current holders of bump-stock-type devices – or any other firearm or device covered by the NPR – to register them and will therefore be compelled to dispose of them. 83 Fed. Reg. 13448. There is no dispute, and ATF readily admits, that its proposed rule would change the definition of a machinegun; thereby, affecting numerous sections of federal law and immediately turning, *at a minimum*, half a million law-abiding citizens into criminals overnight. ATF's proposal neither includes a grandfather provision nor a safe harbor, even for a limited period of time. More disconcerting – as if such

---

[38] It likewise does not cover rubber bands, belt loops, slamfire shotguns and firearms, Gatling guns, triggers, or fingers.

were fathomable in anything but an Orwellian nightmare – is the fact that those possessing

bump-stock-devices will have no knowledge of whether any final rule will be implemented, the

text of that rule, and the date, as the final rule would become effective immediately upon the

signature of Attorney General Sessions, without prior publication to the public. But that's no big

deal, right? It's only 10 years in jail and $250,000.00, per violation. Thank God that Article 1,

Section 9, Clause 3 precludes such. [39]

Just as there can be no dispute that the current definition of machinegun does not cover

bump-stock-devices, rubber bands, belt loops, "slamfire" shotguns and firearms, Gatling guns,

triggers, and fingers, as evidenced by the proposed rule seeking to modify the regulatory

definition of machinegun, there can be no dispute that the proposed rule violates the *ex post facto*

Clause, even though it is a regulatory action because the "sanction or disability it imposes is 'so

punitive in fact' that the law 'may not legitimately be viewed as civil in nature." *United States v.*

*O'Neal*, 180 F.3d 115, 122 (4th Cir. 1999) (quoting *U.S. v. Ursery*, 518 U.S. 267, 288 (1996)).

## III.    ATF'S PROPOSAL EXCEEDS ITS STATUTORY AUTHORITY

From the outset, it is clear that the NFA was designed to provide a basis for prosecution

of "gangsters" with untaxed, unregistered firearms and not as a regulation of law-abiding citizens

who complied with the law. ATF has turned the statutory scheme on its head, imposing ever

more draconian burdens on law-abiding citizens who seek to make and acquire NFA firearms

---

[39] FPC make this statement pursuant to their First Amendment rights under the U.S. Constitution to the extent that ATF has not seemingly sought to abrogate that inalienable right in the NPR, although ATF has declared its intent, in violation of the First Amendment, not to consider comments containing what it deems to be "inappropriate language" for which FPC will vigorously challenge in court.

EX2-123

while diverting resources to do so from investigating and prosecuting criminals who use illegal means to obtain NFA firearms.

ATF describes the NFA in terms that go beyond the statutory text. According to ATF's Website, the NFA's "underlying purpose was to curtail, *if not prohibit,* transactions in NFA firearms." http://www.atf.gov/content/firearms/firearms-industry/national-firearms-act (emphasis added). It describes the $200 tax imposed by the NFA as having been designed "to discourage *or eliminate* transactions in these firearms." *Id.* (emphasis added). But Congress has never "prohibited" NFA firearms or "eliminated" the ability to transfer them provided the tax is paid and registration procedures are followed.

### A.     *Congress Prohibited "Undue or Unnecessary" Restrictions*

Congress has, in fact, legislated to *limit* the authority of ATF to impose more burdens on law-abiding citizens. Congress was aware of ATF's over-zealous interpretation of the NFA when it enacted the Firearms Owners' Protection Act ("FOPA"), Pub. L. 99-308, 110 Stat. 449 (1986). It would be an understatement to say that Congress thought ATF had reached the maximum boundary of its rulemaking and enforcement authority. Well aware of ATF's history, as discussed *supra* in Section I., D., made clear in FOPA that ATF's regulation and enforcement activities of *legal* owners of firearms – like those who seek to register firearms under the NFA – had already gone too far. Congress found that not only were statutory changes needed to protect *lawful* owners of firearms, but that "enforcement policies" needed to be changed as well. FOPA § 1(b). In doing so, Congress reaffirmed that "it is not the purpose of this title to place *any undue or unnecessary* Federal *restrictions or burdens* on law-abiding citizens with respect to the acquisition, possession, or use of firearms," *id*. (emphasis added), signaling in the strongest

possible language that ATF should not impose yet additional burdens on law-abiding citizens,

especially in light of the existing criminal laws prohibiting, *inter alia*, murder, manslaughter,

aggravated assault, *etc*. Yet, that is precisely what ATF's proposed rule would do.

**B.      *Independent of FOPA, ATF Lacks Statutory Authority As the Congress Defined What Constitutes a Machinegun***

Even without consideration of FOPA, there are ample reasons to doubt that Congress

authorized ATF to formulate the proposed regulation, as Congress, itself, defined what

constitutes a machinegun when enacting the NFA in 1934 and the GCA in 1968 and numerous

members of Congress have stated that ATF lacks the authority to redefine what constitutes a

machinegun. As an administrative agency cannot override a congressional enactment, ATF lacks

authority and jurisdiction to amend or otherwise modify the definition of a machinegun as

enacted by the Congress.

In the original NFA as enacted in 1934, and reaffirmed in enacting the GCA in 1968, the

Congress expressly defined what constitutes a machinegun. 18 U.S.C. § 921(a)(23) states "[t]he

term 'machinegun' has the meaning given such term in section 5845(b) of the National Firearms

Act (26 U.S.C. 5845(b))." 26 U.S.C. § 5845(b) declares:

> The term "machinegun" *means* any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

(Emphasis added).

ATF proposes to expand the definition of what a "machinegun" means by adding the following two sentences to the end of the current definition found in 27 C.F.R. §§ 478.11 and 479.11. [40]

> For purposes of this definition, the term "automatically" as it modifies "shoots, is designed to shoot, or can be readily restored to shoot," means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and "single function of the trigger" means a single pull of the trigger. The term "machine gun" includes bump-stock-type devices, i.e., devices that allow a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter.

83 Fed. Reg. 13457.

And, lest there be no dispute, even Senator Diane Feinstein declared that "ATF lacks authority under the law to ban bump-fire stocks. Period." *See* Exhibit 9. And ATF previously admitted to Congress that it "does not have authority to restrict [bump-stock devices'] lawful possession, use or transfer." See Exhibit 10, p. 5. More importantly, as confirmed by J. Thomas Manger, President of the Major Cities Chiefs Association and Chief of Police of Montgomery County, in his testimony before the Senate Judiciary Committee, ATF Acting Director Thomas Brandon admitted that "ATF does not now have the authority under Federal law to bar [bump-stock-devices] and *new legislation is required to do so*." *See* Exhibit 30, p. 3 (emphasis added).

And the courts have agreed that such an alteration is beyond the power of ATF. "As a rule, [a] definition which declares what a term 'means' ... excludes any meaning that is not stated." *Colautti v. Franklin,* 439 U.S. 379, 392–393, n. 10, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979). Congress clearly defined the meaning of the term "machinegun" as evidenced by its use of the

---

[40] The definition of "machinegun" contained in 27 C.F.R. §§ 478.11 and 479.11 mirrors the definition Congress gave the term in 26 U.S.C. § 5845(b).

phrase "[t]he term 'machinegun' *means*." [41] Even if ATF could define the terms "automatically" and "single function of the trigger", which is disputed, ATF lacks the authority to unilaterally declare an item to be a machine gun when it falls outside the statutory parameters, particularly by incorporating it into the definition itself. [42]

"If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-843 (1984). "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion." *City of Arlington, Tex. V. F.C.C.*, 569 U.S. 290, 296 (2013).

Here, there can be no question that the intent of Congress was clear. Congress sought to regulate firearms that: 1) shoot, 2) were designed to shoot, or 3) can be readily restored to shoot, 4) automatically more than one shot, without manual reloading, 5) by a single function of the trigger. This can be gleaned from an analysis of the debate surrounding the passage of the legislation. "Mr. Frederick.[] The distinguishing feature of a machine gun is that by a single pull of the trigger the gun continues to fire as long as there is any ammunition in the belt or in the magazine. Other guns require a separate pull of the trigger for every shot fired, and *such guns are not properly designated as machineguns*. A gun…which is capable of firing more than one shot by single pull of the trigger, a single function of the trigger, is properly regarded, in my

---

[41] Even Dictionary.com defines the term "Machine Gun" to mean "a small arm operated by a mechanism, able to deliver rapid and continuous fire as long as the trigger is pressed." *Available at:* http://www.dictionary.com/browse/machine-gun. ATF taking such a nuanced approach to parsing specific terms to shoehorn a particular group of accessories into the definition flies in the face of the statutory text's plain meaning.

[42] *See* 18 U.S.C. 926(a) "The Attorney General may prescribe *only such rules and regulations* as are *necessary* to carry out provisions of this chapter…" (Emphasis added).

opinion, as a machine gun." Exhibit 29, National Firearms Act: Hearings Before the Committee on Ways and Means, H.R. Rep. No. 9066, 73rd Cong. 2nd Sess. at 40 (1934) (emphasis added).

For the purposes of this analysis, a machinegun can be distilled down to: a firearm which shoots automatically more than one shot, without manual reloading, by a single function of the trigger. Congress also sought to regulate the frames or receivers of such weapons, along with any parts that could be used to make or convert a firearm into a machinegun. Such an interpretation is in line with prior court and agency decisions. *See Staples v. United States*, 511 U.S. 600 (1994) ("The National Firearms Act criminalizes possession of an unregistered 'firearm,' 26 U.S.C. § 5861(d), including a 'machinegun,' § 5845(a)(6), which is defined as a weapon that automatically fires more than one shot with a single pull of the trigger, § 5845(b)."); *see also Id*. at n1 ("As used here, the terms 'automatic' and 'fully automatic' refer to a weapon that fires repeatedly with a single pull of the trigger. That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted. Such weapons are 'machineguns' within the meaning of the Act."). [43]

Moreover, the Government has previously argued to a Federal Court that a bump-stock-device was not a machinegun. "While the shooter receives an assist from the natural recoil of the weapon to accelerate subsequent discharge, the rapid fire sequence in bump firing is *contingent*

---

[43] *See also* ATF Rul. 2004-5 quoting George C. Nonte, Jr., Firearms Encyclopedia 13 (Harper & Rowe 1973) (the term "automatic" is defined to include "any firearm in which a single pull and continuous pressure upon the trigger (or other firing device) will produce rapid discharge of successive shots so long as ammunition remains in the magazine or feed device – in other words, a machine gun"); Webster's II New Riverside-University Dictionary (1988) (defining automatically as "acting or operating in a manner essentially independent of external influence or control"); John Quick, Ph.D., Dictionary of Weapons and Military Terms 40 (McGraw-Hill 1973) (defining automatic fire as "continuous fire from an automatic gun, lasting until pressure on the trigger is released").

EX2-128

*on shooter input* in pushing the weapon forward, rather than mechanical input, and is *thus not an automatic function of the weapon.*" *See* Exhibit 25, page 22.

The statutory language is explicitly clear as to what constitutes a machinegun and is inclusive of parts that can be used to assemble a functioning firearm. ATF acknowledges that bump-stock-devices are not currently able to be regulated as machineguns because it seeks to amend the definition to specifically include them and other firearms and devices covered by the NPR, discussed *supra* and *infra*. Notably absent from the statutory text is language, specifically or implicitly, naming parts that can be used in conjunction with a firearm, which is not a machinegun, to *simulate* automatic fire.

**C.    *ATF is Statutorily Prohibited From Retroactively Applying the NPR***

ATF has acknowledged that it is precluded from taking any action with regard to the reclassification of bump-stock-devices manufactured prior to at least March 29, 2018. As noted in ATF Rul. 82-8, the reclassification of SM10 and SM11A1 pistols and SAC carbines as machineguns, under the National Firearms Act, was not applicable to those firearms manufactured before or assembled before June 21, 1982 pursuant to 26 U.S.C. § 7805(b). 26 U.S.C. § 7805(b) states:

> Retroactivity of regulations.--
> (1) In general.--Except as otherwise provided in this subsection, no temporary, proposed, or final regulation relating to the internal revenue laws shall apply to any taxable period ending before the earliest of the following dates:
> (A) The date on which such regulation is filed with the Federal Register.
> (B) In the case of any final regulation, the date on which any proposed or temporary regulation to which such final regulation relates was filed with the Federal Register.
> (C) The date on which any notice substantially describing the expected contents of any temporary, proposed, or final regulation is issued to the public.

40

More recently, in enacting ATF-41F (81 Fed. Reg. 2658 through 2723), ATF seemingly invoked Section 7805(b) in declining to retroactively apply the final rule and instead permitting a six month delay in implementation of the final rule and acknowledging that all applications submitted prior to the effective date would be adjudged by the law as it existed prior to the final rule, regardless of whether the application was approved before the effective date of the final rule.

Thus, any final regulation that is promulgated has no effect on bump-stock-devices and other firearms and devices covered by the NPR, which were manufactured, at a minimum, prior to the date of publication of this NPR in the Federal Register.

## IV.     ATF'S PROPOSAL IS ARBITRARY AND CAPRICIOUS

Contrary to the contention in the proposed rulemaking, bump-firing is neither the result of any particular firearm accessory, device or part nor the modification thereof. Rather, it is a technique that can be utilized with the intrinsic capabilities of most *factory* semi-automatic firearms, including the rifles, such as the AR-15, and pistols, such as the 1911. As reflected *infra* and admitted by ATF (83 Fed. Reg. 13454), bump-firing can be done with a belt loop, a rubber band, or just one's finger. More importantly, no device – whether bump stock, belt loop, rubber band or finger – changes the intrinsic capability of the firearm to be bump-fired. This is made explicitly evident by Jerry Miculek, who can not only shoot faster than an individual employing bump-fire but can shoot far more accurately. [44]

---

[44] *See* Exhibits 3 and 4.

EX2-130

Thus, the proposed rule in this matter is so completely arbitrary and capricious that it will not withstand scrutiny. *See*, *Motor Vehicle Manufacturers Association v. State Farm Auto Mutual Insurance Co.*, 463 U.S. 29, 42-44 (1983).

### A.   *ATF's Interpretative Jiggery-Pokery is Pure Applesauce*

As reflected in the expert report of former ATF Acting Chief of the Firearms Technology Branch Rick Vasquez, bump-stock-devices do not constitute a machinegun, as they are not designed to shoot more than one shot by a single function of the trigger. *See* Exhibit 32. Specifically, he declares that a "Slide Fire [stock] does not fire automatically with a single pull/function of the trigger" and as a result, "ATF could not classify the slide fire as a machinegun or a machinegun conversion device, as it did not fit the definition of a machinegun as stated in the GCA and NFA." *Id*. More importantly, although ATF has failed to disclose it in the NPR or docket, the Slide Fire determination "was sent to Chief Counsel and higher authority for review. After much study on how the device operates, the opinion, based on definitions in the GCA and NFA, was that the Slide Fire was not a machinegun nor a firearm, and, therefore, did not require any regulatory control." *Id*.

Thus, regardless of the interpretative jiggery-pokery employed by ATF in the NPR, at the end of the day, it is pure applesauce.

### B.   *Belt Loops, Rubber Bands and Fingers, OH MY!*

Reflecting the absolutely arbitrary and capricious nature of this rulemaking, ATF admits – albeit at the end of the proposal in the "Alternatives" section – that an individual does not require a bump-stock-device in order to bump-fire a factory semi-automatic firearm. 83 Fed.

42

Reg. 13454. In fact, ATF readily acknowledges that bump-firing can be lawfully achieved through the "use [of] rubber bands, belt loops, or [to] otherwise train their trigger finger to fire more rapidly," in a clear statement of its intent to unequally apply the law. *Id*.

Numerous videos and articles are available reflecting individuals bump-firing with everything from their finger to belt loops and rubber bands. For example, P.M.M.G. TV posted a video in 2006 of a rubber band being utilized to bump fire a factory semi-automatic firearm. *See* Exhibit 11. [45] In 2011, StiThis1, posted a video of him utilizing his belt loop to bump-fire his AK-47. *See* Exhibit 12. [46]

More importantly, reflecting that no device is necessary to bump-fire a factory semi-automatic firearm, ThatGunGuy45 posted a video of him bump-firing an AK-47 style rifle with his finger. *See* Exhibit 13. [47] Similarly, M45 posted a video of him bump-firing both an AK-47 and AR-15 solely with his finger. *See* Exhibit 14. [48] In no better example, former former ATF Acting Chief of the Firearms Technology Branch Rick Vasquez, who previously reviewed bump-stock-devices – specifically the Slide Fire bump-stock – while with ATF, after declaring that a bump-stock-device is not statutorily or regulatorily a machinegun, [49] demonstrates the

---

[45] A copy of the video is also available online – Shooting Videos, *Rapid manual trigger manipulation (Rubber Band Assisted)*, YouTube (Dec. 14, 2006), https://www.youtube.com/watch?v=PVfwFP_RwTQ&t.

[46] A copy of the video is also available online – StiThis1, *AK-47 75 round drum Bumpfire!!!*, YouTube (Sept. 5, 2011), https://www.youtube.com/watch?v=-03y3R9o6hA.

[47] A copy of the video is also available online – ThatGunGuy45, *'Bump Fire' without a bump-fire stock, courtesy of ThatGunGuy45*, YouTube (Oct. 13, 2017), https://www.youtube.com/watch?v=-9fD_BX-afo&t.

[48] A copy of the video is also available online – M45, *How to bumpfire without bumpfire stock*, YouTube (Oct. 8, 2017), https://www.youtube.com/watch?v=7RdAhTxyP64&t. *See also*, wrbuford13, How To: Bump fire a semi-automatic rifle from the waist, YouTube (May 25, 2011), https://www.youtube.com/watch?v=wZCO-06qRgY.

[49] During his interview, he declares "[i]f Congress wants to change the law and come up with a new interpretation, then ATF will follow that new interpretation. But until they do that, they have to go by the [law] they have today."

EX2-132

ability of a factory semi-automatic AR-15 and AK-47 to bump-fire solely with his finger. *See* Exhibit 17. [50] Expert Vasquez then goes on to declare, in response to a question of what if Congress bans bump-fire devices, "[w]hat are they going to ban? If they come out today and say the Slide Fire Stock or the binary trigger by name is made illegal, they're going to have to make illegal the operating principle." *Id*.

Beyond showing that the proposed rulemaking in this matter is completely arbitrary and capricious, as no device is even necessary to bump-fire a factory semi-automatic firearm, these videos and others that are available on YouTube and other social media platforms, reflect that law-abiding citizens have been bump-firing long before Al Gore invented the internet; [51] and yet, ATF cannot produce a single shred of evidence of a bump-stock-device *ever* having been utilized in a crime.

**C.    *The Jerry Miculek Example – He's One Bad Mother… Shut Your Mouth (And: Oh No! They Banned Jerry!)***

As mentioned *supra*, Jerry Miculek not only can shoot faster than an individual employing a bump-stock-device but can shoot far more accurately. *See* Exhibit 3 and 4. [52] Even more evident of the completely arbitrary and capricious nature of this proceeding is the video compendium of Mr. Miculek's abilities and achievements, which depicts that "he did it. He did 8

---

[50] A copy of the video is also available online – Vice News, *Meet One Of The Analysts Who Determined That Bump Stocks Were Legal*, YouTube (Oct. 11, 2017), https://www.youtube.com/watch?v=kryIJIrD5eQ&t.

[51] It has to be true – he said it on live TV… https://www.youtube.com/watch?v=BnFJ8cHAlco.

[52] Copies of the videos are also available online – Iraqveteran8888, Worlds Fastest Shooter vs Bump Fire! – Guns Reviews, YouTube (Oct. 13, 2014), https://www.youtube.com/watch?v=JTb6hsSkV1w and Miculek.com, AR-15 5 shots in 1 second with fastest shooter ever, Jerry Miculek (Shoot Fast!), YouTube (June 20, 2013) https://www.youtube.com/watch?v=v3gf_5MR4tE&t.

EX2-133

rounds in one second, on one target. He did 8 rounds on four targets in 1.06 [seconds]. Six shots and reload and six shots in 2.99 seconds." *See* Exhibit 18. [53] Thus, as individuals can achieve, with greater accuracy, faster cyclic rates than those utilizing bump-stock-devices, the underlying premise of this proceeding is completely arbitrary and capricious.

More disconcerting is that to the extent ATF contends in the NPR that it is carrying out some unverified and unsupported contention of Congress to ban anything mimicking the rate of fire of a machinegun [54] (83 Fed. Reg. 13447) – a rate of which varies greatly [55] and neither has a commonly accepted average rate nor a proposed rate by ATF – Mr. Miculek would seemingly be banned by any final promulgated rule, in violation of his Constitutional Rights and reflecting the sheer absurdity of this NPR.

### D.     *Whoops, We Did it Again! ATF Misleads the Public Regarding the Use of Bumpstock Devices in the Las Vegas Shooting*

As discussed *supra* in Section I., B., while implying that a bump-stock-device was utilized in the Las Vegas shooting, ATF has failed to provide evidence of a single instance where a bump-stock-device was utilized in the commission of a crime and neither ATF nor FBI have confirmed the use of a bump-stock-device in any crime. Instead, ATF relies solely on prior

---

[53] A copy of the video is also available online – *Fastest Shooter OF ALL TIME! Jerry Miculek | Incredible Shooting Montage*, DailyMotion (2014), https://www.dailymotion.com/video/x2y1eb8.

[54] In fact, ATF's assertion is contradicted by the testimony in enacting the NFA – previously cited to by ATF in federal court proceedings – which reflects the Congress' intent that guns which "require a separate pull of the trigger for every shot fired, … *are not property designated as machineguns*." Exhibit 29, p. 40.

[55] For example, the Metal Storm gun has a cyclic rate of fire of 1,000,000 rounds (that isn't a typo), per minute (*see*, http://www.businessinsider.com/worlds-fastest-gun-2016-2), a minigun has a rate of fire of 6,000 rounds, per minute (*id.*), and some have as slow of a cyclic rate as 200 rounds, per minute (*see*, https://encyclopedia2.thefreedictionary.com/Cyclic+rate).

"public comments," which are merely conjecture, to suggest that a bump-stock-device was

utilized in Las Vegas (83 Fed. Reg. 13454), [56] while thereafter declaring that bump-stock devices

"*could* be used for criminal purposes." (83 Fed. Reg. 13455)(emphasis added). The use of the

word "could" reflects that such use is merely speculative and limited to a *possible* future, not

past, occurrence. More importantly, as ATF is involved in the investigation into the Las Vegas

shooting, it is in the unique position to have evidence reflecting the use of bump-stock-devices in

the shooting, if such devices were utilized; yet, it has not only failed to submit any evidence even

suggesting the use of bump-stock-devices in the Las Vegas shooting but has failed to even

contend, based on its own knowledge, that such devices were utilized. Additionally, the Las

Vegas Metropolitan Police Department Preliminary Investigative Report likewise provides no

indication that any bump-stock-devices *were* utilized in the shooting. *See*, Exhibit 2. [57]

Thus, ATF acknowledges that but for public conjecture, it has *no* evidence or knowledge

that a bump stock device has been utilized in a crime and only hypothesizes that a bump-stock

device "could be used for criminal purposes." Moreover, as discussed *supra* in Section I., D.,

based on ATF's lack of candor before the courts, Congress, and the public, any contention by

ATF that such devices were utilized in the Las Vegas shooting must be dismissed, in the absence

of independently-verifiable evidence in support.

Further, ATF's argument as to why they need to be regulated is misleading.

---

[56] Given ATF's prior use of proxies in rulemaking proceedings to support its contentions, these alleged "public comments" cannot be taken at face value, especially in the absence of any evidentiary support. *See* Firearms Industry Consulting Group's comment in response to ATF-41P, RIN: 1140-AA43, available at https://www.regulations.gov/document?D=ATF-2013-0001-8364, wherein it documents in Section G the ATF's use of proxies in rulemaking proceedings to support its own contentions.

[57] A copy of the report is also available online at – https://www.lvmpd.com/en-us/Documents/1_October_FIT_Report_01-18-2018_Footnoted.pdf.

> Commenters also argued that banning bump-stock-type devices will not significantly impact public safety. Again, the Department disagrees. The shooting in Las Vegas on October 1, 2017, highlighted the destructive capacity of firearms equipped with bump-stock-type devices and the carnage they can inflict. *The shooting also made many individuals aware that these devices exist—potentially including persons with criminal or terrorist intentions—and made their potential to threaten public safety obvious. The proposed regulation aims to ameliorate that threat.*

83 Fed. Reg. 13447. (Emphasis added).

This position is no more valid than asserting that drill presses and the internet need to be regulated because individuals with criminal or terrorist intentions can readily access a drill press to manufacture a machine gun after viewing a video on the internet, or even fabricate a firearm from a chunk of raw aluminum. (Nevermind the fact that a person can purchase ammonium nitrate and nitromethane, or pressure cookers, to build a bomb.) In the land of hypotheticals, anything and everything could be perceived to be and categorized as a potential threat to public safety. But a hypothetical should not and cannot be the premise of a proposed regulation.

 

     **E.**     ***We Lied To You Once (Shame On Us). We Lied To You More Times Than We Can Count (Shame On You For Having Your Eyes Wide Shut). The Continuing Lies Espoused By ATF Regarding The Functionality Of Bump-Stock-Devices***

In the Summary for the NPR, ATF claims that bump-stock-devices

> allow a shooter of a semiautomatic firearm to initiate a *continuous firing cycle with a single pull of the trigger*. Specifically, these devices convert an otherwise semiautomatic firearm into a machinegun *by functioning as a self-acting or self-regulating mechanism* that harnesses the recoil energy of the semiautomatic firearm in a manner that *allows the trigger to reset and continue firing without additional physical manipulation of the trigger by the shooter*. Hence, a semiautomatic firearm to which a bump-stock-type device is attached is able to produce automatic fire with *a single pull of the trigger*.

83 Fed. Reg. 13442 (emphasis added).

Even setting aside former Acting Chief of the Firearms Technology Branch Richard Vasquez's expert report disputing ATF's current contention (discussed *supra* in Section IV., A.,

47

and Exhibit 28) and before addressing the video evidence of the outright falsity of these assertions, let us first review the known determinations issued by ATF and the sworn testimony and pleadings submitted by ATF to the courts regarding bump-stock-devices.

On June 07, 2010, ATF issued a determination letter to Slide Fire, holding that

The stock has *no automatically functioning mechanical parts or springs* and *performs no automatic mechanical function* when installed. In order to use the installed device, *the shooter must apply constant forward pressure with the non-shooting hand and constant rearward pressure with the shooting hand*. Accordingly, we find that the "bump-stock" is a firearm part and is not regulated as a firearm under the Gun Control Act or the National Firearms Act.

*See* Exhibit 10 (emphasis added.)

Thus, ATF has already admitted that the Slide Fire stock does not operate automatically and is neither self-acting nor self-regulating. But what about Bump Fire Systems' bump-stock-device? Glad you asked.

On April 2, 2012, ATF issued a determination letter to Bump Fire Systems, declaring that

The FTB live-fire testing of the submitted devices indicates that if, as a shot is fired, an *intermediate* amount of pressure is applied to the fore-end with the support hand, the shoulder stock device will recoil sufficiently rearward to allow *the trigger to mechanically reset*. Continued intermediate pressure applied to the fore-end will then push the receiver assembly forward until the trigger re-contacts the shooter's stationary firing hand finger, allowing a subsequent shot to be fired. In this manner, the shooter pulls the firearm forward to fire each shot, *the firing of each shot being accomplished by a single trigger function*.
…
Since your device is *incapable of initiating an automatic firing cycle* that continues until either the finger is released or the ammunition supply is exhausted, FTB find that it is **not** a machinegun as defined under the NFA, 26 U.S.C. 5845(b), or the Gun Control Act, 18 U.S.C. 921(a)(23).

*See* Exhibit 10 (emphasis in original, emphasis added.)

Once again, now in relation to Bump Fire Systems' bump-stock device, ATF found that bump-stock-devices are incapable of automatic firing and require a mechanical reset of the

trigger – no different than any other semi-automatic firearm – and thus, are not capable of a continuous firing cycle with a single pull of the trigger.

But, in sworn testimony and pleadings submitted to the courts, ATF contended bump-stock-devices were machineguns, right? Nope.

As reflected on page 20 of the U.S. Government's Brief in Support of Cross Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment in *Freedom Ordinance Mfg. Inc., v. Thomas E. Brandon*:

> An ATF expert testified that a true trigger activating devices [i.e. bump-stock-devices], although giving the impression of functioning as a machine gun, are not classified as machine guns because *the shooter still has to separately pull the trigger each time he/she fires the gun by manually operating a lever, crank, or the like*.

*See* Exhibit 25 (emphasis added).

Hence, ATF in sworn testimony and pleadings submitted to the United States District Court, Southern District of Indiana, admitted that the function of bump-stock-devices requires the shooter to separately pull the trigger each time he/she fires the gun, which is two-levels removed from being a machinegun. [58]

So, the question becomes, was ATF lying then, or is it lying now? There can be no dispute, it's lying now.

---

[58] The use of the terminology two-levels removed from being a machinegun is in relation to the explicit definition of machinegun that was enacted by the Congress in 26 U.S.C. § 5845(b), which for a firearm to constitute a machinegun, requires it to shoot "automatically more than one shot … by a single function of the trigger." As acknowledged by ATF, since the trigger is pulled (*i.e.* a single function of the trigger) and then released (*i.e.* a second and separate single function of the trigger), before the subsequent round can be fired, a bump-stock-device is two-levels removed from being a machinegun, as it still would not constitute a machinegun, even if a subsequent round was discharged on the release of the trigger. ATF has determined that this is a proper analysis of Section 5845(b) in approving binary triggers, which permit the discharge of a round on both the pull and release of the trigger.

EX2-138

In response to this NPR, a video was recorded depicting the actual function of a bump-stock-device. *See* Exhibit 28.[59] *See also* Exhibit 33 Declaration of Jonathan Patton. As reflected in the video, a magazine full of ammunition is placed into an AR-15 type firearm that has a Slide Fire bump-stock-device[60] installed onto it. The shooter then proceeds to fire the bump-stock equipped firearm with the stock in the locked position.[61] As depicted, the bump-stock-device neither self-acts nor self-regulates and the shooter proceeds to fire several rounds, without the bump-stock automatically firing more than one round, per function of the trigger.[62][63] The video clearly depicts the trigger being pulled, the gun firing a round, the bolt carrier group cycling and the trigger being released and reset. In fact, for a subsequent round to be fired, two single and separate functions of the trigger are necessary – the release of the trigger and the subsequent pull of the trigger, which is no different than any other factory semi-automatic firearm. The shooter then proceeds to unlock the stock so that it can move freely on the buffer tube and fire the gun one handed. Once again, the video clearly depicts the trigger being pulled, the gun firing a round, the bolt carrier group cycling and the trigger being released and reset. At not point does the gun fire more than one round per function of the trigger.

Additionally, the close-ups reveal, contrary to ATF's contention (83 Fed. Reg. 13447), that "additional physical manipulation of the trigger by the shooter" *is necessary* for subsequent

---

[59] A copy of the video is also available online – Adam Kraut, Esq. and Patton Media and Consulting, *Bump Stock Analytical Video*, (June 14, 2018), *available at* https://youtu.be/1OyK2RdO63U.

[60] The actual device is a Slide Fire SSAR-15 SBS.

[61] This position is the same as any other AR-15 type firearm with an adjustable stock.

[62] Thus, contrary to the NPR, bump-stock-devices do not cause a continuous firing cycle with a single pull of the trigger.

[63] If the bump-stock-device actually turned the firearm into a machinegun, the entire magazine of ammunition would have been expended, when the shooter maintained constant pressure on the trigger. *See* Exhibit 26. A copy of the video is also available online – Molon Labe, *hogan 7 m16.wmv*, YouTube (Oct. 25, 2011), is https://www.youtube.com/watch?v=NwQ1aZnVLFA.

EX2-139

rounds to be discharged. Of course, all of this is irrefutably consistent with ATF's prior determinations and sworn testimony and pleadings submitted to the courts.

So what if the shooter shoots the bump-stock equipped AR-15 in the manner depicted by the NPR – *i.e.* while "maintaining constant forward pressure with the non-trigger hand on the barrelshroud or fore-grip of the rifle, and maintaining the trigger finger on the device's extension ledge with constant rearward pressure?" 83 Fed. Reg. 13443. Clearly, it will shoot automatically, right? It self-acts and self-regulates, right? Nope.

When the shooter maintains constant forward pressure with the non-trigger hand on the barrelshroud or fore-grip of the rifle, while maintaining the trigger finger on the device's extension ledge with constant rearward pressure, after the first shot is discharged, the trigger must be released, reset, and pulled completely rearward, before the subsequent round is discharged – again no different than any factory semi-automatic firearm. Moreover, as evidenced by the close-ups, contrary to ATF's assertion (83 Fed. Reg. 13443, 13447), "bump-stock-type devices [*do not*] allow multiple rounds to be fired when the shooter maintains pressure on the extension ledge of the device," as the shooter in the video specifically maintains pressure on the extension ledge of the device the entire time; and yet, only a single round is discharged each time.

Surely, the video must not depict the actual function of a bump-stock-device, right? Wrong.

Former Acting Chief of the FTB and expert Rick Vasquez was responsible for reviewing and making a determination on the Slide Fire stock, when it was submitted to the FTB for evaluation and classification. *See* Exhibit 32. After concluding that the Slide Fire stock was neither a firearm nor a machinegun under the NFA and GCA, the determination was "reviewed

by ATF Chief Counsel and higher authorities within ATF and affirmed." *Id*. More recently, he reviewed the *Bump Stock Analytical* video (Exhibit 28) and declared that it "fully, explicitly, and accurately depicts the function of bump-stock-devices, including, but not limited to, the function and operation of the firearm's trigger, which is exactingly consistent with my evaluation and review of the Slide Fire stock during my tenure with ATF and my Slide Fire Analysis." *Id*. He then goes on to explain that as depicted in the video:

    a.   The bump-stock-device neither self-acts nor self-regulates, as the bump-stock never fires, in any of the three possible ways to fire a bump-fire-device, more than one round, per function of the trigger, even while the shooter maintained constant pressure on the extension ledge. In fact, as explicitly and accurately depicted in the slow motion portions, the bump-stock-device requires two functions of the trigger before a subsequent round can be discharged (*i.e.* after the firearm is discharged for the first time, the trigger must be fully released, reset, and then fully pulled rearward for a subsequent round to be discharged); [64]

    b.   Bump-stock-devices do not permit a continuous firing cycle with a single pull of the trigger, as the video clearly depicts that the trigger must be released, reset, and fully pulled rearward before the subsequent round can be fired; [65]

    c.   The bump-stock-device requires additional physical manipulation of the trigger by the shooter, as the video clearly depicts that the trigger must be released, reset, and fully pulled rearward before the subsequent round can be fired;

    d.   Even when the shooter maintains constant forward pressure with the non-trigger hand on the barrel shroud or fore-grip of the rifle, and maintains the trigger finger on the device's extension ledge with constant rearward pressure, after the first shot is discharged, the trigger must be released, reset, and pulled completely

---

[64] It must be noted, as made explicitly clear in the slow motion portions of the video, that the bump-stock-device actually requires over-releasing of the trigger, as the shooter's finger travels past the trigger reset by approximately a half-inch, before beginning the sequence to fire a subsequent round (*e.g.* video at 3:46 – 3:51; 3:52 – 3:55; 3:56 – 4:00). Thus, the video makes extremely evident and clear that bump-stock-devices are actually slower than a trained shooter, as a trained shooter, such as Jerry Miculek, would immediately begin the sequence to fire a subsequent round after the trigger resets.

[65] If the device had permitted continuous firing cycle with a single pull of the trigger, the video would depict a scenario identical to Exhibit 26 of Firearm Policy Coalition's Comment (*also available at* https://www.youtube.com/watch?v=NwQ1aZnVLFA), where it clearly and accurately depicts the emptying of the entire magazine, while the shooter maintains constant pressure on the trigger.

rearward, before the subsequent round is discharged. *See* video at 3:47 – 4:01. This is no different than any factory semi-automatic firearm; and,

e. The bump-stock-device does not permit automatic fire by harnessing the recoil energy of the firearm. Harnessing the energy would require the addition of a device such as a spring or hydraulics that could automatically absorb the recoil and use this energy to activate itself. If it did harness the recoil energy, the bump-stock equipped firearm in the video would have continued to fire, while the shooter's finger remained on the trigger, after pulling it rearwards without requiring the shooter to release and reset the trigger and then pull the trigger completely reward for a subsequent round to be fired.

So where does this leave us? It leaves us with ATF's prior determinations and sworn testimony and pleadings submitted to the courts as being legally and factually indisputable, with the contrary statements in the NPR being solely designed to carry out a false narrative on the functionality of bump-stock-devices and to appease Attorney General Jeff Sessions and President Donald Trump. [66]

Surely, ATF hasn't sought to *further* mislead the public, right? Wrong.

Once again in the NPR, ATF contends that "[s]hooters use bump-stock-type devices with semiautomatic firearms to *accelerate the firearm's cyclic firing rate* to mimic automatic fire" (83. Fed. Reg. 13444)(emphasis added); yet, as discussed *supra* in Section I., B. and supported by Expert Declaration of Vasquez and the Savage Comment, the mechanical cyclic rate of both the semi-automatic and fully-automatic versions of a firearm are *identical* (and thus cannot be accelerated), except where the manufacturer purposely slows the rate of fire for the machinegun-version; whereby, in such instances, the semi-automatic-version can *exceed* the cyclic rate of the machinegun-version.

---

[66] *See* Memorandum of February 20, 2018 to Attorney General Sessions from President Donald Trump, "directing the Department of Justice to dedicate all available resources to complete the review of the comments received, and, as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns," *available at* https://www.whitehouse.gov/presidential-actions/presidential-memorandum-application-definition-machinegun-bump-fire-stocks-similar-devices.

F.      *The Akins Accelerator Difference*

There is a fundamental difference in the manner in which the Akins Accelerator works versus a bump-fire-device. [67] The Government had previously described the function of the Akins Accelerator in a brief filed in Federal Court.

> To operate the Akins Accelerator, the shooter pulled the trigger one time, initiating an automatic firing sequence, which in turn caused the rifle to recoil within the stock, permitting the trigger to lose contact with the finger and manually reset (move forward). Springs then forced the rifle forward in the stock, forcing the trigger against the finger, which cause the weapon to discharge the ammunition until the shooter released the constant pull the ammunition is exhausted. *Put another way, the recoil and spring-powered device cause the firearm to cycle back and forth, impacting the trigger finger, which remained rearward in a constant pull, without further impact by the shooter, thereby creating an automatic firing effect.*

*See* Exhibit 25. (Emphasis added).

However, as the video (*see* Exhibit 28) and Expert Vasquez's Declaration (*see* Exhibit 32) reflect, a single pull of the trigger on a firearm equipped with a bump-fire-device does not cause the firearm to cycle back and forth automatically. In order to have the firearm cycle and fire another round, mechanical input from the shooter is required. The shooter must both pull the trigger to the rear and push forward on the fore end of the firearm. Absent any additional input in a forward direction by the shooter, the firearm fires only a single round, even where the trigger is continuously held to the rear. Perhaps the description is best stated by the Government's own brief. "While the shooter receives an assist from the natural backfire of the weapon to accelerate subsequent discharge, *the rapid fire sequence in bumpfiring is contingent on shooter input,*

---

[67] While FPC do not agree that an Akins Accelerator constitutes a machinegun, they acknowledge the 11th Circuit's opinion in *Akins v. U.S.*, 312 Fed.Appx. 197 (11th Cir. 2009) and assume that court's holding for the purposes of this analysis.

54

*rather than mechanical input, and thus it cannot shoot 'automatically'.*" *See* Exhibit 25. (Emphasis added).

As is clearly demonstrated in the video, Expert Vasquez's Declaration and by the Government's own argument, bump-stock-devices are only capable of being fired in a rapid manner [68] when the shooter him or herself adds mechanical input with a forward push on the fore end of the firearm; however, such affirmative action by the shooter does not result in the bump-stock-device turning the firearm into a machinegun. Otherwise, Jerry Miculek and others will be banned by the implementation of the NPR.

## V.      ATF'S PROPOSAL IS OVERLY VAGUE AND CONTRADICTORY

ATF's proposed regulation is overly vague and potentially encapsulates a number of firearms and other products [69] that are commercially available.

Notably, ATF's proposed definition includes

> "..devices that allow a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter."

83 Fed. Reg. 13457. This language could incorporate a variety of triggers that are currently on the market, which are lawfully possessed and utilized. Utilizing the same flawed logic ATF used to turn a bump-stock-devices into a machine gun, ATF would merely need to assert that by

---

[68] As discussed *supra* throughout Section IV. and in the Declaration of Expert Vasquez, this still requires the trigger to be released, reset, and pulled completely rearward, before a subsequent round is discharged; thereby, requiring two separate and distinct functions of the trigger, which precludes any finding that the device is a machinegun or otherwise causes the firearm to which it is attached to fire "automatically".

[69] As discussed *supra*, beyond regulating bump-stock-devices, it would also seemingly include, rubber bands, belt loops, fingers, "slamfire" shotguns and firearms, Gatling guns, triggers, and other devices (*e.g.* Hellfire trigger mechanisms).

placing forward pressure on the gun while holding the trigger to the rear and allowing the recoil energy of the firearm to move the firearm enough to reset the trigger, that the trigger could constitute a bump-stock-device, resulting in a variety of products designed for the competition shooter to be banned overnight. Likewise, as discussed *supra* in Section IV., the technique of bump firing only requires the use of one's finger – as admitted by ATF in numerous court filings – thereby resulting in ATF's ability to contend that fingers, *in and of themselves*, are bump-stock-devices under the NPR. Moreover, the proposal could also apply to everything from rubber bands and belt loops to slamfire shotguns and firearms.

Such interpretations would leave thousands of gun owners unsure as to the status of their particular firearm, device, or even finger, creating an influx of requests for determinations [70] from ATF and making compliance with the proposed regulation the equivalent of navigating a minefield without proper guidance. Moreover, as discussed *infra* in Section II, it raises a plethora of constitutional issues in relation to the Second and Fifth Amendment and Article I, Section 9, Clause 3 of the U.S. Constitution.

Even if one were to set the vagueness issues aside, the NPR is contradictory as it contends that bump-stock-devices must be outlawed, while permitting rubber bands, belt loops and fingers, which operate in an identical manner as bump-stock-devices. Specifically, in the NPR, ATF contends that bump-stock-devices can "mimic automatic fire when added to semiautomatic rifles" which Congress sought to outlaw (83 Fed. Reg. 13447); yet, thereafter, in Alternative 2 (83 Fed. Reg. 13454), declares that "individuals wishing to replicate the effects of bump-stock-type devices could also use rubber bands, belt loops, or otherwise train their trigger

---

[70] Such determinations would be of questionable value given ATF's contention in the NPR that it can overturn its own determination on a whim or to appease politicians by utilizing interpretive jiggery-pokery.

finger to fire more rapidly." As discussed *supra* in Section IV. and the video exhibits specified therein, individuals can bump fire factory semi-automatic firearms with rubber bands, belt loops, and their fingers and some shooters, like Jerry Miculek, can not only shoot faster than an individual employing a bump-stock-device but can shoot far more accurately. Thus, this entire NPR is contradictory to its stated purpose and underlying authority.

## VI.    ATF FAILED TO CONSIDER VIABLE AND PRECEDENTIAL ALTERNATIVES

In the proposal, ATF offers three alternatives. *See* 83 Fed. Reg. 13454. While FPC fully supports ATF moving forward under Alternative 1, [71] to the extent that ATF decides to move forward with some form of rule – despite the major constitutional, statutory, precedential and procedural issues presented by this rulemaking – there are viable alternatives, not previously considered, that would mitigate some of the constitutional and other issues.

### A.    *FPC Supports "Alternative 1"*

FPC fully support ATF not taking any further action in this rulemaking proceeding. Moreover, as discussed throughout this Comment, ATF is foreclosed – constitutionally, statutorily, precedentially and procedurally – from taking any action as described in the NPR. [72]

### B.    *The Amnesty Alternative*

Pursuant to Section 207(d) of 82 Stat. 1235, also known as the Gun Control Act of 1968,

---

[71] "Alternative 1 – No change alternative. This alternative would leave the regulations in place as they currently stand. Since there would be no changes to regulations, there would be no cost, savings, or benefits to this alternative."

[72] To the extent ATF ignores the many issues raised in this and other comments, and moves forward with a final rule, FPC will likely seek judicial relief to invalidate and enjoin the enforcement of any final rule.

(*see* Exhibit 19), the Attorney General [73] has the power to establish amnesty periods for up to ninety days. In fact, an amnesty was previously held between November 2, 1968, to December 1, 1968 and ATF promulgated a regulation – 26 C.F.R. § 179.120, entitled "Registration of Firearms" (*see* Exhibit 20) – which established the amnesty and procedures relating to the registration of unregistered NFA firearms. Moreover, as discussed *infra* in Section VI., C., ATF more recently provided a seven-year registration and amnesty period for Streetsweepers and USAS-12 firearms, when it reclassified them under the NFA.

Thus, contrary to ATF's assertion that "there is no means by which the possessor may register a firearm retroactively, including a firearm that has been reclassified" (83 Fed. Reg. 13348), the Attorney General can provide for an amnesty so that the 520,000-some-odd proscribed bump-stock-devices, and all other firearms and devices covered by the NPR, can be lawfully registered, thereby saving a minimum of $221,494,000.00 in just compensation being paid out by ATF while imposing its regulatory scheme under the NFA, which proponents of gun control, such as Senator Feinstein, desire. *See* Exhibit 21. [74] Given that the primary estimate suggests that around 520,000 bump-stock-devices are in circulation (not inclusive of other firearms and devices for which the NPR seemingly applies), the Attorney General should at least provide for a seven-year amnesty/registration period, as was provided when ATF reclassified the Streetsweeper and USAS-12 shotguns, which is discussed *infra* in Section VI., C. Alternatively, the Attorney General should issue an initial amnesty period of ninety days and provided 50 or

---

[73] While the provision refers to the "Secretary of the Treasury," the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (2002), transferred the functions of ATF from the Department of the Treasury to the Department of Justice, under the general authority of the Attorney General. 26 U.S.C. 7801(a)(2); 28 U.S.C. 599A(c)(1). Thus, it is now the Attorney General that has the authority to institute an amnesty.

[74] A copy of Senator Feinstein's proposal
http://www.feinstein.senate.gov/public/index.cfm/files/serve/?File_id=10993387-5d4d-4680-a872-ac8ca4359119.

more applications are received between the 30th and 60th days, the amnesty period should be extended in increments of ninety days, until such time that less than 50 applications are received during an extension period.

Furthermore, pursuant to the logical outgrowth doctrine [75] and the numerous issues with the National Firearms Registration and Transfer Record ("NFRTR") – especially the deprivation of due process in civil and criminal proceedings (*see* Exhibits 6, 21 [76] and 22 [77] ) – the amnesty should permit the registration of *any* unregistered NFA firearm, not just bump-stock-devices and those items subject to the instant NPR, since such is consistent with the Congress' intent that all NFA firearms be registered to the individual possessing them. [78]

**C.**   ***ATF's Reclassification of the Streetsweeper and USAS 12 and Seven Year Registration/Amnesty that Followed***

In the alternative, as ATF admits that the NPR is a reclassification of the definition of machinegun to include bump-stock-devices (83 Fed. Reg. 13448), it must treat the reclassification equally to how it treated its prior reclassifications of the Streetsweeper and USAS 12 shotguns, for which it provided a seven-year registration and amnesty period.

---

[75] *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007).

[76] A copy of the article is available at – Joshua Prince, *Violating Due Process: Convictions Based on the National Firearms Registration and Transfer Record When its 'Files are Missing'*, (Sept. 28, 2008), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2752028.

[77] A copy of Eric Larson's testimony and exhibits of April 3, 1998, before the House Committee on Appropriations is available online at http://www.nfaoa.org/documents/1998testimony.pdf.

[78] *See* U.S. Senate, *Gun Control Act of 1968, Title II-Amendments to the National Firearms Act*, Report No 1501, 90th Cong., 2nd Sess., at 43 (Washington, GPO, 1968), *available at* http://www.nfaoa.org/documents/SenateReport1501-GCA1968.pdf, declaring that the Congress intends that "every [NFA] firearm in the United States should be registered to the person possessing the firearm."

EX2-148

In a July 12, 2012, ATF Quarterly Roll Call Lesson Plan, the ATF Firearms Technology

Branch admits that based on ATF's March 1, 1994 reclassification of the Striker-

12/Streetsweeper and USAS-12 shotguns,[79] individuals were provided from March 1, 1994

through May 1, 2001 – more than seven years – to register these reclassified NFA firearms. *See*

Exhibit 23, p. 3.

Accordingly, to the extent ATF moves forward with a final rule, ATF must provide a

seven-year amnesty/registration period for individuals to register their bump-stock-devices.


**D.**    ***ATF's Reclassification of Open Bolt Macs***

As discussed by the Savage Comment on pages 3 – 4 [80], ATF Ruling 82-8 held that ATF

was reclassifying semi-automatic SM10 and SM11A1 pistols and SAC carbines as machineguns

and as a result of the ruling:

> "With respect to the machinegun classification of the SM10 and SM11A1 pistols and
> SAC carbines, under the National Firearms Act, pursuant to 26 U.S.C. § 7805(b), this
> ruling *will not be applied* to SM10 and SM11A1 pistols and SAC carbines manufactured
> or assembled before June 21, 1982. Accordingly, SM10 and SM11A1 pistols and SAC
> carbines, manufactured or assembled on or after June 21, 1982, will be subject to all the
> provisions of the National Firearms Act and 27 C.F.R. Part 179."

Emphasis added.

Thus, as discussed *supra* in Section III., C., 26 U.S.C. § 7805(b) precludes – and ATF has

acknowledged – ATF's ability to retroactively reclassify firearms and devices as machineguns

and require their registration and compliance with the NFA. Consistent with Section 7805(b), if

---

[79] *See*, ATF Rulings 94-1 and 94-2.

[80] *See* Analysis and Commentary Regarding: Docket Number: ATF 2017R-22 & Bump-Stock-
Type-Devices, ID: ATF-2018-0002-31210, Tracking Number: 1k2-93f3-s09b, available
*electronically at* – https://www.regulations.gov/document?D=ATF-2018-0002-31210, in "Email
013 (Historic Arms) rec 5-29-18".

ATF reclassifies a firearm or device, it may only require compliance with the NFA in relation to those firearms and devices that were "manufactured or assembled on or after" the date of its reclassification ruling. Moreover, the existence of approximately 50,000 of these reclassified firearms and their lawful possession and transfer absent compliance with the NFA, [81] was testified to by former ATF Acting Chief of the Firearms Technology Branch Rick Vasquez in *U.S. v. One Historic Arms Model54RCCS*, No. 1:09-CV-00192-GET. *See* Exhibit 27.

Accordingly, ATF is statutorily precluded from applying any final rule in this matter to any firearms or devices that were "manufactured or assembled" before at least March 29, 2018 – the date of publication of this NPR in the Federal Register.

Even if, *arguendo*, ATF were not statutorily prohibited, to ensure equal application of the law, its past actions and the public reliance thereon, it must likewise permit all firearms or devices covered by the NPR in this matter to be grandfathered without requisite compliance with the NFA.

### E.   *Revision of Proposed Changes to 27 C.F.R. §§ 447.11, 478.11, and 479.11*

Although FPC vigorously disputes ATF's constitutional, statutory, regulatory, procedural and precedential authority to regulate bump-stock-devices and intends to challenge any final rule adopting any proposal other than Alternative 1, FPC contends that ATF must limit its proposed regulatory changes to the definition proposed by Congress in H.R. 4477. [82]

In the NPR (83 Fed. Reg. 13457), ATF proposes amending to 27 C.F.R. §§ 447.11, 478.11, and 479.11 "by adding two sentences at the end of the definition to reads as follows:

---

[81] *Id.*
[82] *See* https://www.congress.gov/bill/115th-congress/house-bill/4477/text.

EX2-150

*Machine gun.* * * * For purposes of this definition, the term 'automatically' as it modifies 'shoots, is designed to shoot, or can be readily restored to shoot,' means functioning as the result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single function of the trigger; and 'single function of the trigger' means a single pull of the trigger. The term 'machine gun' includes bump-stock-type devices, *i.e.,* devices that allow a semiautomatic firearm to shoot more than one shot with a single pull of the trigger by harnessing the recoil energy of the semiautomatic firearm to which it is affixed so that the trigger resets and continues firing without additional physical manipulation of the trigger by the shooter. * * * ''

As such, ATF's proposal, as discussed throughout this Comment, is far more encompassing than the more limited definition proposed by Congress in H.R. 4477. Accordingly, ATF should revise its proposal to be consistent with the Congress' proposal; whereby, the definition of machinegun in 27 C.F.R. §§ 447.11, 478.11, and 479.11 could, *at the absolute most*, be amended by adding one sentence at the end of the definition to read as follows:

*Machine gun.* * * * For purposes of this definition, the term 'automatically' as it modifies 'shoots, is designed to shoot, or can be readily restored to shoot,' means a device that— (1) attaches to a semiautomatic rifle (as defined in section 921(a)(28) of title 18, United States Code); (2) is designed and intended to repeatedly activate the trigger without the deliberate and volitional act of the user pulling the trigger each time the firearm is fired; and (3) functions by continuous forward pressure applied to the rifle's fore end in conjunction with a linear forward and backward sliding motion of the mechanism utilizing the recoil energy when the rifle is discharged.

62

## VII.   POLICY CONSIDERATIONS DO NOT SUPPORT ATF'S PROPOSED RULE

In arguing that bump-stock devices are or create a machinegun, the proposed rule demonstrates a complete reversal of prior policy – prior policy, as discussed *supra* in Section 1., A., that ATF has failed to provide in the rulemaking docket and for which the absence of, precludes meaningful review and comment by interested persons.

But even if numerous procedural irregularities did not bar ATF from promulgating a final rule in this proceeding, and neither the U.S. Constitution nor the scope of statutory authority served as an obstacle, there are ample reasons ATF should not proceed with its proposed rule. *First,* ATF's assumptions lack statistical validity. *Second,* ATF's reasoning relies on false premises. *Third,* the costs of the proposed rule are much greater than ATF acknowledged.

### A.    *ATF's Assumptions Lack Statistical Validity*

As pertinent to a statistical inquiry, the overarching basis asserted in the NPR – the putative use of a bump-stock-device in the Law Vegas shooting – demands investigation and reflects that at a maximum, [83] only one instance exists [84], where a bump-stock-device was utilized, while acknowledging that there is no quantifiable benefit to the proposal. Thus, to the extent ATF can proceed in this matter, the *first,* and most vital, issue is whether ATF identified a statistically significant basis to conclude that the existing system of regulation should be revised, especially in light of the absence of a quantifiable benefit. As discussed at length *supra* in Sections I., B. and IV., D., ATF relies solely on prior "public comments" – for which, those

---

[83] As discussed *supra* in Section IV., D., FPC dispute that there exists any evidence even suggesting that a bump-stock-device was utilized in the Las Vegas incident and demands, given ATF's lack of candor to the courts, Congress and the public, that any such contention by ATF be dismissed, in the absence of independently, verifiable evidence in support.
[84] Which to date has neither been confirmed by ATF or FBI. *See* Fn. 4, *supra.*

EX2-152

"public comments" may be proxies of ATF [85] – to suggest that a bump-stock-device was utilized in Las Vegas (83 Fed. Reg. 13454), while thereafter declaring that bump stock devices "*could* be used for criminal purposes." 83 Fed. Reg. 13455 (emphasis added). The second issue*, with respect to estimating the costs that would be imposed by ATF's proposed rule, ATF fails to address the just compensation that is necessary for the proposed rule, as is discussed *supra* in Section II., B., 2.

Despite the number of bump-stock-devices grossly exceeding 520,000 (when including rubber bands, belt loops, fingers, triggers, Gatling guns, and "slamfire" shotguns and firearms), ATF's entire rulemaking effort is apparently premised on no more than one unverified instance where a bump-stock-device was alleged to have been utilized unlawfully, even though such products have been on the market for over a decade. Even with ATF's too-low estimate of bump-stock-devices in commerce, one alleged instance represents such a minute, statistically-insignificant fraction that no statistically-valid prediction could even be made about this putative problem. ATF has failed to make available in the docket any information regarding the Las Vegas shooting that would permit meaningful inquiry into whether it is at all representative of the problem ATF claims now requires attention, or that the NPR reflects a substantive, tailored, germane, or proportional response to any such problem.

If, nonetheless, ATF were to go forward with its effort to formulate and impose a new rule, whatever benefits ATF claims, would seem to require discount to reflect the sole instance in which there is any reason to believe the new rule would provide additional protection. That is, the *marginal* benefit of added restrictions would be on the order of 1/520,000 or, stated

---

[85] *See* Section IV., D., and Fn. 56, *supra*.

otherwise, the marginal cost needs to be multiplied by a factor of at least 520,000/1 to be measured against the total benefit.

*     *     *

There is no statistically-significant (if any at all) evidence of the problem ATF purports to address with the proposed rule, even if one credits the sole anecdote. In weighing costs and benefits of the proposed rule, ATF must discount the benefits (or multiply the costs) to reflect the sole example from the large population of individuals who own or have access to bump-stock-devices and the fact that based on ATF's own proposal, individuals would still be able to bump fire with rubber bands, belt loops and their fingers.

### B.    *ATF Relies On Multiple False Premises*

As discussed at length *supra* in Sections IV., D. and E., ATF's proposed rule is based on multiple false premises. Other than one unsupported allegation, there is no evidence – *let alone substantive statistical evidence* – of misuse of bump-stock-devices. Moreover, as made explicitly clear by the video (Exhibit 28) and Vasquez's Expert Declaration, a bump-stock-device does not self-act, self-regulate, nor harnesses energy and thus cannot meet the statutory definition of a machinegun. Thus, ATF has failed to explain, let alone demonstrate, the need for a change in regulations or shown sufficient authority to implement its desired changes. And perhaps worse, ATF appears to be purposely misleading the public on the *actual* function of bump-stock-devices, which cannot be countenanced.

65

## CONCLUSION

ATF has, once again, made a mockery of rulemaking proceedings by engaging in numerous improper and bad-faith tactics that deny meaningful public participation. As shown in these and other comments, the instant NPR is terminally-ridden with procedural defects. As a result, ATF cannot promulgate any final rule that hopes to survive judicial review without starting anew. And ATF's proposed legislation-by-fiat stretches far beyond its statutory authority, ignores important separation of powers principles, and attempts to usurp that which is solely the domain of Congress. But even if ATF were to somehow overcome those fundamental problems, the fact remains that its proposal is built upon a statistically-invalid assumption, a false premise, and flawed policy arguments. To be sure, ATF failed to quantify *any* benefit from the proposed rule, and substantially undercounted the cost it would impose, including a failure to consider (as is its duty) all related costs. The proposed rule is demonstrably un-workable, and many less-burdensome alternatives exist to address any legitimate concerns that might be identified in a proper and procedurally-sound rulemaking.

Finally, even if ATF did initiate a new, proper, and procedurally-sound proposed rulemaking about bump-stock devices, and even if there existed sufficient statutory authority *and* good cause to issue such a rule, there is ample reason to question whether a proposed reclassification of bump-stock-devices as machineguns is consistent with the U.S. Constitution, including but not limited to the Second and Fifth Amendments, as well as Article I, Section 9. ATF fails completely to consider, let alone provide for, the just compensation that would be due to those who would be affected by its proposed rule. Indeed, as discussed above, the proposed rule is unconstitutional, both facially and as applied to law-abiding people who possess and own devices subject to the ATF's proposed rule.

EX2-155

For all of the reasons set forth above, the NPR should be withdrawn and summarily discarded,

or, in the alternative, ATF should elect Alternative 1 and abandon the proposed rulemaking in its

entirety.

Respectfully submitted on behalf of
Firearms Policy Coalition and
Firearms Policy Foundation


Joshua Prince, Esq.
*Chief Counsel*


Adam Kraut, Esq.
*Attorney*


Firearms Industry Consulting Group,
a Division of Civil Rights Defense Firm, P.C.
646 Lenape Road
Bechtelsville, PA 19505
888-202-9297
610-400-8439 (fax)
www.FirearmsIndustryConsultingGroup.com

June 19, 2018

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov

 Regulations.gov - Your
Voice in Federal Decision

# Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder**

## Comment

See attached file(s)

## Attachments (19)

### Comment to ATF re Bumpstocks

View Attachment: 

### Form 1 Approval 9.5.1986_redacted

View Attachment: 

### 17-530_6537

View Attachment: 

### HistoricArmsLLC bump stock analysis (1)_3

View Attachment: 

### MSI Comment

View Attachment: 

### HistoricArmsLLC bump stock analysis (1)_1

**ID:** ATF-2018-0002-75886

**Tracking Number:** 1k2-93y1-pyr1

## Document Information

**Date Posted:**
Jul 3, 2018

**RIN:**
1140-AA52

**Show More Details**

## Submitter Information

**Submitter Name:**
Stephen Stamboulieh

**Organization Name:**
Stamboulieh Law, PLLC

**View Attachment:** [PDF]

## HistoricArmsLLC bump stock analysis (1)_2

**View Attachment:** [PDF]

## March 15 production - full size version - reduced_Redacted_7

**View Attachment:** [PDF]

## March 15 Production 1-5

**View Attachment:** [PDF]

## March 15 production - full size version - reduced_Redacted_6

**View Attachment:** [PDF]

## March 15 production - full size version - reduced_Redacted_10

**View Attachment:** [PDF]

## March 15 production - full size version - reduced_Redacted_9

**View Attachment:** [PDF]

## March 15 production - full size version - reduced_Redacted_8

**View Attachment:** [PDF]

## March 15 production - full size version - reduced_Redacted_11

**View Attachment:** [PDF]

## March 15 production - full size version - reduced_Redacted_12

**View Attachment:** [PDF]

## March 15 production - full size version - reduced_Redacted_13

**View Attachment:** [PDF]

March 15 production - full size
version - reduced_Redacted_14

**View Attachment:** 

---

March 15 production - full size
version - reduced_Redacted_16

**View Attachment:** 

---

March 15 production - full size
version - reduced_Redacted_15

**View Attachment:** 

---

# ⓢ Stamboulieh Law, PLLC

P.O. Box 4008, Madison, MS  39130 | (601) 852-3440 | stephen@sdslaw.us

June 26, 2018

Attn: Vivian Chu, Mailstop 6N-518        *Via Regulations.gov Portal*
Office of Regulatory Affairs
Enforcement Programs and Services
Bureau of Alcohol, Tobacco, Firearms and Explosives
99 New York Ave. NE
Washington, DC  20226
ATTN: 2017R-22
Facsimile: (202) 648-9741

    **Re:   ATF 2017R-22**

Dear Ms. Chu:

I write this comment on behalf of Scott Heuman and other interested parties regarding the Bureau of Alcohol, Tobacco, Firearms and Explosives' ("ATF") Notice of Proposed Rulemaking (ID ATF-2018-0002-0001, Federal Register No. 2018-06292) which attempts to regulate bumpstock type devices as machineguns.

Specifically, the Notice states the following:

On October 1, 2017, a shooter attacked a large crowd attending an outdoor concert in Las Vegas, Nevada. By using several AR-type rifles with attached bump-stock-type devices, the shooter was able to fire several hundred rounds of ammunition in a short period of time, killing 58 people and injuring over 800. The bump-stock-type devices recovered from the hotel room from which the shooter conducted the attack included two distinct, but functionally equivalent, model variations from the same manufacturer.

Despite requests for documentation and information under the Freedom of Information Act ("FOIA") which would allow the public to verify that bumpstock type devices were actually used during the shooting in Las Vegas, Nevada, no such document has been produced. In fact, the Federal Bureau of Investigation ("FBI") has refused to

Vivian Chu
Office of Regulatory Affairs
ATF 2017R-22
June 26, 2018

release information related to the shooting, claiming that the information was "compiled for a law enforcement purpose."[1]

The ATF produced several hundred documents to undersigned[2], but none of the documents demonstrate that the firearms with bumpstock type devices attached were utilized during the shooting.  It is also understood that ATF was precluded from examining the firearms found in Las Vegas by the FBI and only recently received the firearms for testing.  In any event and with that backdrop, the ATF has moved to regulate these devices as machineguns.

Len Savage of Historic Arms L.L.C. was retained as an expert to provide an analysis and commentary regarding Docket Number ATF 2017R-22 and bumpstock type devices.  Mr. Savage's expert report, comment, and supporting documentation were submitted to the ATF and are currently available to view on https://www.regulations.gov/document?D=ATF-2018-0002-31210. For convenience, Mr. Savage's report, comment and supporting documentation are attached hereto and fully incorporated herein.  Additionally, this comment fully supports and incorporates Maryland Shall Issue's comment dated April 9, 2018.  It is also attached to this comment.

The ATF's proposal does nothing to address criminal misuse of either machineguns or bumpstocks.  Much like 18 USC § 922(o), it criminalizes mere possession.  This is why whether the Las Vegas shooter utilized bumpstocks is critically important to this proposed regulation, since such alleged use provides the impetus for this attempt at regulation.  If the Las Vegas shooter did not utilize a bumpstock equipped rifle, then the entire premise of this regulation is at best suspect and at worst fraudulent.

If, as the ATF alludes in its proposed rule, the shooter did in fact utilize a bumpstock equipped rifle, then it would be the first (and since then, only) shooting which utilized a bumpstock device.  The ATF did not provide any documents demonstrating prior crimes committed with bumpstocks and the FBI wholesale refused to provide any documentation.  So, how is it that this proposed rule "would affect the criminal use of bump-stock-style-devices in mass shooting, such as the Las Vegas shooting incident[]"?  If the new regulation goes into effect and magically 519,927

---

[1] This denial has been appealed and we are presently waiting for the FBI to deny the appeal before commencing litigation for the release of these records.

[2] For purposes of a complete record, all documents received in that FOIA are attached hereto.

Vivian Chu
Office of Regulatory Affairs
ATF 2017R-22
June 26, 2018

bumpstock devices[3] are declared machineguns overnight, it still does not stop someone from committing mass murder with a now illegal machinegun.

It is a documented fact that legally owned machineguns are almost never utilized in crimes. How does the public know that the rifle(s) utilized by the Las Vegas shooter were not illegally modified machineguns? Unless either the ATF, the Las Vegas Metro Police Department or the FBI provides actual documentary proof that the rifles were not illegally modified machineguns, but were instead "regular" semi-automatic firearms with bumpstock type devices attached, we will never know.

The National Firearms Act ("NFA") regulates the manufacture and transfer of certain firearms by, in sum, requiring a person proposing to make or transfer an NFA firearm to: (1) file an application with the BATFE; (2) obtain BATFE approval; (3) have the firearm registered in the National Firearms Registration and Transfer Record (completed by BATFE upon approval); and (4) pay a $200.00 tax which is evidenced by the BATFE's attachment of a tax stamp on the application, which is then returned to the maker or transferor. 26 U.S.C. §§ 5812 and 5822. Possession of an NFA firearm not registered to the possessor is a felony punishable by ten years imprisonment and a fine of $250,000.00. 26 U.S.C. § 5861(d), 18 U.S.C. § 3571(b). Machineguns, defined under federal law as any firearm capable of firing more than one round automatically by a single function of the trigger, fall under the NFA's purview. 26 U.S.C. § 5845(b).

18 U.S.C. § 922(o) generally bans the transfer or possession of a machinegun manufactured after May 19, 1986. The statute provides:

> (1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.
>
> (2) This subsection does not apply with respect to—
>
> (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or
>
> (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

This provision was enacted in 1986 as §102(9) of the Firearm Owners' Protection Act, which amended the GCA of 1968. The legislative history of this amendment is, for the most part, nonexistent, except for the mention on the floor by its sponsor,

---

[3] This number is the estimate provided in the proposed rule.

Vivian Chu
Office of Regulatory Affairs
ATF 2017R-22
June 26, 2018

Representative Hughes, when he stated, "I do not know why anyone would object to the banning of machine guns." 132 Cong. Rec. H1750 (1986) (statement of Rep. Hughes). While the House vote on the amendment failed, the amendment still made it into the final bill.

The prohibition on machineguns does not apply to all machineguns. Any machinegun lawfully owned before May 19, 1986 may still be transferred or possessed. Accordingly, there are tens of thousands, if not hundreds of thousands, of machineguns lawfully possessed by private individuals, and but for §922(o), there would likely be hundreds of thousands more lawfully possessed by private individuals. If bumpstocks are now machineguns, then there are an additional 519,927 machineguns that are typically owned by law abiding citizens for lawful purposes. This surpasses the threshold of approximately 200,000 stun guns found to trigger a common use analysis because a firearm cannot be banned unless it is both dangerous and unusual. *See District of Columbia v. Heller*, 554 U.S. 570 (2008) and *Caetano v. Massachusetts*, 577 U.S. 1027 (2016). The proposed regulation attempts to downplay the significance of the numbers of machineguns that would be in circulation that would be otherwise lawfully owned. This is important because these cases referenced in the proposed regulation did not surpass the threshold established by *Caetano* for common use protection.

### **Argument**

First, "[i]t is a widely accepted principle of administrative law that the courts base their review of an agency's actions on the materials that were before the agency at the time its decision was made." *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623, 327 U.S. App. D.C. 126 (D.C. Cir. 1997). This review generally must be based on the "whole record"—no more or no less. See *Overton Park*, 401 U.S. at 420 ("[R]eview is to be based on the full administrative record that was before the [agency] at the time [it] made [its] decision." (emphasis added)); *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792, 242 U.S. App. D.C. 110 (D.C. Cir. 1984) ("If a court is to review an agency's action fairly, it should have before it neither more nor less information than did the agency when it made its decision."). *Styrene Info. & Research Ctr., Inc. v. Sebelius*, 944 F. Supp. 2d 71, 84 (D.D.C. 2013).

As such, this proposed regulation should be able to easily demonstrate whether bumpstocks were utilized in the Las Vegas shooting and that the shooter did not have illegally modified machineguns in his possession. If not, then the stated reasons of the ATF in attempting to regulate these as machineguns is arbitrary and capricious. This comment does not take a position on whether bumpstocks were used or not, only that if they were utilized, then evidence of that utilization should be produced.

Vivian Chu
Office of Regulatory Affairs
ATF 2017R-22
June 26, 2018

Secondly, the proposed rule is vague as it redefines statutory law from "single function of the trigger" to "single pull of the trigger." The plain language of this new proposed rule would appear to turn binary triggers into machineguns. If that is the case, then this is further evidence that the ATF has not fully taken into consideration the pitfalls of legislating by regulation as there are no numbers of binary triggers sold, the costs associated with disposal of same, and in fact, the proposed rule is completely silent with regard to binary triggers.

Thirdly, this proposed regulation would turn, overnight, hundreds of thousands of individuals who legally possess(ed) bumpstock devices into unwitting felons. A firearm accessory heretofore specifically allowed by the ATF would be magically declared a machinegun by administratively legislating through regulation. Further, this proposed rule does not provide any relief to the owners of said bumpstocks and the investment in those bumpstocks. Instead, once this regulation is final-ruled, the instruction to the owners will be, "Mr. and Mrs. America, turn them all in." This is a governmental taking without compensation and is itself unconstitutional.

Fourth, this regulation can be read, and indeed given the ATF's previous expansions of meanings of regulations and legislation, to prohibit belt loop bump firing (perhaps even belt loops?) and bump firing in general if you gain the skill and ability to do so. So, in essence, what the proposed rule could do is to affect a rate-of-fire limitation in a few more iterations, revisions and expansive readings. If the ATF can redefine statutory language in excess of the ATF's authority, why not just propose a one round per minute rule?

Congress legislated the current statutes for what defines a machinegun. The ATF simply has no authority to expand Congress' definition when Congress specifically set forth the rule. The statute is not vague. It is not ambiguous. And given the previous ten or so years of ATF guidance, was not up for interpretation as the ATF has *consistently* taken the position that a bumpstock was not a machinegun. But now, the ATF wants to change its position based on the current political climate. In a recent United States Supreme Court case, *Wis. Cent., Ltd. v. United States*, No. 17-530, 2018 U.S. LEXIS 3837 (June 21, 2018), the Supreme Court interpreted a taxing statute that differentiated between "money" and "stock." For years, the statute was treated the same way and the statute at issue unambiguously excluded "stock" from "money". The corollary here is that the NFA, as passed in 1934, used a definition of machinegun that

Vivian Chu
Office of Regulatory Affairs
ATF 2017R-22
June 26, 2018

has been consistent since its enactment using the standard of a "single function of the trigger." If Congress understood, in 1934, that a machinegun operated automatically on the basis of a "single function of the trigger", then it follows that under *Wisconsin Central*, the ATF cannot expand the definition as it attempts to do so here because the definition of machinegun (and how it has always been) is unambiguous.

Take this quote from the recent case: "If Congress really thought everything is money, why did it take such pains to differentiate between money and stock in the Internal Revenue Code of 1939?" *Wis. Cent., Ltd. v. United States*, No. 17-530, 2018 U.S. LEXIS 3837, at *12 (June 21, 2018) (attached). The same would hold true for bumpstocks. If Congress wanted to expand the definition of machinegun, it would have simply done so. However, in 1934 it was understood that machineguns could not be banned and, instead, Congress infringed on the rights of Americans via the taxing power. Further, and as just recently stated so eloquently by the Supreme Court, "Congress alone has the institutional competence, democratic legitimacy, and (most importantly) constitutional authority to revise statutes in light of new social problems and preferences. Until it exercises that power, the people may rely on the original meaning of the written law." *Id.* at *17.

Finally, should the ATF desire to classify these firearm accessories as machineguns, it would have no choice but to declare an amnesty and allow for the registration of these devices, as machineguns. The ATF could take the position that 922(o) prohibits this, but it is incorrect. §922(o) provides that the ATF could allow the possession and/or transfer of any machinegun, even ones made after May 19, 1986 utilizing the "under the authority of" clause. In fact, this would evade the constitutional takings clause issue and allow lawful possessors of said bumpstocks to continue to enjoy and possess in compliance with federal law. In fact, the ATF is well aware of its authority as it has previously allowed a Form 1 machinegun to be lawfully manufactured and possessed after the May 19, 1986 cutoff. See Attachment.

Ultimately, the ATF should choose to do nothing because it is beyond the scope of your enabling statutes to redefine what Congress has already defined. Doing nothing would allow Congress, if it chose, to revise its statutes and not rely on an unelected agency to further erode citizens' rights under the Second Amendment. Truthfully, that courts have ignored and eviscerated the Second Amendment is a travesty. Machineguns would no doubt have been protected when the Founders drafted the Second Amendment as machineguns are the quintessential military weapon of today. In fact,

Vivian Chu
Office of Regulatory Affairs
ATF 2017R-22
June 26, 2018

most agencies also have a nice collection of machineguns, but apparently the citizens that fund these agencies just cannot be trusted to own these types of weapons.

This comment incorporates the expert report of Mr. Len Savage from Historic Arms, LLC as he sets forth in specific detail the problems with this proposed rule. Additionally, this comment incorporates Maryland Shall Issue's comment as a further basis for why the proposed rule should not be implemented.  In any event, should this rule be finalized and implemented, we are prepared to litigate the matter immediately.

Yours very truly,

STEPHEN D. STAMBOULIEH

EX2-166

Visit the new Regulations.gov Beta site today at https://beta.regulations.gov



# Comment on FR Doc # 2018-06292

The is a Comment on the **Alcohol Tobacco Firearms and Explosives Bureau** (ATF) Proposed Rule: **Bump-Stock Type Device**

For related information, **Open Docket Folder** 

## Comment

The comments of the National Rifle Association on ATF2017R-22 are attached.

## Attachments (1)

### NRA Comments on ATF2017R-22

**View Attachment:** 📄

---

**ID:** ATF-2018-0002-87401

**Tracking Number:** 1k2-93yk-qbbs

## Document Information

**Date Posted:**
Jul 5, 2018

**RIN:**
1140-AA52

**Show More Details**

## Submitter Information

**Submitter Name:**
Josh Savani

**Organization Name:**
National Rifle Association

N<small>ATIONAL</small> R<small>IFLE</small> A<small>SSOCIATION OF</small> A<small>MERICA</small>
**I<small>NSTITUTE FOR</small> L<small>EGISLATIVE</small> A<small>CTION</small>**
11250 W<small>APLES</small> M<small>ILL</small> R<small>OAD</small>
F<small>AIRFAX</small>, V<small>IRGINIA</small> 22030



## COMMENTS OF THE NATIONAL RIFLE ASSOCIATION ON ATF'S PROPOSED RULE TO AMEND THE DEFINITION OF "MACHINEGUN"

June 27, 2018

Vivian Chu
Office of Regulatory Affairs,
Enforcement Programs Services,
Bureau of Alcohol, Tobacco, Firearms, and Explosives,
U.S. Department of Justice,
99 New York Ave. NE,
Washington DC 20226

Via electronic submission to regulations.gov

**Re: ATF's Notice of Proposed Rulemaking Docket Number ATF2017R-22**

On March 29, 2018, ATF posted a notice of proposed rulemaking to the federal register that would amend the existing definition of "machinegun" used in the enforcement of domestic federal gun laws.[1] The National Rifle Association of America submits the following comments in response to the proposed rulemaking.

**I. Congress's Definition of "Machinegun" Creates a Mechanical Test, Not a Performance-Based Standard**

When assessing whether bump fire stocks meet the legal definition of a "machinegun," it's important to keep in mind the statutory limitations of that term. Congress defines "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."[2] More relevant to bump fire stocks,

---

[1] 83 Fed. Reg. 13442 (March 29, 2018). https://www.gpo.gov/fdsys/pkg/FR-2018-03-29/pdf/2018-06292.pdf
[2] 26 U.S.C. § 5845(b); *see also* 18 U.S.C. § 921(a)(23) (adopting the same definition for purposes of the Gun Control Act).

**EX2-168**

the term also includes "the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."[3] Thus, the law sets forth a mechanical test, not a performance-based standard focusing on rate of fire.

Because Congress created a mechanical test, ATF has consistently applied the definition to devices or firearms depending on their function, not on the rate of fire achievable with the device or firearm.[4] Indeed, ATF has noted that "bump fire" can also be induced in unmodified semiautomatic firearms. Yet unmodified semiautomatic firearms are clearly not "machinegun[s]" under federal law and do not become one simply because a particular user induces bump fire with them.[5]

Semiautomatic firearms were in common use when Congress created the first definition of "machinegun" in 1934,[6] and the current definition of "machinegun" in 1968.[7] Yet unmodified semiautomatic firearms have never been considered "machinegun[s]" for purposes of federal law.[8] Indeed, Congress enacted an entirely separate law to regulate AR-15s and various other semiautomatic firearms between 1994 and 2004,[9] with no suggestion that these firearms could simply have been administratively reclassified as "machinegun[s]."

While the new proposed definitions of "automatically" and "single function of the trigger" continue to focus on mechanical function, rather than capability or performance, there are numerous phrases throughout the proposed rule that could be used to imply capability or performance is relevant to a firearm's classification as a "machinegun." For example, Section II of the proposed rule begins: "[s]hooters use bump-stock-type devices with semiautomatic firearms to accelerate the firearm's cyclic firing rate to mimic automatic fire. Such devices are designed principally to increase the rate of fire of semiautomatic firearms."

This focus on performance by claiming that a bump fire stock either "increase[s] the rate of fire of semiautomatic firearms" or "mimic[s] automatic fire" is irrelevant to whether or not a bump fire stock is a machine gun. Either it is a "part designed and intended solely and exclusively, or combination of parts

---

[3] *Id.*

[4] *See, e.g.*, ATF's discussion of prior determinations regarding "bump-stock-type devices" in the proposed rule. 83 Fed. Reg. at 13444-45.

[5] *See* letter from Sterling Nixon, Chief, ATF Firearms Technology Branch, to Jason A. Lee (Oct. 13, 2006) ("As long as you must consciously pull the trigger for each shot of the 'bump fire' operation, you are simply firing a semiautomatic weapon in a rapid manner and are not violating any Federal firearms laws or regulations.").

[6] *See* National Firearms Act of 1934, 48 STAT. 1236, Sec. 1 (June 26, 1934) (defining "machine gun").

[7] *See* Gun Control Act of 1968, Pub. L. 90-618, Sec. 201 (Oct. 22, 1968) (defining "machinegun" for purposes of the re-enacted and amended National Firearms Act) This definition was amended slightly by the Firearm Owners Protection Act of 1986. Pub. L. 99-308, Sec. 109 (May 19, 1986).

[8] This was so, even though the 1934 definition encompassed "any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger." The term "semiautomatically" was omitted from the 1968 definition.

[9] *See* Public Safety and Recreational Firearms Use Protection Act, Title XI of P.L. 103-322 (Sept. 13, 1994).

2

designed and intended, for use in converting a weapon . . . to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger,"[10] or it is not.

Beyond being irrelevant, ATF's claim that "bump-stock-type devices . . . accelerate the firearm's cyclic firing rate . . ." is simply incorrect. These devices do not affect the rate of fire of the host firearm, which is determined by the firearm's operating system and, to a limited extent, certain environmental factors such as the level of lubrication and cleanliness of the host firearm.

The rate of fire achievable with a particular firearm or device is irrelevant to whether or not a particular firearm is a "machinegun." Some "machinegun[s]" fire as slowly as 200-400 rounds per minute, while many common "machinegun[s]" fire 1000 rounds per minute or more.[11] With such a broad range of firing rates, it's apparent why Congress did not use rate of fire as a determinant factor in the definition of "machinegun."

However ATF proceeds with this rulemaking, it is important that the distinction between semiautomatic firearms and machineguns remains clear. There are tens of millions of semiautomatic firearms currently possessed by law-abiding Americans. Suddenly and retroactively banning them as "machinegun[s]" under federal law would create a number of very serious constitutional, legal, and practical problems. More to the point, the statutory definition is simply not intended to stretch this far.

## II. Application of the Regulation to Existing Bump Fire Stocks

The proposed rule does not provide for a registration period for "any device that would be classified as 'machinegun' as a result of this rulemaking." Without the ability to register, owners of existing devices will be required to destroy their heretofore-lawful property. ATF claims that "[a] final rule will provide specific information about acceptable methods of disposal, as well as the timeframe under which disposal must be accomplished to avoid violating 18 U.S.C. 922(o)."

As support for requiring such disposal, ATF claims that, "[t]he NFA provides that only the manufacturer, importer, or maker of a firearm may register it." This statement ignores the three methods that ATF has used in the past when reversing prior classifications under the NFA: amnesty, non-retroactivity, and modification of the device.

In this case, equitable principles strongly favor protecting those who in good faith acquired devices that ATF now seeks to reclassify as "machinegun[s]." Owners of these products have relied on over a decade of ATF's own rulings and guidance when lawfully acquiring bump fire stocks, and the proposed rule would now turn these gun owners into felons or require destruction of their property.

Beyond problems of fundamental fairness, the lack of a way for gun owners to retain some value in their property likely makes the proposed rule a taking in violation of the Fifth Amendment. While some courts have refused to recognize taking challenges that result from the exercise of the government's regulatory

---

[10] 26 U.S.C. § 5845(b) (The definition of machinegun has been reorganized in this case so that it is more readable as applied to a "part" or "combination of parts."

[11] The Chauchat light machine gun has a rate of fire of only 250 rounds per minute. Ivan V. Hogg & John Weeks, Military Small Arms of the 20th Century 269 (DBI Books, 6th ed. 1991).

EX2-170

authority,[12] recent Supreme Court case law makes these cases of questionable merit. In *Murr v. Wisconsin*, a regulatory land-use decision, the Court held that:

> The Takings Clause of the Fifth Amendment provides that private property shall not be taken for public use, without just compensation. The Clause is made applicable to the States through the Fourteenth Amendment. As this Court has recognized, the plain language of the Takings Clause requires the payment of compensation whenever the government acquires private property for a public purpose, but it does not address in specific terms the imposition of regulatory burdens on private property.[13]

In response to this new guidance from the Supreme Court, the United States District Court for the Southern District of California issued an injunction blocking enforcement of a law that would have required gun owners to surrender their lawful magazines, remove them from the state, or sell them to a licensed firearm dealer.[14] That court relied, in part, on the fact that the plaintiffs were likely to succeed on the merits of their Takings Clause claim based on the forced loss of their magazines without compensation.[15]

The case for a Takings Clause violation is even stronger with devices that would be reclassified as "machineguns" by the proposed rule because, unlike the California magazine owners who could move their property out of the state or transfer it to a firearm dealer, owners of bump fire stocks are given only the option of destroying their property.

To comply with principles of equity and ensure that the proposed rule is not a violation of the Takings Clause, ATF must address the problem the proposed rule creates for existing bump fire stock owners -- through an amnesty, by limiting retroactivity of any final rule, or by providing for modification of the devices.

### a. Amnesty

When passing the Gun Control Act in 1968, Congress included a 30-day amnesty period for individuals to register NFA firearms.[16] In addition to that amnesty period, Congress gave the Secretary of the Treasury the authority to conduct additional amnesty periods of up to 90 days for any single period.[17] This provision gave broad authority to the Secretary by allowing amnesty "as the Secretary determines will contribute to the purposes of this title."[18]

---

[12] *See* e.g., *Akins v. United States,* 82 Fed.Cl. 619, 622 (2008).
[13] 137 S. Ct. 1933 (2017).
[14] *Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1139-40 (S.D. Cal. 2017).
[15] *Id*. at 1139.
[16] Pub.L. 90-618, Title II, § 207(b), Oct. 22, 1968, 82 Stat. 1230.
[17] Pub.L. 90-618, Title II, § 207(d), Oct. 22, 1968, 82 Stat. 1230.
[18] *Id.*

EX2-171

When ATF reclassified certain shotguns as destructive devices in 1994,[19] the agency also provided for a period of amnesty, which finally closed May 1, 2001 after about 8,200 of the shotguns were registered with ATF.[20]

ATF could provide one or more 90-day periods of amnesty for the registration of bump fire stocks. While there are some additional complications due to the lack of markings on bump fire stocks, Congress has delegated broad discretion to determine the scope and requirements of any amnesty. ATF already has experience with firearms marking issues for individuals who are not federal firearm licensees. (Every time a non-licensee makes an NFA "firearm," the maker must mark the firearm in compliance with federal law.[21])

In addition to providing amnesty for bump fire stocks, ATF should consider a broader amnesty for "machinegun[s]." When Congress delegated the authority to provide for additional periods of amnesty, there was a clear legislative understanding that amnesty generally serves the purposes of federal firearms laws by bringing "machinegun[s]" and other NFA "firearms" that are currently contraband, and therefore likely to eventually end up in the wrong hands, into the legal market where they have value and are extremely unlikely to be used in crime.[22]

While there has always been some concern about an amnesty affecting ongoing investigations or allowing possession by otherwise prohibited persons[23], ATF, as previously stated, could place substantial limitations on the scope of any amnesty, and would be free to set the requirements for registration to prevent the problems associated with the 1968 amnesty.

### b. No Retroactive Effect

ATF has broad authority to limit the retroactive effect of administrative actions affecting the internal revenue laws.[24] In the case of regulations, there is a general rule against retroactive effect.[25]

In past rulings, ATF has attempted to completely limit any retroactive effect. For example, in the case of AR-15 "Auto Sears," ATF stated that "[w]ith respect to the machine gun classification of the auto sear under the National Firearms Act, pursuant to 26 U.S.C. 7805(b), this ruling will not be applied to auto sears manufactured before November 1, 1981. Accordingly, auto sears manufactured on or after

---

[19] ATF Rul. 94-1, 94-2.
[20] ATF Rul. 2001-1 (repealed by ATF Rul. 2017-1 because ruling was "unnecessary and obsolete" due to long past deadline for registration).
[21] 26 U.S.C. § 5842.
[22] See Testimony of ATF Director Stephen E. Higgins, before the Subcommittee on Crime of the House Committee on the Judiciary on H.R. 641 and Related Bills (May 17, 24, and June 27, 1984) (testifying that "[r]egistered machineguns which are used in crimes are so minimal as to not be considered a law enforcement problem."
[23] These two examples could be determined to not "contribute to the purposes" of the NFA, so ATF could exclude them, and other similarly problematic registrations, from the proposed amnesty.
[24] 26 U.S.C. § 7805(b)(8).
[25] 26 U.S.C. § 7805(b)(1) It's unclear how this section would apply to the reclassification of certain devices as "machinegun[s]" by regulation.

**EX2-172**

November 1, 1981, will be subject to all of the provisions of the National Firearms Act and 27 C.F.R. Part 479."[26]

The Seventh Circuit rejected this broad reading of section 7805(b) in *United States v. Cash*.[27] While ATF's "Auto Sear" ruling seemed to imply that mere possession of a pre-1981 sear alone remained lawful, the *Cash* court limited 7805(b)'s retroactivity limitations to only excusing the payment of taxes:

> Defendants believe that it places auto sears manufactured before November 1, 1981, outside all obligations laid by statute on the ownership and transfer of firearms. But nothing in the firearms statutes gives the Secretary of the Treasury (or the Bureau of Alcohol, Tobacco and Firearms) the power to make exemptions to § 5845(b) and associated legal obligations. The statute to which ATF Ruling 81-4 refers, 26 U.S.C. § 7805(b), provides that the Secretary cannot give retroactive application to tax regulations and adds in § 7805(b)(8) that the "Secretary may prescribe the extent, if any, to which any ruling (including any judicial decision or any administrative determination other than by regulation) relating to the internal revenue laws shall be applied without retroactive effect." Read in conjunction with § 7805(b)(8), the proviso in the fourth paragraph of ATF Ruling 81-4 means only that the Secretary will not collect any tax under 26 U.S.C. §§ 5801, 5811, or 5821 on account of auto sears manufactured or transferred before November 1, 1981. The ruling does not-and cannot-excuse compliance with criminal laws applicable at the time of post-1981 transfers.[28]

In *United States v. Dodson*, the Sixth Circuit agreed with this reading of section 7805(b), concluding that the statute's purpose was to excuse prior tax and regulatory violations, and not continuing non-compliance with criminal laws.[29]

While NRA does not agree with this narrow reading of section 7805(b), reliance on this restrictive interpretation would complicate any attempt to generally limit the retroactivity of the proposed rule. However, this provision still serves an important purpose when used in conjunction with an amnesty. Section 7805(b) can excuse tax payments that might otherwise be required when a firearm is registered under an amnesty.

ATF used the provision in this manner during the registration period for the shotguns that were reclassified as NFA "firearms," discussed *supra*.[30] Registrants were not required to pay the $200 transfer tax that would have been associated with the acquisition of a "destructive device." This same approach

---

[26] ATF Rul. 81-4 (The ruling does note that "[r]egardless of the date of manufacture of a drop in auto sear, possession of such a sear and certain M16 fire control parts is possession of a machine gun as defined by the NFA. Specifically, these parts are a combination of parts designed and intended for use in converting a weapon into a machine gun as defined in the NFA.")

[27] 149 F.3d 706, 707 (7th Cir. 1998).

[28] *Id*.

[29] 519 F. App'x 344, 349 (6th Cir. 2013).

[30] ATF Rul. 94-1, 94-2.

could be applied to excuse tax payments for the registration of bump fire stocks or other "firearms" during the recommended amnesty period.

### c. Modification

As discussed in the proposed rule, when ATF reclassified the "Akins Accelerator" as a "machinegun," existing owners of the device were allowed to remove and dispose of a spring rather than destroying the entire device.[31] Similar modifications could be done in the case of bump fire stocks. While it would be up to ATF to determine the exact extent of modification necessary, removal of the finger rest, permanently affixing the stock, or removal of the stock pin assembly would seem to limit the use of a bump fire stock to semiautomatic fire only.

While modification in these ways would limit the financial harm to gun owners over complete destruction, these types of modifications may so diminish the utility of a bump fire stock that a violation of the Takings Clause still occurs.[32] For this reason, NRA recommends an amnesty as a less onerous solution for dealing with the existing supply of bump fire stocks.

## III. Conclusion

However ATF continues with this proposed rule, it must keep in mind the limitations placed on the definition of "machinegun" by Congress. If ATF decides to reverse prior determinations regarding the classification of specific devices, then it should provide for an amnesty period for these devices and other unregistered "machinegun[s]."

Signed,

Josh Savani
Director
Research & Information Division
NRA-ILA

---

[31] 83 Fed. Reg. at 13445.

[32] A "regulatory taking" occurs when the government regulates the use of property in a manner that "is tantamount to a direct appropriation or ouster." *Lingle v. Chevron USA, Inc.*, 544 U.S. 528, 537 (2005).

EX2-174