UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

SCOTT A. HARDIN,                                                      Plaintiff,

v.                                              Civil Action No. 3:19-cv-56-DJH-RSE

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES et al.,                              Defendants.

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Following the 2017 tragic mass shooting in Las Vegas, when a shooter armed with bump-stock devices opened fire on an outdoor concert, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) revisited its classification of bump-stock devices under federal firearm laws. *See Bump-Stock-Type Devices*, 83 Fed. Reg. 66,514, 66,516 (Dec. 26, 2018) (the Rule); (*see* D.N. 29, PageID # 186)  ATF ultimately issued a final rule that classified bump stocks as "machineguns" and outlawed their continued sale and possession. *Id.*  Plaintiff Scott Hardin, a bump-stock owner (*see* D.N. 3, PageID # 59), filed this action challenging the Rule as exceeding ATF's statutory authority and violating the Administrative Procedure Act and the Constitution.  (*Id.*, PageID # 58)  The parties have filed cross-motions for judgment on the administrative record.  (D.N. 29; D.N. 30)  For the reasons set forth below, the Court will grant the Defendants' motion.

## I.

Congress regulates firearms through three statutes: The National Firearms Act of 1932, codified as amended at 26 U.S.C. §§ 5801–72; the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213; and the Firearm Owners Protection Act of 1986, Pub. L. 99-308, 100 Stat. 449.  The NFA operates pursuant to Congress's taxing authority and imposes a tax on the manufacture and transfer of firearms as well as registration requirements.  *See* 26 U.S.C. §§ 5801–41.  Through the

1

GCA, firearm regulation entered the criminal code—among other provisions, the GCA made it a criminal offense for anyone except for licensed importers, manufacturers, dealers, or collectors to transport machineguns "except as specifically authorized by the [Attorney General] consistent with public safety and necessity." Gun Control Act § 102 (amending 18 U.S.C. § 922).  FOPA amended the GCA to further tighten access to machineguns, making it "unlawful for any person to transfer or possess a machinegun" not lawfully possessed before FOPA's enactment.  Firearm Owners Protection Act § 102 (amending 18 U.S.C. § 922).  Congress gave the Attorney General the authority to promulgate rules and regulations necessary to enforce the provisions of the NFA and GCA.  *See* 26 U.S.C. § 7805(a);[1] 18 U.S.C. § 926(a).  The Attorney General has delegated this authority to ATF.  *See* 28 C.F.R. § 0.130.

The NFA and the GCA, as amended by FOPA, use the definition of "machinegun" set out in the NFA: "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. 5845(b).  The term "machinegun" also includes "the frame or receiver of any such weapon" and any part or combination of parts which can convert a firearm into a machinegun.  *Id.* The statute does not define the terms "automatically" or "single function of the trigger."  *Id.*

"A 'bump stock' is a device that replaces the standard stationary stock of a semiautomatic rifle—the part of the rifle that typically rests against the shooter's shoulder—with a non-stationary, sliding stock that allows the shooter to rapidly increase the rate of fire, approximating that of an automatic weapon."  *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1,

---

[1] NFA provisions still refer to the "Secretary" (of the Treasury) rather than the Attorney General, but the Homeland Security Act of 2002, Pub. L. No. 107–296, 116 Stat. 2135 (2002), transferred ATF from the Department of the Treasury to the Department of Justice.  *See* Homeland Security Act § 1111.

7 (D.C. Cir. 2019), *judgment entered*, 762 F. App'x 7 (D.C. Cir. 2019), *cert. denied*, 140 S. Ct. 789 (2020) (*Guedes II*).   Although in 2006 ATF concluded that certain bump-stock devices qualified as machineguns under the NFA and GCA, between 2008 and 2017 it issued a series of classification decisions concluding that other bump-stock devices did not qualify because they did not fire "automatically."  *See* 83 Fed. Reg at 66,516.

After the Las Vegas shooting, ATF decided to revisit this series of decisions in order to clarify the meaning of the terms "automatically" and "single function of the trigger," particularly as they pertained to bump stocks.  *Id.*  On December 26, 2017, ATF published an advance notice of proposed rulemaking (ANPRM) in the Federal Register.  *Id.*  The public comment period for the ANPRM ran until January 25, 2018, during which time ATF received over 115,000 comments. *Id.*  On March 29, 2018, ATF published a notice of proposed rulemaking (NPRM) defining the statutory term "single function of the trigger" to mean "a single pull of the trigger," and "automatically" to mean "as a result of a self-acting or self-regulating mechanism that allows the firing of multiple rounds through a single pull of the trigger."  *Id.* at 66,517–19.  The NPRM also clarified that under these interpretations, all bump-stock devices would now qualify as machineguns.  *Id.* at 66,519.  ATF received over 186,000 comments in response to the NPRM.  *Id.* On December 26, 2018, ATF published the final rule, which adopted these definitions and had an effective date of March 26, 2019.  *Id.* at 66,514.  The Rule gave possessors of bump stocks ninety days during which to destroy or abandon their devices.  *Id.*

## II.

"The court's function in reviewing final agency action following informal rulemaking is prescribed by the [Administrative Procedure Act].  [The Court] review[s] the administrative record, appl[ies] the standards set forth in section 706 of the APA, 5 U.S.C. § 706, and must set

aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Simms v. Nat'l Highway Traffic Safety Admin.*, 45 F.3d 999, 1003 (6th Cir. 1995) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 414 (1971)).

"On a motion for judgment on the administrative record, the summary judgment standard set forth in Rule 56 'does not apply because of the limited role of the court in reviewing the administrative record.'" *Vaught v. Fed. Deposit Ins. Corp.*, No. 3:16-CV-507, 2018 WL 5098531, at *6 (E.D. Tenn. Apr. 4, 2018) (quoting *N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 79 (D.D.C. 2007)). The district court must only "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.* (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)). "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.* (quoting *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007)).

## A.    Statutory Authority

Hardin argues that ATF exceeded its statutory authority by redefining "machinegun" to include bump-stock devices. (D.N. 30, PageID #700–01) To address this claim, the Court must first determine by which standard to assess ATF's conclusion in light of the statutory definition. The critical question is whether *Chevron* deference applies. Under *Chevron*'s two-step framework, courts first "determine whether the statute is ambiguous." *Arangure v. Whitaker*, 911 F.3d 333, 337 (6th Cir. 2018). If the statute is unambiguous, the inquiry ends and the court applies the statute "as-written"; but if it is ambiguous, the court proceeds to step two and "defer[s] to the agency's construction if it is 'permissible'"—i.e., "within the bounds of reasonable interpretation." *Id.* at 337–38 (quoting *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013)). Absent *Chevron*

deference, agency interpretations may "merit some deference" depending on "agency expertise and the value of uniformity in interpreting . . . the law." *Rhinehimer v. U.S. Bancorp Investments, Inc.*, 787 F.3d 797, 809 (6th Cir. 2015) (quoting *U.S. v. Mead Corp.*, 533 U.S. 218, 234 (2001)). The substantial difference between the deference these standards give to agency interpretation makes the applicability of *Chevron* highly significant.

"*Chevron* only applies if 'Congress delegated authority to the agency generally to make rules carrying the force of law' *and* the agency interpretation was 'promulgated in the exercise of that authority.'" *Atrium Med. Ctr. v. U.S. Dep't of Health & Human Servs.*, 766 F.3d 560, 566 (6th Cir. 2014) (quoting *Mead Corp.*, 533 U.S. at 226–27). Although the parties here have not thoroughly addressed *Chevron*'s applicability to the Rule, both assert that it does not apply. Hardin states that deference is unwarranted because the statutory definition is clear, (*see* D.N. 30, PageID # 708); and ATF refers to the Rule as "an interpretive rule" (D.N. 29, PageID # 205–06), which typically would not receive *Chevron* review, *see Mead Corp.*, 533 U.S. at 232 ("interpretive rules . . . enjoy no *Chevron* status as a class"), and states that "deference to the agency is not required to resolve this case." (D.N. 31, PageID # 737)

Although the Sixth Circuit has not analyzed *Chevron*'s applicability to the Rule,[2] the D.C. Circuit recently addressed this precise issue. *Guedes II*, 920 F.3d at 17. The plaintiffs in *Guedes*

---

[2] It is worth noting that while the Sixth Circuit has not analyzed *Chevron*'s applicability to the Rule, a district court in the circuit has. *See Gun Owners of Am. v. Barr*, 363 F. Supp. 3d 823, 830 (W.D. Mich. 2019). The court concluded that *Chevron* applies to the Rule, the terms "automatically" and "single function of the trigger" render the statutory definition of machinegun ambiguous, and ATF's interpretation of the definition deserved deference. *Id.* at 830–33. The plaintiffs appealed and filed a motion to stay pending appeal. *Gun Owners of Am., Inc. v. Barr*, No. 19-1298, 2019 WL 1395502, at *1 (6th Cir. Mar. 25, 2019). The Sixth Circuit denied the motion to stay in part because the plaintiffs did not show "the likelihood [that the district court] abuse[d] [its] discretion." *Id.* Following the Sixth Circuit's denial, the Supreme Court also denied the stay. *Gun Owners of Am., Inc. v. Barr*, 139 S. Ct. 1406 (2019).

challenged ATF's statutory authority to promulgate the Rule. *Id.* The parties in *Guedes* did not present arguments for applying the *Chevron* framework, and the court therefore conducted its own extensive analysis of whether the Rule qualifies for *Chevron* deference. *Id.* at 17–21. The court first concluded, based on the Rule's effect, the language used by ATF in the Rule, and the Rule's publication in the Code of Federal Regulations, that "the Rule confirms . . . in numerous ways, that it intends to speak with the force of law," and therefore the *Chevron* framework applies. *Id.* at 18–19. Applying *Chevron*, the D.C. Circuit found that two components of the statutory definition of "machinegun"—the phrase "single function of the trigger," and the word "automatically"—render the definition ambiguous. *Id.* at 29. Finally, the D.C. Circuit concluded that ATF had reasonably interpreted these ambiguous terms and therefore "the [Rule] sets forth a permissible interpretation of the statute's ambiguous definition of 'machinegun'" and consequently merits deference. *Id.* at 31–32.

In the absence of contrary precedent from the Sixth Circuit, the Court will follow the D.C. Circuit's well-reasoned analysis. Thus, for the reasons identified in *Guedes*, the Court finds that *Chevron* applies to the Rule, the statute is ambiguous, and ATF reasonably interpreted the definition of "machinegun." *See id.* at 17–20, 28–32; *see also Gun Owners of Am.*, 363 F. Supp. 3d at 830–33. ATF therefore did not exceed its statutory authority in promulgating the Rule.

**B.     Arbitrary and Capricious Review**

"Even if an agency's statutory interpretation is permissible under *Chevron*, it may still be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Atrium*, 766 F.3d at 567 (citing 5 U.S.C. § 706(2)(A)). Agency action qualifies as arbitrary or capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs

counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "This is not an invitation for judicial second-guessing . . . [s]o long as the agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action,' [the court] will not set aside its decision." *Ky. Coal Ass'n, Inc. v. Tenn. Valley Auth.*, 804 F.3d 799, 801 (6th Cir. 2015) (quoting *State Farm*, 463 U.S. at 43).

Hardin argues that the Rule is arbitrary and capricious for several reasons. (D.N. 30, PageID # 696–699). None convince the Court.

### 1.      Bump-Firing Technique

Hardin first argues that the fact that bump firing can be produced without a bump-stock device undermines the validity of the Rule. (D.N. 30, PageID # 698-99) Bump firing "is a technique that any shooter can perform with training or with everyday items such as a rubber band or belt loop." 83 Fed. Reg. at 66,532. According to Hardin, this fact necessarily leads to "one of only two untenable conclusions": ATF approves of such techniques, which would undercut the need to regulate bump stocks at all, or ATF intends to regulate all manipulations that cause bump firing, which would "lead[] to the absurd result" of people being charged with illegal machinegun possession for using a bump-firing technique. (D.N. 30, PageID # 699)

ATF squarely addressed this issue in the Rule, concluding that bump-stock devices "are objectively different" from other items "designed for a different primary purpose," which do not qualify as automatic. 83 Fed. Reg. at 66,533. ATF additionally found bump firing through use of an everyday item such as a belt loop to be "more difficult than using a bump-stock-type device." *Id.* Finally, ATF noted a "fundamental distinction between skilled shooters and those employing bump-stock-type devices," which left skilled shooters "unaffected by the proposed rule"—skilled

shooters must pull and release the trigger for each shot, whereas bump-stock devices only require the shooter to pull the trigger to fire the first round, after which the shooter need only maintain pressure to fire subsequent rounds.  *Id.*  Because ATF "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," the Court does not find the Rule to be arbitrary and capricious on this ground.  *Ky. Coal Ass'n*, 804 F.3d at 801 (alterations in original) (quoting *State Farm*, 463 U.S. at 43).

### 2.      Bump-Stock Operation

Hardin next argues that "all the *known* evidence runs directly counter" to the conclusion that bump stocks qualify as machineguns because "the shooter must still separately pull the trigger to fire each successive shot."  (D.N. 30, PageID # 698)  In support of this claim, Hardin offers an affidavit from a former ATF employee who asserts that a "bump-stock[] device requires additional physical manipulation of the trigger by the shooter . . . [because] the trigger must be released, reset, and fully pulled rearward before the subsequent round can be fired."  (D.N. 3-1, PageID # 91–92)

Hardin's emphasis on trigger mechanics is misplaced.  In determining that bump stocks operate with a single pull of the trigger, ATF focused not on the movement of the trigger but on the action of the shooter in pulling the trigger.  *See* 83 Fed. Reg. at 66,532.  Specifically, ATF concluded that bump stocks enable shooters to discharge multiple rounds by "maintaining the trigger finger on the device's extension ledge with constant rearward pressure."  83 Fed. Reg. at 66,532 (quoting *NPRM*, 83 Fed. Reg 13442, 13443 (March 29, 2018)).  In other words, "[a]lthough operating a bump stock may cause slight movements of the trigger finger, it does not require a shooter to consciously and repeatedly exert force to depress the trigger multiple times"; instead, "[a]fter the initial exertion of force, a shooter is able to discharge multiple rounds by maintaining constant pressure on the trigger."  *Guedes v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,

356 F. Supp. 3d 109, 132 (D.D.C.), *aff'd*, 920 F.3d 1 (D.C. Cir. 2019) (*Guedes I*).  ATF's focus

on the movement of the shooter's finger—rather than the trigger's movement—accords with its

permissible definition of "single function of the trigger" as meaning "single pull of the trigger."

*See supra* at part II(A).  Hardin's challenge to the Rule on this ground therefore fails.

### 3.      Input from Elected Officials

Hardin also suggests that President Trump's outspoken support of the Rule prior to its

enactment renders the Rule arbitrary and capricious.  (D.N. 30, Page ID # 696)  The Rule itself

acknowledges the President's involvement, noting that he "directed the Department of Justice,

working within established legal protocols, 'to dedicate all available resources to complete the

review of the comments received [in response to the ANPRM], and, as expeditiously as possible,

to propose for notice and comment a rule banning all devices that turn legal weapons into

machineguns.'"  83 Fed. Reg. at 66,516–17 (quoting *Application of the Definition of Machinegun*

*to "Bump Fire" Stocks and Other Similar Devices*, 83 Fed. Reg. 7949 (Feb. 20, 2018)).

Additionally, in the wake of the Las Vegas shooting "ATF received correspondence from members

of the United States Congress, as well as nongovernment organizations, requesting that ATF

[re]examine its past classifications."  *Id.* at 66,516.

Any impact these political forces may have had on the creation of the Rule does not raise

concern.  The Supreme Court has held that agency policy change may properly be "spurred by

significant political pressure from Congress."  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S.

502, 523 (2009).  And "[p]residential administrations are elected to make policy."  *Guedes II*, 920

F.3d at 34.  "[A]n agency to which Congress has delegated policy-making responsibilities may,

within the limits of that delegation, properly rely upon the incumbent administration's views of

wise policy to inform its judgments." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 865 (1984).

Hardin further asserts that the President's directive was "without consideration for the legal authority of ATF to regulate bump-stock devices or the public, including Plaintiffs, being afforded an unbiased review of their comments." (D.N. 30, PageID # 696)  The record does not support this claim.  Over twenty-five pages, the Rule systematically documents and responds to each category of public comment received.  *See* Fed. Reg. at 66,519–44.  Rather than jumping to a preordained result as Hardin implies, the agency "articulate[d] a satisfactory explanation for its actions." *State Farm*, 463 U.S. at 43; s*ee also Guedes II*, 920 F.3d at 34 ("[T]he administrative record reflects that the agency kept an open mind throughout the notice-and-comment process and final formulation of the Rule.").  Absent actual evidence of misconduct, which Hardin does not provide, the Court "accords the Bureau a 'presumption of regularity' in its promulgation of the Rule.'" *Guedes II*, 920 F.3d at 34 (quoting *Overton Park*, 401 U.S. at 415); *see also Simms*, 45 F.3d at 1003 ("[T]he agency head's decision is entitled to a presumption of regularity.").

### 4.      Change in Policy

When an agency action changes a prior policy, the agency must demonstrate "that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which [a] conscious change of course adequately indicates." *Fox*, 556 U.S. at 515.  It must also explain "factual findings that contradict those which underlay its prior policy" and acknowledge "serious reliance interests." *Id.*  The Court asks only "whether 'there are good reasons for the new policy.'" *Ky. Coal*, 804 F.3d at 806 (quoting *Fox* at 515).  "Once the agency has satisfied this obligation, 'it need not [also] demonstrate to [the Court's] satisfaction that the reasons for the new policy are *better* than the reasons for the old one.'" *Id*.

Hardin suggests that ATF's decision to change course and classify bump stocks as machineguns was arbitrary and capricious.  (D.N. 30, PageID # 684 ("ATF's abrupt about-face on this issue . . . inherently wreaks [sic] of agency abuse of discretion, and arbitrary and capricious conduct.")  But ATF met all the requirements for implementing a change in policy.  First, as previously discussed, ATF has the authority to define these terms and did so reasonably, *see supra* at part II(A), making the new definitions "permissible under the statute." *Fox*, 556 U.S. at 515.  Second, the Rule acknowledged its change in course, *see* 83 Fed. Reg. at 66,516, and explained that ATF found the changes necessary because it believes that the revised definitions best interpret the statutory text. *See id.* at 66,521.  Finally, ATF assessed reliance interests in its calculation of the Rule's costs. *See id.* at 66,515 (considering, e.g., costs of loss of property and foregone future production and sales).  For these reasons, ATF's change in policy regarding the classification of bump stocks was not arbitrary and capricious. *See Fox*, 556 U.S. at 515; *Ky. Coal*, 804 F.3d at 806.

## C.      Comment Period and Procedural Irregularities

The Gun Control Act requires ninety days' public notice and the opportunity for hearing before the Attorney General can prescribe rules and regulations. *See* 18 U.S.C. § 926(b).  ATF published the NPRM on March 29, 2018, which started the ninety-day clock. *See* 83 Fed. Reg 13,442.  Hardin claims that procedural irregularities invalidated a portion of this ninety-day period and that ATF therefore did not meet its statutory requirement.  (D.N. 30, PageID # 695)  Specifically, Hardin points to the following facts: an advisory incorrectly indicating that the comment period was closed appeared on federalregister.gov on the day that ATF published the NPRM (ATF removed it five days later); and information on federalregister.gov incorrectly

identified the Rule's docket number.  (D.N. 30, PageID # 693–94)  The Rule itself acknowledges these incidents, although with differences as to some of the details.  83 Fed. Reg. at 66,542.

Even assuming Hardin's account of the procedural irregularities to be true, these glitches did not shorten the comment period itself.  Commenters who may have been confused by the incorrect advisory on the federal register website had the option to comment by fax or mail.  *See* 83 Fed. Reg. at 13,442 (explaining how to submit comments by fax or mail).  Additionally, despite the confusion, commenters did actually have the ability to submit electronic comments during the entire ninety-day period— "a simple search for 'bump stock' in the main search bar on Regulations.gov during this time would have displayed the link for the new NPRM Docket ID, which was active and accepting comments."  83 Fed. Reg. at 66,542.

When reviewing agency action, the Court applies the "harmless-error rule," meaning "a mistake that has no bearing on the ultimate decision or causes no prejudice shall not be the basis" for invalidating agency action.  *ECM BioFilms, Inc. v. Fed. Trade Comm'n*, 851 F.3d 599, 612 (6th Cir. 2017).  Hardin states that the incorrect advisory made it "likely that numerous individuals . . . were led to believe that they were unable to submit comments in relation to this rulemaking and were therefore deprived of an opportunity to be heard."  (D.N. 30, PageID# 693) But Hardin identifies no specific instances of such deprivation, and the evidence in the administrative record points the other way: ATF did in fact receive "numerous comments from the very beginning of the comment period."  83 Fed. Reg. at 66,542; (*see* D.N. 29-2, PageID # 297–313)  Moreover, Hardin acknowledges that ATF corrected the mistake after five days (D.N. 30, PageID # 693), meaning that any potentially confused commenters had eighty-five days to return to the website and try again.  Given that ATF received more than 186,000 comments, *see* 83 Fed. Reg. at 66,519, including hundreds within the first two days (*see* D.N. 29-2, PageID # 297–313),

the Court has no reason to conclude that the technical problems prejudiced commenters. The harmless-error rule therefore precludes invalidation of the Rule on this ground. *See ECM BioFilms*, 851 F.3d at 612.

## D.   Constitutional Claims

### 1.   Contracts Clause

Hardin argues that the Rule violates the Contracts Clause (D.N. 30, PageID # 706–07), which provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. But "[t]he plain language of the Contracts Clause itself affirms that it applies only if a *state or local law* interferes with existing contracts." *United States v. May*, 500 F. App'x 458, 465 (6th Cir. 2012). The Rule is a federal regulation. *See* 83 Fed. Reg. 66,514 . Because "the Contracts Clause does not apply to the federal government," Hardin's Contracts Clause claim necessarily fails. *Id*.

### 2.   Ex Post Facto Clause

The Ex Post Facto Clause provides that "[n]o . . . ex post facto Law shall be passed." U.S. Const. art. I, § 9, cl. 3. This ensures that "legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." *Weaver v. Graham*, 450 U.S. 24, 28–29 (1981). "To fall within the *ex post facto* prohibition, a law must be retrospective—that is, it must apply to events occurring before its enactment." *Lynce v. Mathis*, 519 U.S. 433, 441 (1997) (citing *Weaver*, 450 U.S. at 29).

Hardin claims that the Rule violates the Ex Post Facto Clause because it "shackle[s] everyone affected by [it]." (D.N. 30, PageID # 705) But this does not establish an ex post facto violation. The Rule contained a ninety-day delay between its date of publication and its date of implementation, *see* 83 Fed. Reg. at 66,514, giving possessors of bump stocks three months to

destroy or relinquish their devices and thereby come into compliance with the Rule by its effective date.  The Rule therefore "cannot be characterized as retroactive . . . [because] the Rule itself made clear that the possession of bump stocks would become unlawful only after the effective date." *Guedes II*, 920 F.3d at 35.  Hardin's ex post facto claim therefore fails.  *See Samuels v. McCurdy*, 267 U.S. 188, 193 (1925) (rejecting Ex Post Facto Clause challenge to statute that prohibited the post-enactment possession of liquor, even when applied to liquor lawfully acquired before the statute's enactment).

### 3.    Takings Clause

The Takings Clause of the Fifth Amendment prohibits government seizure of private property "for public use, without just compensation."  U.S. Const. amend. V.  Takings Clause challenges fall into two categories:

> challenges to the public-use requirement and challenges to the just-compensation requirement.  Public-use challenges assert that in effecting the taking, the government exceeded its permissible scope of authority under the Constitution; the action is invalid regardless of whether compensation is provided.  Just-compensation challenges concede that the government acted within the scope of its authority and assert that the government must provide the affected party with "just compensation."

*Wilkins v. Daniels*, 744 F.3d 409, 417 (6th Cir. 2014).

Hardin seeks compensation for the loss of his bump stocks (D.N. 30, PageID # 704), so his claim falls into the second category.  But it fails at the threshold, because Hardin does not "concede that the government acted within the scope of its authority," *Wilkins*, 744 F.3d at 417—instead, Hardin asserts that "ATF has not and evidently cannot put forth legitimate support for [its] core conclusion" that bump stocks qualify as machineguns.  (D.N. 30, PageID # 704)  Hardin cannot challenge the lawfulness of the Rule while simultaneously bringing a Takings Clause claim for compensation.  *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005) (explaining that the Takings Clause "is designed not to limit the governmental interference with property rights *per se*,

14

but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking.") (quoting *First English Evangelical Lutheran Church of Glendale v. Cnty. of Los Angeles*, 482 U.S. 304, 315 (1987))).

### 4.      Vagueness

Hardin argues that "[a]llowing . . . ATF to re-evaluate the definition of 'machinegun,' as it has done in this case, depending on the prevailing political winds, renders Congress'[s] definition of 'machinegun' under the NFA a moving target, and thus by definition, constitutionally vague." (D.N. 30, PageID # 708–09)  Hardin rests this claim on the assertion that ATF does not have the statutory authority to redefine "machinegun."  (*Id.* at PageID # 708)  But as discussed above, *see supra* at part II(A), ATF does have such authority.  Moreover, Hardin's premise fails: a law is not made vague simply because it has changed, but only when it "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application."  *United States v. Zobel*, 696 F.3d 558, 576 (6th Cir. 2012).  Hardin does not argue that the Rule's definition of "machinegun" or its application to bump stocks is unclear.  Nor could he, as his APA claims rest on disputing the clearly defined terms and applicability of the Rule.  *See supra* at part II(B).  Hardin's vagueness challenge therefore fails.

### E.      Other Claims

### 1.      Internal Revenue Code Violation

Hardin claims that 26 U.S.C. § 7805 prevents the Rule from being implemented or enforced against "devices manufactured or assembled before the date of the NPRM publication."  (D.N. 30, PageID # 702)  Section 7805(b) prevents "regulation[s] relating to the internal revenue laws" from being "appl[ied] to any taxable period ending before the earliest of . . . (A) [t]he date on which such regulation is filed with the Federal Register . . . (B) [for a] final regulation, the date on which

any proposed or temporary regulation to which such final regulation relates was filed with the Federal Register . . . [or] (C) [t]he date on which any notice substantially describing the expected contents of any temporary, proposed, or final regulation is issued to the public."  26 U.S.C. § 7805(b).

The statutory language does not support Hardin's claim.  The regulation at issue requires the destruction or abandonment of all bump-stock devices within ninety days of the publication of the Rule.  83 Fed. Reg. at 66,514.  The regulation plainly "does not apply to any taxable period" ending before March 29, 2018,[3] because the regulation does not apply retroactively.  *See U.S. v. Dodson*, 519 F.App'x 344, 349 (6th Cir. 2013) ("ATF may retroactively exempt certain weapons from tax and regulation requirements, [but] it cannot exempt those same weapons from prospective application of the law.").  "While § 7805 is meant to limit retroactive application of the law to pre-filing *time periods*, it is not meant to exempt pre-filing *items* (whether manufactured or acquired before the regulation)."  *Id*.  Hardin thus has not shown any violation of § 7805.

### 2.    Failure to Consider Cost

Hardin argues that "ATF flat out ignored any analysis in relation to a cost impact, as the proposed rule fails to provide information on how the Government will fulfill its obligation to compensate affected individuals for the taking."  (D.N. 30, PageID # 695)  But as discussed above, *supra* at part II(D)(3), the Rule does not violate the Takings Clause, and therefore the agency owes no compensation.  Moreover, although ATF was not required to consider the cost of compensation,

---

[3]  The government argues that the "relevant date is December 26, 2017, the date on which the Federal Register published the ANPRM," rather than the date of the Rule's publication.  (D.N. 31, PageID # 733)  The Court need not resolve this issue because Hardin's claim fails even under the later date he uses.  (*See* D.N. 30, PageID # 702)

the agency did in fact do a thorough cost-benefit analysis of the Rule. *See* 83 Fed Reg. 66515, 66538–39, 66543–44.  Hardin's final claim therefore fails.

**III.**

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1)     Defendants' motion for judgment on the administrative record (D.N. 29) is **GRANTED**.  A separate judgment will be entered this date.

(2)     Hardin's motion for judgment on the administrative record (D.N. 30) is **DENIED**.